# 2024-1138

In The

# United States Court Of Appeals

## For The Federal Circuit

### RIDGE CORP.,

*Plaintiff - Appellee,*

v.

### KIRK NATIONAL LEASE CO., TRUCK & TRAILER PARTS SOLUTIONS, INC., ALTUM LLC,

*Defendants - Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO
ORIGINATING CASE NO.: 2:23-CV-03012-ALM-KAJ

———————

## JOINT APPENDIX

———————

Donald E. Burton
FARUKI PLL
110 North Main Street, Suite 1600
Dayton, Ohio 45402
(937) 227-3736

*Counsel for Appellants*
 *Kirk National Lease Co. and*
 *Truck & Trailer Parts Solutions, Inc.*

Melissa L. Watt
FARUKI PLL
201 East Fifth Street, Suite 1420
Cincinnati, Ohio 45202
(513) 632-0303

*Counsel for Appellants*
 *Kirk National Lease Co. and*
 *Truck & Trailer Parts Solutions, Inc.*

Joshua A. Koltak
Michael J. Scarpelli
FAULKNER, GARMHAUSEN,
 KEISTER & SHENK
Courtview Center, Suite 300
100 South Main Avenue
Sidney, Ohio 45365
(937) 492-1271

*Counsel for Appellants*
 *Kirk National Lease Co. and*
 *Truck & Trailer Parts Solutions, Inc.*

Damion M. Clifford
Gerhardt A. Gosnell II
Michael L. Dillard, Jr.
Tiffany L. Carwile
ARNOLD & CLIFFORD LLP
115 W. Main Street, Suite 400
Columbus, Ohio 43215
(614) 460-1600

*Counsel for Appellant*
 *Altum LLC*

Christopher W. Tackett
Graycen M. Wood
BAILEY CAVALIERI LLC
10 West Broad Street, Suite 2100
Columbus, Ohio 43215
(614) 229-3286

*Counsel for Appellee*
 *Ridge Corporation*

## TABLE OF CONTENTS
### Joint Appendix

| Document | Docket No. | Appx. Pages |
|---|---|---|
| Opinion and Order in No. 2:23-cv-3012 (Nov. 3, 2023), United States District Court for the Southern District of Ohio | 77 | Appx1 |
| U.S. Patent No. 9,151,084 | n/a | Appx32 |
| District Court Docket | n/a | Appx39 |
| Complaint | 1 | Appx50 |
| Amended and Restated License Agreement | 28-1 | Appx260 |
| U.S. Patent No. 5,915,445 | 31-14 | Appx276 |
| Preliminary Injunction Hearing Trial Transcript (Oct. 3, 2023) | 56 | Appx285 |
| Preliminary Injunction Hearing Trial Transcript (Oct. 4, 2023) | 57 | Appx448 |
| Preliminary Injunction Hearing Trial Transcript (Oct. 5, 2023) | 58 | Appx669 |
| Preliminary Injunction Hearing Trial Transcript (Oct. 6, 2023) | 59 | Appx766 |
| Plaintiff's Exhibit 23 from the Preliminary Injunction Hearing (May 24, 2023 Email Exchange) | n/a | Appx953 |
| Defendants' Exhibit 7 from the Preliminary Injunction Hearing (Prosecution History for '084 Patent) | n/a | Appx955 |

| Document | Docket No. | Appx. Pages |
|---|---|---|
| Defendants' Exhibit 19 from the Preliminary Injunction Hearing (Oct. 25, 2022 Email Exchange) | n/a | Appx1175 |
| Defendant's Exhibit 14 from Preliminary Injunction Hearing (Ridge-KNL Business Plan) | n/a | Appx1204 |
| Defendant's Exhibit 43 from Preliminary Injunction Hearing (Picture of Ridge's Door) | n/a | Appx1220 |
| Defendant's Exhibit 44 from Preliminary Injunction Hearing (Picture of Ridge's Door) | n/a | Appx1221 |
| Defendant's Exhibit 45 from Preliminary Injunction Hearing (Picture of Ridge's Door) | n/a | Appx1222 |
| Plaintiff's Exhibit 26 from Preliminary Injunction Hearing (June 8, 2023 Email with Exclusive Supply Agreement) | n/a | Appx1224 |
| Plaintiff's Exhibit 47 from Preliminary Injunction Hearing (Dec. 16, 2022 KNL Email) | n/a | Appx1238 |
| Plaintiff's Exhibit 57 from Preliminary Injunction Hearing (Aug. 8, 2023 KNL Email) | n/a | Appx1241 |
| Plaintiff's Exhibit 58 from Preliminary Injunction Hearing (Dec. 14, 2022 KNL Email) | n/a | Appx1243 |
| Plaintiff's Exhibit 59 from Preliminary Injunction Hearing (April 17, 2023 KNL Email Exchange) | n/a | Appx1245 |

| Document | Docket No. | Appx. Pages |
|---|---|---|
| Plaintiff's Exhibit 60 from Preliminary Injunction Hearing (July 14, 2022 KNL Email) | n/a | Appx1251 |
| Plaintiff's Exhibit 61 from Preliminary Injunction Hearing (Aug. 24, 2023 KNL Email) | n/a | Appx1252 |
| Plaintiff's Exhibit 62 from Preliminary Injunction Hearing (Sept. 20, 2022 KNL Email) | n/a | Appx1253 |
| Plaintiff's Exhibit 63 from Preliminary Injunction Hearing (May 12, 2022 KNL Email) | n/a | Appx1254 |
| Plaintiff's Exhibit 64 from Preliminary Injunction Hearing (April 4, 2022 KNL Email) | n/a | Appx1256 |
| Plaintiff's Exhibit 66 from Preliminary Injunction Hearing (Sept. 26, 2023 KNL Email Exchange) | n/a | Appx1257 |
| Loc.R. 65.1 Conference Transcript (Sept. 21, 2023) | n/a | Appx1260 |
| Defendant's Exhibit 19 from Preliminary Injunction Hearing (Oct. 25, 2022 Email Exchange) | n/a | Appx1305 |
| Plaintiff's Exhibit 24 from Preliminary Injunction Hearing (Sept. 9, 2022 Email) | n/a | Appx1310 |
| CERTIFICATE OF FILING AND SERVICE | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RIDGE CORPORATION, | : | |
| | : | |
| Plaintiff, | : | **Case No. 2:23-cv-03012** |
| | : | |
| v. | : | **Chief Judge Algenon L. Marbley** |
| | : | **Magistrate Judge Kimberly A. Jolson** |
| KIRK NATIONAL LEASE CO.,** *et al.*,** | : | |
| | : | |
| | : | |
| Defendants. | : | |

## OPINION & ORDER

Before the Court are Plaintiff Ridge Corporation's ("Ridge") Motion for a Preliminary Injunction ("PI") against Defendants Kirk National Lease Co. ("KNL"), Truck & Trailer Parts Solutions Inc. ("TTPS"), and Altum LLC ("Altum")[1] (ECF No. 2) and Defendant Altum's Motion to Join Cold Chain, LLC ("Cold Chain") (ECF No. 27). On September 20, 2023, Ridge filed its complaint and motion for a temporary restraining order ("TRO") and PI. On September 22, 2023, this Court granted Ridge's motion for a TRO after holding a Rule 65.1 conference. On September 28, 2023, Altum filed its motion to join Cold Chain as a party-plaintiff in this case. (ECF No. 27). From October 3, 2023 through October 6, 2023, this Court held a PI hearing. For the reasons set forth below, this Court **GRANTS** Ridge's Motion for a PI (ECF No. 2) and **DENIES** Altum's Motion to Join Cold Chain (ECF No. 27).

---

[1] Transglobal, Inc. was also a named defendant. On September 28, 2023, Transglobal, Inc. filed a motion to dismiss or transfer venue. (ECF No. 30). On October 1, 2023, Ridge voluntarily dismissed all claims against Transglobal, Inc. without prejudice. (ECF No. 39). Transglobal, Inc. did not participate in the subsequent PI hearing. Transglobal, Inc. later confirmed with this Court that it has no objection to Ridge's voluntary dismissal. Accordingly, this Court did not consider claims against Transglobal, Inc. for purposes of the PI.

1

# I.  BACKGROUND

## A.  Factual Background

This case involves various patent infringement claims involving a single panel roll-up truck door. Ridge is a manufacturing and engineering company that, among other things, produces advanced composites for use in trucks and trailers. (ECF No. 1 ¶ 16). Defendants also do work for the transportation industry. (*Id.* ¶¶ 40, 43, 48). KNL and TTPS have overlapping ownership and are affiliated entities. (*Id.* ¶ 4). Altum only has three employees who are all former Ridge employees.[2] (*Id.* ¶ 41).

### 1.  KNL and Ridge's Joint Venture for a Single Panel Roll-Up Door

For several years prior to October 2018, KNL purchased Ridge's products. (ECF No. 56 at PageID 812, Lines 4-7). Around October 2018, KNL approached Ridge about a joint venture for a single panel roll-up truck door. (ECF No. 1 ¶¶ 25-29). The benefits of single panel roll-up doors include lighter weight, more durable, less maintenance, easier to install, display logos better, and produce less injuries than traditional truck doors. (ECF No. 56 at PageID 810-811). The parties disagree as to who came up with the design for the single panel roll-up door. The parties agree, however, that KNL did not have a fully functioning single panel roll-up door prior to approaching Ridge. (ECF No. 56 at PageID 817, Lines 21-24; ECF No. 57 at PageID 949, Lines 17-19; ECF No. 57 at PageID 950, Lines 11-15). Additionally, the parties agree that Ridge has a team of engineers, whereas KNL does not. (ECF No. 57 at PageID 950, Lines 23-25; ECF No. 57 at PageID 951, Lines 1-7).

---

[2] Specifically, Mr. Dominic Grandominicio was a fourteen-year co-owner of Ridge and Director of Operations; Mr. Greg Karst was a four-year Ridge employee and Product Development Engineer; and Mr. Kyle Gaines was a thirteen-year Ridge employee and Director of Purchasing. (ECF No. 1 ¶ 41).

2

Around July 23, 2021, KNL contacted Ridge and said: "After many attempts we have the rollup door working. Actually it works great. Would like to sit down with you to start the paper work to lock this down. Patent, I.P. . . . ." (PE7). The parties, however, had a dispute over safety testing of the door and did not continue with their joint venture. (ECF No. 1 ¶ 29; ECF No. 58 at PageID 1202, Lines 17-22). Subsequently, KNL and TTPS went into business with Altum to produce a single panel roll-up door. (*Id*. ¶ 42).

### 2. *Defendants' Door*

On February 19, 2022, KNL filed for a patent for a "single panel roll-up door" ("144 Patent Application). (*Id*. ¶ 32, Exhibit 4). KNL did not include Ridge as a joint inventor on the 144 Patent Application. (*Id*. ¶ 34). As of the date of this Opinion and Order, the 144 Patent Application is still pending and, therefore, Defendants do not have a patent.

Around June 2022, KNL and TTPS began selling a single panel roll-up door. (PE53; DE111). Altum supplies "sandwich" panels (i.e. panels containing a layer of foam laminated between two plastic layers) to KNL, and KNL routes grooves, or compression gaps, into the panels. (ECF No. 59 at PageID 1301, Lines 13-17). KNL then sends the panels to Transglobal, Inc. who adds wheels and modifies the panels to become roll-up truck doors. (ECF No. 1 ¶ 46). Transglobal, Inc. then sends the doors back to KNL, and KNL and TTPS sell and install the doors. (ECF No. 1 ¶ 46; ECF No. 57 at PageID 990, Lines 5-7).

Between June 2022 and September 2023, KNL/TTPS sold approximately 177 doors, at a typical retail price of $1,600.00 per door. (PE53; DE111; ECF No. 28 at PageID 367). Altum's business with KNL/TTPS represents approximately 55% of Altum's total business in 2023 thus far. (ECF No. 31 at PageID 440). Around June 2023, Altum proposed an ongoing exclusive supply relationship with KNL/TTPS for the single panel roll-up door. (PE26).

### 3. The Cold Chain Patent

At some point after the dispute between Ridge and KNL, Ridge discovered United States Patent No. 9,151,084 ("Cold Chain Patent"). (ECF No. 1 ¶¶ 29, 30, Exhibit 1). The Cold Chain Patent was issued in 2015 after numerous rounds of rejections and amendments with the U.S. Patent and Trademark Office. (*See* DE7). The Cold Chain Patent is a patent for an "insulated overhead door." (ECF No. 1, Exhibit 1). The Cold Chain Patent provides patent protection for "[a]n article of manufacture for use as an insulated overhead door that is designed to roll open and closed in tracks, with a sheet of thermoplastic material that acts as the outer door membrane and barrier to entry, a sheet of insulating material that acts as a base insulating barrier adhered to the thermoplastic membrane." (*Id*. at PageID 31). The Cold Chain Patent includes nineteen claims, including both independent and dependent claims. (*Id*.). Claim 1, an independent claim, is most at issue in this case, specifically what is bolded below:

> An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, **the insulating overhead door having a first outermost surface, a second outermost surface opposite the first outermost surface**, a top surface, a bottom surface, a first side surface and a second side surface, **both the first outermost surface and the second outermost surface being larger than any of the top surface, bottom surface, first side surface and second side surface**, the door **comprising**:

> > a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the thermoplastic membrane forming the first outermost surface of the door;

> > a sheet of foam insulating material directly attached to the thermoplastic membrane, **the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel** that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, **the foam insulating material forming the second outermost surface of the door**; and

4

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only one of the panel, **the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks** having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, Θ, relative to a track portion of a second length, wherein Θ ranges from about 80° to about 125°.

(*Id*. at Column 6). Other relevant dependent claims include Claim 4, which states: "[t]he insulated overhead door of claim 1, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend during opening and closing of the door;" Claim 9, which states: "[t]he insulated overhead door of claim 1, further comprising an additional membrane that is not the thermoplastic membrane;" and Claim 10, which states: "[t]he insulated overhead door of claim 1, the door having an R value[3] ranging from about 14 to about 50." (*Id*. at Columns 6, 7).

On February 15, 2023, Ridge became the exclusive licensee of the Cold Chain Patent. (ECF No. 1 ¶ 18, Exhibit 2 ¶ 3). On May 1, 2023, the exclusive license agreement between Cold Chain and Ridge was amended and restated. (ECF No. 1 ¶ 19, Exhibit 3). The amended and restated agreement from May 1, 2023 is the final agreement between Cold Chain and Ridge. (ECF No. 56 at PageID 850, Lines 20-23). Under the amended and restated license agreement, Ridge remains the exclusive licensee of the Cold Chain Patent, but Ridge may sublicense the patent to door manufacturers. (ECF No. 1, Exhibit 3 ¶¶ 3, 9, 14). Additionally, both Ridge and Cold Chain have the right to sue for patent infringement. Specifically, paragraph 14 of the agreement states:

Subject to the following, both Licensor and Licensee shall have the right to initiate a patent infringement action against any third party reasonably believed to be infringing a Licensed Patent, but neither party shall have any obligation to do so. Licensee shall give Licensor the option by written notice or initialing any such action before doing so itself (or issuing any demand or threat of such action). . . . If any such action is initiated by only one party,

---

[3] The R value refers to the door's insulating qualities. (ECF No. 1, Exhibit 1 at Column 1).

the non-initiating party shall provide all cooperation reasonably requested by the party initiating the action.

(*Id*. ¶ 14).

Ridge has not brought its single panel roll-up door to market yet, but it has expended significant time and resources getting it ready for market. (ECF No. 1 ¶ 23). Ridge currently has Non-Disclosure Agreements with door manufacturers and is trading agreement drafts with Whiting Door Manufacturing Corporation ("Whiting Door"). (ECF No. 56 at PageID 822, Lines 1-9). Whiting Door controls approximately 40% of the roll-up door market. (ECF No. 31-15 at PageID 567). If Ridge gets to market with Whiting Door, Ridge anticipates its revenue will increase by millions of dollars annually. (ECF No. 56 at PageID 856, Lines 4-10).

## B. Procedural Background

Around May 2023, Ridge discovered Defendants' door at a tradeshow held by the National Truck Equipment Association. (ECF No. 1 ¶ 47). Ridge also discovered TTPS's website was advertising Defendants' door as a "patented single panel roll door." (*Id*. ¶ 57, Exhibit 8 at PageID 101). The website further stated that the door has a "patented single panel design." (*Id*., Exhibit 8 at PageID 103). The assertion that Defendants' door is "patented" is incorrect, as the 144 Patent Application is still pending and not yet patented.

After discovering Defendants' door at the tradeshow and believing that the door infringed on the Cold Chain Patent of which Ridge is the exclusive licensee, Ridge sent KNL/TPPS a cease-and-desist letter. (ECF No. 1, Exhibit 9). The letter informed KNL/TTPS that Ridge is the exclusive licensee of the Cold Chain Patent and asserted Ridge's belief that KNL/TTPS are infringing on the Cold Chain Patent. (*Id*.). On August 1, 2023, KNL/TTPS responded to Ridge and denied any infringement. (*Id*., Exhibit 11). During the time Ridge was communicating with

KNL/TTPS regarding infringement of the Cold Chain Patent, KNL/TTPS sold more doors than it had ever sold before. (PE53; DE111).

On June 9, 2023, Ridge sent Altum a cease-and-desist letter, similar to the letter it sent KNL/TTPS. (ECF No. 1, Exhibit 12). The letter informed Altum that Ridge is the exclusive licensee of the Cold Chain Patent and asserted Ridge's belief that Altum was inducing and contributing to infringement of the Cold Chain Patent. (*Id*.). On July 10, 2023, Altum responded to Ridge and also denied any infringement. (*Id*., Exhibit 13).

On September 6, 2023, an attorney for KNL sent a letter to Ridge's business partner, Whiting Door. (*Id*. ¶ 78, Exhibit 14). The letter enclosed the 144 Patent Application and threatened royalty damages. (*Id*.; ECF No. 56 at PageID 871, Lines 1-9; ECF No. 57 at 70, Lines 21-24). KNL sent this letter to Whiting Door after seeing a video that showed Ridge working with Whiting Door on a single panel roll-up door. (ECF No. 57 at PageID 995, Lines 9-16). After receiving the letter, Whiting Door halted all business with Ridge. (ECF No. 56 at PageID 831, Lines 15-21; ECF No. 58 at PageID 1152, Lines 3-14). On September 11, 2023, five days after sending the letter to Whiting Door, KNL filed substantial amendments to the 144 Patent Application. (ECF No. 1 ¶ 80, Exhibit 15).

On September 20, 2023, Ridge filed its complaint (ECF No. 1) and motion for a TRO and PI (ECF No. 2). Excluding claims against Transglobal, Inc., Ridge's complaint alleges: (1) direct patent infringement against KNL and TTPS; (2) patent inducement against Altum; (3) contributory infringement against Altum; (4) tortious interference with business relationships against KNL, TTPS, and Altum; and (5) false marking against TTPS and KNL. (ECF No. 1). Despite significant testimony and arguments by counsel surrounding co-inventorship of the 144 Patent Application, co-inventorship is not at issue in this case.

Prior to filing its complaint and motion for a TRO and PI, Ridge gave Cold Chain the option of initiating this infringement action instead of Ridge, but Cold Chain declined the option. (*Id*. ¶ 20). On October 3, 2023, Cold Chain and Ridge executed an Acknowledgment confirming that Cold Chain elected not to bring or join the lawsuit now pending. (ECF No. 63-1).

Regarding the infringement claims, Ridge's opinion witness, Richard Sharpe, prepared a claim chart opining that Defendants' door contains every claim within the Cold Chain Patent. (ECF No. 1, Exhibit 16). The photographs in Mr. Sharpe's claim chart are images of Defendants' door. (ECF No. 57 at PageID 993, Lines 11-20). To prepare the claims chart, Mr. Sharpe reviewed the Cold Chain Patent, the patent's prosecution history, photographs of Defendants' door, and a video of Defendants' door from TTPS's website. (ECF No. 59 at PageID 1349, Lines 3-23; ECF No. 59 at PageID 1350, Lines 2-8). Figure 4 of the claim chart, located below, is an illustration of Defendants' door with Mr. Sharpe's opinions as to the various surfaces of the door:



FIG. 4 (Illustration of FIG. 3)

**Figure 4**

On September 21, 2023, this Court held a Rule 65.1 conference. (ECF No. 25). On September 22, 2023, this Court granted Ridge's motion for a TRO. (ECF No. 14). On September

8

28, 2023, Defendants filed responses to Ridge's motion for a PI. (ECF Nos. 28, 29, 31). That same

day, Altum filed a motion to join Cold Chain as a party-plaintiff in this case. (ECF No. 27).

During expedited discovery, Ridge discovered that sales personnel from KNL/TTPS sent

numerous emails to prospective customers falsely advertising its door as "patented." (*See* PEs 47,

57, 58, 59, 60, 61, 62, 63, 64, 66).

On October 1, 2023, Ridge filed motions to exclude Defendants' opinion witnesses from

testifying at the PI hearing. (ECF Nos. 40, 41). On October 4, 2023, this Court denied Ridge's

motions to exclude. (ECF No. 50).

From October 3, 2023 through October 6, 2023, this Court held a PI hearing. During the

PI hearing, various officers from Ridge's and Defendants' companies testified, as well as opinion

witnesses for all parties. A substantial portion of the testimony at the PI hearing surrounded

Prosecution Exhibit 70 ("PE70"), a picture of which is located below. Ridge allege, and

Defendants confirm, PE70 is a sales sample of a section of Defendants' door.



**PE70**

On October 17, 2023, Ridge filed a motion to exclude Defense Exhibit 48 ("DE48") and

testimony regarding it from consideration in ruling upon Ridge's motion for a PI. (ECF No. 60).

An Altum employee built DE48 as a demonstrative exhibit to reflect what he believes the Cold

Appx0009

Chain patent protects or what a door constructed pursuant to the Cold Chain Patent would look like. On October 17, Altum responded in opposition to Ridge's motion. (ECF No. 61). On October 18, 2023, Ridge replied to Altum. (ECF No. 62). On October 20, Altum filed a motion for leave to file a sur-reply. (ECF No. 64). That same day, Ridge filed a response in opposition to Altum's motion for leave to file a sur-reply. (ECF No. 65). On October 20, 2023, this Court denied Altum's motion for leave to file a sur-reply. (ECF No. 66). On October 23, 2023, this Court granted Ridge's motion to exclude. (ECF No. 67).

On October 19, 2023, Ridge filed a response in opposition to Altum's motion to join Cold Chain. (ECF No. 63). On October 27, 2023, Altum replied to Ridge's response. (ECF No. 71).[4]

On October 23, 2023, the parties submitted closing briefs for the PI. (ECF Nos. 68, 69, 70). On October 27, 2023, the parties submitted reply briefs. (ECF Nos. 72, 73, 74, 75). Ridge's Motion for a PI (ECF No. 2) and Altum's Motion to Join Cold Chain (ECF No. 27) are now ripe for this Court's consideration.

## II.     STANDARD OF REVIEW

### A.  Preliminary Injunction

Rule 65 of the Federal Rules of Civil Procedure provides for injunctive relief when a party believes it will suffer immediate and irreparable injury, loss, or damage. *See* Fed. R. Civ. P. 65. A preliminary injunction is an "extraordinary remedy" intended to preserve the status quo until trial. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 526 (6th Cir. 2017). A preliminary injunction should only

---

[4] KNL/TTPS confirmed with this Court that they did not want to be heard on Altum's motion to join Cold Chain. KNL/TTPS, however, make a standing argument in their response to Ridge's motion for a PI, arguing similarly what Altum argues in its motion to join Cold Chain.

be awarded upon a clear showing that the movant is entitled to such relief. *Southern Glazer's Disrib. Of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (internal quotation marks and citation omitted).

In determining whether to issue a preliminary injunction, the court must consider the following four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation omitted). All four factors must be balanced rather than treated as prerequisites. *Id.* (internal quotation marks and citation omitted).

Specific to patent infringement actions, patentees seeking a preliminary injunction must make the following four-part showing: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

If the court grants a preliminary injunction, it must be stated in specific terms, describe in reasonable detail the act(s) to be restrained, and give the reasons for its issuance. Fed. R. Civ. P. 65(d). Furthermore, "[the PI] should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978) (internal quotation marks and citation omitted).

### B. Joinder

Rule 19 of the Federal Rules of Civil Procedure governs the compulsory joinder of parties. *See* Fed. R. Civ. P. 19. In determining whether a party must be joined under Rule 19, the court must consider: (1) whether the absent party is a necessary party; (2) if the absent party is a necessary party, whether joinder will deprive the court of subject matter jurisdiction; and (3) if joinder is not feasible because it will eliminate the court's ability to hear the case, whether the absent party is indispensable such that the action should be dismissed. *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004) (citations omitted). To answer whether a party is a necessary party, the court must assess whether the party has "an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a).

### III.   LAW & ANALYSIS

### A. Preliminary Injunction

#### 1.   *Likelihood of Success on the Merits*

A movant is not required to prove her entire case at the preliminary injunction stage, but the movant must show more than a mere possibility of success. *Certified Restoration Dry Cleaning Network,* 511 F.3d at 543 (citations and quotations omitted). Ordinarily, a movant meets its burden if it has "raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citation omitted).

*a. Direct Infringement against KNL and TTPS*

Ridge first claims direct patent infringement against KNL and TTPS. Direct patent infringement is governed by 35 U.S.C. § 271(a), which states: "Whoever without authority makes, uses, offers to sell, or sells any patented invention . . . during the term of the patent therefor, infringes the patent." Direct patent infringement is a strict-liability offense. *Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632, 639 (2015).

To state a claim for direct patent infringement, a plaintiff must allege sufficient facts that the accused's product contains "elements identical or equivalent to each claimed element of the patented invention." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 40 (1997); *see also Ottah v. Bracewell LLP*, No. 2022-1876, 2022 WL 16754378, at *2 (Fed. Cir. Nov. 8, 2022) ("To prove direct infringement, 'one or more claims of the patent [must] read on the accused device literally or under the doctrine of equivalents.'") (quoting *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed. Cir. 2005)). Literal infringement "requires that each and every limitation set forth in a claim appear in an accused product." *Id*. (citing *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1312 (Fed. Cir. 2005)). Alternatively, under the doctrine of equivalents, a product that does not literally infringe upon a patent "may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Id*. (citing *DePuy Spine, Inc. v. Medtronic Sofamore Danek Inc.*, 469 F.3d 1005, 1016 (Fed. Cir. 2006)).

In a direct patent infringement action, a two-step analysis must be conducted: first, the meaning and scope of the particular claims asserted to be infringed must be interpreted properly; and second, the properly construed claims must be compared to the accused device. *Cybor Corp.*

*v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1152 (Fed. Cir. 1997); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). When conducting claim construction, "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted). If a claim term is disputed, the starting place is to look at the claim language. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("It [the claim language] is the best guide to the meaning of a disputed term."). Accordingly, while extrinsic evidence such as expert testimony, dictionaries, and learned treatises can be used in claim construction, extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (citations omitted).

Here, the parties do not dispute that the Cold Chain Patent is valid and that Ridge is the exclusive licensee of the Cold Chain Patent. Rather, the parties dispute whether Defendants' door directly infringes the Cold Chain Patent. Ridge asserts that Defendants' door contains every claim limitation of the Cold Chain Patent. KNL and TTPS argue that Ridge is not likely to succeed on the merits because Ridge lacks standing to sue. This Court will address KNL/TTPS's standing argument with Altum's motion to join Cold Chain, analyzed below after the PI analysis.

KNL and TTPS also argue that Defendants' door does not directly infringe the Cold Chain Patent because it does not have a second outermost surface made of a foam material. To support its substantive argument, KNL and TTPS rely on opinion witness Sam Han and the dictionary definition of "outermost." (*See* ECF No. 57 at PageID 1379-1380, 1385, 1404-1405).

This Court must first interpret the meaning and scope of the claims of the Cold Chain Patent, particularly the phrase "second outermost surface." Claim 1 in the Cold Chain Patent

specifically defines the "second outermost surface": it is the surface "opposite the first outermost surface," it is "larger than any of the top surface, bottom surface, first side surface and second side surface," and it is made of a "foam insulating material." (*See* ECF No. 1, Exhibit 1, Claim 1 at Column 6). Since the language of Claim 1 defines "second outermost surface," this Court does not find Mr. Han's reliance on the dictionary definition of "outermost" being "farthest out" persuasive. Additionally, KNL and TTPS's assertion that the white thermoplastic layer on Figure 4 is the true second outermost surface on Defendants' door is not persuasive since the Cold Chain Patent has a claim allowing for "an additional membrane that is not the thermoplastic membrane." (*See id.* Claim 9 at Column 7).

After interpreting the meaning and scope of the claims of the Cold Chain Patent, this Court next compares the claims construed in the Cold Chain Patent to Defendants' door. This Court thoroughly analyzed PE70 and the photographs of Defendants' door in Defense Exhibits 43-46 against the Cold Chain Patent and agrees with Mr. Sharpe's opinions in the claim chart and Figure 4.[5] Accordingly, this Court finds Ridge established a strong likelihood that it would be successful on the merits of its direct infringement claim against KNL and TTPS, under literal infringement, or, at the least, the doctrine of equivalents.

*b.   Patent Inducement and Contributory Infringement against Altum*

Ridge next claims indirect patent infringement against Altum, specifically patent inducement and contributory infringement. Patent inducement is governed by 35 U.S.C. § 271(b), which states: "Whoever actively induces infringement of a patent shall be liable as an

---

[5] Altum argues in its closing brief that Mr. Sharpe's claim chart and testimony should be excluded. (ECF No. 69 at PageID 1485-1486). Altum, however, did not object to Mr. Sharpe's testimony during the PI hearing or file a motion to exclude. Altum also recognizes that its own expert should be excluded based on its argument. This Court finds Mr. Sharpes testimony admissible since he did not testify on the ultimate issue of infringement. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 991 (Fed. Cir. 1995) (Mayer, J., concurring) ("The judge can even advert to the testimony of patent law experts—that is, patent lawyers—for advice on the interpretation of claims."). This Court gave all opinion witnesses testimony the weight this Court believed it deserved.

infringer." Liability for inducing infringement attaches only if the defendant knew of the patent and knew that the induced acts constituted patent infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765-66 (2011). Knowledge is attributable to a defendant who acts with willful blindness. *Id.* at 766–67.

Contributory inducement is governed by 35 U.S.C. § 271(c). To state a claim for contributory infringement, a plaintiff must show that: (1) defendants knew the alleged infringing products are material to practicing the invention and have no substantial non-infringing uses; (2) defendants knew that the alleged infringing products were especially made or especially adapted to infringe the patents at issue; and (3) a third party used the alleged infringing products to directly infringe the patents at issue. *Gold Crest, LLC v. Project Light, LLC*, 525 F. Supp. 3d 826, 840 (N.D. Ohio 2021) (citation omitted).

For both patent inducement and contributory infringement claims, a plaintiff must first prove direct infringement. *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489, 493 (Fed. Cir. 2019) ("To establish indirect infringement, a patentee must show that the defendant's actions led to direct infringement.") (citing *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004)).

Here, Ridge claims Altum knew about the Cold Chain Patent because Ridge sent Altum a cease-and-desist letter regarding the patent. Ridge further claims Altum induced and contributed to infringement by supplying KNL/TTPS with the sandwich panels for the infringing door and instructing KNL/TTPS on how to cut grooves into the panels to create the infringing door. Ridge argues Altum had the expertise to induce infringement given that all three of its employees are former Ridge employees and one Altum employee worked on Ridge and KNL's joint venture for the single panel-roll up door.

16

Altum argues Ridge cannot prove direct infringement by asserting a "prosecution estoppel" defense. Specifically, Altum argues Cold Chain disclaimed, in the prosecution of its patent, a door with three layers and the use of "multiple rigid, hinged sections." Additionally, Altum argues that Defendants' door does not violate the Cold Chain Patent because it does not have insulating material extending continuously from the top to the bottom and it does not have material that flexes along the door's entire length. Altum primarily replies on opinion witness Jason Foster, specifications and figures within the Cold Chain Patent, and the patent's prosecution history to support its arguments.

As an initial matter, this Court finds the figures and specifications within the Cold Chain Patent less significant to the Court's analysis than the claims themselves. *See Star Tech. Grp., Inc. v. Testerion, Inc.*, No. 99-1168, 1999 WL 693829, at *6 (Fed. Cir. Sep. 7, 1999) ("It is fundamental that infringement is determined by comparing the accused device to the claims, rather than comparing the accused device to the figures of the patent specification.").

As for Altum's prosecution estoppel defense argument, the doctrine of prosecution estoppel "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)). For prosecution estoppel to apply, a disavowal must be clear and unmistakable. *Id*. In this case, the phrase "multiple rigid, hinged sections" does not appear in the final version of the Cold Chain Patent. As such, Cold Chain did not abandon any limitation to exclude "multiple rigid, hinged sections." Furthermore, the Cold Chain Patent contains a claim for compression gaps, specifically Claim 4, which states: "The insulated overhead door of claim 1, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend

17

during opening and closing of the door." (ECF No. 1, Exhibit 1, Claim 4 at Column 6). The fact

that Claim 4 is a dependent claim does not change this Court's analysis since Claim 1 uses the

open language "comprising," which is "well understood to mean 'including but not limited to.'"

*CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007). Accordingly, this

Court does not find Cold Chain disavowed "multiple rigid, hinged sections."

 With respect to Altum's argument that Cold Chain disclaimed a door with three layers,

this Court is not persuaded. Again, Claim 1 uses the open language "comprising" rather than

"consisting." *See id*. As such, the Cold Chain Patent does not say the door must *only* have two

layers; rather, it says the door needs to have *at least* two layers (i.e. the first outermost layer

made of thermoplastic and the second outermost layer made of a foam insulating material). (*See*

ECF No. 1, Exhibit 1, Claim 1 at Column 6).  Additionally, Altum's argument that the Cold

Chain Patent only provides for two layers does not make sense considering the Cold Chain

Patent has a claim allowing for an additional membrane that is not the thermoplastic membrane.

(*See id.* Claim 9 at Column 7). Therefore, this Court does not find Altum has a prosecution

estoppel defense.

 Turning to Altum's argument that Defendants' door does not infringe the Cold Chain

Patent because it has low insulation, this Court is also not persuaded. There was no testimony at

the PI hearing from a person with the technical skill to evaluate Defendants' door's R value.[6]

The Cold Chain Patent also does not specify a particular R value. Rather, the patent only gives

examples of R values in dependent Claim 10, which states: "The insulating overhead door of

claim 1, the door having an R value ranging from about 14 to about 50." (ECF No. 1, Exhibit 1,

---

[6] During the PI hearing, R value was described as the "thermosresistance to heat" and "the ability for a material to keep heat out." (ECF No. 59 at PageID 1247, 1290). The Federal Trade Commission describes "R value" as the numeric measure of a product's ability to restrict heat flow and, thus, to reduce energy costs—the higher the R-value the better the product's insulating ability." *See* 70 Fed. Reg. 31258 (May 31, 2005).

Claim 10 at Column 7). The detailed description of the patent makes clear that 14 and 50 are just example R values. (*See id*. at Column 5 stating: "Example R values for the door can range from about 14 to about 50. The R value van be increased by increasing the thickness of the door and the amount of EVA foam that is used."). Since this Court does not have reliable evidence of Defendants' door's R value and the patent does not require a particular R value, this Court finds Altum's low-insulation argument unpersuasive.

Moreover, this Court disagrees with Altum's claim that Defendants' door does not have insulating material extending continuously from the top to the bottom. Defendants' door contains one sheet of insulating foam material attached to the thermoplastic membrane surface. The horizontal grooves do not change this fact.

Finally, this Court disagrees with Altum's claim that the Defendants' door is not flexible along the entire length of the door. Defendants' door logically has to be flexible along the entire length of the door, otherwise it would not be able to transverse a curve. Therefore, this Court finds direct infringement in this case.

After finding direct infringement, this Court turns to the indirect patent infringement claims. This Court finds the elements of patent inducement and contributory infringement are met in this case. Specifically, Altum knew about the Cold Chain Patent from Ridge's cease-and-desist letter. Additionally, Altum knew that instructing KNL/TTPS on how to cut grooves into the panels to create the infringing door induced infringement, especially since Altum is made up of engineers, whereas KNL/TTPS are not. Furthermore, the panels and instruction Altum provide to KNL/TTPS are material to Defendants' door and have no substantial non-infringing uses[7]. Moreover, Altum knew Defendants' door was especially made to infringe the Cold Chain Patent

---

[7] Altum alleges the panels are generic, stock panels, but there was testimony at the PI hearing that Altum makes custom order panels for roll-up door customers. (*See* ECF No. 57 at PageID 988-989).

19

since Altum is made up of former Ridge employees and one Altum employee worked on Ridge and KNL's joint venture for the single panel roll-up door. Finally, KNL and TTPS used Altum's panels and instruction directly to infringe the Cold Chain Patent and sell single panel roll-up doors. Accordingly, this Court finds Ridge established a strong likelihood that it would be successful on the merits of its indirect infringement claims against Altum.

### c. Tortious Interference with Business Relationships against KNL, TTPS, and Altum

Ridge next claims tortious interference with business relationships against Defendants. In Ohio, the elements of tortious interference with a business relationship are: "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Westfall Auto Sales, LLC v. Zurich Am. Ins. Co.*, No. 21-3126, 2021 WL 5298540, at * 4 (6th Cir. Nov. 15, 2021) (citation omitted).

Here, Ridge claims KNL/TTPS tortiously interfered with Ridge's business relationship with Whiting Door by sending a letter threatening royalty damages. Ridge asserts that after Whiting Door received the letter, Whiting Door halted all business with Ridge. KNL/TTPS do not dispute that elements 1 and 2 of tortious interference with a business relationship are met in this case, but dispute elements 3 and 4. KNL/TTPS also argue that Ridge's allegation is preempted by federal patent law and the First Amendment. Specifically, KNL/TTPS argue that the letter sent to Whiting Door was a notice complying with federal patent law that requires a business to notify others of pending patent applications to lay the groundwork for future claims of pre-issuance royalties.

This Court is not convinced by KNL/TTPS's arguments. Mr. Jeff Phlipot, Chief Executive Officer of KNL and President of TTPS, testified at the PI hearing that he contacted his

patent lawyer after learning that Ridge might be working with Whiting Door on a single panel roll-up door and worked with his patent lawyer to send the letter to Whiting Door threatening royalty damages. (*See* ECF No. 57 at PageID 994-995). As such, it appears the letter was specifically targeting Ridge and its partnership with Whiting Door, rather than being a generic, form-letter simply complying with patent law.

Additionally, at the time KNL/TTPS sent the letter to Whiting Door, KNL/TTPS knew Whiting Door was the leading door manufacturer in the industry. (*See* DE14). Furthermore, KNL/TTPS knew the letter was an "empty threat" since KNL/TPPS were working on substantial amendments to the 144 Patent Application at the time the letter was sent, which precludes the possibility of receiving royalty damages from the date of publication. (*See* ECF No. 56 at PageID 871, Lines 10-20). Accordingly, this Court finds all elements of tortious interference with a business relationship have been satisfied with respect to KNL and TTPS.

Ridge also claims Altum tortiously interfered with Ridge's joint venture with KNL for a single panel roll-up door. This Court finds Altum knew of Ridge's relationship with KNL/TTPS given that Altum is made up of all former Ridge employees. Based on the evidence presented, it is unclear to this Court, however, whether Altum intentionally interfered with the joint venture or whether KNL sought out Altum. Therefore, this Court finds Ridge did not establish a strong likelihood that it would be successful on the merits of its tortious interference with a business relationship claim with respect to Altum.

### d. *False Marking against KNL and TTPS*

Last, Ridge claims false marking against KNL and TTPS. A claim for false marking of a patent is governed by 35 U.S.C. § 292, which states: "Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or

number importing that the same is patented, for the purpose of deceiving the public . . . shall be fined . . . . A person who has suffered a competitive injury as a result of a violation of this section may file a civil action . . . for recovery of damages . . . ."

Here, Ridge claims TTPS advertised on its website and in numerous emails to prospective customers that Defendants' door was "patented" when it, in fact, is not. Ridge provided screenshots of TTPS's website and copies of emails sent from TTPS to prospective customers as evidence. During the PI hearing, Mr. Phlipot conceded that TTPS's website and marketing emails falsely marked Defendants' door as "patented." (*See* ECF No. 57 at PageID 1010, Lines 7-21). Mr. Phlipot testified that he was not sure how long the false advertisements were present on TTPS's website, but he suspected about one year. (ECF No. 57 at PageID 969, Lines 16-20). Defendants argue this false marking claim is moot given that Defendants have represented that they will not claim their door is "patented" unless and until the 144 Patent Application is granted. Nonetheless, this Court finds Ridge established a strong likelihood that it would be successful on the merits of its false marking claim.

Since Ridge established a strong likelihood that it would be successful on the merits of all claims against Defendants (minus tortious interference with a business relationship against Altum), this factor of the PI test weighs in favor of granting the PI.

### 2. *Irreparable Injury*

The next factor of the PI analysis is whether the movant would suffer irreparable injury without the injunction. Generally speaking, injury is not irreparable if it is fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). For patent cases, however, "[t]he several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on

such terms as the court deems reasonable." 35 U.S.C. § 283. Although there is no longer a presumption of irreparable harm upon a showing of patent infringement, courts should not ignore "the fundamental nature of patents as property rights granting the owner the right to exclude." *Robert Bosch LLC v. Pulon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011).

Damages to a plaintiff's goodwill and reputation are difficult to quantify, but can amount to irreparable harm. *See, e.g., Bluemile, Inc. v. YourColo, LLC*, No. 2:11-cv-497, 2011 WL 13233391, at *6 (S.D. Ohio July 8, 2011); *Eat BBQ LLC, et al. v. Walters*, No. 12-71-GFVT, 2012 WL 5835679, at *5 (E.D. Ky. Nov. 16, 2012). Additionally, loss of market share, price erosion, and damages to customer relationships can amount to irreparable harm. *See, e.g., Trebro Mfg., Inc. v. Firefly Equip.,* LLC, 748 F.3d 1159, 1170 (Fed. Cir. 2014) (finding irreparable harm where any sale by competitor was lost customer for patent owner and patent owner was likely to lose significant market share as well as customers); *Celis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 931 (Fed. Cir. 2012) (finding irreparable harm where patentee would have lost value of its patent as well as suffered price erosion, damage to ongoing customer relationships, and loss of customer goodwill through later effort to restore original price); *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001) (finding irreparable harm where alleged infringement would cause price erosion and reduction in market share); *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (finding irreparable harm where patentee would lose revenues and goodwill, and would be required to reduce its research and development activities).

Here, Ridge claims Defendants are eroding Ridge's brand, goodwill, reputation, business opportunities, market position, and price, especially in what Ridge claims is a "niche market." Defendants argue any injury to Ridge is purely speculative, especially since they have yet to sell a

door. Defendants further argue the roll-up door market is not a niche market and any alleged injury to Ridge is fully compensable by money damages.

This Court finds Ridge provided sufficient evidence that it would suffer irreparable harm without a PI. It is irrelevant to the irreparable harm analysis that Ridge has not yet gone to market with its door, especially considering the letter KNL sent to Whiting Door caused Whiting Door to halt bringing Ridge's door to market. *See Trebro Mfg., Inc.*, 748 F.3d at 1171 (finding the fact that the patentee does not presently practice the patent does not detract from its likely irreparable harm). Additionally, Ridge and Defendants are direct competitors.[8] Defendants advertised its door as "patented" when it is not for at least one year and reached out to numerous prosecutive customers advertising its door as "patented." KNL/TTPS did not correct to prospective customers their assertion that they have a patented product when they, in fact, do not. (ECF No. 57 at PageID 970-982). By advertising their door as "patented," Defendants gained attention and momentum in the transportation market since patents give businesses an image of expertise and customers invest in patented products because of their security. (*See* ECF No. 58 at PageID 1151, Lines 1-5). Ultimately, it will be harder for customers to trust Ridge's patented product when it gets to market since Defendants have claimed their near identical product is patented. (*See id.*). Given the length of time Defendants falsely advertised their product as "patented" and the importance of a patent to businesses and customers, this Court finds Ridge has shown more than speculative harm and money damages would not suffice. Accordingly, this factor weighs in favor of granting the PI.

---

[8] KNL/TTPS argue that Ridge and Defendants are not direct competitors because KNL/TTPS sells its door as a replacement for doors on existing trucks, whereas Ridge markets to original equipment manufacturers. Nothing is stopping KNL/TTPS, however, from marketing to original equipment manufactures, nor is anything stopping Ridge from selling its door as a replacement for doors on existing trucks. Therefore, this Court finds KNL/TTPS's argument unpersuasive.

### 3. *Substantial Harm to Others*

The next factor of the PI analysis is whether issuance of the injunction would cause substantial harm to others. Defendants argue their growing, thriving business selling a successful product to the trucking industry will suffer substantial harm if a PI is imposed. Altum alleges it will be forced to lay off most of its employees and will lose substantial revenue if a PI is imposed. Altum also argues, when weighing hardships, this Court should consider the fact that Ridge only brought this lawsuit as retaliation for KNL not listing Ridge as a co-inventor on the 144 Patent Application. Ridge claims any harm to Defendants should not be given weight since they have "unclean hands."

This Court is not concerned with Ridge's motivation for this lawsuit or the alleged co-inventorship claims. Defendants' losses, however, are a result of their own calculated risk in selling a single panel roll-up door with knowledge of the Cold Chain Patent. *See Celsis In Vitro, Inc. v. Cellzdirect, Inc.*, 664 F.3d 922, 931 (Fed. Cir. 2012) (finding substantial harm to competitors did not weigh against granting a PI when competitor's losses were a result of its own calculated risk in selling a product with knowledge of the patent). Nevertheless, when considering the substantial harm alleged by Defendants and the irreparable harm to Ridge, this Court finds this factor is neutral to this Court's overall PI analysis.

### 4. *Public Interest*

The last factor of the PI analysis is whether the public interest would be served by the issuance of the injunction. Ridge argues the public has an interest in intellectual property being protected, while Defendants argue the public will suffer with a PI because only Defendants—and not Ridge—are currently selling a single panel roll-up door, which is safer than a traditional roll-up door. This Court finds the public's current access to a single panel roll-up door does not

override the recognized public interest to enforce patent rights, especially considering Defendants did not engage in the required quality assurance testing for its door. *See PPG Industries, Inc. v. Guardian Industries Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996) (discussing "the strong public policy favoring the enforcement of patent rights."). Accordingly, this factor weighs in favor of granting a PI.

When balancing the four factors for a PI, this Court finds the factors weigh in favor of granting a PI. Therefore, this Court **GRANTS** Plaintiff's Motion for a PI against KNL, TTPS, and Altum (ECF No. 2).

### 5. Bond

This Court must next consider the bond requirement in Rule 65(c), which states: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see also Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538-39 (6th Cir. 1978) (noting the bond requirement is discretionary, but the district court must expressly consider the question).

In this case, none of the parties briefed the bond requirement. The parties provided a spreadsheet for KNL and TTPS's profits from the door (*see* PE53, DE111), but not Altum's profits, if any[9]. Based on the evidence before this Court, therefore, this Court finds a $165,000 bond appropriate, which is the approximate total amount KNL and TTPS profited with the sale of its door between June 2022 and September 2023. (*See id.*).

---

[9] All the Court knows is that Altum alleges its stands to lose more than $10,000 per week if enjoined. (*See* ECF No. 31 at PageID 440).

## B.  Joinder

A "patentee" may bring a civil action for patent infringement. 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). If the party asserting infringement is not the patent's original patentee, "the critical determination regarding a party's ability to sue in its own name is whether an agreement transferring patent rights to that party is, in effect, an assignment or a mere license." *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229 (Fed. Cir. 2019) (quoting *AsymmetRx, Inc. v. Biocare Med., LLC,* 582 F.3d 1314, 1318-19 (Fed. Cir. 2009)). In distinguishing between "an assignment" and a "mere license," the court must "examine whether the agreement transferred all substantial rights to the patents." *Id*.

When an exclusive licensee has "all substantial rights" to the patent, it can be considered an assignee, and may bring an infringement suit itself without joining the patent owner. *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1276 (Fed. Cir. 2007) (citations omitted); *McNeilab, Inc. v. Scandipharm, Inc.*, No. 94-1508, 1996 WL 431352, at *2 (Fed. Cir. July 31, 1996). If, however, "there is an exclusive license agreement . . . but the exclusive license does not transfer enough rights to make the licensee the patent owner, either the licensee or the licensor may sue, but both of them generally must be joined as parties to the litigation." *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 604 F.3d 1354, 1360-61 (Fed. Cir. 2010) (citing *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1344 (Fed. Cir. 2006)).

Therefore, generally speaking, "a patent owner should be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee having fewer than all substantial rights. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333 (Fed. Cir. 2001) (citing *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir.

27

2000)); *see also Abbott Lab. V. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed. Cir. 1995); *Rite-Hite Corp v. Kelley Co., Inc.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995); *Mentor H/S, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001); *Textile Prods. Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998); *Indep. Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459 (1926).

In order to determine whether there was a transfer of all substantial rights to the patent, the court must "ascertain the intention of the parties and examine the substance of that which was granted by the license agreement." *Great Lakes Intellectual Prop. Ltd. V. Sakar Intern., Inc.*, 516 F. Supp. 2d 880, 886 (W.D. Mich. 2007) (citing *Mentor H/S, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001)). When examining the substance of the license agreement, the court should consider the following elements: transfer of the exclusive right to make, use, and sell products or services under the patent; the scope of the licensee's right to sublicense; the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement; the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee; the duration of the license rights granted to the licensee; the ability of the licensor to supervise and control the licensee's activities; the obligation of the licensor to continue paying patent maintenance fees; the nature of any limits on the licensee's right to assign its interests in the patent; and the nature and scope of the licensor's retained right to sue accused infringers. *Alfred E. Mann*, 604 F.3d at 1360-61.

Here, Altum, and KNL/TTPS in response to Ridge's motion for a PI, argues that Cold Chain did not transfer all substantial rights to the patent to Ridge because Cold Chain retains the right to sue under the license agreement. Altum argues Cold Chain is a necessary and indispensable party that must be joined as a party-plaintiff in this case and KNL/TTPS argues Ridge lacks standing and, thus, is not likely to succeed on the merits for purposes of the PI.

Ridge claims Cold Chain did transfer all substantial rights to the patent to Ridge so it has standing to sue, and Cold Chain does not need to be joined since Cold Chain declined to initiate and join this lawsuit and tendered all rights to the litigation to Ridge.

This Court finds Cold Chain transferred all substantial rights to Ridge such that Cold Chain is not a necessary party and does not need to be involuntarily joined under Rule 19. While Cold Chain retained the right to sue under the license agreement, Ridge's rights are essentially unfettered. For example, Ridge can decide whether or not to bring suit, when to bring suit, where to bring suit, what claims to assert, what damages to seek, whether to seek injunctive relief, whether to settle the litigation, and the terms on which the litigation will be settled. (*See* ECF No. 1, Exhibit 3 ¶ 14). Additionally, based on the language of the license agreement, Cold Chain intended for Ridge to be able to pursue a patent infringement suit without the need for Cold Chain to participate as a party in the litigation. Specifically, the agreement states "[i]f any such action is initiated *by only one party*, the non-initiating party shall provide all cooperation reasonably requesting by the party initiating the action." (*Id.*) (emphasis added). Based on the license agreement itself, this Court finds Cold Chain transferred all substantial rights to Ridge.

Aside from the license agreement, Cold Chain and Ridge executed an Acknowledgment confirming that Cold Chain tendered full rights to Ridge to prosecute this infringement action. (ECF No. 63 at PageID 1433) (citing ECF No. 63-1). Accordingly, Cold Chain's absence does not impair or impede Cold Chain's ability to protect its interests in the patent. Furthermore, Cold Chain's absence does not subject Defendants to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations since Cold Chain cannot later bring a separate patent infringement action against Defendants involving the same claims and same subject matter. Therefore, this Court finds Cold Chain is not a necessary party and does not need to be

involuntarily joined as a party-plaintiff in this case. Accordingly, this Court **DENIES** Altum's motion (ECF No. 27).

## IV.     CONCLUSION

### A.  Preliminary Injunction

As stated above, when balancing the four factors for a PI, this Court finds the factors weigh in favor of granting a PI. Therefore, Plaintiff's Motion for a PI against KNL, TTPS, and Altum (ECF No. 2) is **GRANTED**. Specifically, Defendants are **ENJOINED** from the following:

1. Continuing to manufacture, advertise for sale, sell, or further contract to sell the "Infringing Door," as defined in the Complaint (ECF No. 1) or any other infringing door, in violation of United States Patent No. 9,151,084 ("Cold Chain Patent");

2. Inducing any other person or entity to manufacture, advertise for sale, or sell the Infringing Door or any other door that infringes the Cold Chain Patent;

3. Contributing to the manufacture, advertisement for sale, or selling of the Infringing Door or any other door that infringes the Cold Chain Patent; and

4. Tortiously interfering with Ridge's business relationships by making false claims related to the Infringing Door to Ridge's customers or business partners, including barring Defendants from falsely asserting that any aspect of the Infringing Door is "patented" by Defendants.

Additionally, Ridge is **ORDERED** to post bond in the amount of **$165,000**, which it must deliver to the Clerk of Court by **Friday, November 10, 2023, at 3:00 p.m**.

### B.  Joinder

For the reasons set forth above, Altum's Motion to Join Cold Chain, LLC (ECF No. 27) is **DENIED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  November 3, 2023**

Appx0031



US009151084B2

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 9,151,084 B2**

Wachtell et al.　　　　　　　　　　　(45) **Date of Patent:**　　**Oct. 6, 2015**

(54) **INSULATED OVERHEAD DOOR**

(75) Inventors: **Peter J. Wachtell**, Boise, ID (US);
**Daniel M. Aragon**, Meridian, ID (US);
**John J. Prehn**, Boise, ID (US); **Todd J. Lindsey**, Boise, ID (US)

(73) Assignee: **COLD CHAIN, LLC**, Boise, ID (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 63 days.

(21) Appl. No.: **13/585,994**

(22) Filed: **Aug. 15, 2012**

(65) **Prior Publication Data**

US 2013/0042983 A1　　Feb. 21, 2013

**Related U.S. Application Data**

(60) Provisional application No. 61/523,786, filed on Aug. 15, 2011.

(51) **Int. Cl.**

| | |
|---|---|
| *E05D 15/16* | (2006.01) |
| *E05B 81/10* | (2014.01) |
| *F25D 23/02* | (2006.01) |
| *E06B 3/80* | (2006.01) |

(52) **U.S. Cl.**

CPC ................. *E05B 81/10* (2013.01); *E05D 15/16* (2013.01); *E06B 3/80* (2013.01); *F25D 23/021* (2013.01); *Y10T 292/11* (2015.04)

(58) **Field of Classification Search**

USPC .......... 160/201, 230, 231.1, 231.2, 232, 23.1, 160/270, 271, DIG. 8; 296/146.8

IPC ..................... F25D 23/021; E05D 15/20; E06B 3/80, 2003/7044, 2003/7049, 2003/7051, E06B 2003/7053

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,042,002 | A | * | 5/1936 | Hovey ............................. 160/133 |
| 2,258,971 | A | * | 10/1941 | Carlson ....................... 160/368.1 |
| 2,827,118 | A | * | 3/1958 | Wendt ........................... 160/184 |
| 3,017,218 | A | * | 1/1962 | Carlsson et al. ............. 296/106 |
| 3,084,403 | A | * | 4/1963 | Elmendorf .................... 428/166 |
| 3,662,410 | A | * | 5/1972 | Lankheet ........................ 4/498 |
| 3,724,526 | A | * | 4/1973 | Huprich .................... 160/368.1 |
| 3,856,072 | A | * | 12/1974 | Sund ......................... 160/84.01 |
| 4,445,958 | A | * | 5/1984 | Jaksha .......................... 156/211 |
| 5,016,700 | A | * | 5/1991 | Wegner et al. .............. 160/232 |
| 5,515,649 | A | | 5/1996 | Strab |
| 5,738,161 | A | * | 4/1998 | Martin ......................... 160/201 |
| 5,915,445 | A | * | 6/1999 | Rauenbusch ................. 160/230 |
| 6,443,209 | B1 | * | 9/2002 | Hurst ........................... 160/230 |
| 7,111,661 | B2 | * | 9/2006 | Laugenbach ................. 160/270 |
| 2003/0173040 | A1 | * | 9/2003 | Court et al. ................. 160/230 |
| 2008/0110580 | A1 | * | 5/2008 | Hoerner et al. ............. 160/113 |
| 2010/0132894 | A1 | * | 6/2010 | Knutson et al. ............. 160/113 |
| 2010/0270826 | A1 | | 10/2010 | Weeda et al. |

OTHER PUBLICATIONS

Non-Final Office Action dated Apr. 16, 2014, U.S. Appl. No. 13/586,021, filed Aug. 15, 2012, pp. 1-19.

* cited by examiner

*Primary Examiner* — David Purol

(74) *Attorney, Agent, or Firm* — MH2 Technology Law Group, LLP

(57) **ABSTRACT**

An article of manufacture for use as an insulated overhead door that is designed to roll open and closed in tracks, with a sheet of thermoplasite material that acts as the outer door membrane and barrier to entry, a sheet of insulating material that acts as a base insulating barrier adhered to the thermoplastic membrane.

**19 Claims, 2 Drawing Sheets**





**FIG. 1**



FIG. 2A

FIG. 2B

FIG. 2C

US 9,151,084 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## INSULATED OVERHEAD DOOR

This application claims benefit of U.S. Provisional Application No. 61/523,786, filed Aug. 15, 2011, the disclosure of which is hereby incorporated by reference in its entirety.

### BACKGROUND

This invention relates generally to the field of overhead insulated doors and, more specifically, to an insulated overhead door that is designed to roll open and closed in tracks.

In the cold storage distribution industry, insulated doors of various types are used to cover openings between cold areas and warm areas. Depending upon the locations and use of the opening, the doors may be opened multiple times each day, which can result in increased energy costs for maintaining desired temperatures of cold storage containers. Over time, the industry has developed and used doors with increasing insulating qualities (R-value) and with door opening assistance mechanisms (springs and counter weights) that allow for the door to be quickly opened and closed. The speed with which a door can be opened and closed is important as the more that the door can be kept closed, the more energy is saved from having to cool the cold side of the door, and the better the condition of the material that is being kept cool.

With regard to refrigerated trucks, most outer doors that are used for loading and unloading the interior truck space are made of a series of hinged horizontal metal panels filled with insulating foam material. These sections are hinged together to form a single flexible door unit that is sized to fit the opening to be covered. This single unit with several hinged sections is designed to slide up and down in tracks, with the hinged sections allowing the door to bend such that it can slide up and around a curved track path and be suspended in the tracks directly overhead from the refrigerated interior of the truck.

The current state of insulated overhead truck doors is such that they are heavy (e.g., 500+ lbs.), have a lower R-value than that desired by the shippers, and can require large numbers of hinges and other hardware for their construction. There can be significant costs associated with the regular servicing and maintenance of the hinge hardware. In addition to these drawbacks, because the current doors are made up of several separate panels held together by hinges, painting the truck door or applying the company logos or other advertisements to the back panel of the door can be complicated and expensive due, in part, to the need to align the message across multiple panels so as to be readable when door is in the closed position. If a single panel of the door is damaged and requires replacement, the entire door may need to be cleaned and repainted. Further, the doors often employ complicated gaskets in an attempt to provide an improved seal between each of the panel sections. Even then, the multiple horizontal panel design reduces the thermal performance of the entire door.

Due to the heavy nature of most existing overhead doors, large assistance springs or counter weights are often fitted to the door to enable a driver to open and close the door. The springs and/or counter weights increase the total cost and complicate installation of the doors on the truck. In addition, due to the weight of the door, automated systems for opening and closing these doors have not been commercially successful because they are generally considered to be too slow to be useful.

### SUMMARY

One or more of the following advantages may be realized by the doors of the present disclosure: a door with a higher R-value for openings designed to utilize an overhead door that runs on tracks; elimination of horizontal seams in the door that result in air leaks and heat intrusion and cause a reduction of the overall thermal performance of the door; providing an improved, seam free door surface for affixing decals, logos or advertising information; providing a simpler door with fewer parts used for its manufacture than many existing doors and a reduction of maintenance costs; reducing the weight of the door to allow a trailer to carry increased amounts of freight; and providing a door that easily utilizes existing overhead track technologies.

The present disclosure addresses some of the current problems with existing overhead door technology, and in particular, the problems associated with insulated doors used in the cold storage industry, such as on delivery trucks for cold storage distribution. By looking at the existing materials that are used in the current door technology, it was determined that finding a lighter weight solution would be advantageous, and that new closed cell foam insulation material existed that could provide a higher R-value with less weight than existing door panels. In attempting to construct a lighter weight version of an operating door, it was apparent that the hinged door design dictated that the door be cut into discreet sections that could be hinged together so as to allow the door to open and close by traversing along curved tracks, thereby positioning the door out of the way of the driver for loading and unloading the truck.

The inventors of the present disclosure realized that if suitable materials are used, single panel overhead doors can be made that are sufficiently flexible to open and close in curved tracks, as described in detail herein. This would allow for overhead doors having one or more advantages, such as higher R-value for insulation, reduced heat intrusion into a cooled space and reduced weight or elimination of springs and counterweights. Other advantages of the present invention will become apparent from the following descriptions, taken in connection with the accompanying drawings, wherein, by way of illustration and example, an embodiment of the present invention is disclosed.

An embodiment of the present disclosure is directed to an insulated overhead door that is designed to roll open and closed in tracks. The overhead door comprises a thermoplastic membrane. A sheet of insulating material is attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel. Wheels are attached to the door allowing the door to fit into tracks to guide the opening and closing of the door. The overhead door comprises only a single panel.

Another embodiment of the present disclosure is directed to an overhead door assembly. The overhead door assembly comprises a set of curved tracks. An insulated overhead door is configured to roll open and closed in the tracks. The overhead door comprises a thermoplastic membrane. A sheet of insulating material is attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel. Wheels are attached to the door allowing the door to fit into tracks to guide the opening and closing of the door. The overhead door comprises only a single panel.

### BRIEF DESCRIPTION OF THE DRAWINGS

The drawings constitute a part of this specification and include exemplary embodiments to the invention, which may be embodied in various forms. It is to be understood that in some instances various aspects of the invention may be shown exaggerated or enlarged to facilitate an understanding of the invention.

US 9,151,084 B2

3

FIG. **1** is a perspective view of an insulated door, according to an embodiment of the present disclosure.

FIGS. **2**A to **2**C illustrate an insulated door at different positions on a track, according to an embodiment of the present disclosure.

DETAILED DESCRIPTION

In the following detailed description, reference is made to the accompanying drawings that form a part hereof, and in which is shown by way of illustration specific embodiments in which the invention may be practiced. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention, and it is to be understood that other embodiments may be utilized and that various changes may be made without departing from the spirit and scope of the present invention. The following detailed description is, therefore, not to be taken in a limiting sense.

Detailed descriptions of the preferred embodiment are provided herein. It is to be understood, however, that the present invention may be embodied in various forms. Therefore, specific details disclosed herein are not to be interpreted as limiting, but rather as a basis for the claims and as a representative basis for teaching one skilled in the art to employ the present invention in virtually any appropriately detailed system, structure or manner.

In accordance with an embodiment of the disclosure, there is disclosed an article of manufacture for use as an insulated overhead door that is designed to roll open and closed in curved tracks. The door comprises for example, a single sheet of thermoplastic material that acts as the outer door membrane and barrier to entry. The overhead door can also include a single sheet or multiple sheets of material that can act as a base insulating barrier. The door can also include suitable hardware for allowing the door to fit into tracks so as to guide the opening and closing of the door. For example, the door can comprise blocks to which wheels with bearings may be affixed.

FIG. **1** illustrates an overhead door **2**, according to an embodiment of the present disclosure. A thermoplastic membrane **4** can be affixed to an insulating material **6** in any suitable manner so as to form a single panel capable of flexing as it traverses curved tracks. For example, the thermoplastic membrane **4** can be cut or otherwise formed to be approximately the size of the opening to be covered. Insulating material **6** can be affixed to thermoplastic membrane **4** using an adhesive or other fastener. In an embodiment, the fastener can be suitable for cold temperature performance. Suitable techniques for affixing the insulating material to the thermoplastic membrane **4** are well known in the art.

In another embodiment, the thermoplastic membrane **4** can be applied to the insulating material **6** in a liquid form, such as by spraying or coating in any suitable manner. The thermoplastic membrane **4** can then be dried or cured on the insulating material **6**. The Insulating material **6** can be cut to size either before or after the thermoplastic membrane **4** is applied.

In an embodiment, the thermoplastic membrane **4** comprises a flexible, durable polymeric material that will protect the insulating material **6** from physical damage and from the elements, including moisture. It can also include other materials, such as fiber glass, to strengthen and/or provide the desired flexibility versus stiffness or other desired properties. Examples of suitable thermoplastic membrane materials include, for example, polypropylene impregnated with glass fibers and laminated together to create a directional structure, such as VERSATEX® VX or VERSATEX VR, both available

4

from US Liner based in Cranberry Township, Pa. Other examples of suitable thermoplastic membrane material include poly vinyl chloride (PVC) combined with rubberizing agents to increase flexibility, which are well known in the art; or polyurea and/or polyurethane applied directly to the foam or any other acceptable substrate, such as the spray on liners available from LINE X Protective Coatings of Huntsville, Ala., or Rhino Linings Corporation of San Diego, Calif.

Examples of insulating materials include foam. Suitable foams can include, for example, closed cell foams, such as ethylene vinyl acetate ("EVA") foam, which is a copolymer of ethylene and vinyl acetate and is available from many sources. The weight percent vinyl acetate may vary, for example, from about 10% to about 40%, based on the total weight of the EVA material, with the remainder being ethylene. Other examples of suitable closed cell foams include polyethylene foams, polypropylene foams or neoprene based foams. Open cell foams, such as polyether based polyurethanes foams or polyester based polyurethane foams, can also be used. All of these listed foams are generally well known in the art.

In an embodiment, solid blocks or other suitable hardware may be attached to the thermoplastic membrane to allow for the attachment of wheels **18** (which may or may not include bearings), such that the door may be run in overhead door tracks.

In an embodiment, foam blocks **7**, as illustrated in FIG. **1**, (such as EVA foam or any other insulating material, including any foam discussed herein) may be adhered to, for example, an initial sheet of foam, such as closed cell foam, that is employed as insulating material **6**. In this manner, a door with an increased R-value may be provided. The insulating foam can be bonded together in any suitable manner. Techniques for bonding insulting foam together, such as with adhesives, are well known in the art.

The insulating foam can optionally include compression gaps **8**, examples of which are shown in FIG. **1**. The compression gaps **8** in the foam material allow the foam to more easily bend during the opening and closing of the door. The compression gaps **8** can be formed between the foam blocks, as illustrated. Alternatively, the compression gaps **8** can be formed partially through a foam sheet, such as where a second foam sheet is used to replace some or all of the foam blocks bonded to the first foam sheet shown in FIG. **1**. In yet another embodiment, compression gaps **8** could be formed in a foam sheet illustrated in FIG. **1**.

Due to the flexibility of the thermoplastic membrane **4** and foam composite, the doors of the present disclosure can be made as a single integral unit, or panel, that is approximately the size of the door opening, without having to hinge together multiple sections to allow the door to traverse a curved track. In an embodiment, the single laminate door section can flex sufficiently to traverse an existing track. FIGS. **2**A to **2**B illustrate a door **2** flexing to traverse tracks **10**, according to an embodiment of the present disclosure. The tracks **10** can be attached to, for example, a truck or enclosed trailor used for cold storage during transport. Alternatively, the tracks **10** can be attached to a building for which thermally insulated doors are desired, such as might be used for cold storage on a walk-in freezer or refrigerated warehouse, or a garage door.

The tracks **10** comprises a track portion **12** of a first length, $L_1$, positioned at an angle, $\Theta$, relative to track portion **14** of a second length, $L_2$, as shown in FIG. **2**A. $\Theta$ can range, for example, from about 80° to about 125°. In an embodiment, $\Theta$ is approximately 90°. In an embodiment, the door is positioned substantially horizontally from a point near the top of the door opening, so that most or all of the door is in a

US 9,151,084 B2

5

substantially vertical position when closed and most or all of the door is in a substantially horizontal position when open (assuming the truck or refrigerated container the tracks 10 are attached to is positioned on a substantially level surface).

In embodiments, the track portions 12 and 14 can be relatively straight. In alternative embodiments, the track portions 12 and 14 can be somewhat curved.

A third curved track portion 16 connects the first portion 12 and second portion 14. Curved track portion 16 can be curved in any suitable manner that will provide the transition between the relative angles of track portion 12 and track portion 14. The door 2 is designed so that it is capable of flexing to traverse the curved track portion 16. In an embodiment, the portion of door 2 traversing the curve track portion 16 will generally curve to approximate the curved shape of the curved track portion 16. For example, all or a part of track portion 16 can be curved in a circular arc so that the inner path contacted by the wheels has a radius of curvature, R (illustrated in FIG. 2B), where R can range, for example, from about 1 inch to about 25 inches, such as about 5 inches to about 18 inches.

The density of the closed cell foam combined with the thermoplastic liner thickness provides enough stiffness to create a good seal around the edge of the door when the panel is in the closed position, yet may be flexible enough to bend across the horizontal dimension up to, for example, approximately 90 degrees when running through the curved portion of the tracks 10. The flexibility may be increased or decreased by modifying the densities and thicknesses of the foam and liners that are combined such that the panel is able to flex over a very tight radius or a longer radius track curve as a particular door opening and track curvature dictates.

The wheels 18 can be affixed to the door in any suitable manner so that the wheels 18 are positioned to fit into the tracks 10. There are many ways to attach the wheels to the door. For example, the wheels 18 can be mounted using blocks, as discussed above, or brackets. Wheels with sleeves might also be employed to attach the wheels 18 to the door, as is well known in the art.

An optional flexible membrane 20 can also be employed, as illustrated in FIG. 1. The flexible membrane 20 can be made of any suitable flexible material, such as cloth, plastic or rubber sheeting. Optional flexible covers 22 can be employed at the hinge locations, if desired, as is also illustrated in FIG. 1. The flexible covers 22 can also be made of any suitable flexible material, such as those listed for the flexible membrane 20. In an alternative embodiment, the flexible membrane 20 and flexible covers 22 can be a single integral piece of flexible material.

The door can be any desired size or shape. Example door sizes can range from about 6 feet to about 10 feet in width, and about 6 feet to about 12 feet in height. The thickness of the door can be fashioned up to, for example, 12 inches in thickness. Example R values for the door can range from about 14 to about 50. The R value can be increased by increasing the thickness of the door and the amount of EVA foam that is used.

In an embodiment, the door is relatively light weight, so that it can easily be opened and closed by a manual process, or by use of an automatic system, such as, for example, electric, hydraulic or pneumatic systems. These systems can be made to be very efficient at quickly opening and closing doors that are lightweight. Furthermore, the use of these systems may allow the door's opening trigger to be manual or to be automatic based upon the approach of the driver carrying, for example, an RFID transmitter (not shown).

6

Other alterations or changes to the design of the embodiment of FIG. 1 can also be made. For example, rather than employing insulating foam blocks, as illustrated in FIG. 1, the insulating foam sheet can be employed without the foam blocks, in combination with the sheet of thermoplastic material. Further, the location and number of wheels 18 can also be changed. Still other alterations can be made, as would readily be understood by one of ordinary skill in the art.

While the invention has been described in connection with various detailed embodiments, the description is not intended to limit the scope of the invention to the particular forms set forth herein, but on the contrary, it is intended to cover such alternatives, modifications, and equivalents as may be included within the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

1. An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door having a first outermost surface, a second outermost surface opposite the first outermost surface, a top surface, a bottom surface, a first side surface and a second side surface, both the first outermost surface and the second outermost surface being larger than any of the top surface, bottom surface, first side surface and second side surface, the door comprising:

a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the thermoplastic membrane forming the first outermost surface of the door;

a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only one of the panel, the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, Θ, relative to a track portion of a second length, wherein Θ ranges from about 80° to about 125°.

2. The insulated overhead door of claim 1, wherein the thermoplastic membrane is a single sheet.

3. The insulated overhead door of claim 1, wherein thermoplastic membrane comprises polypropylene impregnated with glass fibers.

4. The insulated overhead door of claim 1, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend during opening and closing of the door.

5. The insulated overhead door of claim 1, wherein the insulating material is closed cell foam.

6. The insulated overhead door of claim 5, wherein the closed cell foam comprises ethylene vinyl acetate.

7. The insulated overhead door of claim 5, wherein the closed cell foams is chosen from polyethylene foams, polypropylene foams or neoprene based foams.

US 9,151,084 B2

7

**8**. The insulated overhead door of claim **1**, wherein the insulating material is an open cell foam.

**9**. The insulated overhead door of claim **1**, further comprising an additional membrane that is not the thermoplastic membrane.

**10**. The insulated overhead door of claim **1**, the door having an R value ranging from about 14 to about 50.

**11**. A method comprising:
   providing the insulated overhead door of claim **1** on tracks, at least a portion of the tracks being curved; and
   moving the insulated overhead door so that a portion of the thermoplastic membrane and a portion of the insulating material flex to allow the door to traverse the curved portion of the tracks.

**12**. An overhead door assembly comprising:
   a set of curved tracks; and
   an insulated overhead door configured to roll open and closed in the tracks to cover a door opening having a top and a bottom, the overhead door having a first outermost surface, a second outermost surface opposite the first outermost surface, a top surface, a bottom surface, a first side surface and a second side surface, both the first outermost surface and the second outermost surface being larger than any of the top surface, bottom surface, first side surface and second side surface, the door comprising:
      a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening when the door is in a closed position, the thermoplastic membrane forming the first outermost surface of the door;
      a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door; and
      wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,
   wherein the overhead door comprises only one of the panel, the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, Θ, relative to a track portion of a second length, wherein Θ ranges from about 80° to about 125°.

**13**. A truck comprising the insulated overhead door assembly of claim **12**.

**14**. A cold storage trailer comprising the insulated overhead door assembly of claim **12**.

**15**. A building comprising the insulated overhead door assembly of claim **12**.

**16**. An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door consisting of:

   a flexible thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the flexible thermoplastic membrane comprising polypropylene impregnated with glass fibers;
   a sheet of flexible foam insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and
   wheels attached to the door with wheel attachment hardware, the wheels allowing the door to fit into tracks to guide the opening and closing of the door,
   wherein the panel is flexible along the entire length of the panel so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches, where the track portion has a first length positioned at an angle, Θ, relative to a track portion of a second length, wherein Θ ranges from about 80° to about 125°.

**17**. An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door having a first outermost surface, a second outermost surface opposite the first outermost surface, a top surface, a bottom surface, a first side surface and a second side surface, both the first outermost surface and the second outermost surface being larger than any of the top surface, bottom surface, first side surface and second side surface, the door comprising:
   a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the thermoplastic membrane forming the first outermost surface of the door;
   a foam insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door; and
   wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,
   wherein the overhead door comprises only one of the panel, the panel being sufficiently flexible to traverse curved tracks.

**18**. The insulated overhead door of claim **17**, wherein the foam insulating material comprises foam blocks configured to increased an R-value of the door.

**19**. The insulated overhead door of claim **17**, wherein the panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches.

\* \* \* \* \*

APPEAL,JURY,PROTO

## U.S. District Court
## Southern District of Ohio (Columbus)
## CIVIL DOCKET FOR CASE #: 2:23–cv–03012–ALM–KAJ

Ridge Corporation v. Kirk National Lease Co. et al
Assigned to: Chief Judge Algenon L. Marbley
Referred to: Magistrate Judge Kimberly A. Jolson
Demand: $75,000
Cause: 28:2271 Federal Tort Claims Act

Date Filed: 09/20/2023
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Ridge Corporation**                     represented by     **Christopher W. Tackett**
Bailey Cavalieri LLC
10 West Broad Street
Suite 2100
Columbus, OH 43215
614–229–3286
Fax: 614–221–0479
Email: ctackett@baileycav.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Graycen Marie Wood**
10 W. Broad Street
Suite 2100
Columbus, OH 43215
440–591–8881
Email: gwood@baileycav.com
*ATTORNEY TO BE NOTICED*

**John Phillip Miller**
Bailey Cavalieri LLC
10 W. Broad Street
Ste 2100
Columbus, OH 43215
614–229–3274
Fax: 614–229–0479
Email: jmiller@baileycav.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Kirk National Lease Co.**                 represented by     **Joshua A Koltak**
Fgks Law
100 South Main Avenue
Suite 300
Sidney, OH 45365
937–492–1271
Fax: 937–498–1306
Email: jkoltak@fgks–law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Darren William Ford**
Faruki Pll
201 East Fifth Street
Suite 1420
Cincinnati, OH 45202
513–632–0313
Email: dford@ficlaw.com

*ATTORNEY TO BE NOTICED*

**Donald E Burton**
110 North Main Street
Ste 1600
Dayton, OH 45402
937–227–3736
Email: dburton@ficlaw.com
*ATTORNEY TO BE NOTICED*

**Melissa L Watt**
Faruki Pll
Ohio
201 East Fifth Street
Suite 1420
Cincinnati, OH 45202
513–632–3233
Fax: 513–632–0319
Email: mwatt@ficlaw.com
*ATTORNEY TO BE NOTICED*

**Michael J. Scarpelli**
Faulkner, Garmhausen, Keister & Shenk
100 South Main Avenue
Suite 300
Sidney, OH 45365
937–489–2042
Fax: 937–498–1306
Email: mscarpelli@fgks–law.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Truck & Trailer Parts Solutions, Inc.**          represented by    **Darren William Ford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Donald E Burton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa L Watt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Transglobal, Inc.**          represented by    **John Manuel Gonzales**
*TERMINATED: 10/24/2023*                         The Behal Law Group LLC
501 S. High Street
Columbus, OH 43215
614–643–5050
Email: jgonzales@behallaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gilbert Joseph Gradisar**
The Behal Law Group LLC
501 South High Street
Columbus, OH 43215
614–643–5050
Fax: 614–340–3892
Email: ggradisar@behallaw.com
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

| | | |
|---|---|---|
| **Altum LLC** | represented by | **Damion M Clifford** |

Arnold & Clifford LLP
115 W. Main Street
Suite 400
Columbus, OH 43215
614–460–1635
Fax: 614–469–1093
Email: dclifford@arnlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gerhardt A Gosnell , II**
Arnold & Clifford LLP
115 W. Main Street
Suite 400
Columbus, OH 43215
614–460–1608
Fax: 614–469–1093
Email: ggosnell@arnlaw.com
*ATTORNEY TO BE NOTICED*

**James Edward Arnold**
Arnold & Clifford LLP
115 West Main Street
4th Floor
Columbus, OH 43215
614–460–1600
Fax: 614–469–1066
Email: jarnold@arnlaw.com
*ATTORNEY TO BE NOTICED*

**Michael Lee Dillard , Jr.**
Arnold Clifford LLP
Arnold Clifford LLP
115 West Main Street 4th Floor
43215
Columbus, OH 43220
614–460–1600
Fax: 614–469–1134
Email: mdillard@arnlaw.com
*ATTORNEY TO BE NOTICED*

**Tiffany L. Carwile**
Arnold & Clifford LLP
115 West Main Street, 4th Floor
Columbus, OH 43215
614–460–1600
Fax: 614–469–1134
Email: tcarwile@arnlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/20/2023 | 1 | COMPLAINT with JURY DEMAND against Altum LLC, Kirk National Lease Co., Transglobal, Inc., Truck & Trailer Parts Solutions, Inc. ( Filing fee $ 402 paid – receipt number: AOHSDC–9607677), filed by Ridge Corporation. (Attachments: # 1 Civil Cover Sheet) (Tackett, Christopher) (Entered: 09/20/2023) |
| 09/20/2023 | 2 | MOTION for Temporary Restraining Order – *Plaintiff Ridge Corporations Motion For Temporary Restraining Order and Preliminary Injunction* by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 09/20/2023) |

| 09/20/2023 | 3 | ORDER OF RECUSAL. Judge James L. Graham recused. Case reassigned to Chief Judge Algenon L. Marbley for all further proceedings. Signed by Judge James L. Graham on 9/20/23. (ds) (Entered: 09/20/2023) |
|---|---|---|
| 09/20/2023 | 4 | ORDER Setting 65.1 Conference on Motion 2 MOTION for Temporary Restraining Order – *Plaintiff Ridge Corporations Motion For Temporary Restraining Order and Preliminary Injunction:65.1 Conference set for 9/21/2023 03:00 PM in Chambers before Chief Judge Algenon L. Marbley. Signed by Chief Judge Algenon L. Marbley on 9/20/2023. (cw) (Entered: 09/20/2023)* |
| 09/21/2023 | 5 | NOTICE of Appearance by Damion M Clifford for Defendant Altum LLC (Clifford, Damion) (Entered: 09/21/2023) |
| 09/21/2023 | 6 | NOTICE of Appearance by Donald E Burton for Defendants Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc. (Burton, Donald) (Entered: 09/21/2023) |
| 09/21/2023 | 7 | Corporate Disclosure Statement by Defendant Kirk National Lease Co.. (Burton, Donald) (Entered: 09/21/2023) |
| 09/21/2023 | 8 | Corporate Disclosure Statement by Defendant Truck & Trailer Parts Solutions, Inc.. (Burton, Donald) (Entered: 09/21/2023) |
| 09/21/2023 | 9 | NOTICE by Plaintiff Ridge Corporation re 2 MOTION for Temporary Restraining Order – *Plaintiff Ridge Corporations Motion For Temporary Restraining Order and Preliminary Injunction Proposed Temporary Restraining Order* (Wood, Graycen) (Entered: 09/21/2023) |
| 09/21/2023 | 10 | Corporate Disclosure Statement by Defendant Altum LLC. (Clifford, Damion) (Entered: 09/21/2023) |
| 09/21/2023 | 11 | NOTICE by Plaintiff Ridge Corporation of Proposed Order re 2 MOTION for Temporary Restraining Order and Preliminary Injunction. *(Tackett, Christopher) Modified text on 9/21/2023. jlk (Entered: 09/21/2023)* |
| 09/21/2023 | 12 | Corporate Disclosure Statement by Plaintiff Ridge Corporation. (Wood, Graycen) (Entered: 09/21/2023) |
| 09/21/2023 | 13 | Corporate Disclosure Statement by Plaintiff Ridge Corporation. (Wood, Graycen) (Entered: 09/21/2023) |
| 09/21/2023 | 25 | Minute Entry for proceedings held before Chief Judge Algenon L. Marbley: Initial 65.1 Conference held on 9/21/2023. (Court Reporter: Mary Schweinhagen) (dms) (Entered: 09/27/2023) |
| 09/22/2023 | 14 | ORDER GRANTING 2 MOTION for Temporary Restraining Order against KNL, TTPS, Altum, and Transglobal and SETTING A HEARING ON 2 Motion For Preliminary Injunction: Motion Hearing set for 10/3/2023 08:30 AM in Courtroom 331 – Columbus before Chief Judge Algenon L. Marbley. Plaintiff will pay its $10,000 bond to the Clerk of Court by today 9/22/2023 at 4:00 p.m. Defendants Response is due by 9/28/2023 at 5:00 p.m. Plaintiff's Reply is due by 10/2/2023 at 12:00 p.m. Signed by Chief Judge Algenon L. Marbley on 9/22/2023. (cw) (Entered: 09/22/2023) |
| 09/22/2023 | 15 | NOTICE of Appearance by Michael Lee Dillard, Jr for Defendant Altum LLC (Dillard, Michael) (Entered: 09/22/2023) |
| 09/22/2023 | | Bond fee received: $10,000.00, receipt number 200004245. (vb) (Entered: 09/22/2023) |
| 09/22/2023 | 16 | NOTICE by Defendant Altum LLC *of Issuance of Subpoenas* (Attachments: # 1 Exhibit Exhibit 1) (Dillard, Michael) (Entered: 09/22/2023) |
| 09/25/2023 | 17 | Transcript of Proceedings held on September 21, 2023, before Judge Algenon L. Marbley. Court Reporter/Transcriber Mary Schweinhagen, Telephone number 937–512–1604/mary_schweinhagen@ohsd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's |

| | | intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms – Electronic Availability of Transcripts). Please read this policy carefully.<br><br>For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office.. Redaction Request due 10/16/2023. Redacted Transcript Deadline set for 10/26/2023. Release of Transcript Restriction set for 12/26/2023. (mas) (Entered: 09/25/2023) |
|---|---|---|
| 09/26/2023 | 18 | NOTICE of Appearance by John Manuel Gonzales for Defendant Transglobal, Inc. (Gonzales, John) (Entered: 09/26/2023) |
| 09/26/2023 | 19 | NOTICE of Appearance by Joshua A Koltak for Defendant Kirk National Lease Co. (Koltak, Joshua) (Entered: 09/26/2023) |
| 09/26/2023 | 20 | NOTICE of Appearance by Michael J. Scarpelli for Defendant Kirk National Lease Co. (Scarpelli, Michael) (Entered: 09/26/2023) |
| 09/26/2023 | 21 | NOTICE of Appearance by Darren William Ford for Defendants Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc. (Ford, Darren) (Entered: 09/26/2023) |
| 09/26/2023 | 22 | NOTICE of Appearance by Gilbert Joseph Gradisar for Defendant Transglobal, Inc. (Gradisar, Gilbert) (Entered: 09/26/2023) |
| 09/26/2023 | 23 | NOTICE of Appearance by Melissa L Watt for Defendants Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc. (Watt, Melissa) (Entered: 09/26/2023) |
| 09/26/2023 | 24 | STIPULATION *Stipulated Protective Order* by Plaintiff Ridge Corporation. (Wood, Graycen) Modified for statistical purposes on 9/28/2023 (jlk). (Entered: 09/26/2023) |
| 09/27/2023 | 26 | NOTICE of Appearance by Tiffany L. Carwile for Defendant Altum LLC (Carwile, Tiffany) (Entered: 09/27/2023) |
| 09/28/2023 | 27 | MOTION for Joinder by Defendant Altum LLC. (Carwile, Tiffany) (Entered: 09/28/2023) |
| 09/28/2023 | 28 | RESPONSE in Opposition re 2 MOTION for Temporary Restraining Order – *Plaintiff Ridge Corporations Motion For Temporary Restraining Order and Preliminary Injunction Memorandum of Defendants Kirk NationaLease Co. and Truck & Trailer Parts Solutions, Inc. in Opposition to Motion of Plaintiff Ridge Corporation's Motion for Temporary Restraining Order and Preliminary Injunction* filed by Defendants Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Burton, Donald) (Entered: 09/28/2023) |
| 09/28/2023 | 29 | RESPONSE to Motion re 2 MOTION for Temporary Restraining Order – *Plaintiff Ridge Corporations Motion For Temporary Restraining Order and Preliminary Injunction* filed by Defendant Transglobal, Inc.. (Gradisar, Gilbert) (Entered: 09/28/2023) |
| 09/28/2023 | 30 | MOTION to Dismiss *or Transfer Venue* by Defendant Transglobal, Inc.. (Attachments: # 1 Affidavit Affidavit of Mark Schroeder) (Gradisar, Gilbert) (Entered: 09/28/2023) |
| 09/28/2023 | 31 | RESPONSE in Opposition re 2 MOTION for Temporary Restraining Order – *Plaintiff Ridge Corporations Motion For Temporary Restraining Order and Preliminary Injunction* filed by Defendant Altum LLC. (Attachments: # 1 Affidavit of Dominic Grandominico, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N) (Clifford, Damion) (Entered: 09/28/2023) |
| 09/29/2023 | 32 | WAIVER OF SERVICE Returned Executed. Waiver sent to Altum LLC on 9/28/2023, answer due 11/27/2023. (Tackett, Christopher) (Entered: 09/29/2023) |
| 09/29/2023 | 33 | WAIVER OF SERVICE Returned Executed. Waiver sent to Transglobal, Inc. on 9/28/2023, answer due 11/27/2023. (Gradisar, Gilbert) (Entered: 09/29/2023) |
| 09/29/2023 | 34 | ORDER issued re 30 Motion to Dismiss or, in the Alternative, Transfer Venue filed by Transglobal, Inc. Plaintiff Ridge is ORDERED to respond to Transglobal's motion on |

| | | |
|---|---|---|
| | | October 2, 2023, by 5:00 p.m. The Parties should be prepared to argue the issue of venue at the Preliminary Injunction Hearing scheduled for October 3, 2023. Signed by Chief Judge Algenon L. Marbley on 9/29/23. (sem) (Entered: 09/29/2023) |
| 09/29/2023 | | Set/Reset Deadlines as to 30 MOTION to Dismiss *or Transfer Venue*.Plaintiff's Response due by 10/2/2023. (sem) (Entered: 09/29/2023) |
| 09/29/2023 | 35 | NOTICE by Plaintiff Ridge Corporation (Wood, Graycen) (Entered: 09/29/2023) |
| 09/29/2023 | 36 | Protective Order. Signed by Chief Judge Algenon L. Marbley on 9/29/2023. (cw) (Entered: 09/29/2023) |
| 09/29/2023 | 37 | WAIVER OF SERVICE Returned Executed. Waiver sent to Kirk National Lease Co. on 9/29/2023, answer due 11/28/2023. (Tackett, Christopher) (Entered: 09/29/2023) |
| 09/29/2023 | 38 | WAIVER OF SERVICE Returned Executed. Waiver sent to Truck & Trailer Parts Solutions, Inc. on 9/29/2023, answer due 11/28/2023. (Tackett, Christopher) (Entered: 09/29/2023) |
| 10/01/2023 | 39 | NOTICE of Voluntary Dismissal by Plaintiff Ridge Corporation (Wood, Graycen) (Entered: 10/01/2023) |
| 10/01/2023 | 40 | MOTION to Exclude *Expert Testimony of Jason Foster* by Plaintiff Ridge Corporation. (Wood, Graycen) (Entered: 10/01/2023) |
| 10/01/2023 | 41 | MOTION to Exclude *Expert Testimony of Sam Han* by Plaintiff Ridge Corporation. (Wood, Graycen) (Entered: 10/01/2023) |
| 10/02/2023 | 42 | RESPONSE to Motion re 40 MOTION to Exclude *Expert Testimony of Jason Foster* filed by Defendant Altum LLC. (Clifford, Damion) (Entered: 10/02/2023) |
| 10/02/2023 | 43 | NOTICE by Defendant Altum LLC *Deposition Designations for Mark A. Schroeder* (Clifford, Damion) (Entered: 10/02/2023) |
| 10/02/2023 | 44 | REPLY to Response to Motion re 2 MOTION for Temporary Restraining Order – *Plaintiff Ridge Corporations Motion For Temporary Restraining Order and Preliminary Injunction* filed by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 10/02/2023) |
| 10/02/2023 | 45 | REPLY to Response to Motion re 2 MOTION for Temporary Restraining Order – *Plaintiff Ridge Corporations Motion For Temporary Restraining Order and Preliminary Injunction* filed by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 10/02/2023) |
| 10/02/2023 | 46 | NOTICE by Defendants Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc. *Kirk NationaLease Co.'s and Truck & Trailer Parts Solutions Inc.'s Deposition Designations for Mark A. Schroeder* (Scarpelli, Michael) (Entered: 10/02/2023) |
| 10/02/2023 | 47 | RESPONSE in Opposition re 41 MOTION to Exclude *Expert Testimony of Sam Han* filed by Defendants Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Burton, Donald) (Entered: 10/02/2023) |
| 10/02/2023 | 48 | NOTICE by Defendant Altum LLC *REVISED DEPOSITION DESIGNATIONS FOR MARK A. SCHROEDER* (Clifford, Damion) (Entered: 10/02/2023) |
| 10/03/2023 | | Set/Reset Hearings: Preliminary Injunction Hearing set for 10/3/2023 and 10/4/2023 at 8:30 AM in Courtroom 331 – Columbus before Chief Judge Algenon L. Marbley. Hearing days added for statistical purposes only. (dms) (Entered: 10/03/2023) |
| 10/03/2023 | 49 | Minute Entry for proceedings held before Chief Judge Algenon L. Marbley: Preliminary Injunction Hearing held on 10/3/2023. (Court Reporter: Shawna Evans) (dms) (Entered: 10/03/2023) |
| 10/04/2023 | 50 | ORDER denying 40 Motion to Exclude; denying 41 Motion to Exclude. Signed by Chief Judge Algenon L. Marbley on 10/3/2023. (cw) (Entered: 10/04/2023) |
| 10/04/2023 | | Set/Reset Hearings: Preliminary Injunction Hearing to continue on 10/5/2023 at 8:30 AM in Courtroom 331 – Columbus before Chief Judge Algenon L. Marbley. Hearing day added for statistical purposes only. (dms) (Entered: 10/04/2023) |

| 10/04/2023 | 51 | Minute Entry for proceedings held before Chief Judge Algenon L. Marbley: Continued Preliminary Injunction Hearing held on 10/4/2023. (Court Reporter: Shawna Evans) (dms) (Entered: 10/04/2023) |
|---|---|---|
| 10/05/2023 | | Set/Reset Hearings: Evidentiary Hearing set for 10/5/2023 09:00 AM and 10/6/2023 02:00 PM in Courtroom 331 – Columbus before Chief Judge Algenon L. Marbley (docketed for calendaring purposes only). (sem) (Entered: 10/05/2023) |
| 10/05/2023 | 52 | Minute Entry for proceedings held before Chief Judge Algenon L. Marbley: Continued Preliminary Injunction Hearing held on 10/5/2023. (Court Reporter: Shawna Evans) (dms) (Entered: 10/05/2023) |
| 10/06/2023 | 53 | Minute Entry for proceedings held before Chief Judge Algenon L. Marbley: Continued Preliminary Injunction Hearing held on 10/6/2023. (Court Reporter: Shawna Evans) (dms) (Additional attachment(s) added on 10/13/2023: # 1 amended minutes and admitted exhibits) (sem). (Entered: 10/06/2023) |
| 10/10/2023 | 54 | ORDER regarding Closing Briefs regarding preliminary injunction. The parties are ORDERED to submit their opening briefs on 10/23/2023 at 5:00 p.m. Reply Briefs are due on 10/27/2023 at 5:00 p.m. Signed by Chief Judge Algenon L. Marbley on 10/10/2023. (cw) (Entered: 10/10/2023) |
| 10/11/2023 | 55 | NOTICE by Defendant Altum LLC *DEFENDANT ALTUM LLCS NOTICE OF ISSUANCE OF SUBPOENA* (Attachments: # 1 Exhibit Exhibit 1) (Carwile, Tiffany) (Entered: 10/11/2023) |
| 10/13/2023 | 56 | Transcript of Motion for Preliminary Injunction Proceedings held on October 3, 2023, before Judge Algenon L. Marbley. Court Reporter/Transcriber Shawna J. Evans, Telephone number 614–719–3316. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms – Electronic Availability of Transcripts). Please read this policy carefully.<br><br>For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office.. Redaction Request due 11/3/2023. Redacted Transcript Deadline set for 11/13/2023. Release of Transcript Restriction set for 1/11/2024. (Evans, Shawna) (Entered: 10/13/2023) |
| 10/13/2023 | 57 | Transcript of Motion for Preliminary Injunction Proceedings held on October 4, 2023, before Judge Algenon L. Marbley. Court Reporter/Transcriber Shawna J. Evans, Telephone number 614–719–3316. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.<br><br>NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms – Electronic Availability of Transcripts). Please read this policy carefully.<br><br>For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office.. Redaction Request due 11/3/2023. Redacted Transcript Deadline set for 11/13/2023. Release of Transcript Restriction set for 1/11/2024. (Evans, Shawna) (Entered: 10/13/2023) |
| 10/13/2023 | 58 | Transcript of Motion for Preliminary Injunction Proceedings held on October 5, 2023, before Judge Algenon L. Marbley. Court Reporter/Transcriber Shawna J. Evans, Telephone number 614–719–3316. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. |

| | | |
|---|---|---|
| | | NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms – Electronic Availability of Transcripts). Please read this policy carefully. <br><br> For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office.. Redaction Request due 11/3/2023. Redacted Transcript Deadline set for 11/13/2023. Release of Transcript Restriction set for 1/11/2024. (Evans, Shawna) (Entered: 10/13/2023) |
| 10/13/2023 | 59 | Transcript of Motion for Preliminary Injunction Proceedings held on October 6, 2023, before Judge Algenon L. Marbley. Court Reporter/Transcriber Shawna J. Evans, Telephone number 614–719–3316. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. <br><br> NOTICE RE: REDACTION OF TRANSCRIPTS: Within 5 business days of this filing, each party shall inform the Court, by filing a Notice of Redaction, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ohsd.uscourts.gov (Forms – Electronic Availability of Transcripts). Please read this policy carefully. <br><br> For a complete copy of a transcript, please contact the Court Reporter or the Clerk's Office.. Redaction Request due 11/3/2023. Redacted Transcript Deadline set for 11/13/2023. Release of Transcript Restriction set for 1/11/2024. (Evans, Shawna) (Entered: 10/13/2023) |
| 10/17/2023 | 60 | MOTION to Exclude *Exhibit D48 and Testimony of Dominic Grandominico re Exhibit D48* by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 10/17/2023) |
| 10/17/2023 | 61 | RESPONSE in Opposition re 60 MOTION to Exclude *Exhibit D48 and Testimony of Dominic Grandominico re Exhibit D48* filed by Defendant Altum LLC. (Dillard, Michael) (Entered: 10/17/2023) |
| 10/18/2023 | 62 | REPLY to Response to Motion re 60 MOTION to Exclude *Exhibit D48 and Testimony of Dominic Grandominico re Exhibit D48* filed by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 10/18/2023) |
| 10/19/2023 | 63 | RESPONSE in Opposition re 27 MOTION for Joinder filed by Plaintiff Ridge Corporation. (Attachments: # 1 Exhibit A – Signed Cold Chain Acknowledgment) (Tackett, Christopher) (Entered: 10/19/2023) |
| 10/20/2023 | 64 | First MOTION for Leave to File *Sur–Reply in Further Opposition to Motion to Exclude* by Defendant Altum LLC. (Attachments: # 1 Exhibit Sur–Reply) (Dillard, Michael) (Entered: 10/20/2023) |
| 10/20/2023 | 65 | RESPONSE in Opposition re 64 First MOTION for Leave to File *Sur–Reply in Further Opposition to Motion to Exclude* filed by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 10/20/2023) |
| 10/20/2023 | 66 | ORDER denying 64 Motion for Leave to File. Signed by Chief Judge Algenon L. Marbley on 10/20/2023. (cw) (Entered: 10/20/2023) |
| 10/23/2023 | 67 | ORDER granting 60 Motion to Exclude Defense Exhibit 48 and Testimony of Dominic Grandominico regarding Defense Exhibit 48 from Consideration in Ruling Upon Ridge's request for a Preliminary Injunction. Signed by Chief Judge Algenon L. Marbley on 10/23/2023. (dms) (Entered: 10/23/2023) |
| 10/23/2023 | 68 | BRIEF by Defendants Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc.. (Burton, Donald) (Entered: 10/23/2023) |
| 10/23/2023 | 69 | BRIEF by Defendant Altum LLC. (Clifford, Damion) (Entered: 10/23/2023) |
| 10/23/2023 | 70 | BRIEF by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 10/23/2023) |
| 10/27/2023 | 71 | REPLY to Response to Motion re 27 MOTION for Joinder filed by Defendant Altum LLC. (Clifford, Damion) (Entered: 10/27/2023) |

| 10/27/2023 | 72 | Reply *BRIEF TO CLOSING BRIEF* by Defendants Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc.. (Burton, Donald) (Entered: 10/27/2023) |
|---|---|---|
| 10/27/2023 | 73 | Reply *Brief* by Defendant Altum LLC. (Clifford, Damion) (Entered: 10/27/2023) |
| 10/27/2023 | 74 | Reply *Brief* by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 10/27/2023) |
| 10/27/2023 | 75 | Reply *Brief to Altum LLC's Closing Brief* by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 10/27/2023) |
| 11/02/2023 | 76 | NOTICE by Defendant Altum LLC *Notice of Filing Depo Excerpt* (Attachments: # 1 Schroeder Depo Excerpt) (Clifford, Damion) (Entered: 11/02/2023) |
| 11/03/2023 | 77 | OPINION and ORDER granting 2 Plaintiff's Motion for a Preliminary Injunction and denying 27 Defendant Altum's Motion to Join Cold Chain, LLC. Additionally, Plaintiff is ORDERED to post bond in the amount of $165,000, which it must deliver to the Clerk of Court by Friday, November 10, 2023, at 3:00 p.m.. Signed by Chief Judge Algenon L. Marbley on 11/3/23. (sem) (Entered: 11/03/2023) |
| 11/04/2023 | 78 | NOTICE OF APPEAL re 77 Order on Motion for TRO,, Order on Motion for Joinder, **(Filing Fee received on 11/6/23– $505, receipt number 200004649)** by Defendants Altum LLC, Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc.. Appeal Record due by 11/20/2023. (Carwile, Tiffany) Modified by adding payment details on 11/6/2023 (mas). (Entered: 11/04/2023) |
| 11/04/2023 | 79 | MOTION to Stay re 77 Order on Motion for TRO,, Order on Motion for Joinder, *Pending Appeal* by Defendants Altum LLC, Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc.. (Carwile, Tiffany) (Entered: 11/04/2023) |
| 11/06/2023 | 80 | ORDER: Plaintiff is Ordered to file a response brief within 10 days of this Order and Defendants are Ordered to file their reply brief within 5 days thereafter re 79 Motion to Stay filed by Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc., Altum LLC. Signed by Chief Judge Algenon L. Marbley on 11/6/2023. (cw) (Entered: 11/06/2023) |
| 11/06/2023 | | Notice of Appeal Filing fee received: $ 505, receipt number 200004649. (mas) (Entered: 11/06/2023) |
| 11/08/2023 | | BOND in the amount of $ 165,000.00 posted by Plaintiff Ridge Corporation; Receipt No. 20004677. (mas) Modified by adding receipt number on 11/8/2023 (mas). (Entered: 11/08/2023) |
| 11/15/2023 | 81 | RESPONSE in Opposition re 79 MOTION to Stay re 77 Order on Motion for TRO,, Order on Motion for Joinder, *Pending Appeal* filed by Plaintiff Ridge Corporation. (Tackett, Christopher) (Entered: 11/15/2023) |
| 11/16/2023 | 82 | REPLY to Response to Motion re 79 MOTION to Stay re 77 Order on Motion for TRO,, Order on Motion for Joinder, *Pending Appeal* filed by Defendants Altum LLC, Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc.. (Carwile, Tiffany) (Entered: 11/16/2023) |
| 11/20/2023 | 83 | OPINION AND ORDER denying 79 Motion to Stay. Signed by Chief Judge Algenon L. Marbley on 11/20/2023. (cw) Modified to correct case number on order 11/20/2023 (cw). Modified type and text on 11/20/2023 (jlk). (Entered: 11/20/2023) |
| 11/27/2023 | 84 | ANSWER to 1 Complaint, filed by Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc.. (Burton, Donald) (Entered: 11/27/2023) |
| 11/27/2023 | 85 | MOTION to Dismiss by Defendant Altum LLC. (Attachments: # 1 Exhibit Exhibit D–7) (Clifford, Damion) (Entered: 11/27/2023) |

| | | |
|---|---|---|
| 11/28/2023 | 86 | USCAFC Case Number 2024–1138 for 78 Notice of Appeal filed by Kirk National Lease Co., Truck & Trailer Parts Solutions, Inc., Altum LLC. (er) (Entered: 11/28/2023) |
| 12/01/2023 | 87 | ORDER HOLDING IN ABEYANCE re 85 Motion to Dismiss filed by Altum LLC pending the outcome of the appeal. The parties are ORDERED to notify this Court upon resolution of the appeal. Signed by Chief Judge Algenon L. Marbley on 11/28/2023. (cw) (Entered: 12/01/2023) |

| 12/12/2023 | 88 | ORDER Treating the Attachment, Altum's Email, as a Motion for Clarification. Ordering Plaintiff Ridge to respond to Altum's Motion within 7 days of this Order. Signed by Chief Judge Algenon L. Marbley on 12/12/2023. (Attachments: # 1 Altum's Email Court Treating as a Motion for Clarification) (cw) (Entered: 12/12/2023) |
| --- | --- | --- |
| 12/19/2023 | 89 | NOTICE by Plaintiff Ridge Corporation re 88 Order, *Indicating Opposition to Def. Altum's Email Motion to Clarify Injunction* (Tackett, Christopher) (Entered: 12/19/2023) |
| 12/20/2023 | 90 | Respondent's REPLY BRIEF by Altum LLC *to Docket 89 Notice*. (Dillard, Michael) (Entered: 12/20/2023) |
| 01/05/2024 | 91 | ORDER GRANTING [88-1] Altum's Motion for Clarification. KNL/TTPS may pay Altum for panels that Altum provided to KNL/TTPS prior to this case being initiated (i.e. September 30, 2023). The panels, however, cannot be used in any way that would violate the PI. Signed by Chief Judge Algenon L. Marbley on 1/5/2024. (cw) (Entered: 01/05/2024) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| Ridge Corporation,<br>1201 Etna Parkway<br>Pataskala, Ohio 43062<br><br>Plaintiff,<br><br>vs.<br><br>Kirk National Lease Co.,<br>3885 W. Michigan St.<br>Sidney, Ohio 45365<br>c/o Registered Agent<br>John Garmhausen<br>100 S Main Ave, Suite 300<br>Sidney, Ohio 45365; and,<br><br>Truck & Trailer Parts Solutions Inc.<br>3858 W. Michigan Ave.<br>Sidney, Ohio 45365<br>c/o Registered Agent<br>John Garmhausen<br>100 S Main Ave, Suite 300<br>Sidney, Ohio 45365;<br><br>Transglobal, Inc.<br>500 N. Warpole St.<br>Upper Sandusky, Ohio 43351<br>c/o Registered Agent<br>James Schroeder<br>5489 Brookview Lane<br>Upper Sandusky, Ohio 43351; and<br><br>Altum LLC<br>92 Elm Street, Suite B,<br>Canal Winchester, Ohio 43110<br>c/o Registered Agent<br>Kyle Timothy Gaines<br>403 Streamwater Drive<br>Blacklick, Ohio 43004,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>Case No. 2:23-cv-03012 |

1

implies to the consuming demographic that by purchasing any other door the purchaser could be subject to legal action—that is precisely why it is illegal to say that things are patented when they are not.

65.     Thus, Defendants have beat Ridge to market and now imminently threaten to gain massive portions of the market share in the limited, niche market for commercial roll-up doors by claiming that their product is patented when it is not, and when it, in fact, infringes on the protected intellectual property rights of Ridge.

**Defendants Have Notice and Knowledge of the Relevant Ridge Intellectual Property**

66.     On June 6, 2023, Ridge's counsel sent KNL and TTPS a letter informing them that their single panel roll-up door infringes on one or more claims of the Cold Chain Patent and requesting they cease offering for sale and selling the Infringing Door and provide Ridge with an accounting of past sales ("**KNL/TTPS Cease and Desist Letter**"). A true and accurate copy of the KNL/TTPS Cease and Desist Letter is attached as **Exhibit 9**.

67.     Ridge received a response to the KNL/TTPS Cease and Desist Letter on July 5, 2023, acknowledging receipt of the KNL/TTPS Cease and Desist Letter and stating that due to overlapping vacations in the next several weeks, counsel will respond "as soon as I am able to do so" ("**July 5 Letter**"). A true and accurate copy of the July 5 Letter is attached as **Exhibit 10**. Thus, nearly a full month after receiving a cease-and-desist letter for patent infringement, KNL and TTPS could only muster the response that they "would respond later."

68.     After receiving the July 5 Letter, Ridge's counsel emailed KNL and TTPS's lawyers and asked for confirmation of whether they would cease and desist. KNL and TTPS failed to provide any response to this email.

76.     Altum employee-principals Grandominico, Gaines, and Karst, who are former Ridge employees, knew that KNL was a Ridge customer. The Altum employee-principals are also aware of Ridge's long-term interest in developing a roll-up door like the Ridge Door, and Karst even worked on those efforts while he was employed at Ridge.

77.     Altum and its CEO, Dominic Grandominico, have intentionally interfered with Ridge's business relationships through its inducement of the Defendants' infringement and ongoing role in the infringement, including interference with existing and prospective customers of the patented roll-up doors that Ridge is bringing to market.

78.     KNL, by and through Mr. Barnes, sent a letter to Ridge's business partner, Whiting Door Corporation ("**Whiting Door**"), on September 6, 2023, that contained knowingly misleading statements to Whiting Door, all for the purpose of disrupting Ridge's business relationship with its important partner ("**Barnes Letter**").  A true and accurate copy of the Barnes Letter is attached as **Exhibit 14**.

79.     The Barnes Letter is deeply concerning, both from the standpoint of the author and from the standpoint of KNL and TTPS directing it to be sent. The Barnes Letter to Whiting Door actively misleads a Ridge business partner by both citing a non-existent statute, 28 U.S.C. sect. 154(d), and threatening potential royalty damages for sales of Ridge's single panel door—even though KNL, TTPS, and their counsel, Mr. Barnes, knew that the '144 Patent Application would need to be amended in a manner that would preclude the threatened royalty damages, and further knew that any patent issuing from the '144 Patent Application would be unenforceable due to their failure to correct the inventorship of the '144 Patent Application as required.

US009151084B2

(12) **United States Patent**
Wachtell et al.

(10) Patent No.: **US 9,151,084 B2**
(45) Date of Patent: **Oct. 6, 2015**

(54) **INSULATED OVERHEAD DOOR**

(75) Inventors: **Peter J. Wachtell**, Boise, ID (US);
**Daniel M. Aragon**, Meridian, ID (US);
**John J. Prehn**, Boise, ID (US); **Todd J. Lindsey**, Boise, ID (US)

(73) Assignee: **COLD CHAIN, LLC**, Boise, ID (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 63 days.

(21) Appl. No.: **13/585,994**

(22) Filed: **Aug. 15, 2012**

(65) **Prior Publication Data**
US 2013/0042983 A1      Feb. 21, 2013

**Related U.S. Application Data**

(60) Provisional application No. 61/523,786, filed on Aug. 15, 2011.

(51) **Int. Cl.**
| | |
|---|---|
| *E05D 15/16* | (2006.01) |
| *E05B 81/10* | (2014.01) |
| *F25D 23/02* | (2006.01) |
| *E06B 3/80* | (2006.01) |

(52) **U.S. Cl.**
CPC ................. **E05B 81/10** (2013.01); *E05D 15/16* (2013.01); *E06B 3/80* (2013.01); *F25D 23/021* (2013.01); *Y10T 292/11* (2015.04)

(58) **Field of Classification Search**
USPC .......... 160/201, 230, 231.1, 231.2, 232, 23.1, 160/270, 271, DIG. 8; 296/146.8
IPC ..................... F25D 23/021; E05D 15/20; E06B 3/80, 2003/7044, 2003/7049, 2003/7051, E06B 2003/7053
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2,042,002 | A | * | 5/1936 | Hovey ........................ 160/133 |
| 2,258,971 | A | * | 10/1941 | Carlson ................. 160/368.1 |
| 2,827,118 | A | * | 3/1958 | Wendt ........................ 160/184 |
| 3,017,218 | A | * | 1/1962 | Carlsson et al. ........... 296/106 |
| 3,084,403 | A | * | 4/1963 | Elmendorf .................. 428/166 |
| 3,662,410 | A | * | 5/1972 | Lankheet ..................... 4/498 |
| 3,724,526 | A | * | 4/1973 | Huprich ................. 160/368.1 |
| 3,856,072 | A | * | 12/1974 | Sund .................. 160/84.01 |
| 4,445,598 | A | * | 5/1984 | Jaksha ..................... 156/211 |
| 5,016,700 | A | * | 5/1991 | Wegner et al. ............. 160/232 |
| 5,515,649 | A | | 5/1996 | Strab |
| 5,738,161 | A | * | 4/1998 | Martin ..................... 160/201 |
| 5,915,445 | A | * | 6/1999 | Rauenbusch ............... 160/230 |
| 6,443,209 | B1 | * | 9/2002 | Hurst ........................ 160/230 |
| 7,111,661 | B2 | * | 9/2006 | Laugenbach ............... 160/270 |
| 2003/0173040 | A1 | * | 9/2003 | Court et al. ............... 160/230 |
| 2008/0110580 | A1 | * | 5/2008 | Horner et al. ............. 160/113 |
| 2010/0132894 | A1 | * | 6/2010 | Knutson et al. ........... 160/113 |
| 2010/0270826 | A1 | | 10/2010 | Weeda et al. |

OTHER PUBLICATIONS

Non-Final Office Action dated Apr. 16, 2014, U.S. Appl. No. 13/586,021, filed Aug. 15, 2012, pp. 1-19.

* cited by examiner

*Primary Examiner* — David Purol

(74) *Attorney, Agent, or Firm* — MH2 Technology Law Group, LLP

(57) **ABSTRACT**

An article of manufacture for use as an insulated overhead door that is designed to roll open and closed in tracks, with a sheet of thermoplasitc material that acts as the outer door membrane and barrier to entry, a sheet of insulating material that acts as a base insulating barrier adhered to the thermoplastic membrane.

**19 Claims, 2 Drawing Sheets**



**Exhibit 1**

5

substantially vertical position when closed and most or all of the door is in a substantially horizontal position when open (assuming the truck or refrigerated container the tracks **10** are attached to is positioned on a substantially level surface).

In embodiments, the track portions **12** and **14** can be relatively straight. In alternative embodiments, the track portions **12** and **14** can be somewhat curved.

A third curved track portion **16** connects the first portion **12** and second portion **14**. Curved track portion **16** can be curved in any suitable manner that will provide the transition between the relative angles of track portion **12** and track portion **14**. The door **2** is designed so that it is capable of flexing to traverse the curved track portion **16**. In an embodiment, the portion of door **2** traversing the curve track portion **16** will generally curve to approximate the curved shape of the curved track portion **16**. For example, all or a part of track portion **16** can be curved in a circular arc so that the inner path contacted by the wheels has a radius of curvature, R (illustrated in FIG. **2**B), where R can range, for example, from about 1 inch to about 25 inches, such as about 5 inches to about 18 inches.

The density of the closed cell foam combined with the thermoplastic liner thickness provides enough stiffness to create a good seal around the edge of the door when the panel is in the closed position, yet may be flexible enough to bend across the horizontal dimension up to, for example, approximately 90 degrees when running through the curved portion of the tracks **10**. The flexibility may be increased or decreased by modifying the densities and thicknesses of the foam and liners that are combined such that the panel is able to flex over a very tight radius or a longer radius track curve as a particular door opening and track curvature dictates.

The wheels **18** can be affixed to the door in any suitable manner so that the wheels **18** are positioned to fit into the tracks **10**. There are many ways to attach the wheels to the door. For example, the wheels **18** can be mounted using blocks, as discussed above, or brackets. Wheels with sleeves might also be employed to attach the wheels **18** to the door, as is well known in the art.

An optional flexible membrane **20** can also be employed, as illustrated in FIG. **1**. The flexible membrane **20** can be made of any suitable flexible material, such as cloth, plastic or rubber sheeting. Optional flexible covers **22** can be employed at the hinge locations, if desired, as is also illustrated in FIG. **1**. The flexible covers **22** can also be made of any suitable flexible material, such as those listed for the flexible membrane **20**. In an alternative embodiment, the flexible membrane **20** and flexible covers **22** can be a single integral piece of flexible material.

The door can be any desired size or shape. Example door sizes can range from about 6 feet to about 10 feet in width, and about 6 feet to about 12 feet in height. The thickness of the door can be fashioned up to, for example, 12 inches in thickness. Example R values for the door can range from about 14 to about 50. The R value can be increased by increasing the thickness of the door and the amount of EVA foam that is used.

In an embodiment, the door is relatively light weight, so that it can easily be opened and closed by a manual process, or by use of an automatic system, such as, for example, electric, hydraulic or pneumatic systems. These systems can be made to be very efficient at quickly opening and closing doors that are lightweight. Furthermore, the use of these systems may allow the door's opening trigger to be manual or to be automatic based upon the approach of the driver carrying, for example, an RFID transmitter (not shown).

6

Other alterations or changes to the design of the embodiment of FIG. **1** can also be made. For example, rather than employing insulating foam blocks, as illustrated in FIG. **1**, the insulating foam sheet can be employed without the foam blocks, in combination with the sheet of thermoplastic material. Further, the location and number of wheels **18** can also be changed. Still other alterations can be made, as would readily be understood by one of ordinary skill in the art.

While the invention has been described in connection with various detailed embodiments, the description is not intended to limit the scope of the invention to the particular forms set forth herein, but on the contrary, it is intended to cover such alternatives, modifications, and equivalents as may be included within the spirit and scope of the invention as defined by the appended claims.

What is claimed is:

**1**. An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door having a first outermost surface, a second outermost surface opposite the first outermost surface, a top surface, a bottom surface, a first side surface and a second side surface, both the first outermost surface and the second outermost surface being larger than any of the top surface, bottom surface, first side surface and second side surface, the door comprising:

a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the thermoplastic membrane forming the first outermost surface of the door;

a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only one of the panel, the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about 80° to about 125°.

**2**. The insulated overhead door of claim **1**, wherein the thermoplastic membrane is a single sheet.

**3**. The insulated overhead door of claim **1**, wherein the thermoplastic membrane comprises polypropylene impregnated with glass fibers.

**4**. The insulated overhead door of claim **1**, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend during opening and closing of the door.

**5**. The insulated overhead door of claim **1**, wherein the insulating material is closed cell foam.

**6**. The insulated overhead door of claim **5**, wherein the closed cell foam comprises ethylene vinyl acetate.

**7**. The insulated overhead door of claim **5**, wherein the closed cell foams is chosen from polyethylene foams, polypropylene foams or neoprene based foams.

## LICENSE AGREEMENT

THIS AGREEMENT is made and entered into as of the 15th day of February, 2023 (the "Effective Date"), by and between COLD CHAIN, LLC, a Delaware limited liability company (the "Licensor") and RIDGE CORPORATION, an Ohio corporation (the "Licensee").

The parties hereby agree as follows:

1. <u>Defined Terms.</u>  As used in this Agreement, the following defined terms shall have the following respective meanings:

   a. <u>Affiliate.</u> "Affiliate" shall mean with respect to a party, any Person that, directly or indirectly, is controlled by, controls, or is under common control with such party, only while such control exists.

   b. Confidential Information. "Confidential Information" shall mean: any and all technical or business data, information or items (including third party data, information, or items) in whatever form or medium, of one party provided to or obtained by the other party or accessed by the other party pursuant to this Agreement regardless of whether such data, information or items are marked or identified as "Confidential".

   c. Licensed Patent.  "Licensed Patent(s)" shall mean those certain patents legally described as U.S. 10,066,434 (application S/N 14,875,577) titled INSULATED OVERHEAD DOOR, filed on October 5, 2015 claiming priority to U.S. 9,151,084, and U.S. 9,151,084 (application S/N 13/585,944) titled INSULATED OVERHEAD DOOR, filed on August 15, 2012 claiming the benefit of U.S. Provisional Application 61/523,786 filed on August 15, 2011 including all future, pending, expired counterparts (domestic and foreign) related to the foregoing patents and/or technological scope.

   d. Licensed Product. "Licensed Product" or "Licensed Products" shall mean a truck roll-up door, trailer roll-up door or other roll-up door application that includes every limitation of at least one valid and enforceable claim of the Licensed Patent(s) and manufactured, used, imported, offered for sale or sold by the Licensee.

   e. <u>Net Sales Price.</u>  "Net Sales Price" shall mean the amount actually received by the Licensee for each Licensed Product, including adjustments for all discounts and deductions allowed by Licensee to purchaser, less all freight costs, sales, excise, value added or similar taxes and less any returns and allowances in respect of Licensed Products all as actually incurred or paid by Licensee.  In the event that a Licensed Product is sold by Licensee to any Affiliate of Licensee or sold in combination with another product, then the Net Sales Price with respect to such sales will be the greater of either (i) the above definition of Net Sales Price (as applied to sales of such product to the Affiliate, if applicable), or (ii) the average Net Sales Price of all Licensed Products sold by Licensee to all non-Affiliates during the calendar quarter in which such sale was made.

claims as the U.S. Licensed Patent(s) in such country. In each foreign country in which such counterpart is filed are subject to any amounts due under this Section 11, upon the filing of such application, and for twenty-four (24) months thereafter, Licensee shall pay Licensor a Royalty of five percent (5%) of the Net Sales Price of all Licensed Products sold by Licensee in such foreign country. For avoidance of doubt, only one Royalty shall be payable on each Licensed Product sold by Licensee hereunder whether such Royalty amount is determined pursuant to Section 6 hereof or this Section 11. For the further avoidance of doubt, Royalties shall also be due in the event that Product is sold in any and all jurisdictions not covered by an applicable patent or pending application.

12. *[reserved]*.

13. Future Developments. All future developments, improvements and inventions relating to the Licensed Patent or Licensed Products, together with all intellectual property rights relating thereto, shall belong to the party developing or inventing the same. Any such subsequent developments, improvements or inventions made by Licensor shall be deemed to be included in the License granted herein. Joint developments, improvements and inventions shall be jointly owned by both parties. In the event of such joint ownership, the parties agree to cooperate in the seeking of patent or other intellectual property protection thereof. Additionally, the License granted herein shall extend to Licensee with regard to any such jointly developed intellectual property and/or patents for the term of this Agreement.

14. Infringement Actions. Subject to the following, both Licensor and Licensee shall have the right to initiate a patent infringement action against any third party reasonably believed to be infringing a Licensed Patent, but neither party shall have any obligation to do so. Licensee shall give Licensor the option by written notice of initiating any such action before doing so itself (or issuing any demand or threat of such action). If Licensee initiates such action or the parties cooperatively initiate a joint action: (i) Licensee and Licensor shall share equally all attendant costs and expenses incurred by Licensee and/or Licensor up to an aggregate amount of US $2,000,000 ("Maximum Shared Costs") and, accordingly, Licensee shall indemnify, defend and hold harmless Licensor for any costs or expenses incurred by Licensor exceeding US $1,000,0000 (i.e., ½ of the Maximum Shared Costs); (ii) any judgment or settlement shall be collected for the benefit of Licensee and Licensor in proportion to the total costs and expenses incurred by each with respect to the action; (iii) Licensor's share of the Maximum Shared Costs shall be paid exclusively: (a) from Licensor's share of any applicable judgment or settlement and (b) to the extent not so paid and/or pending such judgment or settlement, in the form of a credit against any and all current and future Royalties due and payable by Licensee until paid in full; (iv) if Licensor's share of the Maximum Shared Costs exceeds the sum of (a) Licensor's share of all judgments or settlements and (b) all Royalties due and payable by Licensee pursuant to this Agreement, any such excess amount shall be forgiven; and (v) Licensee shall retain final control over any major strategic decisions and/or settlement of any such action If any such action is initiated by only one party, the non-initiating party shall provide all cooperation reasonably requested by the party initiating the action.

## AMENDED AND RESTATED LICENSE AGREEMENT

This Amended and Restated License Agreement (this "Agreement") is made and entered into as of the 1st day of May, 2023 (the "Effective Date"), by and between COLD CHAIN, LLC, a Delaware limited liability company (the "Licensor") and RIDGE CORPORATION, an Ohio corporation (the "Licensee"). The Agreement amends and restates in its entirety that certain License Agreement between Licensor and Licensee dated effective February 15, 2023.

The parties hereby agree as follows:

1. Defined Terms. As used in this Agreement, the following defined terms shall have the following respective meanings:

   a. Affiliate. "Affiliate" shall mean with respect to a party, any Person that, directly or indirectly, is controlled by, controls, or is under common control with such party, only while such control exists.

   b. Confidential Information. "Confidential Information" shall mean: any and all technical or business data, information or items (including third party data, information, or items) in whatever form or medium, of one party provided to or obtained by the other party or accessed by the other party pursuant to this Agreement regardless of whether such data, information or items are marked or identified as "Confidential".

   c. Door Manufacturer. "Door Manufacturer" shall have the meaning set forth in Section 3 of this Agreement.

   d. Licensed Patent. "Licensed Patent(s)" shall mean those certain patents legally described as U.S. 10,066,434 (application S/N 14,875,577) titled INSULATED OVERHEAD DOOR, filed on October 5, 2015 claiming priority to U.S. 9,151,084, and U.S. 9,151,084 (application S/N 13/585,944) titled INSULATED OVERHEAD DOOR, filed on August 15, 2012 claiming the benefit of U.S. Provisional Application 61/523,786 filed on August 15, 2011 including all future, pending, expired counterparts (domestic and foreign) related to the foregoing patents and/or technological scope.

   e. Licensed Patent Challenge. "Licensed Patent Challenge" shall mean Licensee or its Affiliates, directly (e.g., by itself) or indirectly (e.g., through a "straw man," or other involvement for or with a third party, or otherwise), challenging the scope, validity, enforceability, ownership, or inventorship of the Licensed Patent, whether pursuant to a court action, reexamination, opposition or patent office proceeding. However, "Licensed Patent Challenge" shall not include compliance with subpoenas or other court orders, provided that (and to the extent): (i) Licensee and its Affiliates have not directly or indirectly encouraged or acquiesced to the issuance of such order or subpoena; and (ii) Licensee and its Affiliates have given Licensor prompt notice of such order or subpoena, and reasonably cooperate with

**Exhibit 3**

Licensor to challenge and/or limit the scope of such subpoena or court order with respect to any response thereto.

f.   <u>Licensed Product.</u> "Licensed Product" or "Licensed Products" shall mean a truck roll-up door, trailer roll-up door or other roll-up door application that includes every limitation of at least one valid and enforceable claim of the Licensed Patent(s) and manufactured, used, imported, offered for sale or sold by the Licensee or a Door Manufacturer.

g.   <u>Net Sales Price.</u> "Net Sales Price" shall mean the amount actually received by the Licensee for each Panel or Licensed Product, including adjustments for all discounts and deductions allowed by Licensee to purchaser, less all freight costs, sales, excise, value added or similar taxes and less any returns and allowances in respect of such Panels and/or Licensed Products all as actually incurred or paid by Licensee. In the event that a Panel or Licensed Product is sold by Licensee to any Affiliate of Licensee or sold in combination with another product, then the Net Sales Price with respect to such sales will be the greater of either (i) the above definition of Net Sales Price (as applied to sales of such product to the Affiliate, if applicable), or (ii) the average Net Sales Price of all Panels or Licensed Products sold by Licensee to all non-Affiliates during the calendar quarter in which such sale was made.

h.   <u>Panel.</u> "Panel" shall mean any roll-up door panel sold by Licensee to a Door Manufacturer for purposes of manufacturing Licensed Products pursuant to a sublicense of the License from Licensee to such Door Manufacturer, as further set forth in this Agreement.

i.   <u>Person.</u> "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, trust, business, association or other entity.

j.   <u>Territory.</u> "Territory" shall mean all countries of the world.

2.   <u>Term and Termination.</u> The initial term of this Agreement shall begin on the Effective Date and shall continue until the expiration of the last expiring Licensed Patent(s) on October 19, 2032. Notwithstanding the stated term hereof, either party may terminate this Agreement in the event of a material breach hereof by the other party provided that (i) the terminating party notifies the other party in writing of the specific nature of such material breach, and (ii) the other party fails to correct the same within twenty-one (21) days after receipt of such notice (or such additional time as reasonably necessary to cure the breach so long as the other party diligently pursues the cure to completion).

3.   <u>Grant of License.</u> Licensor hereby grants to Licensee an exclusive, royalty bearing, non-transferable, sublicensable right and license to make, have made, use, sell, install, service, import/export and/or otherwise commercialize Licensed Products in the Territory (the "License"). Notwithstanding the foregoing, Licensee's right of sublicense shall: (a) be limited to sublicensing to those sublicensees that agree to purchase and use Panels in the manufacture and sale of other Licensed Products (each a, "<u>Door Manufacturer</u>"); (b) be

granted in each instance for a period no longer than the term of this Agreement (including any permitted disposal under Section 5 of this Agreement); and (c) not be further sublicensable by Door Manufacturers. Except for the licenses granted to Licensee in this Section (including, without limit, attendant rights of sublicense to Door Manufacturers), Licensor hereby expressly retains all rights, title and interest in and to all Licensed Patents and Licensor's other intellectual property; and, no other rights are or shall be deemed to be granted to Licensee by implication, estoppel, statute, operation of law or otherwise pursuant to this Agreement.

4. <u>Survival</u>. The following Sections shall survive the expiration or termination of this Agreement: 6 (with respect to any amounts owed prior to termination or expiration), 7 (with respect to any amounts owed prior to termination or expiration), 8 (pursuant to its terms), 13, 14 (with respect to any action commenced prior to expiration or termination), 17, 21, 22, 23, 25, 26, 28, 29 and 31.

5. <u>Disposal Upon Expiration.</u> Upon expiration or termination of this Agreement, Licensee shall have the right, pursuant to the provisions hereof, for a period of one hundred and eighty (180) days, to dispose of all unsold Licensed Products manufactured by Licensee or by Door Manufacturers or in the process of manufacture at the time of expiration or termination; provided that Licensee makes timely payment to Licensor of all Royalties due on such Licensed Products.

6. <u>Royalties.</u> During the term hereof, Licensee shall pay royalties ("<u>Royalty</u>" or "<u>Royalties</u>") to Licensor as follows:

   a. <u>Royalty Percentage.</u> Subject to Section 11, Licensee shall pay to Licensor a Royalty in the amount of five percent (5%) of the Net Sales Price of (i) all Panels and (ii) all Licensed Products, if any, which are sold by Licensee itself in the Territory; provided, however, that no such Royalties shall apply to and/or accrue before and until May 1, 2025 as additional consideration for Licensee's best efforts to commercialize the Licensed Patent.

   b. <u>Licensed Patent Challenge</u>. Notwithstanding the above, to the extent the following is enforceable under applicable law, if Licensee or any of its Affiliates or agents directly or indirectly bring or initiate a Licensed Patent Challenge during the term of this Agreement, Licensee shall pay Royalties (as per Section 6.a, above) to Licensor (while such Licensed Patent Challenge continues) at the rate of fifteen percent (15%).

   c. <u>Currency.</u> Licensee shall make all payments of Royalties in U.S. dollars by wire transfer to the account Licensor designates in writing to Licensee from time to time, without deduction for bank wire or other charges (which charges will be paid by Licensee). For any sales that are conducted in a foreign currency, Licensee shall provide currency conversion information showing the foreign currency and the conversion to U.S. Dollars using the exchange rate for the fifteenth (15th) day of the relevant month in which the sale occurred (or the next business day if such day

9. <u>Exclusivity.</u> The License granted to Licensee hereunder shall be exclusive through the term of this Agreement.

10. <u>Commercialization.</u> Licensee acknowledges and agrees that part of the consideration for Licensor's grant of the License herein is Licensee's best efforts to sell Panels. Accordingly, Licensor shall have the right to terminate this Agreement, upon ten (10) days written notice, if Licensee fails to use Commercially Reasonable Best Efforts (as defined below) to sell Panels in the Territory. "<u>Commercially Reasonable Best Efforts</u>" means the efforts that a prudent person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved expeditiously; provided, however, that an obligation to use commercially reasonable best efforts under this Agreement does not require Licensee to take actions that would result in a material adverse effect on Licensee or that would materially reduce the benefits to Licensee of the final result.

11. <u>Foreign Licensed Patents.</u> The parties shall jointly decide in which foreign countries, if any, Licensor will file foreign counterparts of the Licensed Patent(s) or related technologies, the expenses for which filings shall be borne solely by Licensor or as otherwise agreed in writing by the parties, and those countries will be included in the Territory upon the filing of such corresponding foreign patent having materially similar claims as the U.S. Licensed Patent(s) in such country. In each foreign country in which such counterpart is filed are subject to any amounts due under this Section 11, upon the filing of such application, and for twenty-four (24) months thereafter, Licensee shall pay Licensor a Royalty of five percent (5%) of the Net Sales Price of all Panels or Licensed Products sold by Licensee in such foreign country. For avoidance of doubt, only one Royalty shall be payable on each Panel or Licensed Product sold by Licensee hereunder whether such Royalty amount is determined pursuant to Section 6 hereof or this Section 11. For the further avoidance of doubt, Royalties shall also be due in the event that a Panel or Licensed Product is sold by Licensee in any and all jurisdictions not covered by an applicable patent or pending application.

12. *[reserved].*

13. <u>Future Developments.</u> All future developments, improvements and inventions relating to the Licensed Patent or Licensed Products, together with all intellectual property rights relating thereto, shall belong to the party developing or inventing the same. Any such subsequent developments, improvements or inventions made by Licensor shall be deemed to be included in the License granted herein. Joint developments, improvements and inventions shall be jointly owned by both parties. In the event of such joint ownership, the parties agree to cooperate in the seeking of patent or other intellectual property protection thereof. Additionally, the License granted herein shall extend to Licensee with regard to any such jointly developed intellectual property and/or patents for the term of this Agreement.

14. <u>Infringement Actions.</u> Subject to the following, both Licensor and Licensee shall have the right to initiate a patent infringement action against any third party reasonably believed to be infringing a Licensed Patent, but neither party shall have any obligation to do so. Licensee shall give Licensor the option by written notice of initiating any such action

before doing so itself (or issuing any demand or threat of such action). If Licensee initiates such action or the parties cooperatively initiate a joint action: (i) Licensee and Licensor shall share equally all attendant costs and expenses incurred by Licensee and/or Licensor up to an aggregate amount of US $2,000,000 ("Maximum Shared Costs") and, accordingly, Licensee shall indemnify, defend and hold harmless Licensor for any costs or expenses incurred by Licensor exceeding US $1,000,0000 (i.e., ½ of the Maximum Shared Costs); (ii) any judgment or settlement shall be collected for the benefit of Licensee and Licensor in proportion to the total costs and expenses incurred by each with respect to the action; (iii) Licensor's share of the Maximum Shared Costs shall be paid exclusively: (a) from Licensor's share of any applicable judgment or settlement and (b) to the extent not so paid and/or pending such judgment or settlement, in the form of a credit against any and all current and future Royalties due and payable by Licensee until paid in full; (iv) if Licensor's share of the Maximum Shared Costs exceeds the sum of (a) Licensor's share of all judgments or settlements and (b) all Royalties due and payable by Licensee pursuant to this Agreement, any such excess amount shall be forgiven; and (v) Licensee shall retain final control over any major strategic decisions and/or settlement of any such action. If any such action is initiated by only one party, the non-initiating party shall provide all cooperation reasonably requested by the party initiating the action.

15. Representations and Warranties of Licensor. The Licensor represents and warrants each of the following to Licensee, as of the date hereof:

   a. Ownership of Licensed Patent. Licensor owns all of the undivided right, title and interest in and to the Licensed Patent(s). As of the date hereof, there are no other domestic or foreign patents or patent applications owned by Licensor, or any Affiliate of Licensor, which are related to the technology and/or cover or pertain to Licensed Products.

   b. Validity of Licensed Patent. Except for prior art cited or submitted during the prosecution of the Licensed Patent(s) (and corresponding application(s)), Licensor is not aware of any factual circumstances which is likely to cause the Licensed Patent(s) to be or become invalid.

   c. No Conflict. The execution and performance of this Agreement by Licensor will not conflict with any other obligation of Licensor.

   d. Authority. The Person signing this Agreement on behalf of Licensor is duly authorized to do so in order to create a binding agreement upon Licensor.

   e. Maintenance. Licensor will maintain the Licensed Patent(s) in force during the term hereof, including making the timely payment of all maintenance fees and annuities necessary to do so.

   f. Disclaimer of Other Warranties. Except as provided in this Section 15, THE LICENSED PATENT IS LICENSED HEREUNDER ON AN AS IS BASIS. THERE ARE NO WARRANTIES OF ANY KIND, AND LICENSOR HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR

US 2022/0169099 A1

Jun. 2, 2022

1

## SINGLE PANEL ROLL-UP DOOR

### BACKGROUND

**[0001]** Various aspects of the present disclosure relate generally to a roll-up door, and specifically to a single panel roll-up door.

**[0002]** Tractor trailers, large containers, refrigerated containers, and the like normally have either one multi-panel roll-up door to secure the opening of the enclosure of the trailer; or contain a set of two doors having outside hinged doors; or contain a combination of the two sets of two doors having outside hinged doors and internal multi-panel roll-up door. The multi-panel roll-up door is prevalent in semi-truck trailers, storage containers, refrigerated trailers, garages, and aircrafts. The multi-panel roll-up door consist of multiple panels of corrugated metal, aluminum, or wood panels wherein the multiple individual panels are coupled together, by hinges, joints, or the like, to allow for the door to be lifted into an open position and lowered into a closed position.

**[0003]** There are two main types of multi-panel roll-up doors, multi-panel roll-up doors that roll upon itself on a drum and multi-panel roll-up doors that are coupled to guide tracks and follow the guide tracks along the ceiling of the container. Multi-panel roll-up doors that are on a drum although present the ease of use, reduce the internal clearing height of a trailer or container. Multi-panel roll-up doors that roll-up on guide tracks and rest flat against the ceiling provide better clearance but are heavy and can present a hazard when lowering.

**[0004]** In considerations for a tractor trailer roll-up door, and various implementations of a multi-panel roll-up doors, the door must be able to withstand the elements and abuse from heavy use. The multi-panel door has the structural integrity to withstand the opening and closing, assaults from forklifts, and the durability to withstand bumpy roads. Multi-panel roll doors are heavy and even the best multi-panel door still has seams that are susceptible to water intrusion. Multi-panel roll-up doors that have seals and joints to prevent water intrusion add to the overall weight of the roll-up door.

**[0005]** Therefore, a single panel roll-up door that is lighter than conventional roll-up doors, designed to withstand the elements, and eliminates water intrusion would be useful and advantageous.

### BRIEF SUMMARY

**[0006]** According to aspects of the present disclosure, a single panel roll-up door, coupled to a framed opening, the framed opening comprising a right side and a left side, of a container, the container comprising a floor and a ceiling; wherein the single panel roll-up door comprising a single solid panel, roller brackets, and rollers; wherein the single panel roll-up door rollers are coupled to the left and right guide tracks of the framed opening of the container; and wherein the single panel roll-up door can be selectively raised to an open position and selective lowered into a closed position.

**[0007]** The panel, of the single panel roll-up door, comprising a top edge of the panel, a bottom edge of the panel, a left edge of the panel, a right edge of the panel, a front side of the panel, and a back side of the panel. Wherein, the back side of the panel having a surface comprising a first plateau, a first recessed channel, a plateau, a recessed channel, and a

last plateau. Wherein the first plateau comprising a top edge, a bottom edge, and a flat surface spanning an area longitudinal, from the left edge of the panel to the right edge of the panel, and perpendicular, from a top edge of the first plateau to the bottom edge of the first plateau, wherein the top edge of the first plateau meets with the top edge of the panel defining an edge therein. The first recessed channel, spanning longitudinal from the left edge of the panel to the right edge of the panel, comprising a top ridge of the first recessed channel, wherein the top ridge of the first recessed channel meets the bottom edge of the first plateau defining an edge therein. The plateau comprising a top edge of the plateau, a bottom edge of the plateau, and a flat surface spanning an area longitudinal, from the left edge of the panel to the right edge of the panel, and perpendicular, from a top edge of the plateau, wherein the top edge of the plateau meets with the bottom ridge of the first recessed channel, and the bottom edge of the plateau. The recessed channel, spanning longitudinal from the left edge of the panel to the right edge of the panel, comprising a top ridge of the recessed channel, wherein the top ridge of the recessed channel meets the bottom edge of the plateau, a bottom ridge of the recessed channel, and a channel of the recessed channel. The last plateau comprising a top edge of the last plateau, a bottom edge of the last plateau, and a flat surface of the last plateau, spanning an area longitudinal from the left edge of the panel to the right edge of the panel, and perpendicular, from a top edge of the last plateau, wherein the top edge of the last plateau meets the bottom ridge of the recessed channel, to the bottom edge of the last plateau, wherein the bottom edge of the last plateau meets the bottom edge the panel.

**[0008]** A left series of rollers, comprising rollers and roller brackets, are coupled to the left edge of the panel. The left series of rollers are coupled to the left edge of the panel and are coupled to the left guide track. Wherein the left series of rollers coupled to the left edge of the panel and coupled to the left guide track in a manner that allows the rollers to freely roll along the left guide track. The left guide track is coupled to the left series of rollers and coupled to the left side of the framed opening of the container.

**[0009]** The right series of rollers, comprising rollers and roller brackets, coupled to the right edge the panel. The right series of rollers coupled to the right edge of the panel are coupled to the right guide track. Wherein the right series of rollers coupled to the right edge of the panel and coupled to the right guide track in a manner that allows the rollers to freely roll along the right guide track. The right guide track being coupled to the right side of the framed opening of the container.

**[0010]** Wherein the left series of rollers move in the left guide track and the right series of rollers move in the right guide track, allowing the panel to be lifted in the opened position and lowered to the closed position. The left series and right series of rollers respectively traversing the left and right guide tracks. The course of the left and right guide tracks extending vertically form the floor of the container, the left guide track on the left side of the framed opening of the container and the right guide track on the right side of the framed opening of the container, to the ceiling of the container. When approaching the ceiling of the container, the guide tracks, bend at an arched angle back into the container following the course of direction of the ceiling into the container, allowing the panel, the left series of rollers and right series of rollers when in the opened position to rest in

# PEARNE GORDON

PATENTS · TRADEMARKS · COPYRIGHTS · INTELLECTUAL PROPERTY LITIGATION

Richard A. Sharpe
*rsharpe@pearne.com*

J. Gregory Chrisman
*gchrisman@pearne.com*

June 6, 2023

Via Electronic Mail and Federal Express
Return Receipt Requested

Andrew Barnes, Esq.
Law Office of Andrew R. Barnes, LLC
5759 Sebastian Lane
Liberty Township, OH 45011

Andrew Barnes, Esq.
7634 Township Line Road
Waynesville, OH 45068

Flanagan Liebermann & Rambo
Attn: Andrew Barnes, Esq.
10 N. Ludlow St., Suite 200
Dayton, OH 45402

Re:     Notice of Joint Inventorship of U.S. Pat. Appl. No. 17/676,144 (Pub. No. 2022/0169099
        A1) to Phlipot et al.
        Our Ref. RIDGE.J9651

Dear Sirs,

This firm represents Ridge Corporation ("Ridge") in connection with its intellectual property matters. Ridge's products include composite materials such as panels for use in trucks and trailers. Through Ridge's previous work on a single-panel composite door it became aware of U.S. Patent Nos. 9,151,084 and 10,066,434, both of the same patent family, to Cold Chain, LLC. By now you are likely aware that Ridge cited the first of these patents (i.e. the '084 patent) in the above-noted patent application by way of a third-party submission under 37 C.F.R. §1.290. The purpose of that submission was to fulfill Ridge's duty of candor before U.S. Patent & Trademark Office pursuant to 37 C.F.R. §1.56 because it has been determined that Ridge personnel are joint inventors of subject matter claimed in the '144 application.

More specifically, documents establish that by the time Jeff Phlipot of Kirk NationaLease Co. ("KNL") approached Ridge in October 2018 about panels for a potential roll-up door application, Ridge had already developed its "living hinge" technology based on the ability of

Appx0128

**Exhibit 5**

  

June 6, 2023
Page 2 of 2

Ridge's composite materials to be engineered for various bending applications including trailer air foils and roll-up doors. Based on Ridge's understanding of the living hinge concept and the material properties of its panels and skins, including with prior truck door applications, it became apparent that Ridge could employ its living hinge concept to engineer a single panel roll-up door for KNL's application. Thereafter, working with KNL to understand its specific application requirements, Ridge engineered and produced drawings for a single panel roll-up door employing the living hinge concept to enable the door to effectively bend around the tight radius required by KNL's application. Because the documents corroborate that Ridge contributed to both the conception and reduction to practice of its living hinge technology for KNL's roll-up door application, it is our opinion that Ridge employees are joint inventors of subject matter presently claimed in the '144 patent application. Indeed, Mr. Phlipot effectively acknowledged Ridge's inventive contribution in his email of July 23, 2021, requesting a meeting to start the paperwork to "lock this down. Patent, I.P."

As you are aware, 35 U.S.C. §115 requires that an application for patent *shall* include, or be amended to include, the name of the inventors for any invention claimed in the application. Because the Office automatically presumes that the named inventors in an application are the actual inventors, and considering the above information, we believe that the inventorship of the '144 application should be promptly corrected to comply with the requirements of inventor naming under U.S. patent law. The USPTO provides the ability to file a request to correct inventorship under 37 C.F.R. §1.48 and, if inventorship is not corrected, the Office personnel are to reject the claims of the application under 35 U.S.C. §101 and §115, as appropriate. As you can appreciate, intentional failure to correct the fundamental issue of inventorship can jeopardize the enforceability of a patent.

In view of the above, we request that you contact us within fourteen (14) days of the receipt of this letter to begin the process of correcting the inventorship of the '144 patent application. If we do not hear from you within fourteen days, we will assume that you do not intend to correct inventorship as required and will advise our client in the pursuit of further legal recourses. We look forward to your anticipated cooperation in this matter.

Please contact us if you have any questions.

With regards,                    Very truly yours,

Richard A. Sharpe              J. Gregory Chrisman

RAS/JGC/rpk

cc:    Ridge Corporation

# PEARNE & GORDON

PATENTS • TRADEMARKS • COPYRIGHTS • INTELLECTUAL PROPERTY LITIGATION

Richard A. Sharpe
rsharpe@pearne.com

J. Gregory Chrisman
gchrisman@pearne.com

June 6, 2023

Via Electronic Mail and Federal Express
Return Receipt Requested

Jeff Phlipot, CEO
Kirk NationalLease Co.
3885 W. Michigan Ave.
Sidney, OH 45365

Truck & Trailer Parts Solutions Inc.
3858 W. Michigan Ave.
Sidney, OH 45365

John M. Garmhausen
FGKS Law
100 South Main Avenue
Suite 300
Sidney, Ohio 45365

Re:     Notice of U.S. Patent No. 9,151,084
        Our Ref. RIDGE.J9650

Dear Sirs,

This firm represents Ridge Corporation ("Ridge") in connection with their respective intellectual property matters. Ridge's products include composite materials such as Transcore® panels for use in trucks and trailers. Through Ridge's previous work on a single-panel composite door it became aware of patents owned by Cold Chain, LLC. Ridge is the exclusive licensee of U.S. Patent Nos. 9,151,084 and 10,066,434 to Cold Chain, LLC. Of note, the claims of the '084 patent cover single-panel, roll-up doors for use in trucks, trailers and buildings, along with methods for providing the single-panel, roll-up doors on tracks for moving the doors. A copy of the '084 patent is attached as Exhibit A.

It has come to our client's attention that Truck & Trailer Parts Solutions Inc. ("TTPS") and/or Kirk NationaLease Co. ("KNL") is offering for sale and selling a single panel roll door in the United States, for example, as pictured in the attached Exhibit B, that infringes one or more



claims of the '084 patent. Specifically, the single panel roll door is designed to flexibly roll open and closed in tracks having a radius of curvature to cover a door opening, for instance, an opening in a truck or trailer. The door has wheels attached to allow the door to fit into the tracks for guiding the door during opening and closing. Further, the single panel roll door has a first outermost surface formed by membrane having fibers and a sheet of foam attached to the membrane that forms a second outermost surface. Accordingly, the single panel roll door infringes one or more claims of the '084 patent.

Our client is not interested in fostering a protracted dispute with TTPS and KNL, but rather a commercial solution is more desirable. If TTPS and KNL will agree to (i) cease offering for sale and selling the infringing product and (ii) provide us with an accounting of past sales, then our client is willing to negotiate a settlement incorporating a release of its claims and any other mutually-acceptable terms. Because our client is interested in a mutually beneficial business solution, to facilitate a settlement Ridge is willing to offer a sublicense for the Cold Chain patents along with supplying TTPS and KNL with Ridge's high quality Transcore® panels so any future door products are ensured to not infringe the Cold Chain patents. This should give TTPS and KNL comfort knowing that their door is a high-quality product that is patent protected.

While our client is actively evaluating how best to act on protecting its valuable rights, it prefers and hopes that we may quickly come to an amicable agreement. Please respond no later than July 1, 2023 to indicate TTPS and KNL's willingness to resolve this matter along the foregoing lines. If I do not hear from you by that date, I will assume that you do not intend to cooperate and will advise my client accordingly.

We look forward to your anticipated cooperation in this matter. This letter is without prejudice to my client's rights, all of which are expressly reserved.

Please contact me if you have any questions.

With best regards,                         Very truly yours,

Richard A. Sharpe                          J. Gregory Chrisman

JGC/rpk

Enclosures
    Exhibit A - U.S. Patent No. 9,151,084
    Exhibit B – TTPS website (Truck & Trailer Parts Solutions - ttpsusa.com) selling
        "Patented" Single Panel Roll Door

cc:    Ridge Corporation
       Cold Chain, LLC



# BARNES LAW

PO Box 915
Waynesville, OH
Email: andrewbarnesip@gmail.com
Phone: (513) 494-6616

---

NOTICE OF PENDING PATENT
September 6, 2023

To:    Whiting Door Manufacturing Corp.
113 Cedar Street
Akron, NY 14001

John Garmhausen
Faulkner, Garmhausen, Keister & Shenk
100 S Main Ave, Ste 300
Sidney, Ohio 45365

Subject: Notice of Pending Patent Application – Pub. No. US 2022/0169099 A1

Dear Whiting Door Manufacturing Corporation;

I am writing to provide notice regarding a Patent Application that is currently pending and could be relevant to your operations or products. The spirit of this letter mirrors the essence of the "Pat. Pending" notation commonly seen on product labels, serving to make stakeholders aware of the Patent's current status.

It is crucial to underscore that the Patent mentioned herein is at its application stage, with the status "pending." This distinction is made to ensure there is no misunderstanding or assertion that this letter might be misleading in any way.

In line with the above, I have included a copy of the published patent application with this letter for your reference. This step is in adherence to transparency and to provide a full context regarding the said application.

For legal clarification and pursuant to the rights and implications under U.S. legal provisions, particularly 28 USC sec. 154(d), notice is hereby provided to Whiting Door Manufacturing Corp. of Pub. No. US 2022/0169099 A1, a copy of which is enclosed. Potential entitlements to a reasonable royalty might arise for an infringer's utilization of the invention, starting from the date of the infringer's actual notice of the published patent application. This is subject to the eventual issuance of the patent and its claims aligning fundamentally with what has been disclosed in the publication.

I trust that this notice will be treated with the seriousness and consideration it warrants. If you have questions or require further clarification, please do not hesitate to contact me directly at 513-494-6616 or at andrewbarnesip@gmail.com

**Exhibit 14**

Thank you for your attention to this matter.

Warm regards,
Andrew R Barnes, Esq.
USPTO Reg. # 76893


Enclosed:

US Patent Application  US 2022/0169099A1

# EXHIBIT 16

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

**U.S. Patent No. 9,151,084**

| Claim Elements | Exemplary Kirk NationaLease ("KNL")/Truck & Trailer Parts Solutions Inc. ("TTPS") Device |
|---|---|
| What is claimed is:<br>1. An insulated overhead door that is designed to roll open and closed in tracks to cover a **door opening having a top and a bottom**,<br><br><br><br><br><br><br><br><br><br><br><br>the insulating overhead door having a **first outermost surface**, **a second outermost surface** opposite the **first outermost surface**, | The accused KNL overhead door, shown below in FIGS. 1-7, is formed from a sheet of foam insulating material attached to a thermoplastic membrane and is therefore an insulated overhead door. The door rolls open (FIG. 2) and closed (FIG. 1) in tracks. In the closed position, the overhead door covers a **door opening having a top and a bottom.**<br><br><br>FIG. 1 – Closed Door Position<br><br><br>FIG. 2 – Open Door Position |

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 1, cont.] | Shown in FIGS. 1 and 2, and illustrated in FIG. 4, the KNL door has a **first outermost surface** arranged opposite a **second outermost surface,** the **first outermost surface** being the exterior surface shown in FIG. 1 and the **second outermost surface** being the exposed foam surface shown in FIGS. 2 and 3.  More specifically, claim 1 (at Col. 6, ll. 32-41), expressly defines the **second outermost surface** as being formed by the **foam insulating material**.  FIG. 3 below is a close-up of the exposed **foam** surface of the KNL door shown in FIG. 2.  Thus, the accused KNL door includes a **second outermost surface** opposite the **first outermost surface** as claimed. |



FIG. 3        FIG. 2



"a sheet of foam insulating material directly attached to the thermoplastic membrane, ... , the foam insulating material forming the second outermost surface of the door;" (Claim 1 - Col. 6, lines 32-41) (emphasis added)

"a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane .." (Claim 1 - Col. 6, lines 32-35)

"a thermoplastic membrane comprising glass fibers ... the thermoplastic membrane forming the first outermost surface of the door;" (Claim 1 - Col. 6, lines 27-31) (emphasis added)

FIG. 4 (Illustration of FIG. 3)

Second outermost surface (exposed foam)

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

[claim 1, cont.]
both the **first outermost surface** and the **second outermost surface** being larger than any of the top surface, bottom surface, first side surface and second side surface,

The accused KNL door has a top surface, a bottom surface and first and second side surfaces corresponding to the outer perimeter edge surfaces of the door. The KNL overhead door has an estimated height (H) of 75 inches, a width (W) of 65 inches, and a thickness (T) of 0.5 inch as illustrated below.



FIG. 1

FIG. 2

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 1, cont.] | Area Dimensions of KNL insulated overhead door: |
|---|---|

Area Dimensions of KNL insulated overhead door:

1) Top (edge) surface = Width x Thickness = 65" x 0.5" = 32.5 square inches
2) Bottom (edge) surface = Width x Thickness = 65" x 0.5" = 32.5 square inches
3) First side (edge) surface = Height x Thickness = 75" x 0.5" = 37.5 square inches
4) Second side (edge) surface = Height x Thickness = 75" x 0.5" = 37.5 square inches
5) **First outermost surface** = Width x Height = 65" x 75" = 4,875 square inches, which is greater than any of 1), 2), 3) or 4)
6) Total **second outermost surface** = at least 10 second surfaces (cuts) x 60.45 square inches = 604.5 square inches, which is greater than any of 1), 2), 3) or 4)
   a. Each **second outermost surface** is formed by a strip of exposed foam. The exposed foam width = 0.93"
   b. Each **second outermost surface** = exposed foam width x door width = 0.93" x 65" = 60.45 square inches
   c. Each **second outermost surface** is greater than any of 1), 2), 3) or 4)
   d. Accused KNL door has at least 10 **second outermost surfaces** (i.e. exposed foam insulating material)



FIG. 7

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

[claim 1, cont.]
the door comprising:

a **<u>thermoplastic membrane comprising glass fibers</u>** and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the **<u>thermoplastic membrane forming the first outermost surface</u>** of the door;

a **sheet of foam insulating material** directly attached to the **thermoplastic membrane**,

As established by the underlined claim language, the claimed thermoplastic membrane comprising glass fibers forms the **first outermost surface.** As seen above in FIGS. 1 and 2, the thermoplastic membrane forming the **first outermost surface** of the accused KNL door has a top side corresponding to the **top of the door opening** and a bottom side corresponding to the **bottom of the door opening** (See FIG. 1). The membrane forming the **first outermost surface** of the accused KNL door is a glass fiber reinforced membrane. Thus, the **first outermost surface** of the accused KNL door is a **thermoplastic membrane comprising glass fibers** as claimed.

As seen in FIG. 3, the accused KNL door has a continuous **sheet of foam insulating material** directly attached to **the thermoplastic membrane**.



Exposed foam insulating material forming the second outermost surface

Sheet of <u>continuous</u> foam insulating material

Thermoplastic membrane, which forms the first **outermost surface**

<u>FIG. 3</u>

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

[claim 1, cont.]
the **insulating material** extending continuously from the top side to the bottom side of the **thermoplastic membrane**, the **thermoplastic membrane** and **insulating material** forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the <u>**foam insulating material forming the second outermost surface**</u> of the door; and

**wheels** attached to the door allowing the door to fit into **tracks** to guide the opening and closing of the door,

As seen in FIG. 3 and the illustration in FIG. 4, the **foam insulating material** is a continuous layer that has thick sections where the **foam insulating material** is covered by membrane layers and thin sections where the **foam insulating material** is exposed **forming the second outermost surface.** As shown above in FIGS. 2 and 3, the **foam insulating material** extends continuously from the top to the bottom of **thermoplastic membrane**, thus forming a single panel that is approximately the size of the door opening to be covered, with the length of the single panel being the distance between the top side and the bottom side.

As seen in FIG. 2, and FIG. 5 below, the accused KNL door includes **wheels** attached to the door allowing the door to fit into **tracks** to guide the opening and closing of the door as demonstrated in FIG. 5.



FIG. 5

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

[claim 1, cont.]
wherein the overhead door comprises only one of the panel, the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved **tracks** having a radius of curvature ranging from about 5 inches to about 25 inches,

where the **track** has a **first length** positioned at an **angle, Θ**, relative to a **track** portion of a **second length**, wherein **Θ** ranges from about 80° to about 125°.

As seen throughout the above figures, the accused door comprises a single panel, which is defined in the claim as being formed by the **thermoplastic membrane (forming the first outermost surface)** and the **foam insulating material (forming the second outermost surface)**. As shown above in FIG. 5, because the accused KNL door the is able to open and close by traveling along the curved **tracks,** the KNL door is flexible along its entire length so as to be capable of approximating the curvature of the **tracks**, as claimed.  The track radius of the accused KNL door is estimated to be about 10 inches.

As illustrated in FIG. 6 below, the **track** shown has a **first track length** positioned at **an angle Θ** relative to a **second track length,** wherein the **angle Θ** is estimated to be about 90° and within the claimed range of about 80° to about 125°.



FIG. 6

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| | |
|---|---|
| 2. The insulated overhead door of claim 1, wherein the **thermoplastic membrane** is a single sheet. | The **thermoplastic membrane** of the accused KNL overhead door in FIG. 1 below forms the **first outermost surface**. As shown, the thermoplastic membrane of the accused KNL door is in the form of a single sheet as claimed.<br><br><br>**Thermoplastic membrane (first outermost surface) in the form of a <u>single sheet</u>**<br><br>FIG. 1 – Closed Door Position |
| 3. The insulated overhead door of claim 1, wherein the **thermoplastic membrane** comprises polypropylene impregnated with glass fibers. | The **thermoplastic membrane** of the accused KNL overhead door comprises polypropylene impregnated with glass fibers. Polypropylene is a thermoplastic material and, thus, the **first outermost surface** of the KNL insulated overhead door is a thermoplastic membrane comprising glass fibers as claimed. |

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| | |
|---|---|
| 4. The insulated overhead door of claim 1, wherein the **insulating foam** comprises <u>compression gaps</u> configured to allow the foam to more easily bend during opening and closing of the door. | As seen in FIG. 3, the continuous **sheet of foam insulating material** of the accused KNL door has a gap in its overall thickness where a portion of the foam has been removed to allow the foam to more easily bend. As seen in FIGS. 2 and 5, the accused door comprises a plurality of these <u>compression gaps</u> configured to allow the foam insulating material to more easily bend around the curved **tracks** during opening and closing of the door as shown in FIG. 2 and 5. <br><br>  <br> FIG. 3 |
| 5. The insulated overhead door of claim 1, wherein the **insulating material** is closed cell **foam**. | As see in FIG. 3, the sheet of foam insulating material is a cellular foam. |
| 6. The insulated overhead door of claim 5, wherein the closed cell **foam** comprises ethylene vinyl acetate. | As seen in FIG. 3, the sheet of foam insulating material is cellular and made from a polymeric material. |
| 7. The insulated overhead door of claim 5, wherein the closed cell **foam** is chosen from polyethylene foams, polypropylene foams or neoprene based foams. | As seen in FIG. 3, the sheet of foam insulating material is cellular and made from a polymeric material. |

| | |
|---|---|
| 8. The insulated overhead door of claim 1, wherein the **insulating material** is an open cell foam. | As see in FIG. 3, the sheet of foam insulating material is a cellular foam. |
| 9. The insulated overhead door of claim 1, further comprising an additional membrane that is not the **thermoplastic membrane**. | The accused KNL overhead door has an additional membrane attached to the **sheet of foam insulating material**. As shown in FIG. 2 below, in areas where the **foam insulating material** is not exposed (i.e. the **second outermost surface**), the KNL door has an additional membrane that is not the **thermoplastic membrane** that forms the **first outermost surface**.<br><br><br>FIG. 2 – Open Door Position |

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| | |
|---|---|
| 11. A method comprising: providing the insulated overhead door of claim 1 on **tracks**, at least a portion of the **tracks** being curved; and moving the insulated overhead door so that a portion of the **thermoplastic membrane** and a portion of the **insulating material** flex to allow the door to traverse the curved portion of the **tracks**. | The accused KNL insulated overhead door operates on **tracks** having a curved portion such that a portion of the **thermoplastic membrane** (**first outermost surface**) and a portion of the **foam insulating material** (**second outermost surface**) flex to allow the door to traverse the curved portion of the **tracks**. This operation of KNL door is shown in FIGS. 1, 2. |



**Thermoplastic membrane (first outermost surface)**

FIG. 1 – Closed Door Position



**Second outermost surface**

**Curved portion of tracks**

FIG. 2 – Open Door Position

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| | |
|---|---|
| 12. An overhead door assembly comprising:<br><br>a set of curved **tracks**; and<br><br><br><br>an insulated overhead door configured to roll open and closed in the tracks to cover a **door opening having a top and a bottom**, | The accused KNL overhead door, shown below in FIGS. 1-7, is formed from a sheet of foam insulating material attached to a **thermoplastic membrane** and is therefore insulated.  The overhead door rolls open (FIG. 2) and closed (FIG. 1) in **tracks.**  In the closed position, the accused door covers a **door opening having a top and a bottom.** |



FIG. 1 – Closed Door Position

FIG. 2 – Open Door Position

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 12, cont.] the overhead door having a **first outermost surface**, a **second outermost surface** opposite the **first outermost surface**, | Shown in FIGS. 1 and 2, the KNL door has a **first outermost surface** arranged opposite a **second outermost surface,** the **first outermost surface** being the exterior surface shown in FIG. 1 and the **second outermost surface** being the exposed **foam** surface shown in FIGS. 2 and 3.   More specifically, claim 12 (at Col. 7, ll. 40-42), expressly defines the **second outermost surface** as being formed by the **foam insulating material**.  FIG. 3 below is a close-up of the exposed **foam** surface shown in FIG. 2.  Thus, the accused KNL door includes a **second outermost surface** opposite the **first outermost surface** as claimed. |
|---|---|



FIG. 3                                FIG. 2

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 12, cont.]<br>a top surface, a bottom surface, a first side surface and a second side surface, both the **first outermost surface** and the **second outermost surface** being larger than any of the top surface, bottom surface, first side surface and second side surface, | The accused KNL door has a top surface, a bottom surface and first and second side surfaces corresponding to the outer perimeter edge surfaces of the door.  The KNL overhead door has an estimated height (H) of 75 inches, a width (W) of 65 inches, and a thickness (T) of 0.5 inch as illustrated below.<br><br><br>FIG. 1<br><br><br>FIG. 2 |

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 12, cont.] | Area Dimensions of KNL insulated overhead door: |
|---|---|
| | 7) Top (edge) surface = Width x Thickness = 65" x 0.5" = 32.5 square inches |
| | 8) Bottom (edge) surface = Width x Thickness = 65" x 0.5" = 32.5 square inches |
| | 9) First side (edge) surface = Height x Thickness = 75" x 0.5" = 37.5 square inches |
| | 10) Second side (edge) surface = Height x Thickness = 75" x 0.5" = 37.5 square inches |
| | 11) **First outermost surface** = Width x Height = 65" x 75" = 4,875 square inches, which is greater than any of 1), 2), 3) or 4) |
| | 12) Total **second outermost surface** = at least 10 second surfaces (cuts) x 60.45 square inches = 604.5 square inches, which is greater than any of 1), 2), 3) or 4) |
| |    e. Each **second outermost surface** is formed by a strip of exposed foam. The exposed foam width = 0.93" |
| |    f. Each **second outermost surface** = exposed foam width x door width = 0.93" x 65" = 60.45 square inches |
| |    g. Each **second outermost surface** is greater than any of 1), 2), 3) or 4) |
| |    h. Accused KNL door has at least 10 **second outermost surfaces** (i.e. exposed foam insulating material) |
| |  |
| | FIG. 7 |

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

[claim 12, cont.]
the door comprising:

a **thermoplastic membrane comprising glass fibers** and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening when the door is in a closed position, the **thermoplastic membrane forming the first outermost surface** of the door;

a **sheet of foam insulating material** directly attached to the **thermoplastic membrane**,

As established by the underlined claim language, the claimed thermoplastic membrane comprising glass fibers forms the **first outermost surface.** As seen above in FIGS. 1 and 2, the thermoplastic membrane forming the **first outermost surface** of the accused KNL door has a top side corresponding to the **top of the door opening** and a bottom side corresponding to the **bottom of the door opening** (See FIG. 1). The membrane forming the **first outermost surface** of the accused KNL door is a glass fiber reinforced membrane. Thus, the **first outermost surface** of the accused KNL door is a **thermoplastic membrane comprising glass fibers** as claimed.

As seen in FIG. 3, the accused KNL door has a continuous **sheet of foam insulating material** directly attached to **the thermoplastic membrane**.



FIG. 3

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| | |
|---|---|
| [claim 12, cont.]<br>the **insulating material** extending continuously from the top side to the bottom side of the **thermoplastic membrane**, the **thermoplastic membrane** and **insulating material** forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the **foam insulating material** forming the **second outermost surface** of the door; and | As seen in FIG. 3, the **foam insulating material** is a continuous layer that has thick sections where the **foam insulating material** is covered by membrane layers and thin sections where the **foam insulating material** is exposed, forming the **second outermost surface.** As shown above in FIGS. 2 and 3, the **foam insulating material** extends continuously from the top to the bottom of the **thermoplastic membrane**, thus forming a single panel that is approximately the size of the door opening to be covered, with the length of the single panel being the distance between the top side and the bottom side. |
| **wheels** attached to the door allowing the door to fit into **tracks** to guide the opening and closing of the door, | As seen in FIG. 2, and FIG. 5 below, the accused KNL door includes **wheels** attached to the door allowing the door to fit into **tracks** to guide the opening and closing of the door as demonstrated in FIG. 5.<br><br><br><br>FIG. 5 |

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

[claim 12, cont.]
wherein the overhead door comprises only one of the panel, the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved **tracks** having a radius of curvature ranging from about 5 inches to about 25 inches,

where the **track** has a **first length** positioned at an **angle, Θ**, relative to a **track** portion of a **second length**, wherein **Θ** ranges from about 80° to about 125°.

As seen throughout the above figures, the accused door comprises a single panel, which is defined in the claim as being formed by the **thermoplastic membrane (forming the first outermost surface)** and the **foam insulating material (forming the second outermost surface)**. As shown above in FIG. 5, because the accused KNL door is able to open and close by traveling along the curved **tracks,** the door is flexible along its entire length so as to be capable of approximating the curvature of the **tracks**, as claimed. The track radius of the accused KNL door is estimated to be about 10 inches.

As illustrated in FIG. 6 below, the **track** shown has a **first track length** positioned at **an angle Θ** relative to a **second track length,** wherein the **angle Θ** is estimated to be about 90° and within the claimed range of about 80° to about 125°.



FIG. 6

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| 13. A truck comprising the insulated overhead door assembly of claim 12. | The accused KNL overhead door, shown below in FIGS. 1-2, is installed in a truck.  |

FIG. 1 – Closed Door Position

FIG. 2 – Open Door Position

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| | |
|---|---|
| 17. An insulated overhead door that is designed to roll open and closed in **tracks** to cover a **door opening having a top and a bottom**, | The accused KNL overhead door, shown below in FIGS. 1-7, is formed from a **foam insulating material** attached to a **thermoplastic membrane** and is therefore insulated.  The accused door rolls open (FIG. 2) and closed (FIG. 1) in **tracks.**  In the closed position, the accused door covers a **door opening having a top and a bottom.** |



**Top of door opening**

**First outermost surface**

**Bottom of door opening**

FIG. 1 – Closed Door Position



**Second outermost surface**

FIG. 2 – Open Door Position

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 17, cont.] | Shown in FIGS. 1 and 2, and illustrated in FIG. 4, the KNL door has a **first outermost surface** arranged opposite a **second outermost surface,** the **first outermost surface** being the exterior surface shown in FIG. 1 and the **second outermost surface** being the exposed **foam** surface shown in FIGS. 2 and 3.  More specifically, claim 1 (at Col. 6, ll. 32-41), expressly defines the **second outermost surface** as being formed by the **foam insulating material**.  FIG. 3 below is a close-up of the exposed **foam** surface of the KNL door shown in FIG. 2.  Thus, the accused KNL door includes a **second outermost surface** opposite the **first outermost surface** as claimed. |
|---|---|
| the insulating overhead door having a **first outermost surface**, a **second outermost surface** opposite the **first outermost surface**, | |



**Second outermost surface (exposed foam)**

FIG. 3                              FIG. 2



"a foam insulating material attached to the thermoplastic membrane, ... , the foam insulating material forming the **second outermost surface** of the door;" (Claim 17 - Col. 8, lines 40-48) (emphasis added)

"a foam insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane .." (Claim 17- Col. 7, lines 40-43)

"a thermoplastic membrane comprising glass fibers ... the thermoplastic membrane forming the **first outermost surface** of the door;" (Claim 17 - Col. 7, lines 34-39 (emphasis added)

FIG. 4 (Illustration of FIG. 3)

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 17, cont.]<br>a top surface, a bottom surface, a first side surface and a second side surface, both the **first outermost surface** and the **second outermost surface** being larger than any of the top surface, bottom surface, first side surface and second side surface, | The accused KNL door has a top surface, a bottom surface and first and second side surfaces corresponding to the outer perimeter edge surfaces of the door. The KNL overhead door has an estimated height (H) of 75 inches, a width (W) of 65 inches, and a thickness (T) of 0.5 inch as illustrated below.<br><br><br>FIG. 1<br><br><br>FIG. 2 |

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 17, cont.] | Area Dimensions of KNL insulated overhead door: |
|---|---|
| | 13) Top (edge) surface = Width x Thickness = 65" x 0.5" = 32.5 square inches |
| | 14) Bottom (edge) surface = Width x Thickness = 65" x 0.5" = 32.5 square inches |
| | 15) First side (edge) surface = Height x Thickness = 75" x 0.5" = 37.5 square inches |
| | 16) Second side (edge) surface = Height x Thickness = 75" x 0.5" = 37.5 square inches |
| | 17) **First outermost surface** = Width x Height = 65" x 75" = 4,875 square inches, which is greater than any of 1), 2), 3) or 4) |
| | 18) Total **second outermost surface** = at least 10 second surfaces (cuts) x 60.45 square inches = 604.5 square inches, which is greater than any of 1), 2), 3) or 4) |
| |     i.   Each **second outermost surface** is formed by a strip of exposed foam.  The exposed foam width = 0.93" |
| |     j.   Each **second outermost surface** = exposed foam width x door width = 0.93" x 65" = 60.45 square inches |
| |     k.   Each **second outermost surface** is greater than any of 1), 2), 3) or 4) |
| |     l.   Accused KNL door has at least 10 **second outermost surfaces** (i.e. exposed foam insulating material) |
| | <br>FIG. 7 |

[claim 17, cont.]

the door comprising:

a **thermoplastic membrane comprising glass fibers** and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the **thermoplastic membrane forming the first outermost surface of the door**;

As established by the underlined claim language, the claimed thermoplastic membrane comprising glass fibers forms the **first outermost surface**. As seen above in FIGS. 1 and 2, the thermoplastic membrane forming the **first outermost surface** of the accused KNL door has a top side corresponding to the **top of the door opening** and a bottom side corresponding to the **bottom of the door opening** (See FIG. 1). The membrane forming the **first outermost surface** of the accused KNL door is glass fiber reinforced membrane. Thus, the **first outermost surface** of the accused KNL door is a **thermoplastic membrane comprising glass fibers** as claimed.

a **foam insulating material** attached to the **thermoplastic membrane**,

As seen in FIG. 3, the accused KNL door has a continuous **sheet of foam insulating material** directly attached to **the thermoplastic membrane**.



FIG. 3

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 17, cont.] | |
|---|---|
| the **insulating material** extending continuously from the top side to the bottom side of the **thermoplastic membrane**, the **thermoplastic membrane** and **insulating material** forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the **foam insulating material** forming the **second outermost surface** of the door; and | As seen in FIG. 3 and the illustration in FIG. 4, the **foam insulating material** is a continuous layer that has thick sections where the **foam insulating material** is covered by membrane layers and thin sections where the **foam insulating material** is exposed forming the **second outermost surface**. As shown above in FIGS. 2 and 3, the **foam insulating material** extends continuously from the top to the bottom of the **thermoplastic membrane**, thus forming a single panel that is approximately the size of the door opening to be covered, with the length of the single panel being the distance between the top side and the bottom side. |
| **wheels** attached to the door allowing the door to fit into **tracks** to guide the opening and closing of the door, | As seen in FIG. 2, and FIG. 5 below, the accused KNL door includes **wheels** attached to the door allowing the door to fit into **tracks** to guide the opening and closing of the door as demonstrated in FIG. 5.  FIG. 5 |

PRIVILEGED AND CONFIDENTIAL
PREPARED IN ANTICIPATION OF LITIGATION

| [claim 17, cont.]<br><br>wherein the overhead door comprises only one of the panel, the panel being sufficiently flexible to traverse curved **tracks**. | As seen throughout the above figures, the accused door comprises only one panel, which is defined in the claim as being formed by the **thermoplastic membrane (forming the first outermost surface)** and the **foam insulating material (forming the second outermost surface)**. As shown above in FIGS. 1, 2 and 5, the accused KNL single panel door is opened and closed by rolling the single panel door up and down along tracks.  Thus, the accused KNL single panel door is sufficiently flexible to traverse the curved **tracks** as claimed. |
|---|---|
| 19. The insulated overhead door of claim 17, wherein the panel is sufficiently flexible so that the overhead door is capable of traversing **tracks** of varying radii of curvature ranging from about 5 to about 25 inches. | As seen in FIGS. 2 and 5, the accused KNL door comprises a single panel that is sufficiently flexible so as to be capable of traversing **tracks** having a radius of curvature that is estimated to be about 10 inches. Thus, the accused single panel is sufficiently flexible to traverse tracks of a radius of curvature between about 5 to about 25 inches as claimed. |

# EXHIBIT A

Case 2:23-cv-00112-ALM-KAJ Doc # 28 Filed 09/01/23 Page 1 of 13 PAGEID #: 387

## AMENDED AND RESTATED LICENSE AGREEMENT

This Amended and Restated License Agreement (this "Agreement") is made and entered into as of the 1st day of May, 2023 (the "Effective Date"), by and between COLD CHAIN, LLC, a Delaware limited liability company (the "Licensor") and RIDGE CORPORATION, an Ohio corporation (the "Licensee"). The Agreement amends and restates in its entirety that certain License Agreement between Licensor and Licensee dated effective February 15, 2023.

The parties hereby agree as follows:

1. Defined Terms. As used in this Agreement, the following defined terms shall have the following respective meanings:

   a. Affiliate. "Affiliate" shall mean with respect to a party, any Person that, directly or indirectly, is controlled by, controls, or is under common control with such party, only while such control exists.

   b. Confidential Information. "Confidential Information" shall mean: any and all technical or business data, information or items (including third party data, information, or items) in whatever form or medium, of one party provided to or obtained by the other party or accessed by the other party pursuant to this Agreement regardless of whether such data, information or items are marked or identified as "Confidential".

   c. Door Manufacturer. "Door Manufacturer" shall have the meaning set forth in Section 3 of this Agreement.

   d. Licensed Patent. "Licensed Patent(s)" shall mean those certain patents legally described as U.S. 10,066,434 (application S/N 14,875,577) titled INSULATED OVERHEAD DOOR, filed on October 5, 2015 claiming priority to U.S. 9,151,084, and U.S. 9,151,084 (application S/N 13/585,944) titled INSULATED OVERHEAD DOOR, filed on August 15, 2012 claiming the benefit of U.S. Provisional Application 61/523,786 filed on August 15, 2011 including all future, pending, expired counterparts (domestic and foreign) related to the foregoing patents and/or technological scope.

   e. Licensed Patent Challenge. "Licensed Patent Challenge" shall mean Licensee or its Affiliates, directly (e.g., by itself) or indirectly (e.g., through a "straw man," or other involvement for or with a third party, or otherwise), challenging the scope, validity, enforceability, ownership, or inventorship of the Licensed Patent, whether pursuant to a court action, reexamination, opposition or patent office proceeding. However, "Licensed Patent Challenge" shall not include compliance with subpoenas or other court orders, provided that (and to the extent): (i) Licensee and its Affiliates have not directly or indirectly encouraged or acquiesced to the issuance of such order or subpoena; and (ii) Licensee and its Affiliates have given Licensor prompt notice of such order or subpoena, and reasonably cooperate with

**Exhibit 3**

Licensor to challenge and/or limit the scope of such subpoena or court order with respect to any response thereto.

f. <u>Licensed Product.</u> "Licensed Product" or "Licensed Products" shall mean a truck roll-up door, trailer roll-up door or other roll-up door application that includes every limitation of at least one valid and enforceable claim of the Licensed Patent(s) and manufactured, used, imported, offered for sale or sold by the Licensee or a Door Manufacturer.

g. <u>Net Sales Price.</u> "Net Sales Price" shall mean the amount actually received by the Licensee for each Panel or Licensed Product, including adjustments for all discounts and deductions allowed by Licensee to purchaser, less all freight costs, sales, excise, value added or similar taxes and less any returns and allowances in respect of such Panels and/or Licensed Products all as actually incurred or paid by Licensee. In the event that a Panel or Licensed Product is sold by Licensee to any Affiliate of Licensee or sold in combination with another product, then the Net Sales Price with respect to such sales will be the greater of either (i) the above definition of Net Sales Price (as applied to sales of such product to the Affiliate, if applicable), or (ii) the average Net Sales Price of all Panels or Licensed Products sold by Licensee to all non-Affiliates during the calendar quarter in which such sale was made.

h. <u>Panel.</u> "Panel" shall mean any roll-up door panel sold by Licensee to a Door Manufacturer for purposes of manufacturing Licensed Products pursuant to a sublicense of the License from Licensee to such Door Manufacturer, as further set forth in this Agreement.

i. <u>Person.</u> "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, trust, business, association or other entity.

j. <u>Territory.</u> "Territory" shall mean all countries of the world.

2. <u>Term and Termination.</u> The initial term of this Agreement shall begin on the Effective Date and shall continue until the expiration of the last expiring Licensed Patent(s) on October 19, 2032. Notwithstanding the stated term hereof, either party may terminate this Agreement in the event of a material breach hereof by the other party provided that (i) the terminating party notifies the other party in writing of the specific nature of such material breach, and (ii) the other party fails to correct the same within twenty-one (21) days after receipt of such notice (or such additional time as reasonably necessary to cure the breach so long as the other party diligently pursues the cure to completion).

3. <u>Grant of License.</u> Licensor hereby grants to Licensee an exclusive, royalty bearing, non-transferable, sublicensable right and license to make, have made, use, sell, install, service, import/export and/or otherwise commercialize Licensed Products in the Territory (the "<u>License</u>"). Notwithstanding the foregoing, Licensee's right of sublicense shall: (a) be limited to sublicensing to those sublicensees that agree to purchase and use Panels in the manufacture and sale of other Licensed Products (each a, "<u>Door Manufacturer</u>"); (b) be

granted in each instance for a period no longer than the term of this Agreement (including any permitted disposal under Section 5 of this Agreement); and (c) not be further sublicensable by Door Manufacturers. Except for the licenses granted to Licensee in this Section (including, without limit, attendant rights of sublicense to Door Manufacturers), Licensor hereby expressly retains all rights, title and interest in and to all Licensed Patents and Licensor's other intellectual property; and, no other rights are or shall be deemed to be granted to Licensee by implication, estoppel, statute, operation of law or otherwise pursuant to this Agreement.

4.  Survival.  The following Sections shall survive the expiration or termination of this Agreement:  6 (with respect to any amounts owed prior to termination or expiration), 7 (with respect to any amounts owed prior to termination or expiration), 8 (pursuant to its terms), 13, 14 (with respect to any action commenced prior to expiration or termination), 17, 21, 22, 23, 25, 26, 28, 29 and 31.

5.  Disposal Upon Expiration.  Upon expiration or termination of this Agreement, Licensee shall have the right, pursuant to the provisions hereof, for a period of one hundred and eighty (180) days, to dispose of all unsold Licensed Products manufactured by Licensee or by Door Manufacturers or in the process of manufacture at the time of expiration or termination; provided that Licensee makes timely payment to Licensor of all Royalties due on such Licensed Products.

6.  Royalties.  During the term hereof, Licensee shall pay royalties ("Royalty" or "Royalties") to Licensor as follows:

    a.  Royalty Percentage.  Subject to Section 11, Licensee shall pay to Licensor a Royalty in the amount of five percent (5%) of the Net Sales Price of (i) all Panels and (ii) all Licensed Products, if any, which are sold by Licensee itself in the Territory; provided, however, that no such Royalties shall apply to and/or accrue before and until May 1, 2025 as additional consideration for Licensee's best efforts to commercialize the Licensed Patent.

    b.  Licensed Patent Challenge.  Notwithstanding the above, to the extent the following is enforceable under applicable law, if Licensee or any of its Affiliates or agents directly or indirectly bring or initiate a Licensed Patent Challenge during the term of this Agreement, Licensee shall pay Royalties (as per Section 6.a, above) to Licensor (while such Licensed Patent Challenge continues) at the rate of fifteen percent (15%).

    c.  Currency.  Licensee shall make all payments of Royalties in U.S. dollars by wire transfer to the account Licensor designates in writing to Licensee from time to time, without deduction for bank wire or other charges (which charges will be paid by Licensee). For any sales that are conducted in a foreign currency, Licensee shall provide currency conversion information showing the foreign currency and the conversion to U.S. Dollars using the exchange rate for the fifteenth (15th) day of the relevant month in which the sale occurred (or the next business day if such day

AMENDED AND RESTATED LICENSE AGREEMENT - 3
4892-0044-0160v4
16736418.2 [10932-13]

falls on a weekend or a holiday) as set forth in the U.S. edition of *The Wall Street Journal*.

    d.   <u>Late Payment</u>. If any payment of Royalties is delayed more than fifteen (15) days after the due date (as set forth in Section 7, below), and if such deficiency is not cured within fourteen (14) business days after receipt by Licensee of written notice thereof from Licensor, then Licensee shall pay interest on the unpaid Royalty amount from and after the date on which the same became due at a rate of one and a half percent (1.5%), compounded monthly, or the maximum amount allowed by law, whichever is less. In the event that any collection action is initiated, the prevailing party shall be entitled to recover its attorneys' fees and other costs of bringing or defending such action.

    e.   <u>Patent Exhaustion</u>. Each Licensed Product on which Licensee has paid a Royalty hereunder may be subsequently installed, serviced, used, licensed and re-sold by each subsequent owner thereof without any further Royalty obligation to Licensor with respect to the Licensed Patent(s).

    f.   <u>Taxes</u>. Each party shall be solely responsible for its own taxes, charges, expenses and duties incurred in connection with the sale of Panels and/or Licensed Products and any payment of Royalties.

7.   <u>Royalty Payments and Reports.</u> On or before the last day of the month following the end of each calendar quarter, Licensee shall pay to Licensor the Royalties for such quarter. Each Royalty payment shall be accompanied by a statement of the number of Panels and/or Licensed Products sold by Licensee during such quarter, in units and dollars, and Licensee's calculation of the Royalty due thereupon, including any currency conversion information.

8.   <u>Audit Rights.</u> At all times during this Agreement and for two (2) years following its termination or expiration, Licensee shall make all relevant documents, reports and books of account which contain information reasonably related to the amount of Royalties due hereunder available to Licensor and Licensor's public accounting firm for inspection, audit and copying during normal business hours, upon not less than five (5) business days advance notice, which will be made by Licensor at its own expense, except as provided below. Licensee shall also make reasonably available qualified employees and agents to answer all questions pertaining to such audit. If the audit reveals that there is an underpayment error in excess of the greater of US $5,000 or twenty percent (20%) of the Royalties which would have been properly payable in any calendar quarter, then without prejudice to any other amounts due to Licensor or to any of its rights hereunder, all third party reasonable costs and expenses paid by Licensor in connection with such audit shall be borne and promptly paid by Licensee. Licensee shall have the right to require that Licensor's public accounting firm sign a reasonable Confidentiality Agreement prior to any audit limiting its disclosure of Licensee's financial information only to Licensor and only to such information as reasonably relates to compliance with this Agreement.

9.  <u>Exclusivity.</u>  The License granted to Licensee hereunder shall be exclusive through the term of this Agreement.

10. <u>Commercialization.</u>  Licensee acknowledges and agrees that part of the consideration for Licensor's grant of the License herein is Licensee's best efforts to sell Panels. Accordingly, Licensor shall have the right to terminate this Agreement, upon ten (10) days written notice, if Licensee fails to use Commercially Reasonable Best Efforts (as defined below) to sell Panels in the Territory.  "<u>Commercially Reasonable Best Efforts</u>" means the efforts that a prudent person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved expeditiously; provided, however, that an obligation to use commercially reasonable best efforts under this Agreement does not require Licensee to take actions that would result in a material adverse effect on Licensee or that would materially reduce the benefits to Licensee of the final result.

11. <u>Foreign Licensed Patents.</u>  The parties shall jointly decide in which foreign countries, if any, Licensor will file foreign counterparts of the Licensed Patent(s) or related technologies, the expenses for which filings shall be borne solely by Licensor or as otherwise agreed in writing by the parties, and those countries will be included in the Territory upon the filing of such corresponding foreign patent having materially similar claims as the U.S. Licensed Patent(s) in such country.  In each foreign country in which such counterpart is filed are subject to any amounts due under this Section 11, upon the filing of such application, and for twenty-four (24) months thereafter, Licensee shall pay Licensor a Royalty of five percent (5%) of the Net Sales Price of all Panels or Licensed Products sold by Licensee in such foreign country.  For avoidance of doubt, only one Royalty shall be payable on each Panel or Licensed Product sold by Licensee hereunder whether such Royalty amount is determined pursuant to Section 6 hereof or this Section 11. For the further avoidance of doubt, Royalties shall also be due in the event that a Panel or Licensed Product is sold by Licensee in any and all jurisdictions not covered by an applicable patent or pending application.

12. <u>*[reserved].*</u>

13. <u>Future Developments.</u>  All future developments, improvements and inventions relating to the Licensed Patent or Licensed Products, together with all intellectual property rights relating thereto, shall belong to the party developing or inventing the same. Any such subsequent developments, improvements or inventions made by Licensor shall be deemed to be included in the License granted herein. Joint developments, improvements and inventions shall be jointly owned by both parties.  In the event of such joint ownership, the parties agree to cooperate in the seeking of patent or other intellectual property protection thereof.  Additionally, the License granted herein shall extend to Licensee with regard to any such jointly developed intellectual property and/or patents for the term of this Agreement.

14. <u>Infringement Actions.</u>  Subject to the following, both Licensor and Licensee shall have the right to initiate a patent infringement action against any third party reasonably believed to be infringing a Licensed Patent, but neither party shall have any obligation to do so. Licensee shall give Licensor the option by written notice of initiating any such action

AMENDED AND RESTATED LICENSE AGREEMENT - 5
4892-0044-0160v4
16736418.2 [10932-13]

before doing so itself (or issuing any demand or threat of such action). If Licensee initiates such action or the parties cooperatively initiate a joint action: (i) Licensee and Licensor shall share equally all attendant costs and expenses incurred by Licensee and/or Licensor up to an aggregate amount of US $2,000,000 ("Maximum Shared Costs") and, accordingly, Licensee shall indemnify, defend and hold harmless Licensor for any costs or expenses incurred by Licensor exceeding US $1,000,0000 (i.e., ½ of the Maximum Shared Costs); (ii) any judgment or settlement shall be collected for the benefit of Licensee and Licensor in proportion to the total costs and expenses incurred by each with respect to the action; (iii) Licensor's share of the Maximum Shared Costs shall be paid exclusively: (a) from Licensor's share of any applicable judgment or settlement and (b) to the extent not so paid and/or pending such judgment or settlement, in the form of a credit against any and all current and future Royalties due and payable by Licensee until paid in full; (iv) if Licensor's share of the Maximum Shared Costs exceeds the sum of (a) Licensor's share of all judgments or settlements and (b) all Royalties due and payable by Licensee pursuant to this Agreement, any such excess amount shall be forgiven; and (v) Licensee shall retain final control over any major strategic decisions and/or settlement of any such action. If any such action is initiated by only one party, the non-initiating party shall provide all cooperation reasonably requested by the party initiating the action.

15. <u>Representations and Warranties of Licensor.</u>  The Licensor represents and warrants each of the following to Licensee, as of the date hereof:

    a.  <u>Ownership of Licensed Patent.</u>  Licensor owns all of the undivided right, title and interest in and to the Licensed Patent(s).  As of the date hereof, there are no other domestic or foreign patents or patent applications owned by Licensor, or any Affiliate of Licensor, which are related to the technology and/or cover or pertain to Licensed Products.

    b.  <u>Validity of Licensed Patent.</u>  Except for prior art cited or submitted during the prosecution of the Licensed Patent(s) (and corresponding application(s)), Licensor is not aware of any factual circumstances which is likely to cause the Licensed Patent(s) to be or become invalid.

    c.  <u>No Conflict.</u>  The execution and performance of this Agreement by Licensor will not conflict with any other obligation of Licensor.

    d.  <u>Authority.</u>  The Person signing this Agreement on behalf of Licensor is duly authorized to do so in order to create a binding agreement upon Licensor.

    e.  <u>Maintenance.</u>  Licensor will maintain the Licensed Patent(s) in force during the term hereof, including making the timely payment of all maintenance fees and annuities necessary to do so.

    f.  <u>Disclaimer of Other Warranties.</u>  Except as provided in this Section 15, THE LICENSED PATENT IS LICENSED HEREUNDER ON AN AS IS BASIS. THERE ARE NO WARRANTIES OF ANY KIND, AND LICENSOR HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR

**AMENDED AND RESTATED LICENSE AGREEMENT - 6**
4892-0044-0160v4
16736418.2 [10932-13]

FROM A COURSE OF DEALING OR USAGE OF TRADE, INCLUDING BUT NOT LIMITED TO, WARRANTIES OF NON-INFRINGEMENT AND THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY. LICENSOR DOES NOT WARRANT THAT THE LICENSED PATENT OR THE LICENSED PRODUCTS WILL FUNCTION UNINTERRUPTED OR ERROR FREE, NOR DOES IT MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM USE OF THE LICENSED PATENT OR LICENSED PRODUCTS.

g. <u>LIMITATION OF LIABILITY</u>. LICENSOR SHALL NOT BE LIABLE IN CONTRACT OR IN TORT, INCLUDING NEGLIGENCE AND STRICT LIABILITY, FOR ANY SPECIAL, PUNITIVE, INDIRECT OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND OR CHARACTER, INCLUDING LOSS OF USE, LOST PROFITS, LOSS OF REPUTATION, LOSS OF DATA OR THE COST OF ANY REPLACEMENT INTELLECTUAL PROPERTY, EVEN IF LICENSOR IS INFORMED IN ADVANCE OF THE POSSIBILITY OF DAMAGES. FURTHER, NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT TO THE CONTRARY, LICENSOR'S AGGREGATE LIABILITY UNDER THIS AGREEMENT, WHETHER ARISING OUT OF CONTRACT, TORT OR OTHERWISE, SHALL NOT EXCEED THE AVERAGE ANNUAL ROYALTY ACTUALLY PAID TO LICENSOR UNDER THIS AGREEMENT OVER THE LAST TWO (2) YEARS.

16. <u>Representations and Warranties of Licensee.</u> The Licensee represents and warrants each of the following to Licensor:

   a. <u>No Conflict.</u> The execution and performance of this Agreement by Licensee will not conflict with any other obligation of Licensee.

   b. <u>Authority.</u> The Person signing this Agreement on behalf of Licensee is duly authorized to do so in order to create a binding agreement upon Licensee.

17. <u>Indemnification.</u>

   a. <u>By Licensee.</u> If notified in writing by Licensor promptly upon Licensor's actual knowledge of same, Licensee shall indemnify, hold harmless, and defend Licensor and its Affiliates and their respective officers, directors, employees, agents, members, managers and contractors (the "<u>Licensor Indemnified Parties</u>") against any and all third-party claims, demands, liens, actions, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders, and liabilities of whatever kind or nature at law arising out of, occurring or asserted against one or more of the Licensor Indemnified Parties arising out of (i) any Licensed Patent Challenge initiated by Licensee or any Affiliate of Licensee, or (ii) any Licensed Product manufactured, sold or distributed by Licensee including, the design, manufacture, distribution, marketing, or sale

AMENDED AND RESTATED LICENSE AGREEMENT - 7
4892-0044-0160v4
16736418.2 [10932-13]

thereof, including any alleged defects, imperfection, and/or inherent dangers, whether obvious or hidden, in the Licensed Products or the use thereof, any product liability issues or claims, the packaging or labeling of a Licensed Product, the failure of a Licensed Product to confirm to its published specifications or promotional or other informational materials, or a failure to warn.

b. <u>By Licensor</u>. If notified in writing by Licensee promptly upon Licensee's constructive or actual knowledge of same, Licensor shall indemnify, hold harmless, and defend Licensee, its Affiliates and their respective officers, directors, employees, agents, members, managers and contractors (the "<u>Licensee Indemnified Parties</u>") against any and all third-party claims, demands, liens, actions, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders, and liabilities of whatever kind or nature at law arising out of, occurring or asserted against one or more of the Licensee Indemnified Parties arising out of the actual or alleged infringement of the Licensed Product on the patent or other intellectual property rights of a third party; provided, however, Licensor's obligation under this subsection 17.b. shall not apply to any claims, demands, liens, actions, suits, causes of action, obligations, controversies, debts, costs, attorneys' fees, expenses, damages, judgments, orders or liabilities relating to or arising from an infringement action initiated pursuant to Section 14 above.

18. <u>Insurance</u>.    Licensee shall obtain and maintain current throughout the term of this Agreement, at its own expense, product liability and general liability insurance for claims or suits referred to in part  (ii) of  Section 17 in amounts no less than two million dollars ($2,000,000) per occurrence, naming Licensor as an additional insured party and requiring that the insurer shall not terminate or materially modify such policy without written notice to Licensor at least twenty (20) days in advance thereof.  Licensee shall provide Licensor with a certificate of insurance demonstrating the above required coverage.  Licensee hereby waives for itself and its insurer(s) any and all rights of subrogation or transfer of claims against Licensor, and Licensee shall ensure that all such policies provide for such waiver of subrogation or transfer.

19. <u>Marking</u>. Licensee shall place or require each Door Manufacturer to place in a conspicuous location on each Licensed Product, a patent notice in accordance with 35 U.S.C. §287 ("<u>Licensed Patent Notice</u>") that either physically or virtually identifies the number(s) of the Licensed Patent(s) applicable to each Licensed Product.  Licensee shall also: (a) reasonably amend such Licensed Patent Notice (including, but not limited to, the addition and deletion of one or more patents), from time to time, at Licensor's written direction; and, (b) notify Licensor of any request for disclosure Licensee receives under 35 U.S.C. §287(b)(4)(B) related to the Licensed Patent.

20. <u>No Trademark License.</u>  Licensor is not licensing any of its names or trademarks to Licensee or any Door Manufacturer as part of this Agreement.  Unless otherwise agreed to by the parties in writing, Licensee shall not sell Licensed Products under any of Licensor's names and trademarks and shall require Door Manufacturers not to sell Licensed Products under any of Licensor's names and trademarks.

**AMENDED AND RESTATED LICENSE AGREEMENT - 8**
4892-0044-0160v4
16736418.2 [10932-13]

21. <u>Confidentiality</u>.

    a.   Each party (the "<u>Receiving Party</u>") shall: (a) treat as confidential, and preserve the confidentiality of, all Confidential Information disclosed by the other party (the "<u>Disclosing Party</u>"); (b) use such Confidential Information solely for the purposes of this Agreement; (c) limit dissemination of such Confidential Information to those individuals to whom disclosure is necessary for the purposes of this Agreement; and, (d) immediately notify the Disclosing Party upon discovery of any loss or unauthorized disclosure of the Disclosing Party's Confidential Information and use all reasonable efforts to retrieve such Confidential Information.

    b.   The confidentiality obligations imposed by this Agreement shall not apply to any information that: (a) is or becomes publicly available through no fault of the Receiving Party; (b) is obtained by the Receiving Party from a third person without breach by such third person of an obligation of confidence; (c) is already known by the Receiving Party at the time of disclosure; or (d) is required to be disclosed by the Receiving Party pursuant to a valid judicial or administrative order if the Receiving Party: (i) provides timely written notice of such order to the Disclosing Party and reasonably cooperates with any efforts by the Disclosing Party to contest or limit the scope of such order; and (ii) uses all reasonable efforts to limit the disclosure of such Confidential Information and seek a protective order or an equivalent to protect the disclosure of such Confidential Information.

22. <u>Choice of Law; Prevailing Party.</u> This Agreement is governed by the laws of the State of Delaware without regard to the principles of conflict of laws. Each party hereby irrevocably and unconditionally submits to the exclusive jurisdiction and venue of Delaware state and federal courts. In the event of any litigation or arbitration between the parties related to this Agreement, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees and costs.

23. <u>Arbitration.</u> Any claim or controversy arising out of, or relating to, this Agreement , or the breach thereof, shall be settled by arbitration by a single arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and the judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The site of the arbitration shall be Boise, Idaho if Lessor is the defendant and Columbus, Ohio if the Lessee is the defendant.

24. <u>Independent Contractors.</u> Each of the parties hereto is acting as an independent contractor hereunder. Neither party will act as an agent of the other party or have any right or authority to assume any obligation for, or bind, the other party. This Agreement does not and shall not be deemed to create a partnership, joint venture or any other legal relationship between the parties.

25. <u>Notices.</u> Notices that are required to be sent hereunder shall be in writing and sent via e-mail with confirmation by overnight courier as follows or to such other address as may subsequently be specified by the receiving party:

**AMENDED AND RESTATED LICENSE AGREEMENT - 9**
4892-0044-0160v4
16736418.2 [10932-13]

    a.  <u>If to the Licensor:</u>

    Cold Chain LLC.
    875 W. McGregor Ct., Ste 150
    Boise, Idaho 83705
    Attn: CEO
    E-mail: jforney@coldchainllc.com

    b.  <u>If to the Licensee:</u>

    Ridge Corporation
    8290 Dustin Road
    Galena, Ohio 43021
    Attn: Gary A. Grandominico
    E-mail: gary.grandominico@ridgecorp.com

26. <u>No Waiver.</u>  The failure or delay by either party to enforce any of the provisions hereof shall not be construed as a waiver and shall not preclude either party from thereafter enforcing such provision or any other provision hereof.

27. <u>Assignment.</u>  Licensee shall not assign this Agreement or any of its rights or obligations under this Agreement without the prior written consent of Licensor, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, that no such consent will be required to assign this Agreement to a purchaser of substantially all of Licensee's assets or a controlling interest in Licensee's capital stock.  Licensee shall notify Licensor in writing of any such permitted assignment within thirty (30) days of such assignment. This Agreement and all of Licensee's rights hereunder shall automatically terminate upon the occurrence of any assignment in violation of the foregoing. Licensor may assign, transfer or delegate this Agreement or any right, license or obligation hereunder in its sole discretion as a part of any transfer of ownership or control without notice to or consent from Licensee.  This Agreement shall be binding and inure to the benefit of any permitted assignees, transferees and other successors of either party.

28. <u>Severability.</u>  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law.  If any provision hereof is held to be invalid, illegal or unenforceable, no other provision hereof shall be affected and this Agreement shall be reformed, construed and enforced in such manner as will effect as nearly as lawfully possible the purposes and intent of the invalid, illegal or unenforceable provision.

29. <u>Headings.</u>  The titles and headings to sections herein are inserted for convenience and reference only, and are not intended to be part of, or affect the meaning or interpretation of, any portion of this Agreement.

30. <u>Counterparts and Electronic Signatures.</u>  This Agreement may be executed in counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same document.  This Agreement may be signed by facsimile or by scanned e-mail and when so executed shall be deemed to be an original counterpart hereof.

**AMENDED AND RESTATED LICENSE AGREEMENT - 10**
4892-0044-0160v4
16736418.2 [10932-13]

31. <u>Entire Agreement.</u>  This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and it supersedes all prior agreements, understandings and commitments, written or oral, with respect thereto.  Any amendment or modification hereof must be in writing and signed by both of the parties hereto.

[SIGNATURE PAGE FOLLOWS]

AMENDED AND RESTATED LICENSE AGREEMENT - 11
4892-0044-0160v4
16736418.2 [10932-13]

IN WITNESS WHEREOF, the parties have executed this Amended and Restated License Agreement as of the date first above written.

COLD CHAIN, LLC, a Delaware limited
liability company

By: _____

Name: ___Joe Forney_____

Its: ___CEO_____


RIDGE CORPORATION, an Ohio
corporation

By: _____

Name: ___Gary Grandominico_____

Its: ___CEO_____



US005915445A

# United States Patent [19]

## Rauenbusch

[11] **Patent Number:** **5,915,445**

[45] **Date of Patent:** **Jun. 29, 1999**

[54] **SECTIONAL OVERHEAD GATE**

[75] Inventor: **Gerd Rauenbusch**, Wehr, Germany

[73] Assignees: **Wihag Nutzfahrzeugtechnik GmbH&Co. KG**, Bielefeld, Germany; **Tubus Bauer AG**, Baar, Switzerland

[21] Appl. No.: **09/025,458**

[22] Filed: **Feb. 18, 1998**

[30]    **Foreign Application Priority Data**

Feb. 21, 1997  [DE]  Germany ........................ 297 03 077

[51] **Int. Cl.[6]** ...................................... **E06B 3/12**

[52] **U.S. Cl.** ............................................ **160/230**

[58] **Field of Search** .............................. 160/230, 231.1, 160/231.2, 232, 135, 201, 133, 370.23

[56]    **References Cited**

U.S. PATENT DOCUMENTS

3,017,218   1/1962   Groth et al. ...................... 160/232 X

| | | | |
|---|---|---|---|
| 3,084,403 | 4/1963 | Elmendorf | 160/133 |
| 3,662,410 | 5/1972 | Lankheet | 160/201 X |
| 4,194,313 | 3/1980 | Downing | 160/135 X |
| 5,131,448 | 7/1992 | Miller | 160/231.1 X |
| 5,267,599 | 12/1993 | Kim | 160/370.23 |
| 5,738,161 | 4/1998 | Martin | 160/230 X |

*Primary Examiner*—David M. Purol
*Attorney, Agent, or Firm*—Henry M. Feiereisen

[57]    **ABSTRACT**

An articulated sectional overhead gate, in particular for a commercial vehicle, includes a plate-shaped body structure comprised of a plurality of rigid panels made from a single-layer plastic strip, multi-layer plastic strip or laminate of different material layers, and a hinged connection for articulating the panels to one another such that flexible zones are created between consecutive panels. The flexible zones are effected through formation of depressions spaced along at least one side of the body structure.

**14 Claims, 4 Drawing Sheets**



ALTUMLLC000253

*FIG. 1*



ALTUMLLC000254



ALTUMLLC000255

FIG. 4

FIG. 5

ALTUMLLC000256

Case: 24-1138    Document: 54    Page: 117    Filed: 03/21/2024



FIG. 6

FIG. 7

ALTUMLLC000257

5,915,445

1

# SECTIONAL OVERHEAD GATE

## BACKGROUND OF THE INVENTION

The present invention generally relates to a sectional overhead gate, in particular for utility vehicles, and in particular to an articulated overhead gate of a type having a plate-shaped body structure formed essentially of a plurality of consecutive panels or lamellae members articulated to one another.

This type of overhead gate is used especially for commercial vehicles such as trucks and trailers as well as containers for such vehicles, and include a plurality of panels that are articulated to one another along the direction the gate moves so that during transition between the closed state to the open state travel along a curved track between a substantially vertical disposition and a horizontal disposition. The articulation between the panels enables the gate to travel through the curved section and, optionally, to be coiled to a roll, if necessary. The body structure (also called "filling plate") of conventional overhead gates is normally so formed especially from steel, aluminum or plastic as to exhibit a stiffness at least in transverse direction. The individual panels should be movably joined with one another to permit a deflection or roll-up of the plate-shaped body structure, if required. The articulation between individual panels is normally formed either by hinges or by so profiling the opposing side edges of the individual panels that the profiled areas movably interlock with one another.

These known constructions have the drawback that the individual panels of the plate-shaped body structure must be shaped by means of respective tools or, if made from plastic material, through extrusion. Even when providing a construction without hinges, the assembly costs become significant. Also, in case the individual panels are made of metal, the weight becomes relatively high so that e.g. roll-up gates require the provision of an auxiliary drive, e.g. a spring shaft with biased springs to enable an opening of the gate. In the event an electromotive drive is used for opening and closing, the driving power must then be accordingly high.

## SUMMARY OF THE INVENTION

It is thus an object of the present invention to provide an improved sectional overhead gate, obviating the afore-stated drawbacks.

In particular, it is an object of the present invention to provide an improved sectional overhead gate which is capable of being deflected or rolled up, without requiring separate hinges or interlocking edge profiling of the panels.

These objects, and others which will become apparent hereinafter, are attained in accordance with the present invention by providing a body structure in the form of panels made from single-layer plastic strips, multi-layered plastic strips, or laminates of different material layers; and articulated to one another by a hinged connection in the form of at least one flexible strip which is formed in one piece with the panels or with at least one layer of the panels.

Unlike conventional constructions, the present invention enables the use of plastic panels or plate-shaped laminates that are commercially available on a large scale, for fabrication of the body structure. As these panels or laminates are made of plastic material, they can thus be treated extremely easily. Depending on the type of plastic material, the flexible strips can be shaped in heated state in non-cutting fashion or through a material removing process. The use of plastic

2

panels enables fabrication of a single-piece plate-shaped body structure, and it is also conceivable that at a respective size of the body structure, several such elements can be joined together in the event the size of the body structure exceeds for example the standard dimensions of commercial plastic panels. The mobility of the panels is effected by the flexible strips between the individual panels, with the flexible strips resembling film hinges and designed according to the type of used plastic panels.

The plate-shaped body structure according to the invention is suitably made of alternating rigid and flexible zones so that the plate-shaped body structure can be coiled to a roll or deflected along a curved track, depending on the application. The used materials allow a significant weight reduction of the body structure compared to conventional designs so that the formed sectional overhead gate may be opened at much less force, and electromotive drives can be operated at extremely low output.

The flexible strips can be made in a simple manner when the plate-shaped body structure is made of thermoplastic material. Suitably, the flexible strips can be made through deformation of the plastic panel by heat-application and pressure. An appropriate tool allows production of flexible strips also through a material removal process, whereby the use of thermoplastic material allows operation at significant cutting speed. The flexible strips are created in both cases by forming depressions at least on one side of the body structure so that the thickness of the flexible strips is significantly smaller in relation to the thickness of the panels.

In accordance with a first embodiment, the plate-shaped body structure is made from a sandwich panel comprised of three layers and formed at least on one side with spaced-apart, parallel depressions for thickness reduction so as to form flexible zones. Preferably, the three layers are so designed that the thickness of both outer face layers is significantly smaller than the thickness of the central layer that forms the core member, resulting in a sufficient stiffness of the plate-shaped body structure and in a superior thermal insulation.

Advantageously, the core member is made of a material of relatively low density, e.g. honeycombed material, foam, fiber material or the like, so that the weight can be even further reduced and the formation of depressions for creating flexible strips is particularly simple. Suitably, the core member and the cover sheets are made of a material which is deformable under the influence of heat and pressure. Thus, the plate-shaped body structure can be produced from a sandwich panel in non-cutting manner by suitable tools in one step. The outer face layers and the core member may be made from suitable plastic material such as polypropylene so that the plate-shaped body structure can then be recycled as well.

Suitably, the depressions can be so selected that both outer face layers are connected to one another, preferably through welding because immediately after formation of the depressions through pressing, the welding operation may be carried out. The depressions are so designed as to contact both face layers for welding, and may have V-shaped cross section, trapezoidal cross section or semi-circular configuration so as to expand toward the jointed region of both face layers to the outer side or outer sides. A fabrication of the depressions through heat-treatment and pressure results in jointless surfaces, regardless of the respective design, while yet ensuring the mobility of the rigid panels.

Regardless of the selected design of the thermoplastic plates for fabrication of the body structures, it is also

ALTUMLLC000258

5,915,445

3

possible to form on both sides depressions in opposite disposition. The formation of depressions on both sides has the advantage that the deformation can be configured less pronounced compared to depressions on only one side. On the other hand, the provision of depressions on only one side has the advantage that the other side, e.g. the visible side, can be smooth, thereby reducing deposit of dirt or the like and permitting easier cleaning. This effect may however also be achieved in connection with a body structure made from several layers or from a laminate, by covering at least the side of the body structure formed with the depressions, preferably both sides, with a cover sheet.

Suitably, a massive plate is used as starting material, even when the central core member is of honeycomb configuration, of foam or fiber material. Conceivably, the initial plate may however also be a hollow section, with the outer wall surfaces being connected to one another through welding. Also in this type of design, the use of cover sheets is possible.

BRIEF DESCRIPTION OF THE DRAWING

The above and other objects, features and advantages of the present invention will now be described in more detail with reference to the accompanying drawing in which:

FIG. 1 is a schematic side view of a plate-shaped body structure for fabrication of a sectional overhead gate according to the present invention;

FIG. 2 is a schematic side view of a plate-shaped body structure in the form of a three-layered sandwich panel, with formation of a first variation of depressions;

FIG. 3 is a schematic side view of a plate-shaped body structure in the form of a three-layered sandwich panel, with formation of a second variation of depressions;

FIG. 4 is a schematic side view of a plate-shaped body structure assembly in the form of a sandwich panel, with the body structure assembly being covered on both sides with a cover sheet and formed with depressions extending to about half a thickness of the body structure; and

FIG. 5 is a schematic side view of a plate-shaped body structure assembly in the form of a sandwich panel, with the body structure assembly being covered on both sides with a cover sheet and formed with a different design of depressions extending to about half a thickness of the body structure;

FIG. 6 is a schematic side view of a plate-shaped body structure assembly in the form of a sandwich panel, with the body structure assembly being covered on both sides with a cover sheet and formed with depressions extending on both sides of the body structure; and

FIG. 7 is a schematic side view of a plate-shaped body structure assembly in the form of a sandwich panel, with the body structure assembly being covered on both sides with a cover sheet and formed with a different design of depressions extending on both sides of the body structure.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Throughout all the Figures, same or corresponding elements are generally indicated by same reference numerals.

Turning now to the drawing, and in particular to FIG. 1, there is shown a schematic side view of a plate-shaped body structure, generally designated by reference numeral 10 for fabrication of a sectional overhead gate according to the present invention including. The body structure 10 is made from a laminate formed by sandwiching a core member 13

4

between a pair of outer face layers 11, 12 which are made from a plastic sheet, e.g. of polypropylene. The face layers 11, 12 have each a thickness that is relatively large for these types of sheets, but is relatively small in proportion to the overall thickness of the body structure 10. The core member 13 forming the center layer of the body structure 10 may have a honeycomb structure, or may also be made from a foamed material or distance fabric.

As shown in particular in FIG. 2, the body structure 10 is evenly recessed over its length through formation of depressions 14 extending from one side toward the opposite side of the body structure 10, with the zones situated between the depressions 14 forming rigid panels or lamellae 20, while the areas of the depressions 14 form flexible strips 17 to allow deflection along a curved track, as shown in FIG. 1, or roll up of the body structure 10. Depending on the type of starting material, each flexible strip 17 can be formed by at least one layer of the face layer 11, 12 and connected to at least one layer of the panel 20. In the embodiment of FIGS. 1 and 2, the flexible strips 17 are formed by two layers, i.e. sections of both face layers 11, 12, which sections are connected to one another through welding.

In the embodiment of FIG. 2, the depressions 14 exhibit a trapezoidal configuration and extend over the entire height of the core member 13 so that the face layer 12 is in direct contact with the opposing face layer 11 in the area of the base of the depression 14. In the embodiment of FIG. 3, the depressions 14 are of arcuated configuration or may be V-shaped, with the area where both face layers 11, 12 are in direct contact being joined together by welding.

Thus, the formation of the depressions 14 affords the body structure 10 according to the present invention with flexible zones resembling a film hinge so that consecutive panels 20 can be positioned at an angle, as shown e.g. in FIG. 1 to travel along a curved track, with the maximum possible pivot range being defined by the configuration of the depressions 14.

Although not shown in detail, persons skilled in the art will understand that the body structure 10 may also be formed on both sides with depressions positioned at a same level but not necessarily of same depth to generate a particular texture or decor instead of a smooth outer surface. Examples thereof are shown in FIGS. 6 and 7.

FIGS. 2 and 3 indicate further the ability to fabricate the depressions 14 in a single operation through use of a suitable tool, by plastifying the areas of the depressions though heat application. Shaping of the depressions 14 can then be effected by dies or rams which are pressed into the sandwich panel. It will be understood by persons skilled in the art that the face layers 11, 12—in the event both sides are formed with depressions—, or the face layer 12—in the event of forming depressions on only one side, as shown in FIGS. 1 to 3—, should have extendible characteristics. The core member 13 is compacted along the side flanks of the depressions 14.

Turning now to FIG. 4, there is shown a modified body structure 10 formed with depressions 14 extending from one side (here from face layer 12) to about half the thickness of the body structure 10, with the depressions 14 exhibiting a trapezoidal shape. FIG. 5 shows an example of a body structure 10 with depressions 14 of semi-circular configuration. Depending on the type of material used for the core member 13, the depth of the depressions 14, as shown in FIGS. 4 and 5 may already be sufficient to create flexible areas.

As shown in FIGS. 4 and 5, the body structure 10 is covered on both sides with a cover sheet 15, 16 to thereby

Appx0282

ALTUMLLC000259

5,915,445

5

render the depressions **14** invisible from outside and afford the body structure **10** a pleasing look. The cover sheets **15, 16** have a thickness which is relatively small in proportion to the overall thickness of the body structure **10**. Preferably, the cover sheets **15, 16** are made from a plastic film which is bonded onto the outside of the face layers **11, 12** or secured in any other suitable manner. Persons skilled in the art will understand that the cover sheets **15, 16** should be of flexible nature to enable a wrapping around the body structure **10** or coiling. Certainly, it is within the scope of the present invention to provide a cover sheet over only one side of the body structure **10**, whereby, preferably, the cover sheet is attached on the side that is recessed through formation of the depressions **14**.

The depressions **14** are suitably made through hotforming because the plastic plate is made preferably form a thermoplastic material. In dependence on the depth of the depressions, the core member **13** is compacted to a varying degree in the areas adjoining the depressions. It will be understood by persons skilled in the art that the depressions may certainly also be formed through a mechanical process, e.g. milling.

The foregoing description should not be limited to the formation of a plate-shaped body structure on the basis of a laminate. It is certainly within the scope of the invention to fabricate the body structure from a single layer plastic panel or multi-layer plastic plate, whereby the plate is formed with depressions or recesses through a material removing process, with the depressions having such a depth that the remaining material exhibits flexible characteristics.

While the invention has been illustrated and described as embodied in a sectional overhead gate, it is not intended to be limited to the details shown since various modifications and structural changes may be made without departing in any way from the spirit of the present invention.

What is claimed as new and desired to be protected by Letters Patent is set forth in the appended claims:

**1**. A sectional overhead gate; comprising a plate-shaped body structure comprised of a plurality of rigid panels made from an element selected from the group consisting of single-layer plastic strip, multi-layer plastic strip, and laminate of different material layers; and hinged means for connecting adjacent panels to one another, said hinge means

6

being formed by least one flexible strip formed in one piece with the panels or at least one layer of the panels to thereby realize a continuous unitary arrangement of the panels of the body structure.

**2**. The overhead gate of claim **1** wherein the plate-shaped body structure is made of a thermoplastic material.

**3**. The overhead gate of claim **1** wherein the plate-shaped body structure is made in sandwich construction by at least three layers and so formed at least on one side with thickness-reducing depressions in spaced-apart parallel disposition that flexible zones are defined.

**4**. The overhead gate of claim **3** wherein the plate-shaped body structure is made of three layers with a central layer forming a core member and disposed between two outer face layers, said face layers having a thickness which is significantly smaller than the thickness of the central layer.

**5**. The overhead gate of claim **4** wherein the core member is made of a material of relatively small density.

**6**. The overhead gate of claim **5** wherein the core member is made of a material selected from the group consisting of honeycombed material, foam, and fiber material.

**7**. The overhead gate of claim **5** wherein the core member and the face layers are made of a material which is deformable when subject to heat and pressure.

**8**. The overhead gate of claim **5** wherein the face layers are connected to one another in an area of the depressions.

**9**. The overhead gate of claim **8** wherein the face layers are connected to one another in the area of the depressions by welding.

**10**. The overhead gate of claim **3** wherein the depressions are formed on one side of the body structure.

**11**. The overhead gate of claim **3** wherein the depressions are formed on both sides of the body structure.

**12**. The overhead gate of claim **10**, and further comprising a cover sheet for covering the one side of the plate-shaped body structure formed with the depressions.

**13**. The overhead gate of claim **11**, and further comprising two cover sheets for covering both sides the plate-shaped body structure.

**14**. The overhead gate of claim **1** in the form of a hollow section having outer wall surfaces connected to one another by welding.

*    *    *    *    *

ALTUMLLC000260

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RIDGE CORPORATION,                    )
                                      )
   PLAINTIFF,                         )      CASE NO. 2:23-cv-3012
                                      )
        vs.                           )
                                      )
KIRK NATIONAL LEASE CO., *et al.*,)
                                      )
   DEFENDANTS.                        )
_____)

TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
VOLUME I OF IV
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
OCTOBER 3, 2023; 8:30 A.M.
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:
     Bailey Cavalieri LLC
     By:  Christopher W. Tackett, Esq.
          John P. Miller, Esq.
          Graycen M. Wood, Esq.
     10 West Broad Street, Suite 2100
     Columbus, Ohio  43215

FOR THE DEFENDANTS KIRK NATIONAL LEASE CO. and
TRUCK AND TRAILER PARTS SOLUTION:
     FGKS Law
     By:  Joshua A. Koltak, Esq.
     100 South Main Avenue, Suite 300
     Sidney, Ohio  45365

     Faruki PLL
     By:  Donald E. Burton, Esq.
     110 North Main Street, Suite 1600
     Dayton, Ohio  45402

     Faruki PLL
     By:  Melissa L. Watt, Esq.
     201 East Fifth Street, Suite 1420
     Cincinnati, Ohio  45202

APPEARANCES CONTINUED:

FOR THE DEFENDANT ALTUM LLC:
        Arnold & Clifford LLP
        By:  Damion M. Clifford, Esq.
             Michael L. Dillard, Jr., Esq.
        115 West Main Street, 4th Floor
        Columbus, Ohio  43215

- - -

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

VOL. I -   13

1  presentation because it's sort of a compilation of the defense

2  brief which I've already reviewed.  So you may continue.

3        Your objection is duly noted.

4        MR. TACKETT:  Thank you, Your Honor.

5        MR. CLIFFORD:  Critically, Your Honor, Ridge admits it

6  has never sold a roll-up door.

7        Let's look at the defendants.  Kirk National Lease,

8  Truck and Trailer Parts, and Altum.  Those are the defendants

9  that are sued in this matter.  Kirk National Lease, Truck and

10 Trailer Parts Solution, they have a relationship together.

11 Altum is simply a supplier.

12        In 2008, Kirk National Leasing, KNL, and TTPS is what

13 we'll call them, approaches Ridge and has a design for a

14 roll-up door.  They bring it to Ridge and say:  Can you provide

15 supplies to us to make this?  They have the idea.  Here is an

16 example.  I think we keep talking about what a roll-up door is,

17 Your Honor.  This is an example of what the door looks like in

18 the final phase.  It's the middle part.  It rolls up, single

19 panel.  Ridge is the supplier.  Ridge says that's great.  We

20 can provide you with panels to make your door.  They do.

21        Now, this is a picture of the panel that Altum makes.

22 But I have for you, Your Honor, just to show, this is the

23 example of kind of what a panel is.  I can bring this up to you

24 if you want to feel it, hold it.

25        THE COURT:  I get it.

VOL. I -    23

1    Flexible.  It says, because the foam and liner chosen for the

2    panel are designed to flex, the flexibility is a property of

3    the material chosen for the panel.

4          And this is very important, Your Honor.  It is the

5    material itself that flexes.  The material itself that flexes,

6    rather than bending, it hinges which is what we're here for

7    today.  This doesn't -- the material of this panel does not

8    flex.  Instead, it bends, it hinges.  This is what the Cold

9    Chain patent told the Patent and Trademark Office.  It says it

10   is the material itself that flexes, rather than bending, it

11   hinges as would be the case with the rigid panel and hinge

12   structure.

13         So let's get to what the standard is for the injunction.

14   A likelihood of success on the merits.  Now, there are three

15   claims -- four claims that are the basis of this injunction

16   request.  The evidence will show that the plaintiffs will not

17   carry their burden.  As you can see and what you will hear is

18   the claim for direct infringement simply fails on its face.

19   The Cold Chain patent is not the door being made by KNL.  And

20   if there is no direct infringement, the claims for indirect

21   infringement against Altum, the contributory infringement and

22   the inducement also fail.

23         Lastly, there is a claim for tortious interference

24   against Altum.  Altum has not caused any relationship to be

25   terminated between Ridge and a third party.  Altum is not aware

VOL. I -   37

 1    said we're going to have Mr. Sharpe testify and go over the

 2    patent claims.  And, in response, we are going to have

 3    testimony and go over the second outermost surface issue that

 4    we raise in our brief.  I think the groundwork has been laid

 5    for all of that already so I'm going move ahead past the

 6    infringement slides to the last slide.

 7         This is the lack of irreparable harm point.  As

 8    Mr. Clifford pointed out, there were a lot of representations

 9    made in the Rule 65.1 conference and the TRO motion that Ridge

10    is in direct competition with defendants.  There's going to be

11    loss of market position, price erosion, it's happening in a

12    narrow and niche market.

13         This is plaintiff's counsel in the Rule 65.1 conference.

14    "This is a really narrow market space, this commercial

15    trucking-related industry.  It's niche and it's narrow."  Later

16    on he says:  I mean, they're whole -- here, their whole product

17    is infringing.  Once it gets in the market, and, again, I think

18    in particular because of this narrow niche industry that we're

19    talking about in particular, that is a problem.  Yet, we have

20    evidence, as mentioned even in plaintiff's opening, of 275,000

21    sales a year of possible market.

22         And that -- so that representation which is part of the

23    Court's finding in the motion, in the TRO order on page 6, will

24    not -- the proof will not bear that out in the preliminary

25    injunction hearing.  We also mention some of the points

VOL. I -   38

1    Mr. Clifford went in more detail, that Ridge does not have a

2    sellable product at this moment.  Also one of the irreparable

3    harm factors that's listed in our brief, at least, is

4    willingness to license the product.  If you want to license

5    your patent, that cuts against the idea that you have

6    irreparable harm as opposed to a damages recovery.

7          So the evidence will show, and I think what's been

8    introduced by Mr. Clifford's opening and the complaint itself,

9    is that Ridge was very eager at one point, May, June 2023, to

10   license to the KNL defendants the Cold Chain patent in exchange

11   for Ridge becoming the exclusive supplier of panels.  KNL can

12   go out and sell the door with Ridge selling the panels.  The

13   Whiting Motor Company, the company that Mr. Clifford mentioned

14   which the evidence will show has a big presence in the roll-up

15   market, one of the big three of the roll-up market, Ridge is

16   working with them and it looks like it would be in the same

17   capacity.  They're content to be a supplier of panels while

18   Whiting, it's big position in the market, goes out and sells

19   the doors.

20         The only other point I want to add to that, the

21   irreparable harm point for patent infringement is we have -- we

22   asked for discovery, of course, before this proceeding on

23   issues relating to irreparable harm.  We asked for discovery --

24   and these are attached as exhibits in our exhibits: Exhibits

25   142 and 143.  Exhibit 142, Defendant's Exhibit 142, is Ridge's

VOL. I -   45

1  boats.  We do some aerospace work.  We do a lot with

2  automotive, electric vehicles, many different markets that are

3  requiring light weighting, high strength and sophisticated

4  manufacture.

5      Q.   When did you mean when you said final mile as you were

6  going through that recitation?

7      A.   We provide components -- for example, the Amazon truck

8  that comes to your house.  The floor in that Amazon truck very

9  well may be a Ridge floor.  We manufacture those products for

10 OEMs that eventually supply those to the FedExes, the Amazons,

11 et cetera.  We're solving problems for those fleets.

12     Q.   What do you mean by OEM?

13     A.   Original equipment manufacturer.  Those would be

14 companies -- most of our partners or customers, I should say,

15 are very large billion dollar corporations:  Trans-Lee, Wabash,

16 Great Dane Trailers.  These companies manufacture

17 transportation goods.  Morgan Olson for instance.  Morgan Truck

18 Body.  They would manufacture the actual vehicle or assemble

19 the chassis in the box, and then supply that to a fleet who in

20 turn would use that equipment to service their customers which

21 may very well be yourself ordering something from Amazon.

22     Q.   What would be Ridge's role in working with those larger

23 companies?

24     A.   Twofold.  One, we've done a fair amount of work with

25 fleets directly.  So the fleet has a problem that needs to be

VOL. I -   46

1   solved.  A fleet, say Coke or Pepsi, may have a problem and

2   they want it addressed, and we will design a product.  And that

3   fleet will go to the OEM, the original equipment manufacturer,

4   and say we want this product on our vehicle.  We would like to

5   try it, test it.  That's one avenue.

6        The other avenue is going directly to the OEM, providing

7   them a solution, marketing the solution, and helping them help

8   their customers or gain a market advantage in their markets

9   against their competition.  There's two routes, two channels,

10  that we can work design-wise.

11  Q.   And how would you describe the competitiveness of

12  getting in the door with those OEMs with your solutions?

13  A.   It's a challenge.  They're very busy.  They have a lot

14  of people knocking on their doors with a lot of different

15  ideas.  We're fortunate.  We have very good credibility with

16  our customers.  They come to us.  The OEMs come to us asking

17  for solutions many times, and we will develop new products

18  specifically for their needs.  We have a very good reputation.

19  So we're successful.

20  Q.   When did Ridge first start looking into a potential

21  roll-up door for commercial vehicles?

22  A.   Ridge -- okay, well, several different aspects of that.

23  Gary Grandominico, my partner, has always been interested in

24  roll-up door solutions for decades.  He can talk about that.

25  We've been approached by the top two door manufacturers to

VOL. I -    47

1    supply products for testing.  They wanted to use our materials,

2    our thermoplastic glass reinforced materials, in different ways

3    to try to accomplish different roll-up door solutions.

4         We provided materials as samples.  They've done various

5    testing to try to integrate our materials into their incumbent

6    solutions, their existing solutions.  So we started, I'd say,

7    it was '17, '18, '19, we were having actual material sent to a

8    Whiting Door, a TODCO door, the two largest manufacturers in

9    the industry.  So --

10   Q.   When you say '17, '18, '19, you're referring to 2017,

11   2018, and 2019?

12   A.   I believe so.  I mean, there's records of these

13   transactions where we were involved, whether it's emails or

14   working with various customers on samples.

15   Q.   Can you tell me what it is that Ridge did in its roll-up

16   door work with the TODCO company that you mentioned?

17   A.   My understanding, we supplied them some materials that

18   they could use as an exterior skin for a product that they were

19   trying to develop called Arctic Flex which is a one-piece door,

20   an insulated one-piece door.  And they wanted to try and get

21   rid of the hinges, work with a living hinge-type concept.  We

22   engineered the material to get the proper flex, solve the

23   problem they were achieving, and we provided materials on that

24   front.

25   Q.   And the other one that you mentioned, was that around

VOL. I -   48

1   the same time as your work for TODCO?

2    A.   A little bit later.  They approached -- interestingly, I

3   believe the approach was from Pat Whiting, the owner of Whiting

4   Door.  I believe he saw some of our VCR roof materials, a

5   different product that we were offering to the transportation

6   market.  He was interested in integrating that into a

7   multi-piece panel door.  So those would have been sandwich

8   panels and flat panels that we provided them for testing.  I

9   want to say that was probably more towards 2019, later.

10    Q.   What is the -- what's the great -- what's the great

11   thing, what's the benefit, I guess to say it better, about

12   making a roll-up door that is one piece?

13    A.   Well, there's several advantages.  Obviously, weight is

14   always a concern for transportation.  They want lighter

15   weights, hyper strengths, better durabilities.  The

16   thermoplastic composites we produce are high energy absorbers,

17   very high deflection materials, can take a lot of abuse.

18   They're traditionally used for protective barriers inside of

19   trailers.  A lot of our customers come to us that are familiar

20   with our scuff band products which are used to protect the

21   inside of a trailer.  They also have experience with our skirt

22   products out in the environment and get engaged and hit, many

23   different products.  They know the durability of this

24   thermoplastic composite.  They're all looking to integrate that

25   benefit into other areas of the trailer that they have

VOL. I -   49

1    maintenance problems with or get damaged.

2         So the roll-up door, having a one piece roll-up door

3    made out of that material that saves weight, that would be

4    easier to install for an OEM or fleet, would have lower

5    maintenance because roll-up doors are a maintenance nightmare

6    in general for the traditional fleet.

7         You also have injuries associated with roll-up doors.

8    As there are driver shortages, you have more people coming into

9    the driver market.  Some of these are slighter-build women,

10   younger women.  They can't lift hundreds of pounds on these

11   doors.  There's rotator cuff injuries.  There is a lot of

12   reasons you want a lighter, more durable, easier to operate,

13   lower cost to operate, door.  The material - a composite

14   material - provides a route to achieve a lot of those benefits.

15   Q.   In your experience at Ridge being in this market, when

16   you're doing this work in 2017, 2018 and 2019, was there

17   something already in the market that met that need?

18   A.   No.  I mean, that was a one-piece door that was a

19   commercialized product, no.

20   Q.   What relationship did Ridge Corporation have with Kirk

21   National Lease prior to these most recent events that led to

22   the lawsuit in this case?

23   A.   Well, prior to the discussions regarding the door, Kirk

24   National Lease was a customer of our other products.  Okay.  So

25   I'll divide it into pre-October 2018 and post-October 2018.

VOL. I -   66

1    Q.    At that point in time, what did Ridge Corporation do

2    next?

3    A.    I believe we sent letters to -- cease-and-desist letters

4    to multiple -- all the entities to ask them to stop as well,

5    and we received various responses back from Altum and

6    Transglobal, I believe.

7    Q.    I'd like to turn your attention to the additional

8    cease-and-desist letter at Plaintiff's Exhibit 12.  Turn to

9    that.  Do you recognize and are you familiar with this letter?

10   A.    Yes.

11   Q.    Can you describe what it is?

12   A.    We're serving notice that we are licensed again --

13   similar to what we did with KNL.  We're making Altum aware of

14   the issue.  We're letting them know that Altum supplying

15   materials could be potential grounds, I guess, for contributory

16   infringement or inducing infringement, and we're asking them to

17   cease and desist and asking for a response.

18   Q.    And what is your understanding of whether Altum relayed

19   agreement to cease and desist or whether they disagreed with

20   this position?

21   A.    My understanding is their response was they disagreed

22   with the position and were going to continue to do what they

23   wanted to do.

24   Q.    I'd like you to turn to the next tab that's Plaintiff's

25   Exhibit 13.

VOL. I -   67

 1    A.    Okay.

 2    Q.    This is a letter from Altum's counsel.  Do you recognize

 3  this letter?

 4    A.    Yes.

 5    Q.    When you were just testifying, is that part of what you

 6  were referring to or is there something else?

 7    A.    This is -- this is the response, I guess, the formal

 8  response from Altum regarding our notice of the issue to Altum.

 9  So in response to that.

10    Q.    And how much longer -- how much time had passed between

11  the June 9th cease-and-desist letter to Altum and that response

12  that you're looking at?

13    A.    Approximately a month.

14    Q.    I would like you to turn to the next tab in the binder.

15  It's Plaintiff's Exhibit 14.

16    A.    I'm there.

17    Q.    A letter dated September 6th, 2023, to Whiting Door

18  Corporation.  Have you seen this before?

19    A.    I have.

20    Q.    What is your understanding of this letter?

21    A.    This is a threat to a business partner, threating to sue

22  them if they work with us.

23    Q.    And who directed this letter to be sent to your

24  potential business partner?

25          MR. DILLARD:  Objection, Your Honor.  Lack of

VOL. I -   74

1    Q.   During one of those meetings, you did some brainstorming

2    with other Ridge folks with KNL people there, and you believe

3    this a prototype or a concept, right?

4    A.   Yeah, we proposed the curve cut and corrugation in those

5    meetings.

6    Q.   And the curve cut was going to be applied to a Ridge

7    sandwich panel; is that right?

8    A.   Yes.

9    Q.   That's a structural foam panel?

10   A.   Yes.  We refer to that product line as Transcore, for

11   the most part.

12   Q.   So a three-layered product with polypropylene and

13   fiberglass skins on both sides of polypropylene foam?

14   A.   Yes.  They're polypropylene fiber reinforced skins on

15   both sides of a polypropylene core, foam core.

16   Q.   Exhibit 43.  So here is a picture of -- well, tell me,

17   what do you think that's a picture of there?

18   A.   It appears to be the picture of a prototype door.  It

19   appears to be a door panel that we produced, and it appears to

20   have rollers, and at least one side of it is in the track, the

21   roll-up door track.

22   Q.   The blue lines running across those panels, is that what

23   we're referring to as the relief cuts?

24   A.   In those areas, that would be referred to as the relief

25   cut where the back skin and the foam core is cut so that you

VOL. I -   90

1   questions about Exhibit D14 that they put in front of you, a

2   document entitled Business Plan/Cooperative Agreement.  Can you

3   turn back to that D14, please?

4   A.   I believe they were showing it on the screen.

5   Q.   We'll figure it out one way or another.  It looks like

6   we got belt and suspenders right now.

7        Mr. Dillard was asking you some questions about the

8   portions of the document containing revenue projections.  I'd

9   like you to look at those.  On pages 13 and 14 of this exhibit,

10  so --

11  A.   Okay.  I'm there.

12  Q.   Page 13 contains -- relates to the revenue projections

13  for the door, right?

14  A.   Yes.  This projection is for roll-up door total sales,

15  not to be confused with door panel sales.

16  Q.   Okay.  And under the column that says total and in

17  alignment with the row 2023, what are you projecting there?

18  A.   That would be $3.6 million in sales if -- I'm sorry.

19  2023?  That would be year two.  That would be $299,299 if we

20  sold approximately 299 complete doors at approximately a

21  thousand dollars.

22  Q.   And then in the next year, after ramping up, what are

23  you projecting there on that?

24  A.   Similar.  It's 3,500 complete doors at a thousand

25  thirty-one dollars per door system, and aggregating to

VOL. I -   91

1   $3.6 million.

2   Q.    Now, in terms of Ridge's efforts to go into the market

3   with its exclusive license to different companies and sell what

4   they're offering, what different type of figures would you be

5   looking at for those sales?

6          MR. DILLARD:  Objection, Your Honor.  Speculation.

7          THE COURT:  Overruled.  You may answer.

8          THE WITNESS:  Thank you, Your Honor.

9          Assuming we put together the deal with Whiting, we would

10  be selling a door panel.  They would, in turn, be selling a

11  complete door.  So that's scenario one.

12         Scenario two is we build the door ourselves, nothing

13  happens with Whiting.  And that's what these type of numbers

14  would reflect because this is a complete door.  These numbers,

15  based on this percentage market share penetration, would be low

16  because this was working with KNL which is not an established

17  door manufacturer.  They don't have any clout in that arena.

18  Working with Whiting would be substantially quicker.  The ramp

19  up would be substantially quicker, and the revenues I'd expect

20  to be larger year two, year three, year four than what we're

21  projecting here.

22         Now, this is a 2022 document.  Right?  We're in 2023.

23  So the delay that this whole thing has caused kind of makes the

24  years inaccurate here.  Right?  We got to start the clock

25  again.  So, basically, we would be projecting -- I would

VOL. I -   93

1    Q.    Can you turn to the next page, page 14 of this Exhibit

2    D14?  It's Bates labeled Altum LLC 15.

3    A.    Yes.

4    Q.    Altum's counsel asked you to look at the revenue figure

5    for 2022 which was a projection of 142 million.  And I believe

6    you testified that actual revenue was somewhere in the

7    neighborhood of 60 to 80 million?

8    A.    Correct.

9    Q.    Would getting into the market with your patented

10   solution bridge part of that gap between your projection and

11   what you actually realized?

12   A.    In 2022?

13   Q.    Yes, sir.  Assuming the beginning of '22 things work out

14   and you get into the market with your solution.

15   A.    At that point, we would have been working with KNL and

16   we would have been doing sales with KNL.  This was a projection

17   for doing business together with KNL in the -- in that year.

18   Now, if we -- right now we're moving forward.  You have to

19   slide this probably at least 12 months on the projection.  But,

20   yes, obviously, we would be generating revenues at a much

21   higher ramp with a significant partner that would offset some

22   of these numbers, of course.

23   Q.    And then in terms of 2023, what you have here of the

24   projection of 267 million versus the lower revenue that you

25   have, would getting to the market with Diamond, Whiting, and

VOL. I -   94

1   others help you bridge that gap?

2   A.    Certainly.  Yes.

3   Q.    And how much so?

4   A.    Well, we'd have to have a door that was completed

5   through the testing, and in a matter of our capacity to produce

6   the doors is very high.  We could produce thousands of doors a

7   week, panels a week.  So it would be a matter of which partners

8   were selling the doors.  It could be substantial.

9   Q.    What would be the estimated revenue difference?

10   A.    It could be millions, millions of dollars annually.

11   Q.    And one more point of your testimony on cross that I

12   want to clarify, just one question.

13        There was testimony about Diamond Door, Whiting Door and

14   others as potential partners.  But as we sit here today, are

15   there any agreements that are signed between Ridge and any of

16   those potential partners to go to market?

17   A.    To go to market, no.  Just nondisclosure agreements at

18   this point.

19             MR. TACKETT:  Nothing further.  Thank you, Your Honor.

20             THE COURT:  Thank you.  Thank you, Mr. Tackett.

21        Mr. Dillard, any recross?

22             MR. DILLARD:  No recross, Your Honor.  Thank you.

23             THE COURT:  Mr. Koltak, any recross?

24             MR. KOLTAK:  No, Your Honor.

25             THE COURT:  Mr. McDonald, thank you very much, sir.

VOL. I -   95

1   You may be excused.

2          THE WITNESS:  Thank you, Your Honor.

3          MR. TACKETT:  Your Honor, we have a clarifying

4   question for the Court before calling our next witness.  With

5   regard to the order of the separation of witnesses, may

6   Mr. McDonald stay in the courtroom now or should he leave?

7          THE COURT:  Do any of you intend to call Mr. McDonald

8   as upon cross?

9          MR. DILLARD:  At this time we don't know, Your Honor.

10          THE COURT:  Mr. Koltak?

11          MR. KOLTAK:  Unclear.

12          THE COURT:  Do you have any objection to Mr. McDonald

13   remaining in the courtroom?

14          MR. DILLARD:  Yes, Your Honor.

15          THE COURT:  What's the basis of it?

16          MR. DILLARD:  If we need to recall him for some other

17   witness testifying conversely to what he testified, one of

18   Ridge's own witnesses, and get clarification from him.  That

19   would be our only basis.

20          THE COURT:  So in preparing for this, you didn't

21   contemplate calling him as a witness; is that right?

22          MR. DILLARD:  That is right, Your Honor.

23          THE COURT:  Is that the same for you, Mr. Koltak?

24          MR. KOLTAK:  Correct.  He is not listed as a witness

25   for our side.

VOL. I -   96

1          THE COURT:  But you don't know whether -- for this

2    preliminary injunction hearing, whether you're going to call

3    him back?

4          MR. DILLARD:  We do not at this point, Your Honor.

5          THE COURT:  And you have -- who is your client

6    representative who is here?

7          MR. TACKETT:  Mr. Gary Grandominico, the CEO.

8          THE COURT:  Mr. Grandominico is seated right there?

9          MR. TACKETT:  Yes, Your Honor.

10         THE COURT:  We will have him -- Mr. McDonald excluded,

11   although I would be disingenuous if I said I'm convinced that

12   you're going to recall him.  But there is a possibility that

13   you might because I know how well you all have prepared for

14   this.  And I would assume that you would know whether you're

15   going to call him back.  But given the nature of his testimony,

16   you may be correct.

17         MR. DILLARD:  With that being said, Your Honor, we do

18   not anticipate recalling him.  I just don't know that something

19   may come up.

20         THE COURT:  It's better to be safe than sorry.

21   Mr. McDonald, you are excused.

22       Ms. Wood, your next witness?

23         MS. WOOD:  We call Richard Sharpe to the stand.

24         THE COURT:  Mr. Sharpe, please come forward and be

25   sworn.

```
                                              VOL. I -   97

 1        (Witness sworn.)

 2             THE COURT:  Ms. Wood, please proceed.

 3                       - - -

 4                     RICHARD SHARPE

 5     Called as a witness on behalf of the Plaintiff, being first

 6   duly sworn, testified as follows:

 7                  DIRECT EXAMINATION

 8   BY MS. WOOD:

 9   Q.    Can you please state your name for the record?

10   A.    Richard Andrew Sharpe.

11   Q.    Mr. Sharpe, what is your profession?

12   A.    I'm a patent attorney.

13   Q.    Where do you work?

14   A.    I work at the firm of Pearne and Gordon in Cleveland,

15   Ohio.

16   Q.    How long have you worked there?

17   A.    At Pearne and Gordon, about 12 years, I believe.

18   Q.    What is your title at Pearne and Gordon?

19   A.    I'm a partner.

20   Q.    What is your educational background?

21   A.    I have an undergraduate degree in chemistry, a

22   Bachelor's of Science in chemistry from Otterbein College.  I

23   think it's Otterbein University now in Westerville, and I have

24   a law degree from the American University in D.C.

25   Q.    Do you hold any licenses?
```

VOL. I -   99

1    Cold Chain patent.

2      Q.   And have you reached any conclusions as a result of your

3    examination of those items we discussed?

4      A.   Yes, I have.

5      Q.   What is your conclusion?

6      A.   I conclude that the --

7             MR. CLIFFORD:  Objection, Your Honor.

8             THE COURT:  Basis?

9             MR. CLIFFORD:  It's basically the basis of the motion

10   in limine.  They're asking for him to step in your shoes and

11   determine whether there's infringement or not.  And his

12   testimony is not appropriate in this area.

13            MS. WOOD:  We're not asking Mr. Sharpe to opine on any

14   legal conclusions.

15            THE COURT:  Could you bend the microphone toward you?

16            MS. WOOD:  We're not asking Mr. Sharpe to opine on

17   legal conclusions.  He will be relying on his technical

18   expertise in the area, and he will not be opining as to the

19   ultimate issue as to whether there is infringement or not

20   infringement in this case.

21            THE COURT:  Your objection is overruled.

22        You may answer, Mr. Sharpe.

23            THE WITNESS:  I have concluded that the accused doors

24   have every element that is recited in the asserted claims of

25   the Cold Chain patent in this case.

VOL. I -  104

1    correspondence included.  But it was certainly a fair amount of

2    detailed information on not just the configuration and the

3    geometry of the doors, but the materials and how to make the

4    doors actually function to curve around the tracks.

5    Q.    Could you turn to the page that is Bates labeled Ridge

6    59, please?

7    A.    I'm sorry.  Excuse me?

8    Q.    Ridge 59.

9    A.    An exhibit or page?

10   Q.    The page in that exhibit.

11   A.    Okay.  Gotcha.  Okay.

12   Q.    Are these the drawings that you were referring to?

13   A.    Yes, they are.

14   Q.    Could you please flip the page?

15   A.    Okay.

16   Q.    Are these also drawings that you were referring to?

17   A.    Yes.

18   Q.    And did you think this information satisfied Mr. Barnes'

19   request?

20   A.    I do not believe it did.  I believe that he maintained

21   his position that Ridge employees were not joint inventors of

22   the subject matter of the pending application.

23   Q.    Did you send any other letters in this action?

24   A.    We did.

25   Q.    Could you please turn to Tab P9?

VOL. I -  105

1     A.    All right.

2     Q.    Are you familiar with this document?

3     A.    Yes.

4     Q.    What is it?

5     A.    This is an excerpt from the TTPS website from which we

6     derived some of the information concerning our analysis of the

7     accused door.

8     Q.    Thank you.  I'm sorry if I misspoke.  I meant Tab P9.

9     A.    Yes.  This is a letter also from my law firm, myself,

10    directed to Kirk National Lease and TTPS regarding the Cold

11    Chain patent.

12    Q.    What is the date on this document?

13    A.    June 6th, 2023.

14    Q.    Is this a true and accurate copy of the letter?

15    A.    I believe it is, yes.

16    Q.    And who wrote this letter?

17    A.    I did.

18    Q.    Can you please explain the purpose of this letter?

19    A.    The purpose of this letter was to inform KNL and TTPS of

20    the Cold Chain patent and our analysis or belief that the doors

21    that KNL and TTPS were offering infringed that patent.

22    Q.    What was the basis for the facts in this letter?

23    A.    Again, the information about the accused doors that we

24    received from Ridge.

25    Q.    Did you receive a response to this letter?

VOL. I - 106

1    A.    I believe so.

2    Q.    Could you turn to Tab P10, please?  What is this

3  document?

4    A.    This was the initial response to the letter in Exhibit 9

5  basically saying that they'll get back to us.

6    Q.    And does this look to be a true and accurate copy of the

7  letter?

8    A.    Yes.

9    Q.    Did you have a reaction to this response?

10    A.    I personally thought this was a little flippant.

11    Q.    Did you ever receive another response?

12    A.    I believe we did.

13    Q.    Could you turn to Tab P11, please?  Are you familiar

14  with this document?

15    A.    Yes.

16    Q.    What is it?

17    A.    This is a response, a formal response, from KNL's

18  attorney advising us that they disagreed with our conclusion

19  regarding infringement of the patent.

20    Q.    What is the date on this letter?

21    A.    This is dated August 1st, 2023.

22    Q.    Is this a true and accurate copy of the letter?

23    A.    I believe so, yes.

24    Q.    And did you have a reaction to this letter?

25    A.    We disagreed with the conclusion, obviously, and we

VOL. I -  107

1    advised our client accordingly.

2    Q.   Could you turn to Tab P12, please?  What is this

3    document?

4    A.   Similar to our other notice letter, this is a letter to

5    Altum informing Altum of the Cold Chain patent and our belief

6    that they were contributing or inducing infringement of that

7    patent.

8    Q.   What is the date on this letter?

9    A.   This is dated June 9th, 2023.

10   Q.   Is this a true and accurate copy of the letter?

11   A.   Yes, ma'am.

12   Q.   And who wrote this letter?

13   A.   I did.

14   Q.   What was the basis for the facts in this letter?

15   A.   Our understanding of Altum's contribution to the

16   ultimate -- the KNL door.  There has to be a direct

17   infringement in order for there to be a contributory or induced

18   infringement.  This reflects our understanding that they were

19   materially involved with helping KNL design the door and how to

20   make the grooves and things to let it function to go around the

21   curves.

22   Q.   Did you receive a response to this letter?

23   A.   I believe so.

24   Q.   Can you turn to Tab P13, please?

25        Are you familiar with this document?

VOL. I -  109

1    Q.    What does this letter say?

2    A.    This letter basically was informing Whiting Door of a

3    pending patent application by KNL, the '144 application.  And

4    it alleges or implies, anyways, that Whiting could be liable

5    for royalty damages from the date of publication, and the

6    implication obviously being, in my opinion, a veiled threat.

7    Q.    And you mentioned royalty damages.  This letter brings

8    up royalty damages.

9    A.    Yes.

10   Q.    Do you have any -- did you have a reaction to the

11   royalty damages specifically?

12   A.    We did.  The provision about royalty damages back to the

13   date of publication is contingent on several things.  And one

14   of the things it's contingent on is that the claims are

15   essentially the same as they were when they were originally

16   filed.  We went and took a look at the prosecution and the

17   claims at that point in time and determined the claims were

18   materially changed from the original status as filed and,

19   therefore, that eliminates the possibility to recover those

20   royalty damages prior to -- back to publication.

21   Q.    When you say "the claims," are you -- can you tell me

22   what patent you're talking about?

23   A.    The pending claims in the '144 application.

24   Q.    Can you please turn to Tab P15?

25   A.    Okay.

VOL. I -  138

1    but I don't want to waste the Court's time on going through --

2    A.   I don't.

3    Q.   That's fine.  And Defendant's 7 is one of the sets of

4    documents that you reviewed in form -- in creating Plaintiff's

5    16, correct?

6    A.   I reviewed the prosecution history of the Cold Chain

7    patent.

8    Q.   If I represent to you that Defendant's 7 is the

9    prosecution history for the Cold Chain patent, that would be

10   something you relied upon in creating Plaintiff's 16?

11   A.   Correct.

12   Q.   Turn to Altum 234, please.

13        If we can just tab through this so he can look at this

14   real quick.

15        Mr. Sharpe, this 234 through 248 is the initial patent

16   application of Cold Chain, correct?

17   A.   I don't know that.  But if you're representing that that

18   is the case --

19   Q.   Well, I'm just trying to speed it up.  Take the binder

20   out --

21   A.   I'm not trying to be obstinate.  I don't know it from

22   sight.

23   Q.   Look at pages 234 through 248 in the binder in front of

24   you and confirm that it is the Cold Chain patent application.

25   A.   Defendant's binder?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RIDGE CORPORATION,                  )
                                    )
  PLAINTIFF,                        )          CASE NO. 2:23-cv-3012
                                    )
        vs.                         )
                                    )
KIRK NATIONAL LEASE CO., *et al.*,)
                                    )
  DEFENDANTS.                       )
_____)

TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
VOLUME II OF IV
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
OCTOBER 4, 2023; 8:30 A.M.
COLUMBUS, OHIO

  APPEARANCES:

  FOR THE PLAINTIFF:
        Bailey Cavalieri LLC
        By:  Christopher W. Tackett, Esq.
             John P. Miller, Esq.
             Graycen M. Wood, Esq.
        10 West Broad Street, Suite 2100
        Columbus, Ohio  43215

  FOR THE DEFENDANTS KIRK NATIONAL LEASE CO. and
  TRUCK AND TRAILER PARTS SOLUTION:
        FGKS Law
        By:  Joshua A. Koltak, Esq.
        100 South Main Avenue, Suite 300
        Sidney, Ohio  45365

        Faruki PLL
        By:  Donald E. Burton, Esq.
        110 North Main Street, Suite 1600
        Dayton, Ohio  45402

        Faruki PLL
        By:  Melissa L. Watt, Esq.
        201 East Fifth Street, Suite 1420
        Cincinnati, Ohio  45202

```
    APPEARANCES CONTINUED:

FOR THE DEFENDANT ALTUM LLC:
        Arnold & Clifford LLP
        By:  Damion M. Clifford, Esq.
             Michael L. Dillard, Jr., Esq.
        115 West Main Street, 4th Floor
        Columbus, Ohio  43215
```

- - -

```
        Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

VOL. II -  169

1    Q.    And the rightmost column applies those elements to the

2    accused device, right?

3    A.    Yes.

4    Q.    Would you agree with me that, generally speaking, an

5    infringement claim requires a two-part analysis?  The first

6    part being construing the claims, and the second part applying

7    the properly construed claims to the accused device?

8    A.    Any formal claim construction setting such as a Markman

9    hearing or something of that nature, yes.

10   Q.    So you didn't do that first step for purposes of this

11   chart, right?

12   A.    That's not correct.

13   Q.    Okay.  Does your chart show any claim construction --

14   A.    No.

15   Q.    -- that you did?

16         Okay.  You don't, on the chart, show any definitions of

17   terms; is that correct?

18   A.    No.  Or that's correct.

19   Q.    And I believe you said you -- in your view, you did not

20   look at extrinsic evidence in preparing this chart?

21   A.    It was unnecessary, that's correct.

22   Q.    You did not look at dictionaries, right?

23   A.    I can't say I did not look at dictionaries.  I know I

24   looked at dictionaries.  I don't know at what point I looked at

25   the dictionaries.

VOL. II - 172

1    A.    Yes.

2    Q.    So is the entirety of the -- under the claim 1 of the

3    patent, is the entirety of the foam layer the second outermost

4    surface?

5    A.    Excuse me?

6    Q.    Let me ask you about your diagram.  You have a line

7    pointing to the valley of the groove, the orange stippled area

8    there, right?

9    A.    Yes.

10   Q.    And beside that there are also solid orange pieces that

11   represent the foam layer, right?

12   A.    Yes.

13   Q.    And those parts of the layer outside that groove, do you

14   consider those in the accused device a second outermost

15   surface?

16   A.    Not within the meaning of the claims, no.

17   Q.    Why is that?

18   A.    Because the claim defines the second outermost surface

19   as the foam insulating material.

20   Q.    But that is foam insulating material, the parts --

21   A.    It is not an outermost surface.

22   Q.    Would you say that the white layer above the orange

23   layer is an outermost surface?

24   A.    Yes.

25   Q.    I wrote down -- and you can correct me if I'm misstating

VOL. II - 173

1    it.  In your testimony you said something along the lines

2    there's lots of outermost surfaces, right?

3        A.   There are lots of outermost surfaces, yes.

4        Q.   So, actually, I need you to go back to page 6.  This is

5    where you're talking about Attorney Han's opinion there at the

6    bottom of page 6.  One of your criticisms starts out by saying

7    because, quote, outermost, unquote, and, quote, farthest out,

8    unquote, are synonymous.  You go on to make a criticism of Mr.

9    Han's report.  Is that fair?

10       A.   That's one criticism.

11       Q.   So you are saying outermost and farthest out are

12   synonymous, right?

13       A.   Yes.  One -- outermost he defined as farthest out.  So,

14   to me, that means they're synonymous.

15       Q.   In your report you are saying outermost and farthest out

16   are synonymous, right?

17       A.   Yes.

18            MR. BURTON:  That's all the questions I have, Your

19   Honor.

20            THE COURT:  Thank you.

21       Ms. Wood, do you have any redirect?

22            MS. WOOD:  Yes, Your Honor.

23

24

25

VOL. II -  182

1                             - - -

2                         JEFFREY PHLIPOT

3     Called as a witness on behalf of the Plaintiff, as upon

4     cross-examination, being first duly sworn, testified as

5     follows:

6                        CROSS-EXAMINATION

7     BY MR. TACKETT:

8     Q.    Good morning, sir.

9     A.    Good morning.

10    Q.    Can you please state your full name for the record?

11    A.    Jeffrey Albert Phlipot.

12            THE COURT:  Would you spell your last name for the

13    record, please.

14            THE WITNESS:  P-h-l-i-p-o-t.

15    BY MR. TACKETT:

16    Q.    And Mr. Phlipot, you are a co-owner of Kirk National

17    Lease, correct?

18    A.    Yes.

19    Q.    What's your ownership interest in Kirk National Lease?

20    A.    Roughly 98 percent.

21    Q.    You also serve as an officer of Kirk National Lease as

22    the CEO, correct?

23    A.    Correct.

24    Q.    Now, there is a codefendant with Kirk National Lease in

25    this lawsuit called TTPS, short for Truck and Trailer Parts

VOL. II -  183

1   Solutions.  You're also an owner of that entity, aren't you?

2   A.    Correct.

3   Q.    What's your ownership interest in that entity?

4   A.    50 percent.

5   Q.    Do you provide services to that entity as well?

6   A.    Yes.

7   Q.    And what's your title over there at TTPS?

8   A.    I believe it's president.

9   Q.    And are you familiar with the complaint that Ridge

10  Corporation filed against Kirk National Lease, TTPS, Altum and

11  the now dismissed defendant Transglobal?

12  A.    Yes.

13  Q.    Are you generally familiar with the allegations in that

14  complaint that accuse the KNL overhead single panel roll-up

15  door of infringing on a patent owned by Ridge Corporation?

16  A.    Yes.

17  Q.    Can we agree to call that the KNL door the accused door

18  as we talk here today?

19  A.    Yes.

20  Q.    What is the role of TTPS with respect to manufacturing

21  and selling the accused door?

22  A.    TTPS routs the door, assembles it, and then we ship it

23  from there.

24  Q.    And which entity buys the panels from Altum that are

25  used to create the accused door?

VOL. II -  188

1    A.    Oh, we got one.

2    Q.    Pardon?

3    A.    We got a trailer with a swing door that's been replaced

4    with a roll-up door.

5    Q.    So you believe that that would functionally work long

6    term in the field?

7    A.    It's in the field, yes.

8    Q.    I have a feeling we'll hear some other testimony about

9    that later.

10   A.    Okay.

11   Q.    As you just said, you didn't have a functioning door

12   when you went to Ridge.  You were hoping that their engineering

13   expertise could help take what you already had started and make

14   it something that would function and work long term, correct?

15   A.    Out of their material, yes.

16   Q.    And you would agree that Ridge had expertise with the

17   composites out of which you were hoping to build a functioning

18   door that you could take to market?

19   A.    Yes.

20   Q.    And would you agree that KNL did not have expertise with

21   the composites that you were using?

22   A.    That's why I went to Ridge, yes.

23   Q.    And Ridge also had an engineering team that could work

24   on the product and assist you, correct?

25   A.    To make their product work, yes.

VOL. II - 191

1   we have a straightforward point-blank case of patent

2   infringement.  We don't need the '144 application

3   coinventorship issue, but it is absolutely relevant to this

4   narrative.

5          THE COURT:  I'm going to overrule the objection

6   because I believe that the defense opened the door with respect

7   to the relationship between KNL and Ridge.  I think that this

8   is germane to that.  I don't know that it has gotten to the

9   point where you say that we're trying the case of who --

10  whether Ridge was a coinventor, but I will maintain an ear for

11  that.  And if it gets beyond just a mere background

12  relationship, you may renew your objection.

13         MR. BURTON:  Thank you, Your Honor.

14       (The following proceeding was held in open court.)

15         THE COURT:  Please continue, Mr. Tackett.

16         MR. TACKETT:  Thank you, Your Honor.

17        Your Honor, may I ask to have the court reporter read

18  the open question.

19         THE COURT:  Ms. Evans, would you please read back the

20  underlying question.

21      (Thereupon, the last question was read by the court

22  reporter.)

23         THE WITNESS:  If they did, I haven't seen any drawings

24  from them to show that.

25

VOL. II - 199

1    some sort of joint development and, suddenly, in September,

2    Kirk National Lease goes quiet and starts working with Altum.

3    Isn't that true?

4    A.    Yes.

5    Q.    I want to direct your attention to Plaintiff's 24, sir.

6    This is a document Bates labeled Altum LLC 402.  This is an

7    email from Dominic Grandominico at Altum LLC, to you being Jeff

8    Phlipot, and your brother Larry Phlipot dated September 9,

9    2022, talking about a meeting that you all had to explore Altum

10   potentially working with you to assist you with -- continue to

11   produce a single panel roll-up door, correct?

12   A.    Correct.

13   Q.    Now, before we get into the detail of this, isn't it

14   true that you knew that Altum LLC was made up of employees who

15   came from Ridge?

16   A.    When it got to this email, yes.

17   Q.    And you knew that Dominic Grandominico was a former

18   employee of Ridge Corporation, correct?

19   A.    When the first time Dominic come into the building, I

20   asked him, I says, I hear you're Gary's son.  He said, yes.  I

21   won't tell you -- just yes.

22   Q.    You knew that the Altum team had knowledge and expertise

23   of working on these type of composites from having been at

24   Ridge, didn't you?

25   A.    Yes.

VOL. II - 200

1   Q.   And because of that fact, that made Altum a perfect

2  replacement for Ridge once you had a dispute, didn't it?

3   A.   I also got panels from Impact Guard, US Liner, Tuck

4  Modal.  And the only one that didn't come in was Avient,

5  something like that.

6        MR. TACKETT:  Move to strike.

7  BY MR. TACKETT:

8   Q.   I'm asking you because you knew that these individuals

9  had the knowledge and expertise with composites from Ridge, it

10  made them the perfect replacement with Ridge once you had a

11  dispute?

12        THE COURT:  Just a minute.  You had a motion.  I

13  haven't had a chance to rule on the motion.

14    I'm going to grant the motion, but the answer was

15  unresponsive.  Do you understand the question, Mr. Phlipot?

16        THE WITNESS:  Yes.  I understand the question.

17        THE COURT:  All right.  You may answer.

18        THE WITNESS:  Yes, they are a supplier that could do

19  this, yes.

20  BY MR. TACKETT:

21   Q.   An ideal replacement for Ridge because of their

22  knowledge and expertise gained at Ridge, correct?

23   A.   Yes.

24   Q.   I want to look down through this email.  Dominic

25  Grandominico lists out a number of items here to memorialize

VOL. II -  207

1    Q.   Do you have any way of knowing how many customers saw

2  this advertisement?

3    A.   We have telematics that tracks the number of customers

4  that looked at it.

5    Q.   And have you looked into those telematics and

6  investigated how many potential customers saw this false

7  advertisement?

8    A.   Yes.

9    Q.   Have you reached out to those customers and explained to

10  them that you had incorrectly stated that you had a patent when

11  you did not?

12    A.   I might have misspoke when you asked if we knew how many

13  customers.  I can't tell by their IP address.  So I'm sorry.

14  No, we did not reach out to any of them.

15    Q.   Understood.  Would you agree that separate and apart

16  from -- well, one moment.  How long was this advertisement

17  falsely stating that KNL had a patent, how long was that up?

18    A.   I'm not for sure.  I think from our conversation on the

19  deposition, it's probably been about a year.  I don't know the

20  exact date.

21    Q.   And would you agree that individuals in your sales team

22  also were sending direct marketing emails to large prospective

23  customers in which they marketed and claimed that Kirk National

24  Lease had a patent on a single panel roll-up door?

25    A.   Through the deposition, yes, I found out.

VOL. II -  208

1    Q.   I'd like you to take a look at some of those emails,

2   sir.  The first one is at Plaintiff's 47.  This is KNL 1476.

3    A.   I got it.

4    Q.   This is an email from DJ Marks to a prospective

5   customer.  The contact is name Jack Webster.  It's on

6   December 16th, 2022.  Do you recognize the name DJ Marks?

7    A.   Yes.

8    Q.   And he is an employee of Kirk National Lease, correct?

9    A.   Correct.

10   Q.   On the sales team for Kirk National Lease?

11   A.   Correct.

12   Q.   Would you agree that this is an email that Mr. Marks is

13  sending in the ordinary course of business to a prospective

14  customer?

15   A.   Yes.

16   Q.   And do you see there where he says we're working with

17  Merlin Solar, Dhollandia liftgates, and a one piece rolled door

18  that we have patented in case there might be any interested

19  generated there as well.  Do you see that?

20   A.   Yes.

21   Q.   Would you agree that Mr. Marks is marketing the fact

22  that you have a patent as a positive?

23   A.   I can't deny it, yes.

24   Q.   Now, did Kirk National Lease reach out to this customer,

25  prospective customer, I should say, and alert them that Kirk

VOL. II - 209

1    National Lease had falsely marketed that it had a patent when

2    it did not?

3    A.    When the TRO came in, we didn't talk to anybody about

4    the door.  So, no, we have not.

5    Q.    And does Kirk National Lease have any way of knowing

6    whether this recipient of the message, Jack Webster, may have

7    told others that Kirk National Lease had a patent on a single

8    panel roll-up door?

9            MR. CLIFFORD:  Objection.  Calls for speculation, Your

10   Honor.

11           THE COURT:  Well, Mr. Phlipot --

12           THE WITNESS:  Phlipot.

13           THE COURT:  Mr. Phlipot, did not -- is the CEO of the

14   company.  And Mr. Tackett is inquiring as to what, based on his

15   position as CEO, he knew whether Kirk National Lease did.  He's

16   already indicated that he was aware of representations to

17   others made by Kirk National because marketing ultimately

18   reported to him.  So I don't understand --

19           MR. CLIFFORD:  Let me be clear.  I believe the

20   question was, is he aware of whether the third party talked to

21   other third parties about the contents of the email.

22           THE COURT:  Here is the question.  "And does Kirk

23   National Lease have any way of knowing whether this recipient

24   of the message, Jack Webster, may have told others that Kirk

25   National Lease had a patent on a single panel roll-up door?"

VOL. II -  210

1        He asked if Kirk National Lease had any way of knowing.

2    That's appropriate.  He didn't ask what the third party

3    actually did or knew.

4            MR. CLIFFORD:  That's fair, Your Honor.  Thank you.

5            THE COURT:  You may answer the question as asked.  But

6    I don't want you to speculate.

7            THE WITNESS:  No.

8     BY MR. TACKETT:

9     Q.   Now, there is a number of other emails just like this,

10    so I'm going to try to go through them as fast as we can.  But

11    I want to make sure we identify them.  So can you turn to P57,

12    sir?

13    A.   Okay.

14    Q.   This is another sales email from DJ Marks, the same

15    sales manager.  This one is to a prospective customer at the

16    company Nussbaum.  And he has copied the director of sales

17    Mitchell Rank there.  This is August 8, 2023, just a month

18    before the complaint.

19        Would you agree this is a marketing email in the

20    ordinary course of Kirk National Lease's business to a

21    prospective customer?

22    A.   Yes.

23    Q.   So at the bottom of the page there is a pitch regarding

24    a single panel roll-up door.  He says:  Lastly, Mitch is in

25    charge of our sister company at TTPS where I briefly talked to

VOL. II -  211

1  you about the services that we provide.  We have Dhollandia

2  liftgate, parens, which are the global leader in liftgates,

3  Merlin Solar Solutions that range in many various capabilities,

4  Idlefree systems, so on and so forth.

5      And then he says a couple lines down:  And our patented

6  single panel rolled door.  Do you see that?

7  A.   Yes.

8  Q.   Would you agree that, again, DJ Marks is marketing to

9  this customer that having a patent is a positive in his sales

10 pitch to sell this prospective customer the single panel

11 roll-up door?

12 A.   He's posting it that way.  I don't know if it's a

13 positive or not, but he's posting it that way, yes.

14 Q.   And as you sit here today, are you aware of KNL letting

15 this client know that the sales email it sent a month ago

16 falsely stated that KNL had a patent when it did not?

17 A.   Yes.

18 Q.   Yes, you told this customer that it was incorrect?

19 A.   Oh, no.  I thought if I understood that we had a patent.

20 No, I did not know.

21 Q.   Does KNL have any way of knowing whether this

22 prospective customer may have told others about this false

23 representation?

24 A.   No.

25 Q.   Okay.  Can you turn to 58, sir?  Plaintiff's 58.

VOL. II -  212

1          Here's another marketing email from DJ Marks to GFS,

2     another prospective customer, correct?

3     A.    Correct.

4     Q.    Would you agree that this email was sent by Mr. Marks in

5     the course and scope of his employment for KNL?

6     A.    Yes.

7     Q.    Now, once again, if you go to the bottom of his email,

8     almost as if this is a script, he makes the pitch in that

9     second to last paragraph about the patented single panel door.

10    Do you see that there?

11    A.    Yes.

12    Q.    And you would agree again that Mr. Marks makes this

13    pitch even though KNL does not have a patent on a single panel

14    roll-up door, correct?

15    A.    Yes.

16    Q.    And this occurred in December of '22.  Has KNL ever

17    alerted this prospective customer, GFS, that it did not in fact

18    have a patent when it marketed that it did?

19    A.    No, not that I know of.

20    Q.    Does KNL have any way of knowing whether this customer

21    told others about the false representations that KNL made?

22    A.    No.

23    Q.    Next tab, please.

24          THE COURT:  For the record, what is the next tab?

25          MR. TACKETT:  I'm sorry, Your Honor.  Plaintiff's 59,

VOL. II -  213

1   sir.

2    BY MR. TACKETT:

3    Q.   Mr. Phlipot, this Plaintiff's 59 is an April 17th, 2023,

4   email from DJ Marks to a prospective customer.  And would you

5   agree that Mr. Marks is sending this email in the course and

6   scope of his employment for KNL?

7    A.   Yes.

8    Q.   And if you go to the second page, second paragraph from

9   the bottom, Mr. Marks says to the prospective customer,

10   "Although we've done very minimal business with the Kirk

11   National Lease maintenance side for Kroger, I just want to let

12   you know that we align with you on a lot of different

13   territories and have experience in all of your equipment bumper

14   to bumper, including work on liftgates versus just selling them

15   on the TTPS side."  Do you see that?

16   A.   Yes.

17   Q.   You agree that this is a marketing email in which he's

18   marketing roll-up doors.  Page 5 of this email string has the

19   representation that we're looking for.  Sorry about that.  It's

20   a longer string.

21   A.   Yes, I agree.

22   Q.   Did you find page 5?

23   A.   It seems to be a common thing that he puts down at the

24   end of every paragraph, all the options we list.

25   Q.   And so on page 5, there is an email from Mr. Marks to

VOL. II - 214

1   Kroger where he says, "We have patented a new roll door that is

2   one piece and weighs only 95 pounds which significantly reduces

3   the fatigue to your drivers using the door many times a day."

4   Do you see that?

5      A.   Yes.

6      Q.   You would agree that Mr. Marks is advertising the single

7   panel roll-up door and marketing the patent that you don't have

8   as a positive?

9      A.   Yes.

10     Q.   Now, did KNL alert the Kroger company that those

11  representations were false and it didn't actually have a

12  patent?

13     A.   No.

14     Q.   And does KNL have any way of knowing whether the Kroger

15  company may have shared those false representations with others

16  in the marketplace?

17     A.   No.

18     Q.   I'd like you to turn to the next tab, Plaintiff's 60,

19  sir.  Here is an email from the director of marketing, or

20  whatever his title is -- the individual in charge of marketing,

21  Mitchell Rank at KNL, to someone that is a prospective

22  customer, it looks like by the email domain a carrier of some

23  type.  Do you see this?

24     A.   Yes.

25     Q.   And would you agree that this is also a marketing email

VOL. II -  215

1  sent in the course and scope of Mr. Rank's employment in which

2  he is advertising the single panel roll-up door?

3  A.   He reached out to R and L Carrier to see if they would

4  demo doors so we could get some history on it.

5  Q.   So, again, throughout this process -- and look at the

6  subject line of the email.  Can you tell me what it says?

7  A.   Patented roll-up door.

8  Q.   So would you agree that, again, Mr. Rank is marketing

9  that KNL has a patent on a single panel roll-up door when it

10  does not?

11  A.   Yes.

12  Q.   And did KNL let this prospective customer know that it

13  was false when it marketed the door that way?

14  A.   No.

15  Q.   And does KNL have any way of knowing whether that

16  prospective customer shared this false representation with

17  others in the marketplace?

18  A.   No.

19  Q.   Can you turn to the next tab, Plaintiff's 61, sir?

20  Would you agree this is another marketing email that Mitchell

21  Rank at Kirk National Lease sent to a prospective customer?

22  And, again, the subject line says patented roll door?

23  A.   Yes.

24  Q.   And so, again, Kirk National Lease is marketing to a

25  prospective customer that they have a patent on a roll-up door

VOL. II -  216

1    when they do not, correct?

2       A.    Correct.

3       Q.    And has Kirk National Lease let this prospective

4    customer know that they do not have a patent for a single panel

5    roll-up door?

6       A.    Yes.

7       Q.    You have?

8       A.    Yes.

9       Q.    You've alerted this customer of it?

10      A.    Coca-Cola, yes.

11      Q.    And was Coca-Cola unhappy when they learned of this?

12      A.    No.

13      Q.    I'm going to ask you to turn to Plaintiff's 62, sir.

14   This is another marketing email.  This is from Mitchell Rank to

15   someone at XPO Logistics.  Again, subject line patented single

16   panel rolled door.  Would you agree this is an email that

17   Mr. Rank sent in the course and scope of his employment for

18   KNL?

19      A.    Yes.

20      Q.    And again, here, the subject line is that the door is

21   patented when it is not, correct?

22      A.    Correct.

23      Q.    And did KNL alert XPO that it did not, in fact, have a

24   patent on a single panel roll-up door?

25      A.    No.

VOL. II - 217

1    Q.   And does KNL have any way of knowing whether XPO shared

2    the false marketing that it received from KNL with others in

3    the marketplace?

4    A.   No.

5    Q.   Please turn to Plaintiff's 63, sir.  Now, this is a

6    longer email but, again, from Mitchell Rank to a potential

7    customer at the company JB Hunt.  Subject line, proprietary

8    roll door.  Would you agree this is an email that Mr. Rank sent

9    within the course and scope of his employment for KNL?

10   A.   Yes.

11   Q.   And all of these emails are maintained by KNL in their

12   records, correct?

13   A.   As long as the salesman didn't delete it, yes.

14   Q.   This is KNL 1525 and was produced by KNL in this case,

15   right?

16   A.   Yes.

17   Q.   Okay.  And would you agree that in this email, Mr. Rank

18   markets to JB Hunt that KNL has a patent when it does not?

19   A.   Yes.

20   Q.   And has KNL contacted JB Hunt and alerted them that this

21   marketing was false?

22   A.   I believe we have, yes.

23   Q.   You believe or you know?

24   A.   I don't know for sure.  But I'm -- the communication we

25   have with JB Hunt, I would think they know.  But I don't know

VOL. II -  218

1   for sure so I'd have to say no.

2       Q.   That's what we have to focus on here in court, sir.

3            I'd like you to turn to Plaintiff's 64, sir.  Now, this

4   is another marketing email that Mr. Rank is sending to a

5   prospective customer in the course and scope of his employment

6   for KNL, correct?

7       A.   Correct.

8       Q.   And would you agree that in this email, again, Mr. Rank

9   is marketing that KNL has, quote, developed a patented single

10  panel roll door.  Do you see that?

11      A.   Yes.

12      Q.   And do you agree that Mr. Rank is marketing that KNL has

13  a patent when it does not?

14      A.   Yes.

15      Q.   And has KNL alerted this customer that it was false when

16  it was saying that it had a patent when it did not?

17      A.   No.

18      Q.   And does KNL have any way of knowing whether this

19  customer alerted others in the market of this false

20  representation?

21      A.   No.

22      Q.   Now, I'm going to show you Plaintiff's 65.  This appears

23  to be the email by which Mitchell Rank is communicating to

24  KNL's web developer what he wants the bullets in the video on

25  the TTPS website to say.  Would you agree?

VOL. II -  219

1    A.    Yes.

2    Q.    And right at the top, patented single panel design.  Do

3    you see that?

4    A.    Yes.

5    Q.    And you would agree that when that was given to the web

6    developer and at all times when it was on the website, KNL did

7    not have a patent?

8    A.    Correct.

9    Q.    And, sir, are you familiar -- I'm sorry, there's one

10   more.  Turn to Plaintiff's 66.

11   A.    Yes.

12   Q.    And go to the second page of this email.  Do you

13   recognize the name Eddie Beavers?  It looks like he has a KNL

14   web domain.

15   A.    Yes.

16   Q.    And who is he?

17   A.    He is a salesman.

18   Q.    And would you agree that in this email, Mr. Beavers, on

19   January 27th, 2023, is sending this email within the course and

20   scope of his work for KNL?

21   A.    Yes.

22   Q.    And he is saying in this email:  Here is more

23   information on the door and our TTPS division.  Open the

24   attached link to our TTPS website and scroll down to the bottom

25   until you see the window for the patented single panel roll

VOL. II -   220

1    door.  Do you see that?

2    A.    Yes.

3    Q.    And you would agree that Mr. Beavers is marketing to the

4    prospective customer that KNL has a patent when it does not?

5    A.    Yes.

6    Q.    And has KNL alerted this customer that the marketing

7    representations it made were false?

8    A.    No.

9    Q.    And does KNL have any way of knowing whether this

10   customer shared these false representations with others in the

11   market?

12   A.    No.

13   Q.    Okay.  Mr. Phlipot, are you familiar with the Court's

14   temporary restraining order in this case that ordered KNL and

15   TTPS and Altum to stop manufacturing the single panel roll-up

16   door that's been accused of infringement and also to stop all

17   marketing of the infringed door?

18   A.    Yes.

19   Q.    And do you believe that KNL has removed all false

20   marketing from the Internet?

21   A.    They better have, yes.

22   Q.    Would you have any way to disagree if I told you this

23   morning on a Facebook webpage I found a continued online

24   representation that KNL has a patented single panel roll-up

25   door?

VOL. II -  230

1           THE COURT:  Okay.  Thank you.

2           MR. TACKETT:  I misspoke.  I'm sorry.  The next page,

3    1268, page 3 of the agreement.

4    BY MR. TACKETT:

5    Q.   Do you see where it says:  KNL, TTPS, and Altum agree

6    that TTPS shall at all times use its diligent and good faith

7    efforts to market, promote, and expand the sale of the single

8    panel door?

9    A.   Could you tell me what paragraph you're on?

10   Q.   Yes, sir.  It's a little confusing because there's 2A

11   and then B, and then beneath B is another one that says A.  It

12   really should say C.  But the second A is where that clause is

13   contained.  Do you see that?

14   A.   Yes.

15   Q.   Would you agree that in this proposal, Altum includes a

16   provision that would require KNL to expand its sales and market

17   for the accused door?

18   A.   Yes.

19   Q.   I'd like you to look at two paragraphs beneath that

20   where it is labeled C.  Do you see that?

21   A.   Yep.  Yes.

22   Q.   And it says, "At least once per year, at the request of

23   either party, or more frequently as agreed by the parties, TTPS

24   shall meet with a company representative of Altum to discuss,

25   review and outline sale and distribution goals and to establish

VOL. II -  231

1   distribution targets."  Do you see that?

2   A.   Yes.

3   Q.   So, again, would you agree that in this proposal, Altum

4   isn't just saying I want to sell as many panels as you might

5   need.  Altum is telling you to expand and sell more of the

6   accused door.  Correct?

7   A.   Yes.

8   Q.   You can put that aside.  Just a couple more questions,

9   sir.

10   A.   Okay.

11   Q.   I'd like to turn your attention to Plaintiff's 16.  Do

12   you see the images on Plaintiff's 16, sir?

13   A.   Yes.

14   Q.   And this -- Plaintiff's 16 is a claim chart that was

15   prepared by patent counsel for Ridge and attached to the

16   complaint.  Have you seen it before?

17   A.   Yes.

18   Q.   Would you agree that these images that are contained in

19   the claim chart are the KNL door that we've been talking about?

20   A.   Yes.

21   Q.   Okay.  You can put that to the side.

22        Sir, I want to ask you about Plaintiff's Exhibit 14.

23   Can you turn to Plaintiff's Exhibit 14?  Are you there?

24   A.   I'm there.

25   Q.   This is a letter on the letterhead of a Mr. Andrew

VOL. II -  233

1   They drafted the letter.

2      Q.   To be clear, I don't want to get into any privileged

3   discussions that you had with counsel.  But I want to make sure

4   that you were aware that this letter went out and you approved

5   of it going out?

6      A.   Yes.

7      Q.   And why -- how did you learn -- strike that.  Bad

8   question.

9           Why did you direct a letter to go to Whiting Door?

10     A.   Because we seen a video that went out from Ridge just to

11  let them know that there is something potentially -- a patent

12  pending or an application for a patent.

13     Q.   Let's try to work through this real quickly.  You

14  learned that Ridge might be working with Whiting Door on a

15  potential roll-up door, correct?

16     A.   Correct.

17     Q.   And because you learned that Ridge might be working with

18  Whiting Door, you thought you should send a letter to Whiting

19  and warn them, right?

20     A.   Right.

21     Q.   And this letter threats potential royalties against

22  Whiting Door if they work with Ridge to make a roll-up door,

23  correct?

24     A.   Yes.

25     Q.   But prior to sending this letter, Ridge Corporation had

VOL. II - 236

1                          - - -

2                      LARRY PHLIPOT

3     Called as a witness on behalf of the Plaintiff, as upon

4     cross-examination, being first duly sworn, testified as

5     follows:

6                      CROSS-EXAMINATION

7     BY MR. TACKETT:

8     Q.    Good morning, sir.  Can you please state your name for

9     the record?

10    A.    Larry J. Phlipot.

11    Q.    And Mr. Phlipot, where do you work?

12    A.    I work at TTPS.

13    Q.    What is your job title with TTPS?

14    A.    I do a variety of things.  I build the door.  I help the

15    guys on different jobs they do in the shop.

16    Q.    And how long have you worked for TTPS?

17    A.    TTPS would be probably two years.

18    Q.    And where did you work at before that?

19    A.    Kirk National Lease.

20    Q.    How long have you worked at Kirk National Lease before

21    you got moved over to TTPS?

22    A.    I started at Kirk National Lease in 2004 until I got

23    moved to TTPS.

24    Q.    And I think you just referenced it, but I want to make

25    sure that we're clear on terms.  Are you familiar with the

VOL. II -  245

1   them are listed as inventors here, are they?

2   A.   No, because I didn't have to do the mathematical work to

3   make it work around the radius.  They made me blanks.  I routed

4   the blanks and I put them in the tracks to see if it would go

5   around.  When it didn't go around, I asked them to take layers

6   out to make it more flexible.

7   Q.   Have you ever commercialized a product with an original

8   equipment manufacturer?

9   A.   I put products on from original manufacturers, yes.

10  Q.   What products?

11  A.   Brake chambers, brakes valves.

12  Q.   A product that you designed, invented, and created?

13  A.   No, I didn't invent them and create them.

14  Q.   That's my question.  Have you ever designed, invented,

15  and created a product that you were able to then commercialize

16  with an original equipment manufacturer?

17  A.   No.

18  Q.   Are you aware in order to do that, to commercialize a

19  product with an original equipment manufacturer, that you need

20  to have quality assurance testing and you need to ensure that

21  your product is going to succeed in the market?

22  A.   We have never sold our doors to an OEM.

23  Q.   Are you aware or not aware that the product quality

24  testing must be done?

25  A.   No.

VOL. II -  246

1    Q.   So you would lack that knowledge and expertise, correct?

2    A.   I don't know if I'd say I don't have the expertise at

3    it.  But I would have to have a group of people to help do it

4    if you want to go that route.

5    Q.   But you agree that you've never done it, correct?

6    A.   No, I've never done it.  This is the first thing I ever

7    came up with.

8    Q.   You're aware that Ridge Corporation has successfully

9    created products and commercialized them with original

10   equipment manufacturers?

11   A.   Yes.

12   Q.   Okay.  I want to talk to you about the doors that you're

13   currently selling, the accused doors.  Would you agree that you

14   are working with Altum, a codefendant in this case, regarding

15   the creation of those doors?

16   A.   Yes.

17   Q.   Okay.  And from time to time, you would agree that Altum

18   is providing proposals for layouts that you're looking at in

19   terms of your manufacture of the doors?

20   A.   Yes.  When I talk to Dominic, I tell him what I want.

21   And for him to make sure what I want, he would draw it down and

22   send it back to me and say is this what you're wanting.

23   Q.   Would you agree that the Altum process engineering for

24   their panels requires the use of seams to connect their

25   paneling?

VOL. II - 253

1    flex back into shape.  So that's a key feature, you know, to

2    the success of a lot of Ridge's products.

3          So, initially, it would be GreenWing, that aerodynamic

4    skirt, is very flexible.  It needs to be able to run over

5    different obstacles because it's on the bottom of the trailer,

6    flex and move out of the way.  And then even -- so there's

7    that.  And then we got into -- because of the aerodynamics, got

8    into tails and that's where we really looked at what a living

9    hinge is and deploying it in our designs.  So on the tail.

10   Q.   What year was the product that you were just describing

11   was the skirt wing?

12   A.   The GreenWing?

13   Q.   The GreenWing.

14   A.   Development on that started I would say 2008,

15   approximately.

16   Q.   When did that go to market?

17   A.   Very soon after.  I would approximate about 2009.

18   Q.   And then the aerodynamic tail product that you were

19   talking about, what about that one?

20   A.   That was a few years later.  2013 is approximately when

21   we started work on that.

22   Q.   And do you recall over your years at Ridge ever working

23   on roll-up doors?

24   A.   We -- doors have always been a subject of conversation

25   at Ridge.  And a lot of that comes from our work in the field

VOL. II -  254

1   with the customers.  With them knowing how durable our products

2   are, it was not uncommon for a customer to ask when are you

3   going to make a door.  You know, it went all the way from swing

4   doors and roll-up door parts and then into, you know,

5   developing roll-up doors.

6   Q.   Okay.  And do you know the owners and partners of Altum

7   LLC?

8   A.   Yes.

9   Q.   How so?

10  A.   I worked with all three of them at Ridge Corporation.

11  Q.   And could you go through each one of the three partners

12  and tell us how you are familiar with them from Ridge?

13  A.   Yes.  So Dominic Grandominico I met in college at

14  Purdue.  So I've had a long, good relationship with Nick.  And

15  then I worked at Ridge Corporation with him through 2018,

16  approximately.  Yeah.

17       And then Kyle Gaines I also worked alongside of.  He was

18  a director of purchasing, director of materials at Ridge, one

19  of the other.  So I worked alongside of him.

20       And Greg Karst I also worked alongside of him for a

21  while and eventually was his manager towards the end of his

22  tenure.

23  Q.   How long did each one of those individuals work at Ridge

24  by your recollection?

25  A.   Nick would have been -- or Dominic would have been from

VOL. II - 262

1   design notebooks?

2   A.    Ridge maintains our design notebooks.  But more

3   importantly, as designs progress, we do, you know, change those

4   design records into drawings and things that are kept in our

5   document control system.

6   Q.    Are you familiar, sir, with the Cold Chain patent that

7   Ridge Corporation acquired an exclusive license to?

8   A.    I am familiar.

9   Q.    And are you presently working on bringing a design --

10  strike that -- bringing a -- commercializing a product based on

11  that patent?

12  A.    Yes.

13          MR. TACKETT:  Your Honor, may I please go pick up

14  Plaintiff's 70 and approach the witness with it?

15          THE COURT:  Yes, you may.

16  BY MR. TACKETT:

17  Q.    Mr. Moss, I'm going to show you what's marked as

18  Plaintiff's Exhibit 70.  This is the KNL accused door in the

19  case.

20          MR. DILLARD:  Objection, Your Honor.

21          THE COURT:  Basis?

22          MR. DILLARD:  No foundation.

23          THE COURT:  Well, are you saying he has no foundation

24  for showing him this?

25          MR. DILLARD:  I'm saying there's been no evidence that

VOL. II -  263

1    suggests that's the KNL door.

2              THE COURT:  All right.  That is what plaintiff's

3    counsel has represented to the Court as the KNL door.  Is that

4    right?

5              MR. DILLARD:  Yes.

6              THE COURT:  So for the purpose of laying the

7    foundation, if this witness doesn't recognize it as such, then

8    he can say so.  But for ease of convenience and because we

9    don't have a jury, I'm going to allow him to refer to that as

10   the door, and then it is up for refutation.

11             MR. DILLARD:  Thank you, Your Honor.

12             MR. TACKETT:  While we're at it, I'll just lay the

13   foundation, Your Honor.

14             THE COURT:  All right.

15   BY MR. TACKETT:

16   Q.   Mr. Moss, are you familiar with how this tangible item

17   I'm holding came into the possession of Ridge?

18   A.   Yes.

19   Q.   Can you explain that to us?

20   A.   That sample was given to Gary Grandominico.

21   Q.   And where did it come from?

22   A.   That sample was given to Gary by Chris Fannin.

23   Q.   Where was Chris Fannin employed when he obtained the

24   sales sample?

25   A.   I believe he was employed for TTPS.

VOL. II -  265

1   A.   That's correct.

2   Q.   Just one more question.  When you talked about the

3   single panel roll-up door that you worked on for TODCO, were

4   any of the former Ridge employees who are at Altum -- were any

5   of them involved in that?

6   A.   Yes.  Mr. Greg Karst was.

7   Q.   And what was Mr. Karst's role on that project for TODCO?

8   A.   Mr. Karst, he -- he was on my team at that time.  And

9   when the customer visited, he helped me provide testing and

10  benchmarking of the incumbent material versus Ridge material.

11  Q.   And TODCO asked you -- what did they have you looking at

12  again, specifically?

13  A.   Providing a skin that would perform better than the skin

14  that they current -- that they were using at the time.

15  Q.   What would that be made out of?

16  A.   Polypropylene and glass composite, thermoplastic

17  composite.

18  Q.   What is the exterior surface of P70 made out of?

19  A.   It appears that it's a thermoplastic fiber reinforced

20  composite.

21  Q.   Working at Ridge, is this something that you learn a lot

22  about?

23  A.   Yes.

24  Q.   How so?

25  A.   The majority of our laminates and materials are

VOL. II -  266

1   polypropylene and glass fiber reinforced thermoplastic

2   composite.

3            MR. TACKETT:  I have nothing further.  Thank you, Your

4   Honor.

5            THE COURT:  I have one, maybe two questions for you,

6   Mr. Moss.

7            Mr. Moss, has Ridge produced a door pursuant to the '84

8   Cold Chain patent?

9            THE WITNESS:  Yes.

10           THE COURT:  You've actually made such a door?

11           THE WITNESS:  We have made such a door, door panel.

12           THE COURT:  You made such a door panel?

13           THE WITNESS:  Correct.

14           THE COURT:  But you haven't sold any; is that right?

15           THE WITNESS:  We provided samples for testing to

16   customers and they were sold as zero dollars.

17           THE COURT:  All right.  That's all I had.

18           MR. TACKETT:  I have one more question.  You jogged a

19   question for me, Your Honor.  May I ask it?

20           THE COURT:  Sure.

21    BY MR. TACKETT:

22    Q.   To your knowledge, did Ridge get paid any money by KNL

23   for the design work that it did when they were working together

24   with you on a single panel roll-up door?

25    A.   To my knowledge, there was no payment for the design.

VOL. II - 299

1    approximately line 3 bleeding onto line 4 of the claim itself;

2    or if you're referring at the lines designated in the patent,

3    at approximately line 20, it says the first outermost surface.

4    That's the first phrase I focused on.

5         The second phrase I focused on was a second outermost

6    surface opposite the first outermost surface.  And that's the

7    phrase that immediately follows the first outermost surface.

8         And then the third and last phrase that I focused on is

9    if you drop down to approximately line 40 -- I'm sorry.  Hold

10   on.  Yeah.  Approximately lines 39 to 41, the claim recites the

11   foam insulating material forming the second outermost surface

12   of the door.

13   Q.   What process did you go through to construe those

14   claims?

15   A.   Initially, I read the claim --

16   Q.   Phrases.  Sorry.  Let me reask.  What process did you

17   use to construe those phrases?

18   A.   Initially, I took just the phrases at face value.  I

19   presumed the words meant what they said and they said what they

20   meant.  After I construed the words according to their plain

21   and ordinary meaning, I consulted a dictionary to make sure

22   that my understanding was not contrary to what the dictionary

23   defined those words according to their plain and ordinary

24   meaning.  And specifically, the dictionary was used to construe

25   the term outermost.  And what I found from the dictionary was

VOL. II -  300

1    that the term outermost means farthest out.

2         And I'm actually relieved to know that Mr. Sharpe agrees

3    that farthest out and outermost are synonymous.

4    Q.   I'm going to have you turn to Defendant's Exhibit 107.

5    Turn to -- we're bringing it up on the screen now.  Can you

6    tell me what Defendant's Exhibit 107 is?

7    A.   I believe that Defendant's 107 is the illustration that

8    I used in the report that I provided for my infringement,

9    noninfringement analysis.  And specifically, the drawing itself

10   with the green, the orange and the white layers and the

11   stippling that's inside that gap, that drawing with all of the

12   arrows was in the original claim chart that Mr. Sharpe created.

13   Q.   The one that was attached to the complaint; is that

14   correct?

15   A.   That is correct.  The difference between this particular

16   drawing and the one that was in the claim chart in the

17   complaint is that the labeling of where the arrows point is

18   different in this drawing because I labeled this drawing as I

19   understood what each component meant.

20   Q.   So the phrases that you construed, that you talked

21   about, are the elements corresponding to those construed

22   phrases present in the accused device as depicted in figure 4?

23   A.   When you say figure 4, are you referring to the drawing

24   on the screen right now as Defendant's D107 or are you

25   referring to figure 4 as in the figure 4 of the exhibits to the

VOL. II -  321

1          MR. MILLER:  Yes, Your Honor.  Thank you.

2          THE COURT:  I'm assuming, Mr. Dillard or Mr. Clifford,

3     that you have no questions of this expert or do you?  He is a

4     defense expert and I wanted to make sure that before we got to

5     the cross-examination, I didn't know whether codefendant had

6     questions.

7          MR. CLIFFORD:  No questions, Your Honor.  Thank you.

8          THE COURT:  All right.  Thank you.  Mr. Miller, you

9     may proceed.

10         MR. MILLER:  Thank you, Your Honor.

11                              - - -

12                        CROSS-EXAMINATION

13    BY MR. MILLER:

14    Q.   Mr. Han, you were just going over before why you believe

15    you have ordinary skill in the art, correct?

16    A.   Yes.

17    Q.   And part of that was you saying that you had a garage

18    door, right?

19    A.   Yes.  That is correct.

20    Q.   But not everyone in the world with a garage door has

21    ordinary skill in the art of single panel roll-up doors, do

22    they?

23    A.   No, they do not.

24    Q.   And you have no experience before this case dealing with

25    single panel overhead doors, right?

VOL. II -  322

1    A.   That is correct.

2    Q.   And you've never made them, correct?

3    A.   That is correct.

4    Q.   And this is the first time you're acting as an expert in

5  a patent infringement case, correct?

6    A.   That is correct.

7    Q.   And you can't recall ever having acted as an expert

8  witness in any case before, correct?

9    A.   Not to my recollection.  Before you continue, may I put

10  this exhibit down?  My arm is getting tired.

11    Q.   Of course.

12         As your role as an expert in this case, you went through

13  the claims in the patent, correct?

14    A.   That is correct.

15    Q.   Did you go through the specifications in the patent?

16    A.   I did.

17    Q.   Did you go through the prosecution history?

18    A.   Yes, I did.

19    Q.   And all of those things that I just mentioned, those are

20  the intrinsic evidence of the patent.  Is that fair?

21    A.   That's fair.

22    Q.   And extrinsic evidence is things like additional

23  scientific evidence, right?

24    A.   That is correct.

25    Q.   And it would include dictionaries, right?

VOL. II -  342

1  that.  It doesn't have the definition.  I forget exactly what

2  the question was.  But when he uses the phrase claims

3  specification, to me as a patent attorney, it's a little

4  jarring because the claims mean one thing; the specifications

5  mean another thing.  And claim specification in my field

6  doesn't really have a fixed understanding.  It's either the

7  claims or it's the specification.  It's not a claim

8  specification.

9     Q.   You were asked about whether the term farthest out

10  appears in the specification, right?

11    A.   That is correct.

12    Q.   Do the terms -- either of the terms first outermost

13  surface or second outermost surface appear in the

14  specification?

15    A.   The phrase outermost surface does not appear at all in

16  the specification.

17          MR. BURTON:  Thank you.  That's all I had.

18          THE COURT:  Any recross, Mr. Miller?

19          MR. MILLER:  Just one question.

20                    - - -

21                RECROSS-EXAMINATION

22    BY MR. MILLER:

23    Q.   Mr. Han, you were talking with your counsel and you were

24  making some differentiation between specification and claims,

25  right?

VOL. II -  347

1    Q.    When did you work for them?

2    A.    All of that happened after 1984, yes.  And then

3    continuing from then until I started Ridge Corporation.

4    Q.    What year did you form Ridge Corporation, sir?

5    A.    In December, late December of 2004.

6    Q.    How would you describe the products that Ridge

7    Corporation provides?

8    A.    Ridge Corporation manufacturers a polymer reinforced

9    single sheet composite.  It can be made up of many layers, and

10   also a structural -- or a lot of ways to describe it,

11   stressed-skin panel, structural panel, a load-bearing panel.

12   Q.    What industries does Ridge focus its products towards?

13   A.    Initially, our products were focused towards the

14   truck/trailer industry.  From there we have branched out into

15   industry such as aircraft container industry, RVs, boats, and

16   homeless housing, a variety of industries, truck/trailer, truck

17   body, so on.

18   Q.    And how long total have you, sir, worked in the area of

19   selling products in the truck and trailer industry?

20   A.    Since 1979 with Truck-Lite Corporation.

21   Q.    So the entirety of time from 1979 to 2023 you've worked

22   selling products to the truck and trailer industry?

23   A.    That's correct.

24   Q.    Okay.  Sir, you testified that you are CEO of Ridge.

25   What are your duties in that role?

VOL. II -  350

1   skins separated by a core which brought us into the structural

2   panel world.

3   Q.   What year was that, sir?

4   A.   Sometime -- I'm not certain.  I would say around early

5   2000s.

6   Q.   Okay.

7   A.   We became very practiced at laminating honeycomb because

8   the reason people want honeycomb is because they want

9   lightweight.  So a lightweight honeycomb core and lightweight

10  skins was a very delicate material to make.  And the customer

11  we were building this for made structural aircraft containers

12  to put baggage in and what have you, different type of aircraft

13  container applications for different models of planes.

14       And Bret Moss and I -- we burnt a lot of time and money

15  learning to make a good composite wall for an aircraft

16  container.

17  Q.   Okay, sir.  And what did you do next in terms of any

18  investigation or research you did on a commercial roll-up door?

19  A.   Well, getting into a structural panel was key.  A

20  roll-up door is a sandwich panel, if you will.  It's made of

21  plywood.  And as the industry continued to move forward, a

22  different composite which I helped to work on at a company

23  called Wabash, which was a steel and solid plastic core

24  composite, came on the market and they were looking for more

25  ways to spread that type of product around.  One of the things

VOL. II -  351

1    they did was take that to the roll-up door industry.

2         For Ridge, we continued to progress through cores and

3    looking for the best application to make a structural panel,

4    and that took us through to PET cores and all types of cores

5    and laminating different skins onto those cores.  And finally

6    we settled on polypropylene and polypropylene glass core which

7    allowed us to fuse a panel together without any glue.  This was

8    a huge advancement for the industry.

9    Q.   What year was -- what year was it that you achieved that

10   advancement?

11   A.   Around 2016.  It made a big difference because now we

12   could give a warranty on our material that was lifetime.  It

13   was not ever going to delaminate which for a structural panel

14   is an engineer's dream.

15        So we started looking at different applications.  And we

16   had some customers around that time that were interested in

17   using our panel which we designed to replace plywood as a

18   replacement for plywood on a roll-up door.  So those types of

19   conversations were going on.

20        When KNL came to our office and announced that they were

21   interested in making a roll-up door, I was very excited.

22   Q.   What can you tell me about that?  When was that?

23   A.   KNL was -- let's see -- doing business with us around

24   2017.

25   Q.   What was the nature of that business at that time?

VOL. II -  356

1    Q.    Okay.  And did KNL have an engineering -- did KNL have

2    the engineering capabilities to do that work?

3    A.    No.  I mean --

4              MR. DILLARD:  Objection, Your Honor.  Speculation.

5              THE COURT:  Sustained without more of a foundation,

6    Mr. Tackett.

7              MR. TACKETT:  Thank you, Your Honor.  Understood.

8    BY MR. TACKETT:

9    Q.    Mr. Grandominico, you testified that you worked with

10   Kirk National Lease dating back to 2017, right?

11   A.    Yes, correct.

12   Q.    And how long did you work with Kirk National Lease for?

13   A.    After 2017?

14   Q.    From 2017 until the end or current status of your

15   working relationship with them.

16   A.    All the way into late spring, early summer of 2023.

17   Q.    And during those six years, did you have occasion to

18   observe the capabilities of Kirk National Lease?

19   A.    We did -- we visited Jeff at his place.  And I have a

20   good understanding of what a leasing company is, and repair

21   company and parts company.  So I knew what capabilities there

22   were.  And I want to say that Ridge is extremely unusual in the

23   market.  Most suppliers to the truck/trailer industry have a

24   few engineers on staff.  We have 24 engineers on staff, many of

25   them mechanical engineers to solve these types of issues.  And

VOL. II -  375

1    A.   My recollection was that Jeff felt that we didn't

2   contribute in the inventorship issue.  It was basically what he

3   was telling me.

4    Q.   And how did he respond to the notice regarding the Cold

5   Chain patent covering the KNL door?

6    A.   I told him that in effect, you know, we take

7   inventorship and we take our IP very seriously and we were

8   going to defend this IP.

9    Q.   How did Jeff Phlipot respond to that?

10    A.   I'm not real certain, but I believe Jeff eventually got

11   back to me and told me that he did not feel that we had IP that

12   would cover a roll-up door and that he was going to continue

13   with his own IP and go to the market.  I'm not certain the

14   exact words of the -- I'd have to read the email.

15    Q.   Okay.  And after this occurred, did Ridge -- did KNL

16   stop buying panels from Ridge?

17    A.   KNL pretty much stopped buying panels from Ridge months

18   before this.  We didn't know exactly where they were getting

19   their panels, but we assumed that it was Altum based on

20   comments at that point from Chris Fannin who had come back to

21   work for us.

22    Q.   And do you know the three partners of Altum?

23    A.   Yes, I do.  They -- I know them very well, yes.

24    Q.   How so?

25    A.   One is my son, and Kyle was his best friend in high

VOL. II -  376

1    school and he was the first employee I hired at Ridge.  And

2    then I also hired Greg because he had a good background in

3    composites and chemical engineering.  And they all worked at

4    Ridge Corporation, were very knowledgeable.

5    Q.    How long did Dominic and Kyle Gaines work at Ridge

6    Corporation?

7    A.    I would say from two thousand -- wait a minute, Ridge

8    Corporation was formed in 2004.  I believe my son joined in

9    2007.  I'm not real clear on all of this, but Kyle -- Kyle

10   helped me make the very first panels that Ray and I made in our

11   basement commercially to supply to the market.

12         So I would say it would be after 2005 that Kyle came to

13   work, early 2005.  And my son was completing school so I think

14   he was around 2006 or seven.

15   Q.    When did they leave?

16   A.    Around 2018 or -- yeah, somewhere in there.

17   Q.    And during their time working at Ridge, what knowledge

18   would they have gained that may be relevant to KNL?

19              MR. DILLARD:  Objection.  Speculation.

20              THE COURT:  Basis?  Speculation?  I'm going to sustain

21   the objection as stated.  There's no basis for this witness to

22   tell us what knowledge they would have gained that could be

23   relevant to KNL.  So your objection is sustained, Mr. Dillard.

24              MR. DILLARD:  Thank you, Your Honor.

25

VOL. II  -   377

1    BY MR. TACKETT:

2    Q.    While working at Ridge for over a decade, did Kyle

3    Gaines or Dominic Grandominico gather knowledge of any of the

4    materials that were inside of the single panel roll-up door

5    that you all worked on with KNL?

6              MR. DILLARD:  Objection, Your Honor.

7              THE COURT:  Sustained.  You may get at that particular

8    information, Mr. Tackett, but the question as phrased does

9    require him to speculate.  So if you'll lay the foundation for

10   how he would know what Kyle or Dominic, the knowledge to which

11   they were exposed, then that might be an approach that would be

12   availing to you.

13             MR. TACKETT:  Thank you, Your Honor.

14   BY MR. TACKETT:

15   Q.    Did Dominic or Kyle Gaines do work or have exposure to

16   the structural panels that you used for the KNL door when they

17   were employed at Ridge?

18   A.    Absolutely.  Kyle was director of materials, and Kyle

19   and I worked together on material suppliers such as honeycombs

20   and foams.  Kyle was involved with, very early on, on our

21   development of foams and he was very knowledgeable about the

22   foams.  Of course, Dominic was operations manager.  He was an

23   engineer.  He knew everything that was going on at the company,

24   and he knew our ability to laminate and understood full well

25   how to make those products.

VOL. II -  378

1    Q.    And when Dominic left the company at that point in time,

2    did he have any roles as an officer or director of the company?

3    A.    Yes.  He was a direcer of the company at that time.

4    Q.    Did you have -- strike that.  What concerns did you have

5    when you learned that Altum was the supplier that KNL had gone

6    to after your dispute arose with them?

7    A.    What concerns did I have?  Well, the biggest concern was

8    that there was disruption in the cooperation between Kirk

9    National Lease and Ridge Corporation to develop and market a

10   roll-up door.

11   Q.    And as you continued analyzing the situation with KNL,

12   what further contacts did you make to KNL about the concerns

13   that you had with respect to the Cold Chain patent?

14   A.    We sat with our patent attorneys and discussed the

15   situation of infringement and decided to issue letters to let

16   KNL know that we felt they were infringing on our patent, our

17   licensed patent.

18   Q.    Can I turn your attention to Plaintiff's Exhibit 9, sir?

19   Plaintiff's Exhibit 9 is a June 6th, 2023, letter, from Pearne

20   Gordon to Jeff Phlipot of Kirk National Lease and also to Truck

21   and Trailer Parts Solutions Inc., as well as their counsel.  Is

22   this a letter that you were referring to?

23   A.    Yes, that's correct.

24   Q.    And after this letter went out to Kirk National Lease

25   notifying them of the patent and your belief of infringement,

VOL. II -  379

1   how did Kirk National Lease respond to this?

2    A.    They did not really, I believe, respond quickly to the

3   letter.  It took them quite some time to respond.  And when

4   they did, they merely said that this patent did not read upon

5   what they were putting in the market.

6    Q.    Okay.  And in the course of investigating this, did you

7   learn anything about how KNL was marketing the roll-up door

8   after you -- you all had parted ways?

9    A.    Yeah.  So what KNL was doing was working with the

10   customers they had at hand.  And this is a different level than

11   what Ridge goes to market in.  We sell materials to the trailer

12   OEMs.  And they began selling it to some of their customers

13   that they felt could -- had interest and could use a single

14   panel roll-up door because it's lighter, therefore it's easier

15   for the user.  It's much easier to put graphics on.  If you

16   notice in there, they've got some nice graphics on some of the

17   roll-up doors they put in the market.  These are all good

18   advantages for that roll-up door.

19        Am I rambling again?

20    Q.    That's okay.

21        How do you believe that Kirk National Lease being

22   permitted to sell the door you believe is infringing harms

23   Ridge Corporation?

24            MR. DILLARD:  Objection.

25            THE COURT:  Basis?

VOL. II -  380

 1          MR. DILLARD:  It's a legal conclusion.  Speculation.

 2          THE COURT:  Overruled.

 3          THE WITNESS:  So, you know, I think I've explained I

 4   have years of interest in getting into a high quality roll-up

 5   door, and that's what Ridge is all about, is making quality.

 6   We're rated quality ISO, and soon next year we'll be AITF 16949

 7   which is a very high automotive standard.

 8          And I thought, you know, Jeff made a very bad move here

 9   because when you take a door and you put it out into the market

10   at that level where the user is, that's good, that's fine, but

11   without the engineering background that he had in his company,

12   without the manufacturing expertise, and even if you consider

13   Altum, it's limited compared to Ridge.  A mistake in the market

14   on the door, the performance of the door, this could be huge in

15   tarnishing a structural composite, lightweight door.  And we

16   didn't want to see that happen because that kind of mistake

17   lives for years in the market.

18          THE COURT:  All right.  Let's stop there unless you

19   have another short question that follows up that answer.

20          MR. TACKETT:  Your Honor, I would want to ask him what

21   he means by lives for years in the market, but how long he

22   might respond for --

23          THE COURT:  I will allow that last question.

24          MR. TACKETT:  Thank you, Your Honor.

25

VOL. II -  381

1    BY MR. TACKETT:

2    Q.   What do you mean by that, sir, that a mistake like that

3    lives for years -- can live for years in the market?

4    A.   I think I talked about -- probably too long about

5    Kemlite earlier and their mistake on their translucent panel.

6    Today we try to sell a translucent panel which we know can

7    handle the rigors of trailer construction and endure all the

8    impacts and provide a good surface.  But yet the customer has

9    the attitude, the memory of what happened years ago that cost

10   them a fortune because of mistakes, unknown mistakes to

11   Kemlite.  This is a big, big corporation.  Kemlite was owned by

12   Crane which is a large manufacturer of plastics.  Yet, they

13   didn't fully develop the product before they launched it.  This

14   came back to haunt them and it haunts us today trying to get

15   customers to try our product.  Once they do, they like it.  But

16   it's slow to get back into the market.

17        MR. TACKETT:  Thank you.

18        THE COURT:  We'll pick up there in the morning

19   at 8:30.

20        Mr. Grandominico, may be excused.

21        THE WITNESS:  Thank you, sir.

22        THE COURT:  I'm going to ask counsel to slide your --

23   you can leave your materials, but defense counsel will slide

24   their materials at least to where Mr. Burton is standing, and

25   plaintiff's counsel will slide their materials over so that my

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RIDGE CORPORATION,                  )
                                    )
    PLAINTIFF,                      )      CASE NO. 2:23-cv-3012
                                    )
          vs.                       )
                                    )
KIRK NATIONAL LEASE CO., *et al.*,) 
                                    )
    DEFENDANTS.                     )
_____)

TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
VOLUME III OF IV
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
OCTOBER 5, 2023; 8:30 A.M.
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:
     Bailey Cavalieri LLC
     By:  Christopher W. Tackett, Esq.
          John P. Miller, Esq.
          Graycen M. Wood, Esq.
     10 West Broad Street, Suite 2100
     Columbus, Ohio  43215

FOR THE DEFENDANTS KIRK NATIONAL LEASE CO. and
TRUCK AND TRAILER PARTS SOLUTION:
     FGKS Law
     By:  Joshua A. Koltak, Esq.
     100 South Main Avenue, Suite 300
     Sidney, Ohio  45365

     Faruki PLL
     By:  Donald E. Burton, Esq.
     110 North Main Street, Suite 1600
     Dayton, Ohio  45402

     Faruki PLL
     By:  Melissa L. Watt, Esq.
     201 East Fifth Street, Suite 1420
     Cincinnati, Ohio  45202

```
    APPEARANCES CONTINUED:

FOR THE DEFENDANT ALTUM LLC:
        Arnold & Clifford LLP
        By:  Damion M. Clifford, Esq.
             Michael L. Dillard, Jr., Esq.
        115 West Main Street, 4th Floor
        Columbus, Ohio  43215
```

```
                         - - -

        Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

VOL. III -  388

1   that Jeff Phlipot knows a lot about roll-up doors?

2     A.    Every company has, you know, salespeople, and Jeff's

3   kind of very personal, personable, and he no doubt, as head of

4   the company -- he does some sales work and he understands what

5   the customers are looking for in the way of solutions is

6   basically what I meant.

7         He understands from feedback from customers what fleets

8   are looking for in the way of improving products and reducing

9   cost of operation.  Cost per mile is what our industry runs on.

10    Q.    Okay.  Now, in terms of your sales experience, sir, what

11  are the positive impacts of being able to tell a customer that

12  you have a patent on a product when you're selling?

13    A.    Having a patent is huge.  From one aspect, it means that

14  your intellectual property allows you to invest in something

15  that's ongoing.  It shows a knowledge if you can execute the

16  patent, manufacture the product.  It provides a quality to your

17  customers that they believe in.  If they know you have a

18  patent, then they will, in turn -- if you're going business to

19  business, then they will invest also.  They see the benefits.

20  They see it's protected, and they can invest their assets

21  towards using those patented materials.

22    Q.    And just, conversely, how would that be different if

23  you're trying to sell something but you don't have a patent?

24    A.    Well, then, you know, you're at a disadvantage, and you

25  don't have the ability to influence.  If I could, case in point

VOL. III -  389

1  is Kirk National Lease advertising a patent, it seems, allowed

2  them to gain a lot of attention in the market and gain momemtum

3  because of the word patented and move forward with a lot of

4  interest.  And the customers were investing in that because

5  they saw an advertised patent as security and advantage.

6      Q.    Okay.  I'd like you to turn to Tab 14, Plaintiff's 14,

7  if you could, sir.  It's in one of those binders next to you

8  and it should say plaintiff's.  Let me know when you get to

9  that tab.

10          THE COURT:  Tab 14?

11          MR. TACKETT:  Yes, Your Honor.  Tab 14.

12  BY MR. TACKETT:

13      Q.    Mr. Grandominico, did you find it?

14      A.    I did find it.

15      Q.    Okay.  Now, at Tab 14 is a letter on the letterhead of

16  Barnes Law.  You see that there?  There is an email

17  andrewbarnesip@gmail.com, and it's saying the letter is to

18  Whiting Door Manufacturing Corp.  Do you see that?

19      A.    I do see it.

20      Q.    Do you recognize this letter?

21      A.    I definitely recognize the letter, yes.

22      Q.    And how did you first receive this letter?

23      A.    From Ben Whiting at Whiting Roll Up Door.

24      Q.    And who is Ben Whiting?

25      A.    Ben Whiting is president of Whiting Door.  And he has

VOL. III  -   390

1   been examining our composite panel for use in manufacturing a

2   roll-up door and providing it to his customers.

3       Q.    And how would you characterize this letter to Whiting

4   Door?  What does it do?

5       A.    The effect of the letter was to put the brakes full on

6   for them developing or moving forward.  They were concerned

7   that they were going to get involved in some legal activity and

8   they questioned, you know, of course, our ability to provide a

9   product at that point.

10        And so they were spending a lot of time and money

11  researching the actual use of the panel we had provided to

12  their customers.  And they stopped and hired a patent attorney

13  just to be prepared for what might come next.  But they

14  immediately stopped all testing moving forward.

15      Q.    And has Mr. Whiting said anything else to you about how

16  Whiting feels about this letter threatening royalty damages?

17            MR. KOLTAK:  Objection.

18            THE COURT:  Basis?

19            MR. KOLTAK:  Hearsay.

20            THE COURT:  Why is this not hearsay, Mr. Tackett?  I

21  don't see it coming in as any exception, and it seems to be

22  offered for the truth of the matter asserted.  Why is this not

23  hearsay?

24            MR. TACKETT:  The way I was thinking about it in terms

25  of the question is the effect to Mr. Grandominico in terms of

VOL. III -  391

1   what he heard.  But I can rephrase into what is his

2   understanding of the current status based on them receiving the

3   letter.

4           THE COURT:  I'm going to sustain your objection,

5   Mr. Koltak.

6           MR. KOLTAK:  Thank you, Your Honor.

7           MR. TACKETT:  Thank you, Your Honor.

8           THE COURT:  You may rephrase.

9           MR. TACKETT:  Absolutely.

10   BY MR. TACKETT:

11   Q.   Mr. Grandominico, as a result of this letter threatening

12   royalty damages, what is your understanding of the current

13   status of Whiting's intentions with respect to you all

14   exploring business together on the roll-up door that Ridge is

15   making?

16   A.   My understanding both in conversations with Ben Whiting

17   and also with our corporate attorney David Martin who I asked

18   to contact their counsel was to -- there was a hold on things

19   and -- until they got a better feel for what was going to

20   transpire going forward.

21           MR. TACKETT:  I have no further questions at this

22   time, Your Honor.  Thank you.

23           THE COURT:  Thank you, Mr. Tackett.

24       Mr. Dillard, are you going to conduct cross?

25           MR. DILLARD:  I am, Your Honor.  Thank you.

VOL. III -  394

1    Q.   You guys, fair to say, you run the company?

2    A.   This is correct.

3    Q.   Ridge currently has a total of about 298 employees?

4    A.   Yeah.  It changes day-to-day, but roughly.

5    Q.   And you're not a trained engineer.  I think you

6    testified you had an accounting degree?

7    A.   Accounting and marketing.  Yes, I am not a trained

8    engineer.

9    Q.   But you've been in this industry for decades, fair?

10   A.   Yeah.

11   Q.   You take part, you get involved, you roll up your

12   sleeves and you get in there with the engineering folks and

13   figure things out, don't you?

14   A.   Yes.

15   Q.   You don't need a piece of paper after decades of

16   experience in building things to know what you're doing, right?

17   A.   So I have a sense of how things should work, but I don't

18   do that anymore.  It's something turned over to engineers.

19   Q.   So you used to do it, or you just don't have any input,

20   then, at all?

21   A.   I grew up on a farm.  I learned to do a lot of things.

22   Q.   Yeah.  You know how to put stuff together, right?

23   A.   Yes.

24   Q.   I think you told me in your deposition that at the

25   initial meetings with KNL, you kind of had an idea pretty

VOL. III -  397

1    A.    Yes.

2    Q.    Ridge is making a door currently for a company called

3    Whiting Door, correct?

4    A.    Yes, and other door manufacturers.

5    Q.    And other door manufacturers, correct.

6          You went out and talked to every door manufacturer you

7    could find, right, after you broke up with KNL?

8    A.    Our company did, yes.

9    Q.    And the current Whiting doors, as they're being provided

10   today, have the grooves, correct?

11   A.    That's correct.

12   Q.    And they're generally the same -- pretty similar, very

13   similar to the panels that you provided when you were working

14   with KNL, right?

15   A.    It's the groove that we created for KNL, yes.

16   Q.    And I believe you told me that the structural panel is

17   also very similar to the one that you worked on at KNL, the one

18   that you're now providing to Whiting Door?

19   A.    Yes.

20   Q.    And I think you told me that the Ridge panel provided to

21   KNL and to Whiting Door is a structural panel, not an

22   insulating panel.  Isn't that right?

23   A.    I don't recall, but it is an insulating panel.  It's got

24   foam on it.

25   Q.    Okay.  Deposition transcript, Gary Grandominico, 47, 19

VOL. III -  398

1   through 22.  He's going to bring it up on the screen, what you

2   told me at your deposition.  And then we can read it and talk

3   about that answer.

4       A.   Sure.  Yeah.  I recognize this.

5       Q.   I apologize, Mr. Grandominico.  I'm having some

6   technical difficulties.

7           I think I just asked you -- the Ridge panel provided to

8   KNL and now to Whiting is a structural panel, not an insulated

9   panel.  You just told, me, no, it's an insulating panel.  Would

10  you like to change that answer based on what you're reading on

11  the screen?

12      A.   Like you said, as you pointed out, I'm not an engineer.

13  And you cannot make this panel without foam being left in the

14  groove.

15      Q.   I understand.

16      A.   And the foam -- and if you would also consider that

17  polypropylene and glass in itself is insulating.  So, yeah,

18  it's insulating.

19      Q.   So despite you what said here in your deposition when

20  you said, no, I wouldn't, I'd just consider it a Ridge

21  structural panel -- so you were wrong when you were in your

22  deposition.  Now today you're correct?

23      A.   I mean, if you want to clarify, that's what it is.  It's

24  also insulating.  Yes.

25      Q.   Also insulating.  Okay.

VOL. III -   405

1    Q.   After the prior email about exclusive patent rights, you

2    send this email to Mr. Phlipot telling him that Ridge is going

3    to do what it can to protect its rights as a coinventor,

4    correct?

5    A.   Correct.

6    Q.   If you move to the 922, again, here we see Mr. Phlipot

7    telling you that Ridge is not a coinventor of the patent and

8    asking you if you still want to participate in making panels;

9    is that right?

10   A.   That's correct.

11   Q.   Move to the top.  And your answer is an emphatic no,

12   correct?

13   A.   It says no.

14   Q.   Ridge never signed an agreement on IP with KNL, correct?

15   A.   This is correct.

16   Q.   So Jeff Phlipot had every right to leave R and -- to

17   leave Ridge behind, correct?

18   A.   Yes, he did.

19   Q.   And let me restate that first question because I believe

20   I said R and L instead of Ridge.

21        Just to confirm, KNL never signed an agreement on the IP

22   with Ridge, correct?

23   A.   Correct.

24   Q.   Jeff Phlipot had every right -- since you didn't have an

25   agreement, he had every right to leave you behind and not list

VOL. III -  406

1   you as a coinventor on the invention, correct?

2      A.   Well, that's what he did.

3      Q.   But in your mind that didn't sit right, correct?

4      A.   Definitely did not sit well.

5      Q.   One of the main reasons we're sitting here today,

6   correct?

7      A.   Absolutely.

8      Q.   Now, the KNL breakup was not going to stop Ridge.

9           Mr. Grandominico, the KNL breakup was not going to stop

10  Ridge from entering the roll-up door market, correct?

11     A.   Well, it appears that it was until we did some research.

12     Q.   Well, it's my understanding that before you did any

13  research, you went into the market and talked to every roll-up

14  door company that you could find.  I think you said that

15  earlier, didn't you?

16     A.   No.  We didn't do any of that until we found the Cold

17  Chain IP which put a completely new twist on -- new twist on

18  everything.

19     Q.   You found the -- you acquired licensing rights to the

20  Cold Chain patent in February of 2023, correct?

21     A.   Yes.

22     Q.   You didn't talk to Whiting Door before February 2023?

23     A.   No.

24     Q.   You didn't talk to any other door manufacturers before

25  that?

VOL. III -  407

1    A.    No.

2    Q.    Okay.  Now, you went into the door market because you

3   had acquired experience in the roll-up door market working with

4   KNL, correct?

5    A.    No.

6    Q.    Okay.  You were going to let that KNL work -- that door

7   go to waste, then?  Or you wanted to use that experience?

8    A.    We have a lot of experience in roll-up doors and we

9   understand them fully.

10    Q.    I understand that.  I'm saying you just spent four years

11   working with KNL on a roll-up door, right?

12    A.    Yes, we did.

13    Q.    You didn't want to let that work go to waste, correct?

14    A.    Of course not.

15    Q.    So you wanted to go -- you're going to still continue in

16   the roll-up door market, right?

17    A.    Not if someone had IP, correct, no.

18    Q.    Have you continued in the roll-up door market?

19    A.    Yes, after we found IP that would allow us to continue.

20    Q.    I understand that.  But I'm just asking what your --

21   what you're doing right now.  You're continuing.  You're

22   forging ahead in the roll-up door market?

23    A.    Yes.

24    Q.    Yes.

25    A.    We invented the product.  We worked with Jeff on

VOL. III -  409

1  A.   Short answer, no.

2  Q.   And I think you told me -- you talked a little bit about

3  KNL's market share in the roll-up door market.  And you said it

4  was almost nonexistent, I think.  Is that right?

5  A.   Until, you know, what we found out lately.

6  Q.   Well, I mean, your deposition was on Sunday?

7  A.   Yeah, well.

8  Q.   And I think on Sunday you told me their market is close

9  to zero, right?

10  A.   Yeah, I didn't know that, you know, they had gone to the

11  extent they had.

12  Q.   Okay.  Now, Cold Chain is a company in Idaho that makes

13  a handful of products, right?

14  A.   Yes, sir.

15  Q.   Some doors?

16  A.   Yes.

17  Q.   And after the split with KNL, you started looking for a

18  way to stay relevant in the roll-up door market, right?

19  A.   We started asking, you know, questions about the Arctic

20  Flex door, and that led us to the Cold Chain patent.

21  Q.   Because the Arctic Flex door was actually the Cold Chain

22  door, right?

23  A.   Correct.

24  Q.   Now, in February of 2023, Ridge acquired the licensing

25  for the Cold Chain patent, yes?

VOL. III -  412

 1    A.    Yes.

 2    Q.    And you sent that email as reflected here on May 3rd,

 3   2023, correct?

 4    A.    Yes, correct.

 5    Q.    And that's after you acquired the licensing to the Cold

 6   Chain patent?

 7    A.    Correct.  Well after.

 8    Q.    Right.  And after the amendment?

 9    A.    Yes.

10    Q.    And fair to say that in this letter you're still asking

11   him to add Ridge as a coinventor on the KNL door?

12    A.    Yeah.  I wanted to do business with Jeff.

13    Q.    And you wanted to be coinventor.  You wanted those

14   rights?

15    A.    Yeah, that was a way to remedy the situation and us get

16   back to work.

17    Q.    Move to 4720 still in Exhibit D20.  We're looking at a

18   separate email sent by you on May 22nd.  And you're following

19   up on the May 3rd email because apparently Mr. Phlipot never

20   wrote back, right?

21    A.    That's correct.

22    Q.    And you're following up again.  You say you want to move

23   forward.  You want those rights to that '144 application,

24   correct?

25    A.    Yeah.  You know, we developed a good product together.

VOL. III -   413

1   I wanted to get it to the market.

2   Q.   Look, if KNL came back to you right now and put you on

3   that patent --

4   A.   Yeah.

5   Q.   -- that would be okay with you, correct?

6   A.   Absolutely.  We'd get to work.

7          MR. DILLARD:  I have no further questions, Your Honor.

8          THE COURT:  Mr. Koltak, any cross?

9          MR. KOLTAK:  A few questions, Your Honor, yes.

10          THE COURT:  Mr. Koltak, please proceed.

11          MR. KOLTAK:  Thank you, Your Honor.

12                       - - -

13                  CROSS-EXAMINATION

14   BY MR. KOLTAK:

15   Q.   Good morning, Mr. Grandominico.

16   A.   Good morning.

17   Q.   A few questions for you on behalf of my client Kirk

18   National Lease and TTPS.  You indicated in your testimony that

19   you met with the folks from Cold Chain when you discovered the

20   patent?

21   A.   Yes.

22   Q.   And you -- did you meet with Peter Wachtell?

23   A.   No, I met with Joe Forney.

24   Q.   And Peter Wachtell is the coinventor on the Cold Chain

25   patent, correct?

VOL. III -   414

1    A.    Yes.

2    Q.    Did you have any understanding of his technical

3  background?

4    A.    As Joe explained to me that -- no, I don't really know

5  his technical background, although, you know, we met Peter and

6  he came to our plant.

7    Q.    Okay.  I'm confused.  I just asked you if you met him.

8  He met at your plant?

9    A.    Yes.

10    Q.    Okay.  You indicated that your testimony had changed

11  from your deposition with respect to the market share that Kirk

12  National Lease is taking in the roll-up door market, correct?

13    A.    Yeah.

14    Q.    And you base that on the emails you saw for the

15  advertising?

16    A.    Yes, uh-huh.  They were -- had far-reaching -- you know,

17  as I heard testified here, they were talking to many customers.

18    Q.    You've talked to those customers?

19    A.    No.

20    Q.    So you don't know what impact the word patent had in

21  those advertisements, do you?

22    A.    Only from the background that I have.

23    Q.    You were speculating?

24    A.    Pardon?

25    Q.    You were speculating, guessing?

VOL. III -  415

1    A.   I would say that that's my speculation.

2    Q.   During the development of the KNL/Ridge panel that was

3  going to be used in the KNL/Ridge door, how many engineers went

4  to the KNL manufacturing plant?

5    A.   KNL -- excuse me.  Would you tell me again.

6    Q.   I misspoke.  How many Ridge engineers went to the KNL

7  manufacturing location?

8    A.   KNL doesn't have a manufacturing location I'm aware of.

9    Q.   Where do they make the doors?

10   A.   Where do they cut grooves in their doors?  I have no

11  idea.

12   Q.   You've never been yourself?

13   A.   Yes, I've been to Kirk National Lease office which is

14  not manufacturing.  And two engineers, Ray McDonald and Bret

15  Moss, were present.

16   Q.   When you went to the Kirk National Lease facility?

17   A.   Yes.

18   Q.   Did you see the panels being made?

19   A.   No.

20   Q.   So you never -- so no engineer ever participated in that

21  process at all on site with Kirk or TTPS?

22   A.   We saw the door installed, as we had made it, in a

23  trailer.

24   Q.   So the answer to my question, then, is how many times

25  did a Ridge engineer go to the Kirk National Lease facility

VOL. III -   417

```
1            THE COURT:  Okay.

2            MR. KOLTAK:  One follow-up question off of that.

3            THE COURT:  Please.

4     BY MR. KOLTAK:

5     Q.    Did you make the door or did you make the panel?

6     A.    We made the panel.

7            MR. KOLTAK:  No further questions, Your Honor.

8            THE COURT:  All right.

9         Mr. Tackett, redirect.

10           MR. TACKETT:  Just a few redirect questions, if I may.

11        Would it be possible to ask you to put

12   Mr. Grandominico's deposition transcript back on the screen on

13   page 46?

14                          - - -

15                   REDIRECT EXAMINATION

16    BY MR. TACKETT:

17    Q.    Mr. Grandominico, you were asked some questions on cross

18   about your deposition testimony that I think didn't tell the

19   story of your deposition transcript.  So I just wanted to ask

20   you if you could read the questions and answers from 9 to 18.

21    A.    The question on nine was:  What's the difference between

22   a structural panel and an insulating panel?

23        The answer was:  Well, there are some structural panels

24   that perhaps don't insulate.  They don't have --

25    Q.    I think that was foam.
```

VOL. III -  418

1    A.    -- foam.  Ours does.

2          Do you want me to continue to read?

3    Q.    Yes.  Through 18, please.

4    A.    So the panel that you created for KNL and the panel you

5    created for Whiting both, you would consider those insulating

6    panels?

7          Mr. Tackett:  Objection.

8          And the answer:  All our structural panels are

9    insulated.

10   Q.    Thank you for that.

11         There were some questions about you -- I think the

12   question and answer was making doors for Whiting.  Do you have

13   any formal agreement with Whiting yet?

14   A.    No.

15   Q.    And have you sold full door orders to Whiting at all?

16   A.    No.

17   Q.    There was a question about the '144 application.  As we

18   sit here today, what's the difference between the '144

19   application and the Cold Chain patent?

20         MR. DILLARD:  Objection, Your Honor.

21         THE COURT:  Basis?  Legal basis?

22         MR. DILLARD:  Leading.  No foundation.  No expertise.

23         THE COURT:  Mr. Grandominico has testified as the CEO

24   of Ridge about his involvement in these developments of these

25   products.  You're right, he is not an engineer, but he did

VOL. III -  431

1   trailer, then when the trailer door goes to close, it won't hit

2   the header.  So if you try -- for example, if you try to put a

3   10-inch radius in a 5-inch header, the top part won't close.  I

4   could get it to close.  It won't open.

5      Q.   Okay.  You indicate the grooves.  What's the function of

6   the groove?

7      A.   The groove is just to relieve -- I don't need a foam in

8   there.  I groove it down as close as I can get it to the

9   outside skin without going through it because it's a very fine

10  line that I got to run against.  That groove will -- when I put

11  my bracket on next to the groove, my bracket don't go in the

12  groove, my roller don't go in the groove.  That groove is just

13  to relieve the panel so it can make the radius.

14     Q.   How much foam do you like to have left after you're done

15  cutting your grooves?

16     A.   I try to get down as close as I can to the outside skin.

17  Most of the time there might be a 16th to 3/16th of foam left

18  in the door.

19     Q.   What you have talked us through so far is you got a

20  panel and you've cut some grooves in it.  What's next?

21     A.   After I get that done, the grooves cut, then I cut the

22  dimension the door is.  So, you know, for example, if they say

23  the door is 96-inches wide and 93-inches tall, I have to make

24  that door blank fit that opening.  So then I measure out before

25  it -- I know that dimension before I rout the grooves.  So I

VOL. III -  432

1    already laid out the panel with the grooves.  So when I trim it

2    down to size, I got my bottom panel the size I want and I got

3    my top panel the size I want.  If you don't have the top and

4    bottom panel the right size, it's not going to work right

5    either.

6         So I get my blank.  I already got my grooves all

7    determined.  Now I cut it down to size.  And then, after I do

8    that, I will make my groove on the bottom of the door blank and

9    put my bottom seal on because the bottom seal determines

10   where -- because I have the seal already punched for the

11   lock -- determines where the lock goes.  That has to be in the

12   middle of the door blank.

13        And then after I get that part all done, then I put all

14   of my brackets on.  When I put my brackets on, I put -- my

15   brackets are designed to catch the edge of the groove and go

16   onto the outermost part of the door, which is the inside of the

17   door.  I drill a hole through my brackets, and that's where I

18   run my bolts up through the door and I attach my brackets

19   there.  So I do that on both sides.

20        Then I go to the top of the door which takes a different

21   bracket.  And that bracket is designed on what radius and what

22   track you have in that door or in that trailer because when you

23   go to close it, you can adjust that bracket to close the

24   header.

25   Q.   At this point have you made a door?  Do we have a door

VOL. III -  433

1   yet?

2     A.    I've made several doors already.

3     Q.    No.  The process you just described.

4     A.    After I get that part on, I flip the blank over and

5   attach my anchor brackets which the cable is hooked to, and I

6   put my lock and keeper and handle and pull strap on the door.

7   After that I put my top seal on, and after that the door is

8   done.

9     Q.    Are you familiar with the '144 patent application that's

10  at issue in this case?

11    A.    That's the door that we currently make.

12    Q.    Okay.  Who came up with the idea for the door in the

13  '144 patent application?

14    A.    Jeff did.

15    Q.    When did Jeff come up with that idea?

16    A.    It was probably in the late 2017, early '18, in that

17  time frame.

18    Q.    What was your involvement?

19    A.    Well, I went to his office one day to find out what --

20  if there's anything needed done and he told me he had an idea.

21  I said, What's that?

22          And he says, Well, I was down at Miller Brewery and they

23  want a trailer.  They don't want swing doors because when they

24  open the doors up, the beer cans are exposed to the elements

25  when they're back in the dock.

VOL. III -   434

1          Since we built self-unloading trailers and roller

2     trailers for them, they thought, well, see what you guys can do

3     with this.  I took on the challenge.  I said, That's sounds

4     pretty interesting.  I said, I'll work on that.

5          So that's how it all come about.  And the reason it come

6     about, he seen ceiling liners we was using on the jobs we was

7     doing for Honda.  And it's flexible.  So that's how it came

8     about the idea of making a door.

9     Q.   What kind of materials were you working with?

10    A.   That was a polypropylene material, I believe.

11    Q.   What was a polypropylene material?

12    A.   It was a thermoplastic, basically, had polypropylene and

13    glass webbing fibers put in the glass -- in the panel.

14    Q.   Are you talking about the ceiling liner panel?

15    A.   Yes.

16    Q.   What other materials did you end up trying?

17    A.   That was the material we was working with most of the

18    time.  We didn't really try to make other ones because, you

19    know, I can't take wood and bend wood like that.

20    Q.   Did there come a point where you worked on a different

21    material than the ceiling liner?

22         Where did you get the ceiling liner from?

23    A.   It came from Lakeshore Trailer.

24    Q.   Who was the original manufacturer of that?

25    A.   Ridge.

VOL. III -  435

1    Q.    Did you get any other products from Ridge that you tried

2    to make the door with?

3    A.    No.

4    Q.    Did there come a point where you had a piece of material

5    that you tried to make a mockup with?

6    A.    Well, whenever Jeff went to Ridge to see how they did

7    the lining at, he seen a sandwich panel there.  So he asked if

8    he could have a piece of that to try to make the door he was

9    trying to make.

10   Q.    Is the sandwich panel different than the material you

11   were just describing?

12   A.    Yes.

13   Q.    And so did they give Jeff a piece of material to try to

14   make the door with?

15   A.    Yes.  Chris Fannin gave Jeff a piece of material that he

16   brought back to me.

17   Q.    What did you do with it?

18   A.    The first thing I did with it, I looked at it.  I

19   thought this is pretty interesting.  So I took it and I started

20   putting grooves in it.  I thought I'd try a V groove.  All fine

21   and dandy.  It kind of works a little bit, but it put too much

22   stress on where it bent.

23         So then I took part of the panel and I made grooves in

24   it.  I took a power saw and cut so far to make three grooves in

25   it to be about an inch wide.  You can't let the other material

VOL. III -  436

1   in there because when it goes around the radius, it won't

2   squeeze together.  So then I took a chisel and chiseled that

3   all out and then it started flexing better.

4          I told Jeff, hey, check this out.  It does flex.  I had

5   a sample track I laid on the thing and I sat the rollers and

6   ran it through, you know.  And so I said, I wonder if we can

7   get a piece of this.  So Jeff asked if we could get a piece.

8   Q.   How big was what you were describing that you were

9   rolling through the tracks?

10  A.   That piece was only like maybe a foot wide by three foot

11  long, something like that.

12  Q.   Where is that model now that you built?

13  A.   I built the smaller model with the track and all, and he

14  took it back with him because he had a meeting with them.  And

15  he took the model back with him up to Ridge to show them what

16  we wanted to do.  So they still have the model of the door.

17  Q.   And who built that model?

18  A.   I did.

19  Q.   Did you have any input from Ridge before you built that

20  model?

21  A.   No.

22  Q.   Did you have any input from Ridge before you started

23  putting grooves in the board?

24  A.   No.

25  Q.   I believe plaintiff's exhibit book is up there.  Would

VOL. III -  459

```
 1            THE COURT:  Mr. Koltak, any redirect?

 2            MR. KOLTAK:  No, Your Honor.

 3            THE COURT:  Mr. Phlipot, thank you very much, sir.

 4    You may be excused.

 5            MR. KOLTAK:  Your Honor, if I may, Mr. Phlipot spent

 6    the majority of the last few days sitting out in the hall.  I

 7    didn't know if he was potentially going to be called again.

 8            THE COURT:  Do you anticipate calling him again?

 9            MR. TACKETT:  No, Your Honor, we certainly do not.

10            THE COURT:  Mr. Phlipot, you're free to remain in the

11    courtroom if you'd like.

12         Your next witness.

13            MR. BURTON:  Yes, we'd like to call Jeff Phlipot.

14            THE COURT:  Mr. Jeff Phlipot, you're still under oath.

15    Please resume the stand.

16                          - - -

17                     JEFFREY PHLIPOT

18     Called as a witness on behalf of the Defendants, being

19    previously first duly sworn, testified as follows:

20                    DIRECT EXAMINATION

21    BY MR. BURTON:

22    Q.   Mr. Phlipot, what is your position with KNL?

23    A.   CEO.

24    Q.   What's your position with TTPS?

25    A.   President.
```

VOL. III -  460

 1    Q.    How long have you been with KNL?

 2    A.    The last stint or the one right now?

 3    Q.    Let me go back to the beginning.  When did you first

 4  start working for KNL?

 5    A.    1979.

 6    Q.    How long did you work for them after 1979?

 7    A.    I worked for them for 14 years.

 8    Q.    Did you go to some other position?

 9    A.    I left and went and worked on heavy equipment.

10    Q.    When did you come back to KNL?

11    A.    I should say after I left the heavy equipment, I bought

12  a marine dealership.  But went back to KNL in 2002.

13    Q.    In what capacity did you join KNL?

14    A.    Director of maintenance.

15    Q.    What has been the positions you've held in your career

16  with KNL since then?

17    A.    Director of maintenance.  Then I went to president, and

18  then I went to COO, and then I bought the company in '08.

19    Q.    Since you bought the company, what's been your position?

20    A.    CEO.

21    Q.    And you had some testimony about the relationship or

22  interrelationship between TTPS and KNL.  Which of the companies

23  sells the -- or sell the single panel roll-up door?

24    A.    Well, we both do.  But I guess when you look at it, TTPS

25  actually sells it to Kirk, and then Kirk resells it, or TTPS

VOL. III -  461

1   will sell it directly to a customer.

2       Q.   Do both at times sell the single panel roll-up door?

3       A.   Yes.

4       Q.   Backing up for a minute.  Can you explain what KNL's

5   business is?

6       A.   KNL's actually short for Kirk National Lease.  So the

7   national lease -- we're part of the national lease system and

8   we lease semi-trucks, trailers, straight trucks, and we also

9   maintain -- we have maintenance contracts on larger fleets.

10      Q.   Do you know which of the companies sold the first single

11  panel roll-up door that you made between TTPS and Kirk National

12  Lease?

13      A.   It would have been Kirk National Lease.

14      Q.   When was that?

15      A.   Somewhere around April of '22, maybe May.

16      Q.   Who was that sale to?

17      A.   I think the first one went to Coke.

18      Q.   Was that sale on a trial basis?

19      A.   Yeah, we put the door in.  They were going to run it,

20  test it for us, let us know what they thought of it.  And we

21  had the agreement with them if it didn't work or they didn't

22  like it, we'd take it back out because it's pretty hard to

23  convince them to try it.

24      Q.   What happened with that sale?

25      A.   They ran it for about four days, and they called up and

VOL. III -   462

1    said just go ahead and bill us for the panel.

2       Q.   How many single panel roll-up doors have been sold to

3    date by either company?

4       A.   About 170-some I think was on the sheet.

5       Q.   If you could turn or look on the screen at Defendant's

6    Exhibit 111.  We'll try and make that a little bigger.

7            When you said the sheet, what were you referring to?

8       A.   Please?

9       Q.   You said it's on the sheet.  I was asking what you were

10   referring to.

11      A.   Excel spreadsheet that we sent in.

12      Q.   Does Exhibit 111 reflect the number of total sales?

13      A.   I think if you scroll down to the bottom a little bit

14   further.  Because it doesn't actually total up at the bottom on

15   this one.  There it is.  177.

16      Q.   If you keep it on that page.  And you agree that that's

17   accurate, 177 sales?

18      A.   Yes.

19      Q.   If you keep it on that page and look at the column

20   June -- or the row June '23, how many sales were made in that

21   month?

22      A.   Forty-one.

23      Q.   Was that your biggest month for sales to date?

24      A.   It looks like August is -- total-wise, you're right.

25   Yes, that's the biggest.

VOL. III -   463

1    Q.    And the total is what for June?

2    A.    For June?  Forty-one.

3    Q.    And what do the other two columns that add up to 41

4    after that signify?

5    A.    Well, the 32 is -- at the top sheet it will show Coke,

6    and then the nine is other customers.  Coke is -- used in the

7    door in quite a few of the different locations across the

8    country to see how it's going to hold up.

9    Q.    How did the concept of the single panel roll-up door

10   come about?

11   A.    It came about like you heard in earlier testimony.  We

12   were -- we designed and built a roller for a trailer,

13   self-unloading trailer, for Miller Brewery.  They -- it's kind

14   of when they approached us on the Miller Brewery side of it to

15   build the trailer.  First of all, we built the roller floor

16   trailer because the ones they were using, they didn't like the

17   way they were built.  So they asked us if we could design a

18   trailer that -- for the roller floor.  And about six months

19   after we did that, then he wanted us to make it automated.  And

20   at that point, I thought yeah, right.  But that's what they

21   wanted and that's what we did.  And we have a patent on that.

22        But about two years after that they -- when those were

23   in, they come to us and asked if we could create a door that

24   they wouldn't have to open the swing doors and back in the dock

25   and leave the trailer open till they -- till it was unloaded or

VOL. III - 464

1  whatever.  The challenge that it come up with was to clear 108

2  and a half inches.  That's how tall the cans were.  When you're

3  looking at a trailer, the inside is roughly 111.  The frame of

4  the trailer for the door frame is about 109 and three quarters.

5  So you don't have much room to hide a track or operator

6  or anything else up in there.  But we just took it on.  And I

7  guess it set in the back burner for three months and -- we was

8  working on a Honda project and we got it from Lakeshore but it

9  was a ceiling liner from Ridge.

10  When we were installing that, I just noticed when we

11  would attach it to the roof, the way that it sagged down and

12  the --

13  Q.  The way that what sagged down?

14  A.  The ceiling liner.  It flowed down, nice curve.  You

15  shove it up and straighten up, and it had some really, really

16  strong features about it.  So at the end of the roll that we

17  received, we cut it off and we tried to actually make a -- I

18  should say Larry tried to make a door out of it.

19  Q.  Would that have been a single panel door?

20  A.  Yes.

21  Q.  Was that successful?

22  A.  No.  We -- if you look at your window channel in the

23  car, we were actually going to use some type of felt in the

24  C-channel.  When we did that and made the frame for the track

25  going up -- because the nice thing about that panel, it was

VOL. III -  465

1    thin.  So it was really easy to get the height we needed.  The

2    problem was it was a little flimsy.  And the second thing we

3    ran into, during the winter if you would get water inside that

4    felt, it would freeze and nobody is going to open the door.  So

5    we kind of abandoned that.

6    Q.   How did you come up with a material that -- different

7    from that to use in your single panel door concept?

8    A.   Chris Fannin was a salesman for Ridge, and they come out

9    with what they call ogre which is a scuff liner.  It's -- from

10   my understanding, it's made from recycled material that's cut

11   off their panels.  But anyhow, he wanted me to see it because

12   it was extremely durable.  And so we started installing -- we

13   worked out and started installing the scuff liner into the

14   trailers, but he wanted me to come to Ridge and look at that

15   and see how it was produced.  He took me around and showed me.

16        During that first meeting there, we passed a sandwich

17   panel, and I asked Chris about it.  And he was telling me a

18   little bit about it.  And he gave me a scrap piece -- went to

19   somebody out in the plant and they went somewhere and picked up

20   a scrap piece and I brought it back.

21   Q.   What did he tell you about it?

22   A.   Just it was a sandwich panel.

23   Q.   Why were you interested in it?

24   A.   One thing, it was stiff.  And it basically -- might as

25   well just say it was a board.  Just the idea of what we were

VOL. III -  466

1  trying to do with the ceiling liner would basically use the

2  outside skin or one of the skins of that panel as the ceiling

3  liner and rout the door -- the panel out to put grooves in it

4  to flex, bend, or whatever you want to call it.

5    Q.   Whose idea was it to use the grooves in the panel?

6    A.   Well, Larry messed around with it and started cutting on

7  that panel until he got something that would bend where we need

8  it to.

9    Q.   To back up a step, the scrap piece that you got from

10  Ridge, did it have grooves?

11    A.   No, just sandwich panel.

12    Q.   So a solid rectangle, is that --

13    A.   Yes.

14    Q.   What was the result of cutting the grooves in?

15    A.   Well, it gave enough relief in the panel to bend.

16    Q.   Did you develop a -- what you thought was a successful

17  model or --

18    A.   Yeah.  Larry built that.

19    Q.   -- whatever you call it?

20    A.   We put it into a track with brackets on it and just --

21  we wanted to make sure it would have enough -- would bend

22  enough to make the radius.

23    Q.   What did you -- from doing that process, what did you

24  find out?

25    A.   It worked very well.

VOL. III -   467

```
 1      Q.   Then what did you do?

 2      A.   I took -- got ahold of Chris Fannin and he set a meeting

 3  up at Ridge.

 4      Q.   Did you bring the model?

 5      A.   Yes.

 6      Q.   What should we call that?

 7      A.   I just call -- I just call it a mockup of a door.

 8      Q.   For that -- did that meeting happen?

 9      A.   Yes.

10      Q.   About what time did this happen, your approximation on

11  that?

12      A.   To be honest I really don't know if it was towards the

13  fall.  I would have to look at -- all the dates we've been

14  looking at the last couple -- this week, I really can't

15  remember if it was -- I'm not even going to guess.  I don't

16  know.

17      Q.   Can you guess a year?

18      A.   It would have been 2018.

19      Q.   All right.  Did you bring the mockup with you to that

20  meeting?

21           MR. TACKETT:  Objection.

22           THE COURT:  Basis?

23           MR. TACKETT:  Leading.

24           THE COURT:  I'm going to allow it.  Technically,

25  you're right.  I think it's probably more foundational than
```

VOL. III -  468

1  anything.  So I'm going to allow the question to stand.

2       You may answer, Mr. Phlipot.

3          THE WITNESS:  Yes, I brought the mockup with me.

4  BY MR. BURTON:

5   Q.   What did you explain about it, if anything?

6          THE COURT:  Before you go on to that, what else did

7  you bring with you to the meeting, Mr. Phlipot?

8          THE WITNESS:  That was it.

9          THE COURT:  Just the mockup?

10         THE WITNESS:  Yes.

11         THE COURT:  Did anyone ask you to bring the mockup to

12 the meeting?

13         THE WITNESS:  No.

14         THE COURT:  It was your decision to do so?

15         THE WITNESS:  Yes.

16 BY MR. BURTON:

17  Q.   Can you tell me what you talked about at that meeting?

18  A.   I think I testified earlier that when we went into the

19 meeting, Chris Fannin, and I know Zach was in there, and Bret I

20 believe was in there.  And it was just to show them the panel,

21 whether they could engineer a panel to work for the concept

22 that I wanted, to make a door out of it.

23  Q.   What did you expect Ridge to do for you?

24  A.   To make me a panel.

25  Q.   Had you made any decisions about how many grooves should

VOL. III -  469

1   be on it or where the grooves should be at that point?

2   A.    No.

3   Q.    Did Ridge help you in arriving at that -- at that -- at

4   a final decision of where the grooves should be in the panel?

5   A.    The first panel I think we got from them was exactly the

6   same type of panel that I made the mockup out of.  The mockup

7   was only about a foot wide.  I should say Larry made the

8   mockup.  The mockup was about a foot wide and probably three

9   feet long or somewhere in there.  I think we had four or five

10  rollers and we run it through the track.  When we made the

11  panel the size of a regular door and we installed it into the

12  trailer, the first time they went to close the door, the door

13  got about halfway down the track and then the panel had so much

14  memory, it come back up and it actually literally shot out the

15  back of the track.  So at that point, we went back to Ridge

16  on -- to change the panel.

17  Q.    Change the panel in what way?

18  A.    Whether they were going to -- recommendations to sit

19  there and try to make the panel so it would be easier to bend.

20  Q.    Did "it make it easier to bend" involve any work by

21  Ridge on optimizing where the grooves should be on the panel?

22  A.    No.  Because the next several panels we got from them

23  while we were working on them came with no grooves.

24  Q.    How would you describe generally Ridge's role in the

25  development process for the single panel roll-up door after

VOL. III -   470

1   that first meeting that you mentioned?

2   A.    I would say that they -- their part of it was to make

3   their product work for the idea that I had.  And I said they

4   got a very good product and it did work very well.

5   Q.    When you say "their product," what do you mean?

6   A.    The door, sandwich panel.

7   Q.    Now, did Ridge send invoices to TTPS or KNL during the

8   development process for their work on the door?

9   A.    The only panel I didn't pay for is the one they gave me

10  at the very beginning, the scrap piece.

11  Q.    If you could look at Plaintiff's Exhibit 7.  Can we

12  bring that up on the screen?

13        I'd like to look at the last page of that exhibit.  Do

14  you see at the top there, Mr. Phlipot, a July 23, 2021, email

15  from you to Mr. Grandominico?

16  A.    Yes.

17  Q.    It says:  Gary, good afternoon.  After many attempts, we

18  have the roll-up door working.  Actually, it works great.

19  Would you like to -- would like to sit down with you to start

20  the paperwork to lock this down, the patent, IP, dot dot.

21        So let me ask you, when you say we have the roll-up door

22  working, what were you referring to there as far as working?

23  A.    We had the first door actually inside a trailer, that it

24  operated functionally.  We ran it through a winter, no

25  cracking.  We had a customer take it and use it for a little

VOL. III -   479

1  The seams caused issues because we couldn't rout in the seams.

2  Every time we would try to rout and test a door a different

3  size, we had to shift the panel up and down.

4       So to not create waste -- because Dominic can take a

5  30-inch panel, and to save waste, he can cut that 30-inch panel

6  into like 15 inches, seam that to it, use that next 15 inch

7  onto the next panel.  When he first gave us the first couple of

8  panels, we wasted so much out of those panels, it was costly.

9  Q.   When TTPS receives a panel from Altum, what is the next

10  step?  What do you do with it?

11  A.   We bring it in and we rout it, set the router up for

12  whatever size door.  Larry does most of that.

13  Q.   And what is the router used for in relation to the Altum

14  panel?

15  A.   To cut the grooves out to give it -- so we can bend it.

16  Q.   I'd like you to look at Defendant's Exhibit 124.

17       THE COURT:  Can I see you at sidebar and -- you,

18  Mr. Tackett.  Mr. Burton and Mr. Tackett.

19     (Thereupon, Court and Counsel conferred out of the hearing

20  of open court and off the record.)

21       THE COURT:  We're going to stop here for the day.

22  We're going to resume at two o'clock and work tomorrow until

23  we're done.  Thank you very much, everyone.

24       Mr. Phlipot, you may be excused.

25     (Proceedings concluded at 11:59 p.m.)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RIDGE CORPORATION,                    )
                                      )
  PLAINTIFF,                          )    CASE NO. 2:23-cv-3012
                                      )
        vs.                           )
                                      )
KIRK NATIONAL LEASE CO., *et al.*,)
                                      )
  DEFENDANTS.                         )
_____)

TRANSCRIPT OF MOTION FOR PRELIMINARY INJUNCTION PROCEEDINGS
VOLUME IV OF IV
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
OCTOBER 6, 2023; 8:30 A.M.
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:
    Bailey Cavalieri LLC
    By:  Christopher W. Tackett, Esq.
         John P. Miller, Esq.
         Graycen M. Wood, Esq.
    10 West Broad Street, Suite 2100
    Columbus, Ohio  43215

FOR THE DEFENDANTS KIRK NATIONAL LEASE CO. and
TRUCK AND TRAILER PARTS SOLUTION:
    FGKS Law
    By:  Joshua A. Koltak, Esq.
    100 South Main Avenue, Suite 300
    Sidney, Ohio  45365

    Faruki PLL
    By:  Donald E. Burton, Esq.
    110 North Main Street, Suite 1600
    Dayton, Ohio  45402

    Faruki PLL
    By:  Melissa L. Watt, Esq.
    201 East Fifth Street, Suite 1420
    Cincinnati, Ohio  45202

APPEARANCES CONTINUED:

FOR THE DEFENDANT ALTUM LLC:
        Arnold & Clifford LLP
        By:  Damion M. Clifford, Esq.
             Michael L. Dillard, Jr., Esq.
        115 West Main Street, 4th Floor
        Columbus, Ohio  43215

- - -

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

VOL. IV - 485

1          THE COURT:  I don't believe that that was the point of

2     the -- I think that the point of the question is to identify

3     whether there are insulating qualities.  And he's certainly

4     been involved with the development of the door.  So if he

5     doesn't know, he can simply tell us he doesn't know.  And if he

6     doesn't have that level of expertise, I'm certain that it will

7     be exposed on cross-examination.  So your objection is

8     overruled.

9          You may answer, Mr. Phlipot.

10          THE WITNESS:  I believe the foam that we use has an R

11     value of about one or maybe just a little bit over that.  But

12     not much more than that.

13     BY MR. BURTON:

14     Q.   Actually, that term has been used in the case so far.

15     What does R value mean?

16     A.   R value is the thermoresistance to heat.

17     Q.   What does one or perhaps a little more than one signify

18     to you?

19     A.   One is at the very low end of the scale.

20     Q.   The foam that's in the bottom of the groove on the KNL

21     door, what purpose does that foam serve?

22     A.   The only reason that foam is still in there is because

23     we don't want to get down too far to the outer skin.  If we go

24     through it and damage any of the fiberglass strands in there,

25     it really weakens the door at that point.

VOL. IV - 486

1    Q.    What is used to do -- to put the groove into the KNL

2    door?

3    A.    We have a CNC router that we use.  It's a multicam

4    router.  It's pretty old.

5    Q.    How old?

6    A.    I think like a 1999 or a 2000 model.

7    Q.    How many routers in total do the KNL defendants use

8    currently to make the KNL door?

9    A.    As far as a table router, one.  Larry uses -- got two

10   other handheld routers to put the small groove at the bottom

11   for the seal.

12   Q.    The table router, where is that located?

13   A.    At our place in Sidney.

14   Q.    How many doors can be made with that table router at the

15   same time?

16   A.    At the same time?  We can only do one at a time.

17   Q.    About how many doors could be made in a week with that

18   machine?

19   A.    We're probably about 20 minutes to do one sheet.  So

20   there, again, depends on how many hours in the day you want to

21   work.  Since our router is old, we have to shut down the vacuum

22   pumps on it.  By the time they wind down to where you pick the

23   panel up, get the panel slid over, get another one over on the

24   router centered -- our router isn't sophisticated enough to

25   have an eye to pick up where the edge is at so we have to set

VOL. IV - 487

1   every panel on the router.  So that takes a little bit of time.

2   So it only takes probably eight or nine minutes to rout it, but

3   20 minutes.  So, you know, in a day's time you're doing three

4   an hour.  So if you -- you're about 24 to 25 a day on an eight-

5   to nine-hour day.

6       Q.   How many KNL and TTPS employees make the KNL single

7   panel roll-up door?

8       A.   Larry makes all the doors.  If he needs help, I go down

9   and help him.

10      Q.   Does KNL sell roll-up doors that are not single panel

11  roll-up doors?

12      A.   Yes.

13      Q.   Is there a term for that so I don't -- that's better

14  than me saying nonsingle --

15      A.   I just call it a panel door.  That will be fine.

16      Q.   The panel door that KNL sells -- the panel doors that

17  KNL sells, where does KNL get them from?

18      A.   Transglobal.

19      Q.   How many of those panel doors that KNL sells does KNL

20  manufacture itself?

21      A.   None.

22          THE COURT:  Just so I'm sure.  So the panel doors are

23  not the single panel roll-up doors?

24          THE WITNESS:  Right.

25          THE COURT:  All right.

VOL. IV - 488

1    BY MR. BURTON:

2    Q.   What is KNL's share of the market for panel doors,

3    approximately?

4    A.   It's probably a hundred times less than what we got with

5    the single panel door.  We just -- our customers, if they

6    damage a door, whether it's a TODCO, Whiting, composite door,

7    whatever, we will consult with them for a door to put back in.

8    It's just as a door is damaged or replaced.  A lot of times

9    with the panel door we might replace one or two sections at the

10   bottom and not replace a whole entire door.

11           MR. BURTON:  Your Honor, that's all the questions I

12   have.

13           THE COURT:  Thank you, Mr. Burton.

14       Cross?

15           MR. TACKETT:  Yes, Your Honor, if I may.

16           THE COURT:  Yes.

17                          -  -  -

18                     CROSS-EXAMINATION

19   BY MR. TACKETT:

20   Q.   Mr. Phlipot, good afternoon, sir.

21   A.   Good afternoon.

22   Q.   Just a few questions.  We spent quite a bit of time with

23   each other on Wednesday; so I won't belabor those points.  Do

24   you remember the testimony you gave Wednesday about the

25   engineering work that Ridge did for the KNL door?

VOL. IV - 489

1    A.    I know we talked about it, yes.

2    Q.    Okay.  You testified on direct yesterday that you went

3    to I believe you said five other panel manufacturers besides

4    Altum, and only Altum's panel worked for KNL's door, correct?

5    A.    Right now they're the only ones we're using, yes.

6    Q.    Was it five others?

7    A.    Yes.

8    Q.    Okay.  And those five other vendors weren't made up of

9    all former Ridge employees like Altum, were they?

10   A.    No, I don't think so, no.

11   Q.    And since we're here primarily on a patent claim, I want

12   to ask you, you're not an expert in interpreting patents, are

13   you?

14   A.    No.

15   Q.    So you wouldn't have any opinions about whether the KNL

16   door meets the Cold Chain patent claims or not, would you?

17   A.    No.  The only thing I would do is read them through and

18   it just would be my observation, what I think.

19   Q.    Okay.  Have you ever tested the R value of the foam on

20   any of the KNL doors?

21   A.    No.

22   Q.    Do you know what machine you would use to test the R

23   value of any portion of the foam on a KNL door?

24   A.    I don't know why I would need to.  But, no, I don't have

25   a machine.

VOL. IV - 490

1    Q.    And you don't have one of those machines, do you?

2    A.    No.

3    Q.    So on direct, though, sir, you testified about what you

4    thought the R value of the foam that you're using might be.  Do

5    you remember that?

6    A.    Yes.

7    Q.    Do you know for certain what the R value of the foam is?

8    A.    The only thing I know is when we got the foam -- and

9    it's the same thing -- I believe the same foam like Ridge; we

10   asked.  So -- and I can look it up.  I don't know if I need to

11   know.  If I have to know what -- the R value, I can look it up.

12   Q.    When you just testified on direct about a number for R

13   value, you would agree that you don't actually know the R value

14   of the foam at any point in the door for sure, do you?

15   A.    No.

16         MR. TACKETT:  Okay.  Nothing further.

17         THE COURT:  Mr. Burton, any redirect?

18         MR. BURTON:  No redirect, Your Honor.

19         THE COURT:  Mr. Phlipot, thank you very much, sir.

20   You may be excused.

21         MR. BURTON:  The KNL defendants have no further

22   witnesses, but I would like to move the admittance at this time

23   of three of defendants' exhibits.

24         THE COURT:  Which ones?

25         MR. BURTON:  Defendants' Exhibit 111.

```
                                                      VOL. IV - 508

 1            MR. CLIFFORD:  I gave it to them.

 2            THE COURT:  You don't have to give them that one.  If

 3   you'll give him the one that you're showing to the witness.

 4            MR. CLIFFORD:  Yes, Your Honor.  I will do that.

 5            MR. TACKETT:  Are they the same?

 6            MR. CLIFFORD:  Yes.

 7            MR. TACKETT:  We've seen it, Your Honor.  Thank you.

 8            THE COURT:  The record will reflect that counsel has

 9   provided a copy to opposing counsel.

10            MR. CLIFFORD:  I had actually given him both of them

11   earlier.  I think with the cleaning and moving, it got moved

12   from Mr. Tackett's table back over here.  I will make sure I

13   show it to him next time before I approach.

14            THE COURT:  Yeah, because the point, as you recall

15   from your law school days, is that the exemplar you're giving

16   to the witness, you want him to see that same one just in case

17   you had written something on it.

18            MR. CLIFFORD:  Your Honor, I would never do that but I

19   especially would never do that in your courtroom.

20            THE COURT:  That's the reason for the rule.

21            MR. CLIFFORD:  Yes, Your Honor.  I appreciate that.

22   BY MR. CLIFFORD:

23   Q.   Mr. Grandominico, have you seen Defendant's 47 before?

24   A.   Yes, I have.

25   Q.   What is it?
```

VOL. IV - 509

1   A.   It's one of our structural panels.

2   Q.   And how do you know that?

3   A.   I made it.

4   Q.   Can you describe generally how you would have made

5   Defendant's 47?

6   A.   The same way I described earlier with the machine

7   process.

8   Q.   Can you just set that next to you for now?

9   A.   Yes.

10   Q.   I show you Defendant's 27.  Mr. Grandominico, can you

11   tell me what Defendant's 27 is?

12   A.   It looks like a side view of our panel after routing.

13   Q.   And is this a true and accurate picture of the Altum

14   panel?

15   A.   Yeah, I believe so.

16   Q.   Do you know approximately how thick the outer membrane

17   is of the Altum panel?

18   A.   0.04 inches roughly; so just under a 16th of an inch, or

19   around a millimeter, if you will.

20   Q.   How thick is the Altum panel overall?

21   A.   Around 11/16ths outside to outside.  So .675 thick.

22   Q.   How thick is the foam in the Altum panel?

23   A.   You're asking me to do math on the fly.  About .59.

24   Q.   And after the grooves are cut in the Altum panel by KNL,

25   do you know how much foam is left in the grooves?

VOL. IV - 514

1    Q.   What is it?

2    A.   That's the archive that I found on Cold Chain's door.

3    Q.   Is it a true and accurate copy of Cold Chain's website?

4    A.   It appears so, yes.

5    Q.   After looking at the website and looking at the patent,

6    what did you do next?

7    A.   Well, this was a very helpful tool in helping to

8    cross-reference the claims in the patent versus what Cold Chain

9    was presenting to the world as what they were making.  So I

10   began to pick the raw materials off of this page that made up

11   the Cold Chain panel.

12          THE COURT:  Mr. Grandominico, could you give me the

13   approximate date that this D5 represents, that is, when it was

14   that you saw this or produced this?

15          THE WITNESS:  Yes, Your Honor.  Can you see the very

16   top of the -- do you see -- how the Wayback Machine works is

17   when they do pull the screenshot, do you see the 20130413?

18          THE COURT:  Yes.

19          THE WITNESS:  That's the date.  So this was 2013.  So

20   April 13 of 2013 which is similar to the patent date.

21          THE COURT:  But this is not when you pulled the items

22   up and looked at it.

23          THE WITNESS:  I'm sorry.  No.  That's when it was

24   archived.  I pulled it -- I pulled this up sometime after the

25   complaint was filed.

VOL. IV - 538

1    A.    I think they call out 14.

2    Q.    And how many inches of EVA foam would there have to be

3    in order to meet the minimum R value as called for in the Cold

4    Chain patent?

5    A.    Could you bring up the website spec again?  It's

6    somewhere around more than three inches.  But if you want an

7    exact answer, I'd have to do the math.

8    Q.    No.  That's fine.  What is the amount of EVA foam you

9    put on Defendant's 48?

10   A.    I could only get my hands on one and a half inches.  So

11   the R value here would be a little over 7 and a half or so.

12   Q.    Let's look back at Defendant's 47.

13   A.    Is that this panel?

14   Q.    Yes.  Do you know what type of foam is used in

15   Defendant's 47, the Altum panel?

16   A.    Yes, I do.

17   Q.    What is it?

18   A.    PET foam.

19   Q.    Is it EVA closed cell foam?

20   A.    No, sir.

21   Q.    Is the Altum panel, 47, flexible along the entire length

22   of the panel?

23   A.    No, sir.

24   Q.    Do you know what the R value is of the Altum panel?

25   A.    Yes, sir.

VOL. IV - 545

1    A.    Roughly 20 to 25 a week.

2    Q.    How about by the end of 2024 if sales went as projected

3  among the discussions between you and Jeff and Larry?

4    A.    The demand and the growth of our process and

5  capabilities to meet their demand was we were hoping to trend

6  towards about 100 -- about 115 average per week.

7    Q.    What was the amount of revenue Altum was generating from

8  selling panels to Jeff and Larry in 2023, weekly revenue?

9    A.    About $10,000.

10   Q.    If Altum sold 115 panels per week to Jeff and Larry,

11  what was the expected revenue for Altum?

12   A.    Somewhere around $50,000, I believe, if that scales

13  correctly.

14   Q.    Ridge has claimed that the roll-up panel door is a niche

15  market.  Are you aware of that?

16   A.    I think I heard that, yes.

17   Q.    Do you agree with that?

18   A.    I do not.

19   Q.    Why?

20   A.    Well, I've heard other testimony and I've done my own

21  research on how large -- prior to this, how large the market

22  really is.

23   Q.    Did you reach any conclusions after doing your research

24  and listening to the testimony in the courtroom?

25   A.    Yes.  There's plenty of opportunity out there.

VOL. IV - 546

1    Q.    Can you quantify it for me?

2    A.    At least somewhere around 275,000 doors annually.

3    Q.    And was there anything in the testimony over the -- this

4    past week that changed or altered your belief as the 275,000

5    roll-up panel doors per year?

6    A.    Yeah.  I hadn't considered or I had forgotten, I don't

7    know, when I believe it was Jeff Phlipot talked about replacing

8    swing doors with this low profile-style door.

9    Q.    How would that impact your calculations?

10   A.    There's a lot more swing doors in the market than

11   roll-up doors.

12   Q.    What would the multiplier be of that?

13   A.    Four or five times.

14   Q.    Has Altum sold the same panels it sells to Jeff and

15   Larry to third parties?

16   A.    Yes.  Very small quantity, but, yes.

17   Q.    Do you know how those panels were used?

18   A.    It was one of our vendors was walking through as we were

19   making panels for TTPS, and he is an aluminum extrusion vendor.

20   And he has a partnership with a guy somewhere in Ohio, I don't

21   recall, to make fish tank tables.  And they liked the idea of

22   our panel because it was structural and wouldn't absorb water

23   and stuff like that.  So smaller panel, but, you know, take

24   what you can get.

25           MR. CLIFFORD:  Those are all the questions I have with

VOL. IV - 547

 1    Mr. Grandominico at this time.

 2              THE COURT:  Thank you.

 3         Mr. Tackett, cross?

 4              MR. TACKETT:  Yes, Your Honor, if I may.

 5                        - - -

 6                    CROSS-EXAMINATION

 7    BY MR. TACKETT:

 8    Q.   Mr. Grandominico, good afternoon.

 9    A.   Good afternoon, Mr. Tackett.

10    Q.   Can you start by -- can you put up D5 that you guys had

11    him looking at on direct?  Or I can have you look in

12    defendant's binder.  Either way.

13         Do you remember talking about this webpage on direct?

14    A.   I do, sir.

15    Q.   Okay.  You agree that you made an assumption that this

16    webpage relates to the '84 patent, correct?

17    A.   I believe it does relate to the '84 patent.

18    Q.   Show me where -- take as much time as you need -- where

19    on this webpage does it say anything about the '84 patent.

20    A.   This webpage is multiple pages so I'd have to see the

21    whole thing.

22    Q.   Scroll all the way through.

23    A.   So the terms used in this webpage are identical to the

24    ones in the '84 patent.

25    Q.   That was not my question.  I said show me where on this

VOL. IV - 548

 1  webpage it references the '84 patent.  Can you?

 2    A.   I think there's one more page, maybe.

 3    Q.   It's not on there, is it?

 4    A.   Probably because the date was before the patent was

 5  issued.

 6         MR. TACKETT:  Move to strike.

 7         MR. CLIFFORD:  Your Honor, it is a bench trial here.

 8  I think the move to strike has been used a little more than

 9  necessary.

10         THE COURT:  That's the lawyer's response to an

11  unresponsive answer.  I've allowed it.  And this answer was not

12  responsive to that question.  It was probably responsive to the

13  next question but not to that question.  So I'll allow it to be

14  stricken.

15      Ms. Evans, would you read back to Mr. Grandominico

16  Mr. Tackett's question.

17    (Thereupon, the last question was read by the court

18  reporter.)

19         THE WITNESS:  I didn't see it, no.

20    BY MR. TACKETT:

21    Q.   Thank you.

22      Now, you testified on direct that that demonstrative

23  exhibit on your left, that foamy, spongy panel piece there

24  that's been identified as Defendant's 48, you testified that

25  you created that based on the specifications of this webpage,

VOL. IV - 552

 1   something.  Have you seen a licensing agreement between TODCO

 2   and Cold Chain?

 3   A.    I have not.

 4   Q.    Okay.  Would you agree that you are not aware of the

 5   canons of claim construction that govern interpretation of

 6   patents?

 7   A.    From a legal basis?

 8   Q.    Correct.  Are you aware of what the canons of claim

 9   construction are for interpretation of patents?

10   A.    I'm not sure on canons.  From a legal basis, no, I'm not

11   a legal expert on patents.

12   Q.    Thank you.  Do you have any previous experience opining

13   on interpretation of patent applications?

14   A.    Formal or informal, sir?

15   Q.    Has anyone ever hired you to give an opinion about a

16   patent application?

17   A.    No, sir.

18   Q.    Can you look at Plaintiff's 24, please, sir?

19   A.    Okay.

20   Q.    And this is Altum LLC 402 on the Bates label.  You

21   testified on direct about this.  You agree this is an email

22   that you sent after you had your first visit with KNL about

23   potentially working with them on the roll-up door?

24   A.    Yes.

25   Q.    Now, you sent this email.  There's ten items in the

VOL. IV - 561

1    had for the door, correct?

2    A.   I don't know who specified the latch.  But there was --

3    to my knowledge, I was told there was a latch either supplied

4    by Transglobal or GM.  I don't know who.

5    Q.   And would you agree that you and Mark Schneider went

6    back and forth on that process?

7    A.   I know we went back and forth.  I don't recall how much

8    of it was centered around the latch.  I'm sorry.

9    Q.   That's fine.  You can set that aside.  We'll move on

10   there from.

11   A.   Yes, sir.  You mean set the binder aside?

12   Q.   You can for now.  I'll let you know if we need another

13   exhibit.

14        You gave some testimony about R values.  Do you know

15   what kind of machine is needed in order to test R values of any

16   particular part of any type of material?

17   A.   R value being in the material property is measured --

18   you got to measure heat transfer.  You got to measure Qdot --

19   sorry, the rate of heat transfer.  So the amount of heat

20   transfer that goes through a panel or through a membrane, if

21   you will, you plot it.  And then that curve is what tells you

22   what the R value or the bulk R value or localized R value is.

23   Does that make sense?

24   Q.   I'm asking you if there is a machine that tests R value.

25   A.   I'm certain there is.

VOL. IV - 562

1    Q.    Do you have one?

2    A.    Altum does not own one, no.

3    Q.    Okay.  You testified on direct that you worked for Ridge

4    Corporation for 13 years, correct?

5    A.    I believe that math tracks, yes.

6    Q.    And when you worked at Ridge Corporation, much of your

7    work was with unique composites, wasn't it?

8              MR. CLIFFORD:  Objection.

9              THE COURT:  Basis?  Legal basis?

10             MR. CLIFFORD:  Sidebar on this one, Your Honor.

11                          - - -

12        (The following proceeding was held at sidebar.)

13             MR. CLIFFORD:  Your Honor, there's, I think, two

14   points here.  Unique is an interesting term and unique can mean

15   different things to Mr. Tackett versus me, to the Court.  Also,

16   there is another lawsuit.  I want to make sure it's flagged for

17   the Court.  I don't think Mr. Tackett is trying to go there.

18   But there's another lawsuit about trade secrets between Altum

19   and Ridge.  I want to make sure the Court is aware of it, and

20   we're not going into the trade secret issues of that other

21   matter.  I don't know if we are, but I want to flag it for the

22   Court's perspective.

23        But getting back to the notion of unique, I don't know

24   what he means by that.  I didn't want to clue off

25   Mr. Grandominico of, hey, I don't know what he means by unique.

VOL. IV - 567

1   industry is.

2   Q.   And the sale of a singular component part within the

3   trucking industry is a market within a market, isn't it?

4   A.   I'm not a marketing major.

5   Q.   That's fine.  That's enough.  We'll take that.

6        I'd like you to look at your declaration, if you could.

7   A.   Where would that be?

8   Q.   It is at Plaintiff's 40, sir.

9   A.   I might have ripped a page out.  I'm sorry.  Okay.

10  Q.   Did you find it?

11  A.   I did.

12  Q.   Third page, paragraph 11 of the declaration, you talk

13  about increasing your volume of product that you're selling.

14  Do you see that?

15  A.   Yes, sir.

16  Q.   Okay.  You're saying that you anticipated increasing

17  production from 25 panels per week up to 115 panels per week in

18  2024, right?

19  A.   Yes.

20  Q.   Would it be fair to say -- strike that.  Do you recall

21  receiving a cease-and-desist letter in June of 2023 in which

22  lawyers for Ridge Corporation alerted you that they believed

23  you were assisting in the infringement of the patent by making

24  the panel you were selling to KNL?

25  A.   Vaguely, yeah.

VOL. IV - 573

1   that follow are A, B, and for some reason goes back to A again

2   beneath that in the third paragraph.  Do you see that third

3   paragraph?

4   A.   The A2?

5   Q.   The second A.

6   A.   Yes.

7   Q.   Now, in here you've included language saying that, "TTPS

8   shall at all times use its diligent and good faith efforts to

9   market, promote and expand the sale of the single panel door,"

10  correct?

11  A.   Correct.

12  Q.   Does this accurately reflect your goal that KNL continue

13  to grow its sales of the KNL door?

14  A.   Any supplier hopes their customer is successful.

15  Q.   So yes?

16  A.   So yes.

17  Q.   Just a few more questions.  I have a few questions about

18  the patent.  So if we need to put it back on the screen or need

19  to get it from the binder, it's Defendant's 6, but it's also

20  Plaintiff's 1.  If you have that binder, you can look at in

21  there.

22  A.   The screen is really easy if that's okay.

23       THE COURT:  Put it back on the screen.  Thank you.

24  BY MR. TACKETT:

25  Q.   Do you remember giving testimony where you were talking

VOL. IV - 575

1    claims.

2     Q.   We can.  "What is claimed is."  Do you see that?

3     A.   Yes, sir.

4     Q.   Column 6?

5     A.   I don't see R value there.  You say claim 10, dependent

6    claim 10?

7     Q.   Yeah.  It's only contained in claim 10, a dependent

8    claim.  But if you see it anywhere else, let me know.

9     A.   Correct.  I see it.  As far as I can tell from right

10   now, only 10.

11    Q.   Take a moment if you need.  But you would agree that

12   there is no reference to R value in any of the five independent

13   claims, is there?

14    A.   The words R value are not in the independent claims.

15    Q.   Thank you.

16        MR. TACKETT:  No further questions.

17        THE COURT:  Any redirect, Mr. Clifford?

18        MR. CLIFFORD:  Yes, Your Honor, very brief.

19                          - - -

20                  REDIRECT EXAMINATION

21   BY MR. CLIFFORD:

22    Q.   I want to follow up on a point that seems to be lost on

23   everyone in the courtroom here.  Can you show me any

24   independent claim that mentions compression gaps?

25        THE COURT:  That mentions what?

```
                                               VOL. IV - 600

 1   timing.  I think the October 2013 was the first amendment.  So

 2   I would say it had to be before that.

 3   Q.   Is this the portion of the prosecution history you were

 4   referring to, Mr. Foster?

 5   A.   That's correct.

 6   Q.   What about the applicant initiated interview summary

 7   sticks out to you?

 8           MR. TACKETT:  Objection.

 9           THE COURT:  What is your objection?

10           MR. TACKETT:  Just relevance, Your Honor.  I can

11   explain in a brief sidebar if you'd like.  I can say it out

12   loud if you like too.

13           THE COURT:  Go ahead.

14           MR. TACKETT:  The language he's about to start talking

15   about, about multiple rigid panels, was removed from the

16   ultimate patent application that was granted.  I don't think

17   it's particularly relevant.

18           THE COURT:  Mr. Clifford, is that your area of

19   inquiry?

20           MR. CLIFFORD:  I'm sorry, Your Honor.  What was the

21   thing Mr. Tackett said beyond the relevancy?

22           THE COURT:  Multiple rigid panels hinged together.  Is

23   that what you were going to inquire about?

24           MR. CLIFFORD:  Yes, Your Honor.

25           THE COURT:  You understand that was removed from the
```

VOL. IV - 601

1   '84 patent that was ultimately granted.  Is that right?

2            MR. CLIFFORD:  Specific exclusion was, Your Honor.

3   But there was also multiple instances throughout the patent

4   prosecution history where the patent seeker said we don't have

5   multiple rigid sections without regards to the language of

6   having the exclusion in it.

7            THE COURT:  My point is simply this.  Certainly,

8   Mr. Foster can testify as an opinion witness about whether he

9   believes that there was infringement.

10           MR. CLIFFORD:  Yes, Your Honor.

11           THE COURT:  And in doing so, he can look at the

12  accused product and compare it to the patent, right?

13           MR. CLIFFORD:  Yes, Your Honor.

14           THE COURT:  Because this was not in the patent, I

15  don't see the relevancy of this.  I want him to compare the

16  accused product against the actual patent, not what could have

17  been or what might have been.

18       So I'm going to sustain your objection because it is not

19  included in the patent against which the -- the alleged

20  infringing product is being judged.

21           MR. TACKETT:  Thank you, Your Honor.

22           THE COURT:  So let's move on.

23           MR. CLIFFORD:  If I may, Your Honor, can I have

24  Mr. Foster explain how the prosecution history is important to

25  the patent infringement analysis?  Or would you like me not to

VOL. IV - 602

1    ask that question?

2              THE COURT:  Yes, please.  Mr. Foster, explain it.

3              THE WITNESS:  In this document in particular, but in

4    many documents in the prosecution history, there are statements

5    made about both claim amendments that were later erased or

6    deleted I should say, canceled, and also claim amendments that

7    currently exist in the patent.  That document refers to both.

8    It refers to ones that -- limitations that are in, for example,

9    claim 17 has language that very closely tracks with that

10   interview summary.

11             So the statement that the applicant made to the examiner

12   about the subject matter of the claim limitation that currently

13   existed in the patent is relevant to the analysis of

14   determining infringement.

15             THE COURT:  Relevant to whom, Mr. Foster?

16             THE WITNESS:  Both parties because they're both

17   concerned with infringement.

18             THE COURT:  And you say that as an expert?

19             THE WITNESS:  I do.

20             THE COURT:  That's fine.

21             The objection is still sustained because Mr. Foster is

22   telling me what's relevant from my vantage point as the Court.

23   I want to know what's relevant from his vantage point as

24   someone who compared the infringing to the patent, not to the

25   prosecution history.  And so I don't agree that it's relevant

VOL. IV - 603

1   in the same sense.

2         No disrespect, Mr. Foster, because, you know, you are an

3   opinion witness and, hence, an expert in this particular area.

4   But what I'm trying to determine is whether that door or

5   that -- those panels that are part of that door infringed the

6   patent that was accepted by the PTO.  And I don't believe that

7   that assists this Court in that decision.  Please continue.

8         MR. CLIFFORD:  Yes, Your Honor.

9   BY MR. CLIFFORD:

10  Q.   In looking at the patent prosecution history, how does

11  that impact the claims being asserted by Ridge here?

12  A.   The -- well, the prosecution history needs to be

13  analyzed because you can track when an amendment to the claims

14  that eventually were resulted -- they were the final claims in

15  the patent, you can see when those amendments were introduced.

16  You can see when they perhaps were removed.  And you can see

17  what it was about those amendments or perhaps the arguments

18  that accompanied those amendments, what persuaded the examiner.

19  And so there's also reference to the prior art that the

20  examiner cited that formed the basis of the rejections that the

21  examiner cited.

22  Q.   Regarding the insulating material, what's your opinion

23  regarding the insulating material?

24  A.   Well, if I can -- could I have the claim back up there

25  again?

<https://protect2.fireeye.com/v1/url?k=31323334-501d2dca-31356f64-454455534531-
6a230f9610c20b3d&q=1&e=4bfb9eb2-ba86-4d64-8a76-
4d5d1c9dfdfb&u=https:/jobs.teamengine.io/ridge_corporation_>

From: Gary Grandominico
Sent: Wednesday, May 3, 2023 2:00 PM
To: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Subject: moving forward

Jeff,

Thank you for your note. I realize that you and I are both always on the go! So, I appreciate your patience and please get back to me when you can. I know you are a "solutions" oriented individual as reflected in your company. We try to do the very same thing, which is why I think the development of the single panel roll-up door proceeded as well as it did. Based on our prior work designing a one-piece door solution, Ridge, with my approval and trust, extended to Kirk an open door development. We wanted to help Kirk reach its goals, and once you acknowledged through an email that you thought it was time to work towards IP, I felt we had the right partner. However, as you may understand, learning that you pursued IP without listing us as co-inventors sent things a little sideways. I personally was in disbelief. However, after doing our homework we understand that the inventorship can be corrected. Thus, I would like to get our relationship get back on track. To that end, if we can get the inventorship corrected then I think we can really help advance Kirk's interests in profiting from all the work that has been done to get the door to this point.

While working on a one-piece door solution for a previous customer Ridge became aware of some patents owned by a company called Cold Chain to which the customer felt it necessary to obtain a license in order to commercialize the single panel door concept. After comparing Cold Chain's U.S. Pat. No. 9,151,084 to the single panel door designs we were working on with Kirk, we also felt it was important to secure a license from Cold Chain if Ridge ever wanted to commercialize the single panel roll door. I am pleased to say that we approached them to extend Ridge an exclusive license, and they graciously agreed. Currently, we are working with several door manufacturers to provide one-piece roll up door panels in several varieties that meet their customer needs and, because we have an exclusive license, they can take comfort that their door sales will not conflict with the Cold Chain patent. We would be happy to offer the same opportunity to Kirk, and if we can get the inventorship corrected we would love to supply you with Ridge's high quality Transcore CC panels for your doors, along with a royalty free sublicense for the Cold Chain patent so that you need not be concerned about those patents interfering with your door sales. Furthermore, I will guarantee you that Kirk will never be price or delivery penalized and that no ill will exists. Ridge wants to do what we do best and assist you in your efforts. Our engineering department will assist you with any items, as long as, we are your sole supplier.

Please understand that the reason that things got off track is perhaps unknown to me, but I have suspicions. We are NOT motivated to pursue legal remedies, as Kirk and Ridge won't win – only lawyers. We want a commercial solution.

Love to hear from you.

VALUE always exceeds price,

Gary A. Grandominico

Co-Founder & CEO

Ridge Corporation

1201 Etna Parkway

confidential - subject to protective
order                                                                                    RIDGE004722



EXHIBIT

D-7

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 |

**CONFIRMATION NO. 9027**
**POWER OF ATTORNEY NOTICE**

39878
MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 310
TYSONS CORNER, VA 22182


*OC000000134657166*

Date Mailed: 06/23/2022

## NOTICE REGARDING CHANGE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 06/14/2022.

• The Power of Attorney to you in this application has been revoked by the applicant. Future correspondence will be mailed to the new address of record(37 CFR 1.33).

Questions about the contents of this notice and the
requirements it sets forth should be directed to the Office
of Data Management, Application Assistance Unit, at
**(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/aabranyos/

_____

page 1 of 1

ALTUMLLC000033



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 |

**CONFIRMATION NO. 9027**
**POA ACCEPTANCE LETTER**

36405
MANNAVA & KANG, P.C.
3201 Jermantown Road
Suite 525
FAIRFAX, VA 22030

*OC000000134657214*

Date Mailed: 06/23/2022

# NOTICE OF ACCEPTANCE OF POWER OF ATTORNEY

This is in response to the Power of Attorney filed 06/14/2022.

The Power of Attorney in this application is accepted. Correspondence in this application will be mailed to the above address as provided by 37 CFR 1.33.

Questions about the contents of this notice and the requirements it sets forth should be directed to the Office of Data Management, Application Assistance Unit, at **(571) 272-4000** or **(571) 272-4200** or **1-888-786-0101**.

/aabranyos/

page 1 of 1

Appx0956

ALTUMLLC000034

Doc Code: PA..
Document Description: Power of Attorney

PTO/AIA/82B (07-13)
Approved for use through 03/31/2021. OMB 0651-0035
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number

# POWER OF ATTORNEY BY APPLICANT

I hereby revoke all previous powers of attorney given in the application identified in either the attached transmittal letter or the boxes below.

| Application Number | Filing Date |
|---|---|
|  |  |

(Note: The boxes above may be left blank if information is provided on form PTO/AIA/82A.)

[✓] I hereby appoint the Patent Practitioner(s) associated with the following Customer Number as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above:   [ 36405 ]

OR

[ ] I hereby appoint Practitioner(s) named in the attached list (form PTO/AIA/82C) as my/our attorney(s) or agent(s), and to transact all business in the United States Patent and Trademark Office connected therewith for the patent application referenced in the attached transmittal letter (form PTO/AIA/82A) or identified above. (Note: Complete form PTO/AIA/82C.)

Please recognize or change the correspondence address for the application identified in the attached transmittal letter or the boxes above to:

[✓] The address associated with the above-mentioned Customer Number

OR

[ ] The address associated with Customer Number: [                    ]

OR

| Firm or Individual Name | | | | |
|---|---|---|---|---|
| Address | | | | |
| City | | State | | Zip |
| Country | | | | |
| Telephone | | Email | | |

I am the Applicant (if the Applicant is a juristic entity, list the Applicant name in the box):

## COLD CHAIN, LLC

[ ] Inventor or Joint Inventor (title not required below)

[ ] Legal Representative of a Deceased or Legally Incapacitated Inventor (title not required below)

[✓] Assignee or Person to Whom the Inventor is Under an Obligation to Assign (provide signer's title if applicant is a juristic entity)

[ ] Person Who Otherwise Shows Sufficient Proprietary Interest (e.g., a petition under 37 CFR 1.46(b)(2) was granted in the application or is concurrently being filed with this document) (provide signer's title if applicant is a juristic entity)

### SIGNATURE of Applicant for Patent

The undersigned (whose title is supplied below) is authorized to act on behalf of the applicant (e.g., where the applicant is a juristic entity).

| Signature | *Joe Forney* | Date (Optional) | 6/1/2022 |
|---|---|---|---|
| Name | Joe Forney | | |
| Title | President, CEO | | |

NOTE: Signature - This form must be signed by the applicant in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. If more than one applicant, use multiple forms.

[✓] Total of   1   forms are submitted.

This collection of information is required by 37 CFR 1.131, 1.32, and 1.33. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 3 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

ALTUMLLC000035

PTO/AIA/96 (08-12)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# STATEMENT UNDER 37 CFR 3.73(c)

Applicant/Patent Owner: COLD CHAIN, LLC

Application No./Patent No.: 13/585,994      Filed/Issue Date: 08-15-2012

Titled: INSULATED OVERHEAD DOOR

COLD CHAIN, LLC _____, a corporation

(Name of Assignee)      (Type of Assignee, e.g., corporation, partnership, university, government agency, etc.)

states that, for the patent application/patent identified above, it is (choose **one** of options 1, 2, 3 or 4 below):

1. [✓] The assignee of the entire right, title, and interest.

2. [ ] An assignee of less than the entire right, title, and interest (check applicable box):

     [ ] The extent (by percentage) of its ownership interest is _____%. Additional Statement(s) by the owners holding the balance of the interest <u>must be submitted</u> to account for 100% of the ownership interest.

     [ ] There are unspecified percentages of ownership. The other parties, including inventors, who together own the entire right, title and interest are:

     Additional Statement(s) by the owner(s) holding the balance of the interest <u>must be submitted</u> to account for the entire right, title, and interest.

3. [ ] The assignee of an undivided interest in the entirety (a complete assignment from one of the joint inventors was made). The other parties, including inventors, who together own the entire right, title, and interest are:

     Additional Statement(s) by the owner(s) holding the balance of the interest <u>must be submitted</u> to account for the entire right, title, and interest.

4. [ ] The recipient, via a court proceeding or the like (*e.g.*, bankruptcy, probate), of an undivided interest in the entirety (a complete transfer of ownership interest was made). The certified document(s) showing the transfer is attached.

The interest identified in option 1, 2 or 3 above (not option 4) is evidenced by either (choose **one** of options A or B below):

A. [✓] An assignment from the inventor(s) of the patent application/patent identified above. The assignment was recorded in the United States Patent and Trademark Office at Reel 029072 , Frame 0089 , or for which a copy thereof is attached.

B. [ ] A chain of title from the inventor(s), of the patent application/patent identified above, to the current assignee as follows:

     1. From: _____ To: _____

     The document was recorded in the United States Patent and Trademark Office at

     Reel _____, Frame _____, or for which a copy thereof is attached.

     2. From: _____ To: _____

     The document was recorded in the United States Patent and Trademark Office at

     Reel _____, Frame _____, or for which a copy thereof is attached.

[Page 1 of 2]

This collection of information is required by 37 CFR 3.73(b). The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

ALTUMLLC000036

PTO/AIA/96 (08-12)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## STATEMENT UNDER 37 CFR 3.73(c)

3. From: _____  To: _____

   The document was recorded in the United States Patent and Trademark Office at

   Reel _____, Frame _____, or for which a copy thereof is attached.

4. From: _____  To: _____

   The document was recorded in the United States Patent and Trademark Office at

   Reel _____, Frame _____, or for which a copy thereof is attached.

5. From: _____  To: _____

   The document was recorded in the United States Patent and Trademark Office at

   Reel _____, Frame _____, or for which a copy thereof is attached.

6. From: _____  To: _____

   The document was recorded in the United States Patent and Trademark Office at

   Reel _____, Frame _____, or for which a copy thereof is attached.

☐  Additional documents in the chain of title are listed on a supplemental sheet(s).

☑  As required by 37 CFR 3.73(c)(1)(i), the documentary evidence of the chain of title from the original owner to the assignee was, or concurrently is being, submitted for recordation pursuant to 37 CFR 3.11.

   [NOTE: A separate copy (i.e., a true copy of the original assignment document(s)) must be submitted to Assignment Division in accordance with 37 CFR Part 3, to record the assignment in the records of the USPTO. See MPEP 302.08]

The undersigned (whose title is supplied below) is authorized to act on behalf of the assignee.

| /Matthew L. Whipple/ | June 14, 2022 |
|---|---|
| Signature | Date |
| Matthew L. Whipple | 47,217 |
| Printed or Typed Name | Title or Registration Number |

[Page 2 of 2]

ALTUMLLC000037

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 45954770 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | ASHOK K MANNAVA/Ingrid Hebron |
| **Filer Authorized By:** | ASHOK K MANNAVA |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 14-JUN-2022 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 16:55:02 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | ColdChain-POA.pdf | 2551339 / b2dd1d8b288d5b441bc98952183e9e86f7280cdc | yes | 3 |

ALTUMLLC000038

**Multipart Description/PDF files in .zip description**

| Document Description | Start | End |
|---|---|---|
| Power of Attorney | 1 | 1 |
| Assignee showing of ownership per 37 CFR 3.73 | 2 | 3 |

| | |
|---|---|
| **Warnings:** | |
| **Information:** | |
| **Total Files Size (in bytes):** | 2551339 |

**This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.**

<u>**New Applications Under 35 U.S.C. 111**</u>
**If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.**
<u>**National Stage of an International Application under 35 U.S.C. 371**</u>
**If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.**
<u>**New International Application Filed with the USPTO as a Receiving Office**</u>
**If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.**

ALTUMLLC000039



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 10/06/2015 | 9151084 | 0149.0004 | 9027 |

39878          7590          09/16/2015
MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

### Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 63 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Peter J. Wachtell, Boise, ID;
Daniel M. Aragon, Meridian, ID;
John J. Prehn, Boise, ID;
Todd J. Lindsey, Boise, ID;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)

ALTUMLLC000040

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| In re Application of | : | Daniel M. Aragon et al. | Confirmation No.: | 9027 |
| U.S. Application No. | : | 13/585,994 | | |
| Filed | : | August 15, 2012 | | |
| Title | : | INSULATED OVERHEAD DOOR | | |

Docket No.            :  0149.0004
Customer No.         :  **39878**

**MAIL STOP M CORRESPONDENCE**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Commissioner:

### NOTIFICATION OF A LOSS OF ENTITLEMENT TO SMALL ENTITY STATUS

Pursuant to 37 C.F.R. §1.27, Patentee respectfully requests the Commissioner to accept this paper as written notification of a loss of entitlement to small entity status and requests entry of the status change into the USPTO's records.

No fee is believed necessary with this submission.  However, if it is determined otherwise, the Commissioner is hereby authorized to charge any additional fees or credit any overpayment to the undersigned's Deposit Account No. 50-2961.

Respectfully submitted,

Dated:  August 31, 2015                    By:/Matthew L. Whipple/                    
                                            Matthew L. Whipple
                                            Reg. No. 47,217

ALTUMLLC000041

PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** ~~Mail~~ **Mail** Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
or ~~Fax~~ **Fax** (571) 273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

CUSTOMER NO. 39878

MH2 TECHNOLOGY LAW GROUP, LLP
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Daniel M. ARAGON | 0149.0004 | 9027 |

TITLE OF INVENTION:

INSULATED OVERHEAD DOOR

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $960 | $0 | $960 | 09/14/2015 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PUROL, DAVID M | 3634 | 160-201000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1  MH2 TECHNOLOGY LAW GROUP, LLP

2  _____

3  _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE

COLD CHAIN, LLC

(B) RESIDENCE: (CITY and STATE or COUNTRY)

BOISE, ID (US)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☑ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are enclosed:

☑ Issue Fee

☐ Publication Fee (No small entity discount permitted)

☐ Advance Order - # of Copies _____

4b. Payment of Fee(s):

☐ A check in the amount of the fee(s) is enclosed.

☑ Payment by credit card. ~~Form PTO-2038 is attached.~~

☑ The Director is hereby authorized to charge the required fee(s), or credit any overpayment, to Deposit Account Number   50-2961

5. **Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.

☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

The Director of the USPTO is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.
NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature   /Matthew L. Whipple/

Date   August 31, 2015

Typed or printed name   Matthew L. Whipple

Registration No.   47,217

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85 (Rev. 08-08) Approved for use through 08/31/2013. OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Appx0964

ALTUMLLC000042

# Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALTUMLLC000043

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13585994 |
| **Filing Date:** | 15-Aug-2012 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Filer:** | Timothy M. Hsieh/Matthew L. Whipple (heg) |
| **Attorney Docket Number:** | 0149.0004 |

Filed as Large Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| Utility Appl Issue Fee | 1501 | 1 | 960 | 960 |

Appx0966

ALTUMLLC000044

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| Extension-of-Time: | | | | |
| Miscellaneous: | | | | |
| **Total in USD ($)** | | | **960** | |

ALTUMLLC000045

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 23360267 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew L. Whipple (heg) |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 31-AUG-2015 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 16:46:46 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 960 |
| RAM confirmation Number | 3646 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

ALTUMLLC000046

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Notification of loss of entitlement to small entity status | NOTIFICATION_OF_LOSS_OF_ENTITLEMENT_TO_SMALL_ENTITY_8-31-15.pdf | 64611<br>a8df5a090f5a004000262cd23d8793d4250328b6 | no | 1 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Issue Fee Payment (PTO-85B) | ISSUE_FEE_TRANSMITTAL_8-31-15.PDF | 203520<br>b8b95e5a116e9deffaffd3faa723d48e3c369c84 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30743<br>978f05dbdea92d3dcd558061a1384990c23453c0 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 298874 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

ALTUMLLC000047



U<span>NITED</span> S<span>TATES</span> P<span>ATENT AND</span> T<span>RADEMARK</span> O<span>FFICE</span>

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| | | |
|---|---|---|
| 39878 | 7590 | 06/12/2015 |

MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

DATE MAILED: 06/12/2015

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

TITLE OF INVENTION: INSULATED OVERHEAD DOOR

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $480 | $0 | $0 | $480 | 09/14/2015 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS. THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN <u>THREE MONTHS</u> FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. <u>THIS STATUTORY PERIOD CANNOT BE EXTENDED.</u> SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the ENTITY STATUS shown above. If the ENTITY STATUS is shown as SMALL or MICRO, verify whether entitlement to that entity status still applies.

If the ENTITY STATUS is the same as shown above, pay the TOTAL FEE(S) DUE shown above.

If the ENTITY STATUS is changed from that shown above, on PART B - FEE(S) TRANSMITTAL, complete section number 5 titled "Change in Entity Status (from status indicated above)".

For purposes of this notice, small entity fees are 1/2 the amount of undiscounted fees, and micro entity fees are 1/2 the amount of small entity fees.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office (USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 3

PTOL-85 (Rev. 02/11)

ALTUMLLC000048

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** **Mail**    Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450
**or Fax**    (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

| | | |
|---|---|---|
| 39878 | 7590 | 06/12/2015 |

MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

TITLE OF INVENTION: INSULATED OVERHEAD DOOR

| APPLN. TYPE | ENTITY STATUS | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | SMALL | $480 | $0 | $0 | $480 | 09/14/2015 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PUROL, DAVID M | 3634 | 160-201000 |

**1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).**

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

**2. For printing on the patent front page, list**

(1) The names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) The name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

**3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT** (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                    (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :    ☐ Individual    ☐ Corporation or other private group entity    ☐ Government

**4a. The following fee(s) are submitted:**
☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

**4b. Payment of Fee(s): (Please first reapply any previously paid issue fee shown above)**
☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The director is hereby authorized to charge the required fee(s), any deficiency, or credits any overpayment to Deposit Account Number _____ (enclose an extra copy of this form).

**5. Change in Entity Status** (from status indicated above)

☐ Applicant certifying micro entity status. See 37 CFR 1.29

☐ Applicant asserting small entity status. See 37 CFR 1.27

☐ Applicant changing to regular undiscounted fee status.

NOTE: Absent a valid certification of Micro Entity Status (see forms PTO/SB/15A and 15B), issue fee payment in the micro entity amount will not be accepted at the risk of application abandonment.

NOTE: If the application was previously under micro entity status, checking this box will be taken to be a notification of loss of entitlement to micro entity status.

NOTE: Checking this box will be taken to be a notification of loss of entitlement to small or micro entity status, as applicable.

NOTE: This form must be signed in accordance with 37 CFR 1.31 and 1.33. See 37 CFR 1.4 for signature requirements and certifications.

Authorized Signature _____    Date _____

Typed or printed name _____    Registration No. _____

Page 2 of 3

PTOL-85 Part B (10-13) Approved for use through 10/31/2013.    OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

Appx0971

ALTUMLLC000049



U̲NITED̲ S̲TATES̲ P̲ATENT AND̲ T̲RADEMARK̲ O̲FFICE̲

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

39878        7590        06/12/2015

MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

DATE MAILED: 06/12/2015

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(Applications filed on or after May 29, 2000)

The Office has discontinued providing a Patent Term Adjustment (PTA) calculation with the Notice of Allowance.

Section 1(h)(2) of the AIA Technical Corrections Act amended 35 U.S.C. 154(b)(3)(B)(i) to eliminate the requirement that the Office provide a patent term adjustment determination with the notice of allowance. See Revisions to Patent Term Adjustment, 78 Fed. Reg. 19416, 19417 (Apr. 1, 2013). Therefore, the Office is no longer providing an initial patent term adjustment determination with the notice of allowance. The Office will continue to provide a patent term adjustment determination with the Issue Notification Letter that is mailed to applicant approximately three weeks prior to the issue date of the patent, and will include the patent term adjustment on the patent. Any request for reconsideration of the patent term adjustment determination (or reinstatement of patent term adjustment) should follow the process outlined in 37 CFR 1.705.

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101 or (571)-272-4200.

PTOL-85 (Rev. 02/11)

Appx0972

ALTUMLLC000050

## OMB Clearance and PRA Burden Statement for PTOL-85 Part B

The Paperwork Reduction Act (PRA) of 1995 requires Federal agencies to obtain Office of Management and Budget approval before requesting most types of information from the public. When OMB approves an agency request to collect information from the public, OMB (i) provides a valid OMB Control Number and expiration date for the agency to display on the instrument that will be used to collect the information and (ii) requires the agency to inform the public about the OMB Control Number's legal significance in accordance with 5 CFR 1320.5(b).

The information collected by PTOL-85 Part B is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450. Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Privacy Act Statement

**The Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Appx0973

ALTUMLLC000051

| | Application No. | Applicant(s) |
|---|---|---|
| ***Notice of Allowability*** | 13/585,994 | WACHTELL ET AL. |
| | **Examiner** | **Art Unit** | **AIA (First Inventor to File) Status** |
| | DAVID PUROL | 3634 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *December 10, 2014*.

    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2. ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

3. ☒ The allowed claim(s) is/are *1,2,4,6-10,13-16,18-20 and 22-25*. As a result of the allowed claim(s), you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov .

4. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

    a) ☐ All   b) ☐ Some  *c) ☐ None of the:

      1. ☐ Certified copies of the priority documents have been received.

      2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

      3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____.

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____.

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☐ Notice of References Cited (PTO-892)          5. ☐ Examiner's Amendment/Comment
2. ☐ Information Disclosure Statements (PTO/SB/08),    6. ☐ Examiner's Statement of Reasons for Allowance
    Paper No./Mail Date _____
3. ☐ Examiner's Comment Regarding Requirement for Deposit    7. ☐ Other _____.
    of Biological Material
4. ☐ Interview Summary (PTO-413),
    Paper No./Mail Date _____ .

/DAVID PUROL/
Primary Examiner, Art Unit 3634

ALTUMLLC000052

# Index of Claims

| | |
|---|---|
| **Application/Control No.** | **Applicant(s)/Patent under Reexamination** |
| 13/585,994 | WACHTELL ET AL. |
| **Examiner** | **Art Unit** |
| DAVID PUROL | 3634 |

| | | | |
|---|---|---|---|
| √ Rejected | — (Through numeral) Cancelled | N Non-Elected | A Appeal |
| = Allowed | ÷ Restricted | I Interference | O Objected |

| Claim (Final) | Claim (Original) | 6/9/15 | | | | | | | Claim (Final) | Claim (Original) | Date | | | | | | | Claim (Final) | Claim (Original) | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | = | | | | | | | 51 | | | | | | | | | 101 | | | | | | | | |
| 2 | 2 | = | | | | | | | 52 | | | | | | | | | 102 | | | | | | | | |
| | 3 | - | | | | | | | 53 | | | | | | | | | 103 | | | | | | | | |
| 3 | 4 | = | | | | | | | 54 | | | | | | | | | 104 | | | | | | | | |
| | 5 | - | | | | | | | 55 | | | | | | | | | 105 | | | | | | | | |
| 4 | 6 | = | | | | | | | 56 | | | | | | | | | 106 | | | | | | | | |
| 5 | 7 | = | | | | | | | 57 | | | | | | | | | 107 | | | | | | | | |
| 6 | 8 | = | | | | | | | 58 | | | | | | | | | 108 | | | | | | | | |
| 7 | 9 | = | | | | | | | 59 | | | | | | | | | 109 | | | | | | | | |
| 8 | 10 | = | | | | | | | 60 | | | | | | | | | 110 | | | | | | | | |
| | 11 | - | | | | | | | 61 | | | | | | | | | 111 | | | | | | | | |
| | 12 | - | | | | | | | 62 | | | | | | | | | 112 | | | | | | | | |
| 9 | 13 | = | | | | | | | 63 | | | | | | | | | 113 | | | | | | | | |
| 10 | 14 | = | | | | | | | 64 | | | | | | | | | 114 | | | | | | | | |
| 11 | 15 | = | | | | | | | 65 | | | | | | | | | 115 | | | | | | | | |
| 12 | 16 | = | | | | | | | 66 | | | | | | | | | 116 | | | | | | | | |
| | 17 | - | | | | | | | 67 | | | | | | | | | 117 | | | | | | | | |
| 13 | 18 | = | | | | | | | 68 | | | | | | | | | 118 | | | | | | | | |
| 14 | 19 | = | | | | | | | 69 | | | | | | | | | 119 | | | | | | | | |
| 15 | 20 | = | | | | | | | 70 | | | | | | | | | 120 | | | | | | | | |
| | 21 | - | | | | | | | 71 | | | | | | | | | 121 | | | | | | | | |
| 19 | 22 | = | | | | | | | 72 | | | | | | | | | 122 | | | | | | | | |
| 16 | 23 | = | | | | | | | 73 | | | | | | | | | 123 | | | | | | | | |
| 17 | 24 | = | | | | | | | 74 | | | | | | | | | 124 | | | | | | | | |
| 18 | 25 | = | | | | | | | 75 | | | | | | | | | 125 | | | | | | | | |
| | 26 | | | | | | | | 76 | | | | | | | | | 126 | | | | | | | | |
| | 27 | | | | | | | | 77 | | | | | | | | | 127 | | | | | | | | |
| | 28 | | | | | | | | 78 | | | | | | | | | 128 | | | | | | | | |
| | 29 | | | | | | | | 79 | | | | | | | | | 129 | | | | | | | | |
| | 30 | | | | | | | | 80 | | | | | | | | | 130 | | | | | | | | |
| | 31 | | | | | | | | 81 | | | | | | | | | 131 | | | | | | | | |
| | 32 | | | | | | | | 82 | | | | | | | | | 132 | | | | | | | | |
| | 33 | | | | | | | | 83 | | | | | | | | | 133 | | | | | | | | |
| | 34 | | | | | | | | 84 | | | | | | | | | 134 | | | | | | | | |
| | 35 | | | | | | | | 85 | | | | | | | | | 135 | | | | | | | | |
| | 36 | | | | | | | | 86 | | | | | | | | | 136 | | | | | | | | |
| | 37 | | | | | | | | 87 | | | | | | | | | 137 | | | | | | | | |
| | 38 | | | | | | | | 88 | | | | | | | | | 138 | | | | | | | | |
| | 39 | | | | | | | | 89 | | | | | | | | | 139 | | | | | | | | |
| | 40 | | | | | | | | 90 | | | | | | | | | 140 | | | | | | | | |
| | 41 | | | | | | | | 91 | | | | | | | | | 141 | | | | | | | | |
| | 42 | | | | | | | | 92 | | | | | | | | | 142 | | | | | | | | |
| | 43 | | | | | | | | 93 | | | | | | | | | 143 | | | | | | | | |
| | 44 | | | | | | | | 94 | | | | | | | | | 144 | | | | | | | | |
| | 45 | | | | | | | | 95 | | | | | | | | | 145 | | | | | | | | |
| | 46 | | | | | | | | 96 | | | | | | | | | 146 | | | | | | | | |
| | 47 | | | | | | | | 97 | | | | | | | | | 147 | | | | | | | | |
| | 48 | | | | | | | | 98 | | | | | | | | | 148 | | | | | | | | |
| | 49 | | | | | | | | 99 | | | | | | | | | 149 | | | | | | | | |
| | 50 | | | | | | | | 100 | | | | | | | | | 150 | | | | | | | | |

Part of Paper No.  06092015

Appx0975

ALTUMLLC000053

| *Issue Classification* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 13585994 | WACHTELL ET AL. |
| | Examiner | Art Unit |
| | DAVID PUROL | 3634 |

**CPC**

| Symbol | | | Type | Version |
|---|---|---|---|---|
| E05B | 81 | 10 | F | 2013-01-01 |
| Y10T | 292 | 11 | A | 2015-04-01 |
| F25D | 23 | 021 | A | 2013-01-01 |
| E06B | 3 | 80 | A | 2013-01-01 |
| E05D | 15 | 16 | A | 2013-01-01 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**CPC Combination Sets**

| Symbol | | | Type | Set | Ranking | Version |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| NONE | | Total Claims Allowed: |
|---|---|---|
| | | 19 |
| (Assistant Examiner) | (Date) | |
| /DAVID PUROL/ Primary Examiner.Art Unit 3634 | 06/09/2015 | O.G. Print Claim(s) |  O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 | 1 |

U.S. Patent and Trademark Office                                    Part of Paper No. 06092015

Appx0976

ALTUMLLC000054

| **Issue Classification** | **Application/Control No.** | **Applicant(s)/Patent Under Reexamination** |
|---|---|---|
| | 13585994 | WACHTELL ET AL. |
| | **Examiner** | **Art Unit** |
| | DAVID PUROL | 3634 |

| US ORIGINAL CLASSIFICATION | | INTERNATIONAL CLASSIFICATION | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **CLASS** | **SUBCLASS** | **CLAIMED** | | | | | **NON-CLAIMED** | | | | |
| 160 | 201 | E | 0 | 5 | D | 15 / 16 (2006.01.01) | | | | | |
| **CROSS REFERENCE(S)** | | | | | | | | | | | |
| **CLASS** | **SUBCLASS (ONE SUBCLASS PER BLOCK)** | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

| NONE | | **Total Claims Allowed:** | |
|---|---|---|---|
| (Assistant Examiner) | (Date) | 19 | |
| /DAVID PUROL/<br>Primary Examiner.Art Unit 3634 | 06/09/2015 | **O.G. Print Claim(s)** | **O.G. Print Figure** |
| (Primary Examiner) | (Date) | 1 | 1 |

U.S. Patent and Trademark Office                                          Part of Paper No.  06092015

ALTUMLLC000055

| Issue Classification | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 13585994 | WACHTELL ET AL. |
| | Examiner | Art Unit |
| | DAVID PUROL | 3634 |

☐ Claims renumbered in the same order as presented by applicant   ☐ CPA   ☐ T.D.   ☐ R.1.47

| Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original | Final | Original |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 16 | 23 | | | | | | | | | | | | |
| 2 | 2 | 17 | 24 | | | | | | | | | | | | |
| 3 | 4 | 18 | 25 | | | | | | | | | | | | |
| 4 | 6 | | | | | | | | | | | | | | |
| 5 | 7 | | | | | | | | | | | | | | |
| 6 | 8 | | | | | | | | | | | | | | |
| 7 | 9 | | | | | | | | | | | | | | |
| 8 | 10 | | | | | | | | | | | | | | |
| 9 | 13 | | | | | | | | | | | | | | |
| 10 | 14 | | | | | | | | | | | | | | |
| 11 | 15 | | | | | | | | | | | | | | |
| 12 | 16 | | | | | | | | | | | | | | |
| 13 | 18 | | | | | | | | | | | | | | |
| 14 | 19 | | | | | | | | | | | | | | |
| 15 | 20 | | | | | | | | | | | | | | |
| 19 | 22 | | | | | | | | | | | | | | |

| NONE | | Total Claims Allowed: |  |
|---|---|---|---|
| (Assistant Examiner) | (Date) | 19 | |
| /DAVID PUROL/<br>Primary Examiner.Art Unit 3634 | 06/09/2015 | O.G. Print Claim(s) | O.G. Print Figure |
| (Primary Examiner) | (Date) | 1 | 1 |

U.S. Patent and Trademark Office                            Part of Paper No. 06092015

ALTUMLLC000056

**EAST Search History**

**EAST Search History (Prior Art)**

< This search history is empty>

**EAST Search History (Interference)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| L1 | 372 | E05D15/16.cpc. or F25D23/021.cpc. or E06B3/80.cpc. | USPAT; UPAD | OR | ON | 2015/06/09 16:12 |

**6/9/2015 4:54:08 PM**
**C:\ Users\ dpurol\ Documents\ EAST\ Workspaces\ 13585994.wsp**

file:///C|/Users/dpurol/Documents/e-Red%20Folder/13585994/EASTSearchHistory.13585994_AccessibleVersion.htm[6/9/2015 4:54:11 PM]

Appx0979

ALTUMLLC000057

### Search Notes

| Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|
| 13/585,994 | WACHTELL ET AL. |
| **Examiner** | **Art Unit** |
| DAVID PUROL | 3634 |

#### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 160 | 201 230 | 6/9/2015 | DMP |
| | 231.1 | | |
| | 231.2 | | |
| | 232 23.1 | | |
| | 270 271 | | |
| | Dig. 8 | | |
| 296 | 146.8 | | |
| F25D | 23/021 | | |
| E05D | 15/20 | | |
| E06B | 3/80 | | |
| | 2003/7044 | | |
| | 2003/7049 | | |
| | 2003/7051 | | |
| | 2003/7053 | | |

#### SEARCH NOTES (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| East Interference Search | 6/9/2015 | DMP |
| Inventor Name | | |
| Searched European Patent Register | | |
| | | |
| | | |
| | | |
| | | |
| | | |

#### INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| **E05D** | **15/16** | 6/9/2015 | **DMP** |
| E06B | 3/80 | | |
| F25D | 23/021 | | |
| | | | |

U.S. Patent and Trademark Office

Part of Paper No. 06092015

Appx0980

ALTUMLLC000058

Doc code: RCEX          Case: 24-1138     Document: 54     Page: 293     Filed: 03/21/2024     PTO/SB/30EFS (07-09)
Doc description: Request for Continued Examination (RCE)     Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

# REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
## (Submitted Only via EFS-Web)

| Application Number | 13585994 | Filing Date | 2012-08-15 | Docket Number (if applicable) | 0149.0004 | Art Unit | 3634 |
| First Named Inventor | Peter J. Wachtell | | | Examiner Name | David M. Purol | | |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

## SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

[ ] Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

    [ ] Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

    [ ] Other _____

[X] Enclosed

    [X] Amendment/Reply

    [ ] Information Disclosure Statement (IDS)

    [ ] Affidavit(s)/ Declaration(s)

    [ ] Other _____

## MISCELLANEOUS

[ ] Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months _____
(Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required)

[ ] Other _____

## FEES

[X] **The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to
Deposit Account No   502961

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

[X] Patent Practitioner Signature
[ ] Applicant Signature

Appx0981

ALTUMLLC000059

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

Case: 24-1138    Document: 54    Page: 294    Filed: 03/21/2024

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Matthew L. Whipple/ | Date (YYYY-MM-DD) | 2014-12-10 |
| Name | Matthew L. Whipple | Registration Number | 47217 |

This collection of information is required by 37 CFR 1.114. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

ALTUMLLC000060

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record in this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

EFS - Web 2.1.15

Appx0983

ALTUMLLC000061

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| In re Application of | : | Peter J. Wachtell et al. | Confirmation No.: | 9027 |
| Application Number | : | 13/585,994 | | |
| Filed | : | August 15, 2012 | | |
| Title | : | INSULATED OVERHEAD DOOR | | |
| TC/Art Unit | : | 3634 | | |
| Examiner: | : | David M. Purol | | |

| | | |
|---|---|---|
| Docket No. | : | 0149.0004 |
| Customer No. | : | **39878** |

**Mail Stop RCE**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

### <u>AMENDMENT</u>

In reply to the Final Office Action mailed October 10, 2014, Applicants submit this

Amendment and a Request for Continued Examination. Please Amend the application

as follows:

**Amendments to the Claims** are reflected in the listing of claims in this paper.

**Remarks/Arguments** follow the amendment sections of this paper.

ALTUMLLC000062

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

**AMENDMENTS TO THE CLAIMS:**

This listing of claims will replace all prior versions and listings of claims in the application:

1.    (Currently Amended) An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead <u>door having a first outermost surface, a second outermost surface opposite the first outermost surface, a top surface, a bottom surface, a first side surface and a second side surface, both the first outermost surface and the second outermost surface being larger than any of the top surface, bottom surface, first side surface and second side surface, the </u>door comprising:

a thermoplastic membrane <u>comprising glass fibers and </u>having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, <u>the thermoplastic membrane forming the first outermost surface of the door</u>;

a sheet of <u>foam </u>insulating material <u>directly </u>attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side<u>, the foam insulating material forming the second outermost surface of the door</u>; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only one of the panel, the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, Θ, relative to a track portion of a second length, wherein

-2-

ALTUMLLC000063

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

Θ ranges from about 80° to about 125°~~, wherein the overhead door does not have multiple rigid, hinged sections~~.

2.     (Previously Presented) The insulated overhead door of claim 1, wherein the thermoplastic membrane is a single sheet.

3.     (Cancelled)

4.     (Previously Presented) The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises polypropylene impregnated with glass fibers.

5.     (Cancelled)

6.     (Currently Amended) The insulated overhead door of claim [[5]] 1, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend during opening and closing of the door.

7.     (Original) The insulated overhead door of claim 1, wherein the insulating material is closed cell foam.

8.     (Original) The insulated overhead door of claim 7, wherein the closed cell foam comprises ethylene vinyl acetate.

9.     (Original) The insulated overhead door of claim 7, wherein the closed cell foams is chosen from polyethylene foams, polypropylene foams or neoprene based foams.

10.    (Original) The insulated overhead door of claim 1, wherein the insulating material is an open cell foam.

-3-

ALTUMLLC000064

11.    (Cancelled)

12.    (Cancelled).

13.    (Original) The insulated overhead door of claim 1, further comprising an additional membrane that is not the thermoplastic membrane.

14.    (Original) The insulated overhead door of claim 1, the door having an R value ranging from about 14 to about 50.

15.    (Original) A method comprising:

providing the insulated overhead door of claim 1 on tracks, at least a portion of the tracks being curved; and

moving the insulated overhead door so that a portion of the thermoplastic membrane and a portion of the insulating material flex to allow the door to traverse the curved portion of the tracks.

16.    (Currently Amended) An overhead door assembly comprising:

a set of curved tracks; and

an insulated overhead door configured to roll open and closed in the tracks to cover a door opening having a top and a bottom, the overhead door having a first outermost surface, a second outermost surface opposite the first outermost surface, a top surface, a bottom surface, a first side surface and a second side surface, both the first outermost surface and the second outermost surface being larger than any of the top surface, bottom surface, first side surface and second side surface, the door comprising:

a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening when the

-4-

ALTUMLLC000065

door is in a closed position, the thermoplastic membrane forming the first outermost surface of the door;

a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only one of the panel, the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about 80$^{o}$ to about 125$^{o}$, wherein the overhead door does not have multiple rigid, hinged sections.

17.    (Cancelled).

18.    (Original) A truck comprising the insulated overhead door assembly of claim 16.

19.    (Original) A cold storage trailer comprising the insulated overhead door assembly of claim 16.

20.    (Original) A building comprising the insulated overhead door assembly of claim 16.

-5-

ALTUMLLC000066

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

21.    (Cancelled)

22.    (Currently Amended) The insulated overhead door of claim [[16]] 24, wherein the panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches.

23.    (Currently Amended) An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door ~~comprising~~ consisting of:

a flexible thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the flexible thermoplastic membrane comprising polypropylene impregnated with glass fibers;

a sheet of flexible foam insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and

wheels attached to the door with wheel attachment hardware, the wheels allowing the door to fit into tracks to guide the opening and closing of the door,

~~wherein the overhead door comprises only one of the panel, the panel not having multiple rigid, hinged sections,~~

wherein the panel is flexible along the entire length of the panel so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches, where the track portion has a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about $80^{\circ}$ to about $125^{\circ}$.

-6-

ALTUMLLC000067

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

24.   (Currenlty Amended) An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead <u>door having a first outermost surface, a second outermost surface opposite the first outermost surface, a top surface, a bottom surface, a first side surface and a second side surface, both the first outermost surface and the second outermost surface being larger than any of the top surface, bottom surface, first side surface and second side surface, the</u> door comprising:

a thermoplastic membrane <u>comprising glass fibers and</u> having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening<u>, the thermoplastic membrane forming the first outermost surface of the door</u>;

a ~~sheet of~~ <u>foam</u> insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side<u>, the foam insulating material forming the second outermost surface of the door</u>; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only one of the panel, the panel being sufficiently flexible to traverse curved tracks~~, the panel not having multiple rigid sections~~.

25.   (New) The insulated overhead door of claim 24, wherein the foam insulating material comprises foam blocks configured to increased an R-value of the door.

-7-

ALTUMLLC000068

## REMARKS

Claims 1, 6, 16, 22, 23 and 24 have been amended by this Amendment. New claim 25 has been added.

Written description support for the amendments can be found throughout the application as originally filed. In particular, with respect to the added language, "the thermoplastic membrane forming the first outermost surface of the door," the original disclosure recites a door comprising "a single sheet of thermoplastic material that acts as the outer door membrane and barrier to entry." [0017].  With respect to the added language, "the foam insulating material forming the second outermost surface of the door," the original disclosure generally teaches that the door includes the outer thermoplastic material and single or multiple sheets of insulating material, such as foam, and expressly recites that the flexible membrane 20, shown in FIG. 1, is "optional." The insulating foam sheet is taught as being employable without the foam blocks 7, in combination with the sheet of thermoplastic material 4. [0017] [0031], [0034] and FIG. 1. Given this disclosure, one of ordinary skill in the art would understand that applicants had in their possession a door formed without the optional membrane 20, which would result in the foam insulating material forming the second outermost surface of the door. Additional support for the amendments can be found throughout the original disclosure, including, for example, at paragraghs [0017], [0018], [0028], [0031], [0034], FIG. 1 and original claim 1.  Accordingly, no new matter has been added.

## Interview Summary

Examiner Purol is thanked for the courtesies extended during the telephonic interview of December 4, 2014.  During the interview, Applicants undersigned attorney,

-8-

ALTUMLLC000069

Matthew Whipple, presented arguments with respect to a proposed amendment to the claims adding language of the thermoplastic membrane "comprising glass fibers" and "the panel comprising only two major layers wherein the thermoplastic membrane is the first major layer and the insulating material is the second major layer". During the interview, the Examiner suggested amending the claims to employ "consisting of" language in the preamble. Applicants thank Examiner Purol for this suggestion. No agreement was reached with respect to any of these proposed Amendments.

**Rejections Under 35 USC § 112**

Claims 1-11, 13-16 and 18-24 are rejected under 35 USC § 112, first paragraph, as failing to comply with the written description requirement.

Applicants have amended the claims to delete the language forming the basis of the Examiner's rejection. Accordingly, Applicants respectfully request that the rejection be withdrawn.

**Rejections Under 35 USC § 103**

Claims 1-11, 13-16 and 18-24 are rejected under 35 USC § 103(a) as being unpatentable over Rauenbusch (US Patent No. 5,915,445, hereinafter "Rauenbusch") in view of Wendt (US Patent No. 2,827,118, hereinafter "Wendt") and Martin (US Patent No. 5,738,161, hereinafter "Martin"). Applicants respectfully traverse.

The combination of Rauenbusch, Wendt and Martin fail to teach or suggest the combination of limitations as recited in the amended claims.

With respect to claim 1, the Rauenbusch combination at least fails to teach or suggest a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the

-9-

ALTUMLLC000070

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

bottom of the door opening, the thermoplastic membrane forming the first outermost surface of the door; a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door.

With respect to claim 16, the Rauenbusch combination at least fails to teach or suggest a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening when the door is in a closed position, the thermoplastic membrane forming the first outermost surface of the door; a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door.

With respect to claim 24, Rauenbusch at least fails to teach or suggest a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the thermoplastic membrane forming the first outermost surface of the door; a

-10-

ALTUMLLC000071

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

foam insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door.

As described previously on the record, Rauenbusch teaches laminate structures having rigid panels separated by film hinges that allow the door to flex in order to traverse curved tracks. The laminate panels are is formed by sandwiching a core member 13 between a pair of plastic outer face layers 11, 12. Col. 3, line 66 to col. 2, line 21 and FIGS. 1, 4 and 5.

The sandwich structures of Rauenbusch are not the same as applicants claimed structure. For example, the Rauenbusch sandwich structures do not include a foam insulating material forming the second outermost surface of the door, as recited in claims 1, 16 and 24 and the claims dependent thereon. Further, Rauenbusch does not teach or suggest a thermoplastic membrane comprising glass fibers. The secondary references fail to provide these missing teachings.

With respect to claim 23, Applicants have amended claim 23 to recite closed transition language in the preamble of, "consisting of," as suggested by the Examiner. Thus, claim 23 is now limited to the elements as recited therein.  The Rauenbusch combination does not teach or suggest the limitations as arranged in claim 23.

-11-

ALTUMLLC000072

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

Because all of the limitations of the claims are not taught or suggested, no *prima facie* case of obviousness exists.  Therefore, Applicants respectfully request that the rejection be withdrawn.

Claims 1-5, 7-11, 13-16 and 18-24 are rejected under 35 USC § 103(a) as being unpatentable over Huprich (US Patent No. 3,724,526, hereinafter "Huprich"). Claim 6 is rejected under 35 USC § 103(a) as being unpatentable over Huprich as applied to claims 1-5, 7-11, 13-16, and 18-24 in further in view of Rauenbusch.

The combination of Huprich and Huprich in view of Rauenbusch combination fails to teach or suggest the combination of limitations as recited in the amended claims.

With respect to claim 1, the Huprich and Huprich in view of Rauenbusch combination both at least fail to teach or suggest a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the thermoplastic membrane forming the first outermost surface of the door; a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door.

With respect to claim 16, the Huprich and Huprich in view of Rauenbusch combination both at least fail to teach or suggest a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a

-12-

ALTUMLLC000073

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

bottom side corresponding to the bottom of the door opening when the door is in a closed position, the thermoplastic membrane forming the first outermost surface of the door; a sheet of foam insulating material directly attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door.

With respect to claim 24, the Huprich and Huprich in view of Rauenbusch combination both at least fail to teach or suggest a thermoplastic membrane comprising glass fibers and having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the thermoplastic membrane forming the first outermost surface of the door; a foam insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side, the foam insulating material forming the second outermost surface of the door.

Instead, Huprich teaches insulating material 29 formed between two panels 28 and 30.  The panels can be sheet metal, fiber glass, plastic or other non-elastic but flexible material. The insulating material is specifically chosen to allow movement

-13-

ALTUMLLC000074

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

between the panels 28 and 30 as the door traverses curved tracks.  Col. 1, line 56 to col. 2, lines 9; col. 3, line 36 to col. 4, lines 11 and FIG. 1.

Rauenbusch also teaches laminate structures having rigid panels separated by film hinges that allow the door to flex in order to traverse curved tracks. The laminate panels are is formed by sandwiching a core member 13 between a pair of plastic outer face layers 11, 12. Col. 3, line 66 to col. 2, line 21 and FIGS. 1, 4 and 5.

The door of Huprich is not the same as Applicants claimed structures.  For example, the combination of Huprich and Rauenbusch at least does not teach or suggest a thermoplastic membrane comprising glass fibers. Further, the combination of Huprich and Rauenbusch also does not teach or suggest a foam insulating material forming the second outermost surface of the door, as claimed.

Applicants have amended claim 23 to recite closed transition language in the preamble of, "consisting of". Thus, claim 23 is now limited to the elements as recited therein.  The Huprich and Huprich in view of Rauenbusch combination do not teach or suggest all of the limitations as recited in claim 23.

Because every limitations of the claims is not taught or suggested, no *prima facie* case of obviousness exists.  Therefore, Applicants respectfully request that the rejection be withdrawn.

-14-

ALTUMLLC000075

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

### Conclusion

In view of the foregoing remarks, Applicants submit that this claimed invention, as amended, is neither anticipated nor rendered obvious in view of the prior art references cited against this application. Applicants therefore request reconsideration and reexamination of the application, and the timely allowance of the pending claims.

Please grant any extensions of time required to enter this response and charge any additional required fees to our deposit account 50-2961.

Respectfully submitted,

Dated: December 10, 2014

By: /Matthew L. Whipple/
     Matthew L. Whipple
     Reg. No. 47,217

     MH2 TECHNOLOGY LAW GROUP LLP
     1951 Kidwell Drive
     Suite 550
     Tysons Corner, VA 22182
     Phone: (703) 917-0000
     Facsimile: (703) 997-4905

ALTUMLLC000076

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13585994 |
| **Filing Date:** | 15-Aug-2012 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/dms |
| **Attorney Docket Number:** | 0149.0004 |

Filed as Small Entity

**Filing Fees for** Utility under 35 USC 111(a)

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

ALTUMLLC000077

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| RCE - 2nd and Subsequent Request | 2820 | 1 | 850 | 850 |
| **Total in USD ($)** | | | | **850** |

ALTUMLLC000078

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 20926720 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/dms |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 10-DEC-2014 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 18:44:43 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 850 |
| RAM confirmation Number | 5543 |
| Deposit Account | |
| Authorized User | |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |

ALTUMLLC000079

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Request for Continued Examination (RCE) | RCE_12-10-2014.pdf | 697791 <br><br> 56aef901f8d8c9dfd8b426c96zbcc88dff378ba53 | no | 3 |

**Warnings:**

**Information:**

| 2 | | AM_RCE__12-10-2014.pdf | 125381 <br><br> 9adea52a3e3928fa3e05a1a79a675e5682a0f12f | yes | 15 |

| | Multipart Description/PDF files in .zip description | | | | |
|---|---|---|---|---|---|
| | Document Description | | Start | | End |
| | Response After Final Action | | 1 | | 1 |
| | Claims | | 2 | | 7 |
| | Applicant Arguments/Remarks Made in an Amendment | | 8 | | 15 |

**Warnings:**

**Information:**

| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30707 <br><br> 18e2cfa1262561f564665061f5e3c7a7bc5e38de0 | no | 2 |

**Warnings:**

**Information:**

| | | **Total Files Size (in bytes):** | 853879 | | |

Appx1002

ALTUMLLC000080

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Appx1003

ALTUMLLC000081

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| **PATENT APPLICATION FEE DETERMINATION RECORD** Substitute for Form PTO-875 | Application or Docket Number 13/585,994 | Filing Date 08/15/2012 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☐ LARGE  ☒ SMALL  ☐ MICRO

### APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

### APPLICATION AS AMENDED – PART II

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **12/10/2014** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 19 Minus | ** 22 | = 0 | x $40 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 Minus | *** 4 | = 0 | x $210 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | TOTAL ADD'L FEE | **0** |

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| **AMENDMENT** | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
/ERIC DANTZLER/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

ALTUMLLC000082



U<small>NITED</small> S<small>TATES</small> P<small>ATENT AND</small> T<small>RADEMARK</small> O<small>FFICE</small>

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

39878          7590          12/09/2014
MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/09/2014 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

doreen@mh2law.com
kris@mh2law.com
docketing@mh2law.com

PTOL-90A (Rev. 04/07)

Appx1005

ALTUMLLC000083

| ***Applicant-Initiated Interview Summary*** | Application No. | Applicant(s) |
|---|---|---|
| | 13/585,994 | WACHTELL ET AL. |
| | **Examiner** | **Art Unit** | |
| | DAVID PUROL | 3634 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) *David Purol*.                                                (3)_____.

(2) *Matt Whipple*.                                              (4)_____.

Date of Interview: *03 December 2014*.

Type:     ☒ Telephonic    ☐ Video Conference
          ☐ Personal [copy given to: ☐ applicant    ☐ applicant's representative]

Exhibit shown or demonstration conducted:    ☐ Yes    ☒ No.
If Yes, brief description: _____.

Issues Discussed   ☐101 ☐112 ☐102 ☒103 ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: *1*.

Identification of prior art discussed: *Huprich, Rauenbusch*.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

*The applicant discussed the feature of the overhead door as having only two layers as opposed to the previously claimed three layers. The applicant discussed the advantages of using glass fibers for constructing the overhead door. The applicant will be submitting a further response in due course.*

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /DAVID PUROL/ | |
| Primary Examiner, Art Unit 3634 | |

ALTUMLLC000084

**Summary of Record of Interview Requirements**

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

**37 CFR §1.2 Business to be transacted in writing.**
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

_____

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
–   An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
     (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

**Examiner to Check for Accuracy**

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

ALTUMLLC000085



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

39878          7590          10/10/2014
MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 10/10/2014 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

doreen@mh2law.com
kris@mh2law.com
docketing@mh2law.com

PTOL-90A (Rev. 04/07)

ALTUMLLC000086

| **Office Action Summary** | Application No.<br>13/585,994 | | Applicant(s)<br>WACHTELL ET AL. | |
|---|---|---|---|---|
| | Examiner<br>DAVID PUROL | | Art Unit<br>3634 | AIA (First Inventor to File)<br>Status<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a).  In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment.  See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>July 28, 2014</u>.
  ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☒ This action is **FINAL**.    2b) ☐ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☒ Claim(s) <u>1-11,13-16 and 18-24</u> is/are pending in the application.
  5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>1-11,13-16 and 18-24</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
  Applicant may not request that any objection to the drawing(s) be held in abeyance.  See 37 CFR 1.85(a).
  Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

**Certified copies:**
  a) ☐ All  b) ☐ Some**  c) ☐ None of the:
  1. ☐ Certified copies of the priority documents have been received.
  2. ☐ Certified copies of the priority documents have been received in Application No. _____.
  3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
  Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
  Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

Appx1009

ALTUMLLC000087

Application/Control Number: 13/585,994                                                    Page 2

Art Unit: 3634

1.      The following is a quotation of the first paragraph of 35 U.S.C. 112(a):

> (a)  IN GENERAL.—The specification shall contain a written description of the
> invention, and of the manner and process of making and using it, in such full, clear, concise,
> and exact terms as to enable any person skilled in the art to which it pertains, or with which it
> is most nearly connected, to make and use the same,  and shall set forth the best mode
> contemplated by the inventor or joint inventor of carrying out the invention.

The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the
> manner and process of making and using it, in such full, clear, concise, and exact terms as to
> enable any person skilled in the art to which it pertains, or with which it is most nearly
> connected, to make and use the same, and shall set forth the best mode contemplated by the
> inventor of carrying out his invention.

Claims 1-11, 13-16, 18-24 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112

(pre-AIA), first paragraph, as failing to comply with the written description requirement.

The claim(s) contains subject matter which was not described in the specification in

such a way as to reasonably convey to one skilled in the relevant art that the inventor or

a joint inventor, or for pre-AIA the inventor(s), at the time the application was filed, had

possession of the claimed invention.

The claims have been amended to recite the new limitation of "the overhead door

does not have multiple rigid, hinged sections", "the panel not having multiple rigid,

hinged sections", "the panel not having multiple rigid sections". There is no support for

the negative limitation/exclusionary proviso of the sections as not being rigid.

The applicants state that written description and support can be found at

paragraphs ¶ [004], ¶ [0025], ¶ [0026], ¶ [0028], ¶ [0029] and Figs. 1 and 2B of the

instant application as providing support for the negative limitation/exclusionary proviso.

This is not convincing for ¶ [004] merely provides a discussion of the prior art doors

ALTUMLLC000088

which have a series of hinged horizontal metal panels filled with insulating foam which is

not indicative of a negative limitation/exclusionary proviso of which the claimed door is

not to encompass;  ¶ [0025] states that the claimed door is without having to hinge

together multiple sections to allow the door to traverse a curved track – there is no

disclosure that the multiple sections referenced are rigid; ¶ [0026] and ¶ [0028] discuss

the track angle; ¶ [0029] discusses the flexibility may be increased or decreased by

modifying the densities and thicknesses of the foam and liners; Figs. 1 and 2B of the

instant application depict the overhead door as opposed to that which it is not to

comprise.  See MPEP 2173.05(i).


2.      The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.

Claims 1-11, 13-16, 18-24 are rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over Rauenbusch (U.S. Patent No. 5,915,445) in view of Wendt (U.S.

Patent No. 2,827,118) and Martin (U.S. Patent No. 5,738,161).

Rauenbusch discloses an insulated single panel overhead door 10 comprising a

core member 13 between a pair of outer face layers 11,12 and cover sheets 15,16

having depressions 14 to facilitate the bending of the door 10 as it is guided in tracks.

Rauenbusch discloses that the insulated overhead door is a single-piece plate-shaped

ALTUMLLC000089

body structure (col. 2, lines 1-2) that can be coiled to a roll or deflected along a curved

track (col. 2, lines 10-15; col. 4, lines 13-16, 32-37). It is axiomatic that in order for the

single-piece plate-shaped body structure to be capable of being either coiled to a roll or

deflected along a curved track it must be sufficiently flexible to do so.

The claims have been amended to include the negative limitation/exclusionary

proviso of "the overhead door does not have multiple rigid, hinged sections", "the panel

not having multiple rigid, hinged sections", "the panel not having multiple rigid sections".

Wendt discloses an insulated overhead door 2 which is a single panel made of inner

and outer walls 3,4 filled with a suitable insulating material each being attached to one

another and of which are sufficiently flexible to traverse curved tracks (see col.2; fig. 5).

While the door of Wendt comprises rails 6 or 6' for stiffening, the rails are not "multiple

rigid hinged sections" as defined by the applicants' specification. There are no hinges to

provide any articulation to the rails relative to one another. Wendt sets forth in column 2

at lines 4-15 that it is the rails which are secured to the elastic walls by rivets. The rails

are not connected to one another per se but are secured to and move along with the

door. The movement of the door is not dependent upon the presence of the rails. To

have eliminated the use of the rails together with its function of stiffening, if this feature

was not desired, would have been obvious to one of ordinary skill in the art for the door

would continue to function as intended.  In re Larson, 340 F.2d 965, 144 USPQ 347

(CCPA 1965). Note that the teaching relied upon from the Wendt reference is that of a

single panel door that is flexible per se, this teaching is evident regardless of the

presence of the rails.  To utilize the teachings of Wendt with that of Rauenbusch such

ALTUMLLC000090

that the single panel is flexible *per se* would have been obvious to one of ordinary skill

in the art for the references are each from the applicants field of endeavor and the

applicants are presumed to have full knowledge of the prior art in their respective field of

endeavor.

Rauenbusch does not specifically set forth the use of wheels for guiding the door

in the tracks. Martin discloses an insulated overhead door 10 which employs the use of

wheels 16 for guiding in tracks 12,14. To one having ordinary skill in the art it would

have been obvious to have provided the overhead door of Rauenbusch with wheels, as

taught by Martin, for its purpose of maintaining the overhead door in a predetermined

path as it is guided in the tracks.

The type of material used in constructing the overhead door is considered a

matter of design preference for such a selection is to have been made and to have done

so yields nothing more than a predictable result. In re Leshin,  277  F.2d 197, 125

USPQ 416 (CCPA 1960).

Regarding the recited range of radii of curvature of the tracks as set forth in the

claims, where the only difference between the prior art and the claims is a recitation of

relative dimensions of the claimed device and a device having the claimed relative

dimensions does not perform differently than the prior art device, as is the case here,

the claimed device is not patentably distinct from the prior art device. See  In Gardner v.

TEC Systems, Inc., 725 F.2d 1338, 220 USPQ 777 (Fed. Cir. 1984), cert. denied, 469

U.S. 830, 225 USPQ 232 (1984).

ALTUMLLC000091

3.      Claims 1-5,7-11,13-16,18-24   rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over Huprich (U.S. Patent No. 3,724,526).

Huprich discloses an insulated overhead door 14 that is designed to roll open

and closed in tracks 16,16a,92 to cover a door opening comprising membranes

28,30,28a,30a which may be formed of sheet metal, fiber glass, or other suitable

nonelastic flexible materials; a sheet of insulating material 29,29a attached to the

membranes 28,30,28a,30a which may be formed of flexible polyurethane material

foamed into place and allowed to cure or any one of many elastomeric materials which

are suitably provided that has good insulating properties and is capable of adhering to

the membranes to hold them in a spaced-apart position; and wheels 72 attached to the

door allowing the door to fit into the tracks 16a,92.

Regarding the newly presented claim limitations of "the overhead door does not

have multiple rigid, hinged sections", "the panel not having multiple rigid, hinged

sections", "the panel not having multiple rigid sections", note that Huprich discloses in

column 7 that the door of this invention does not involve the use of hinges, multiple

panels or like devices in its provision of an overhead sliding door.

The type of material used in constructing the overhead door is considered a

matter of design preference for such a selection is to have been made and to have done

so yields nothing more than a predictable result. In re Leshin,  277  F.2d 197, 125

USPQ 416 (CCPA 1960).

Regarding the recited range of radii of curvature of the tracks as set forth in the

claims, where the only difference between the prior art and the claims is a recitation of

ALTUMLLC000092

relative dimensions of the claimed device and a device having the claimed relative

dimensions does not perform differently than the prior art device, as is the case here,

the claimed device is not patentably distinct from the prior art device. See In Gardner v.

TEC Systems, Inc., 725 F.2d 1338, 220 USPQ 777 (Fed. Cir. 1984), cert. denied, 469

U.S. 830, 225 USPQ 232 (1984).

4.     Claim 6 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over

Huprich (U.S. Patent No. 3,724,526) as applied to claims 1-5,7-11,13-16,18-24 above,

and further in view of Rauenbusch (U.S. Patent No. 5,915,445).

       Huprich does not disclose the use of compression gaps. Rauenbusch discloses

an insulated single panel overhead door 10 comprising a core member 13 between a

pair of outer face layers 11,12 and cover sheets 15,16 having depressions 14 which

responds to the claimed compression gaps. To one having ordinary skill in the art it

would have been obvious to have provided the insulated overhead door of Huprich with

the use of compression gaps, as taught by Rauenbusch, for its purpose of facilitating

the bending of the overdoor as it is guided in tracks.

5.     The applicants argue that it would not have been obvious to modify Rauenbusch

based on the teachings of Wendt and Martin to provide the claimed panel being flexible

along the entire length of the panel because it is not obvious to combine reference

teachings if doing so requires a substantial reconstruction and redesign of the elements

shown in the references.  This is not convincing for each references are from the

ALTUMLLC000093

applicants' field of endeavor wherein, the applicants are presumed to have full

knowledge of the prior art it their respective field of endeavor. There is nothing to

indicate that a substantial reconstruction and redesign is necessary for a panel to be

flexible. The test for obviousness is not whether the features of a secondary reference

may be bodily incorporated into the structure of the primary reference; nor is it that the

claimed invention must be expressly suggested in any one or all of the references.

Rather, the test is what the combined teachings of the references would have

suggested to those of ordinary skill in the art.  In the instant case it is known per se to

use only one of a flexible panel as an overhead door. See *In re Keller*, 642 F.2d 413,

208 USPQ 871 (CCPA 1981).

The applicants argue that the prior art of record does not teach the specific

materials recited in the claims, such as polypropylene impregnated with glass fibers or

the specifically claimed foam materials and the applicants assert that the burden of a

design choice is not being met for the specifically claimed materials and for this reason

the applicants assert that the rejections are improper and should be withdrawn. This is

not convincing for the prior art, as advanced above, discuss the different types of

material which may be employed in the construction of the overhead door such as the

use of single-layer plastic strips, multi-layered plastic strips, laminates of different

material layers, thermoplastic material, honeycombed material, foam, fiber material,

polypropylene, any suitable insulating material, sheet metal, fiber glass, polyurethane,

urethane. Thus, it has been established that the type of material employed is a result-

effective variable for it achieves the recognized result of providing insulating properties

ALTUMLLC000094

and allowing for flexibility. The selection of a known desired material having been

recognized as a result-effective variable involves nothing more than routine

experimentation. In reAntonie, 559 F.2d 618, 195 USPQ 6 (CCPA 1977).   Regardless,

the applicants have provided no evidence which would negate that applicability of In re

Leshin,  277  F.2d 197, 125 USPQ 416 (CCPA 1960) as advanced above.

Applicants' arguments have been fully considered but they are not persuasive

inasmuch as all the claimed elements are known in the prior art and one skilled in the

art could have combined the elements as claimed by known methods with no change in

their respective functions, and the combination would have yielded predictable results to

one of ordinary skill in the art at the time of the invention.

6.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.

7.      Applicants' amendment presenting the new limitations of "the overhead door

does not have multiple rigid, hinged sections", "the panel not having multiple rigid,

hinged sections", "the panel not having multiple rigid sections" necessitated the new

ground(s) of rejection presented in this Office action.  Accordingly, **THIS ACTION IS**

**MADE FINAL**.  See MPEP § 706.07(a).  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

ALTUMLLC000095

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of
the advisory action.  In no event, however, will the statutory period for reply expire later
than SIX MONTHS from the date of this final action.

8.      Any inquiry concerning this communication or earlier communications from the

Examiner should be directed to David M. Purol whose telephone number is (571) 272-

6833.

        If attempts to reach the examiner by telephone are unsuccessful, the Examiner's

supervisor, Katherine Mitchell, can be reached at (571) 272-7069.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

        Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free).

/David M Purol/
**David M Purol**
**Primary Examiner**
**Art Unit 3634**

/D. M. P./
(571) 272-6833
October 7, 2014

ALTUMLLC000096

| | Notice of References Cited | Application/Control No. 13/585,994 | Applicant(s)/Patent Under Reexamination WACHTELL ET AL. | |
|---|---|---|---|---|
| | | Examiner DAVID PUROL | Art Unit 3634 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2,258,971 | 10-1941 | PHILIP CARLSON | 160/368.1 |
| * | B | US-3,724,526 | 04-1973 | Huprich, Carl A. | 160/368.1 |
| * | C | US-3,856,072 | 12-1974 | Sund, Erik Ivar | 160/84.01 |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 10072014

Appx1019

ALTUMLLC000097

Doc code: IDS

Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( Not for submission under 37 CFR 1.99)

| | |
|---|---|
| Application Number | 13585994 |
| Filing Date | 2012-08-15 |
| First Named Inventor | Peter J. Wachtell |
| Art Unit | 3634 |
| Examiner Name | Davind M. Purol |
| Attorney Docket Number | 0149.0004 |

| U.S.PATENTS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 5515649 | | 1996-05-14 | STRAB | |

If you wish to add additional U.S. Patent citation information please click the Add button.  **Add**

| U.S.PATENT APPLICATION PUBLICATIONS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 20100270826 | A1 | 2010-10-28 | WEEDA et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button.  **Add**

| FOREIGN PATENT DOCUMENTS | | | | | | | Remove |
|---|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
| | 1 | | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button  **Add**

| NON-PATENT LITERATURE DOCUMENTS | | | Remove |
|---|---|---|---|
| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /DP/

Appx1020

ALTUMLLC000098

| | |
|---|---|
| | **Application Number** |
| | 13585994 |
| | **Filing Date** |
| | 2012-08-15 |
| | **First Named Inventor** |
| | Peter J. Wachtell |
| | **Art Unit** |
| | 3634 |
| | **Examiner Name** |
| | Davind M. Purol |
| | **Attorney Docket Number** |
| | 0149.0004 |

**INFORMATION DISCLOSURE STATEMENT BY APPLICANT**

( **Not for submission under 37 CFR 1.99**)

| | | | |
|---|---|---|---|
| 1 | JOSEPH PAPE (Examiner), Non-Final Office Action dated April 16, 2014, U.S. Application No. 13/586,021 filed August 15, 2012, pages 1-19. | | ☐ |

If you wish to add additional non-patent literature document citation information please click the Add button    **Add**

**EXAMINER SIGNATURE**

| Examiner Signature | /David Purol/ | Date Considered | 10/07/2014 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /DP/

Appx1021

ALTUMLLC000099

| | |
|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( **Not for submission under 37 CFR 1.99**) | Application Number | 13585994 |
| | Filing Date | 2012-08-15 |
| | First Named Inventor | Peter J. Wachtell |
| | Art Unit | 3634 |
| | Examiner Name | Davind M. Purol |
| | Attorney Docket Number | 0149.0004 |

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☐ A certification statement is not submitted herewith.

## SIGNATURE

A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Matthew L. Whipple/ | Date (YYYY-MM-DD) | 2014-07-28 |
|---|---|---|---|
| Name/Print | Matthew L. Whipple | Registration Number | 47,217 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /DP/

Appx1022

ALTUMLLC000100

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /DP/

EFS Web 2.1.17

ALTUMLLC000101

## Index of Claims

| Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|
| 13/585,994 | WACHTELL ET AL. |
| **Examiner** | **Art Unit** |
| DAVID PUROL | 3634 |

| √ | Rejected | — | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Claim Final | Original | 10/7/14 | | | | | | | Claim Final | Original | | | | | | | | Claim Final | Original | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | √ | | | | | | | | 51 | | | | | | | | | 101 | | | | | | | |
| | 2 | √ | | | | | | | | 52 | | | | | | | | | 102 | | | | | | | |
| | 3 | √ | | | | | | | | 53 | | | | | | | | | 103 | | | | | | | |
| | 4 | √ | | | | | | | | 54 | | | | | | | | | 104 | | | | | | | |
| | 5 | √ | | | | | | | | 55 | | | | | | | | | 105 | | | | | | | |
| | 6 | √ | | | | | | | | 56 | | | | | | | | | 106 | | | | | | | |
| | 7 | √ | | | | | | | | 57 | | | | | | | | | 107 | | | | | | | |
| | 8 | √ | | | | | | | | 58 | | | | | | | | | 108 | | | | | | | |
| | 9 | √ | | | | | | | | 59 | | | | | | | | | 109 | | | | | | | |
| | 10 | √ | | | | | | | | 60 | | | | | | | | | 110 | | | | | | | |
| | 11 | √ | | | | | | | | 61 | | | | | | | | | 111 | | | | | | | |
| | 12 | - | | | | | | | | 62 | | | | | | | | | 112 | | | | | | | |
| | 13 | √ | | | | | | | | 63 | | | | | | | | | 113 | | | | | | | |
| | 14 | √ | | | | | | | | 64 | | | | | | | | | 114 | | | | | | | |
| | 15 | √ | | | | | | | | 65 | | | | | | | | | 115 | | | | | | | |
| | 16 | √ | | | | | | | | 66 | | | | | | | | | 116 | | | | | | | |
| | 17 | - | | | | | | | | 67 | | | | | | | | | 117 | | | | | | | |
| | 18 | √ | | | | | | | | 68 | | | | | | | | | 118 | | | | | | | |
| | 19 | √ | | | | | | | | 69 | | | | | | | | | 119 | | | | | | | |
| | 20 | √ | | | | | | | | 70 | | | | | | | | | 120 | | | | | | | |
| | 21 | √ | | | | | | | | 71 | | | | | | | | | 121 | | | | | | | |
| | 22 | √ | | | | | | | | 72 | | | | | | | | | 122 | | | | | | | |
| | 23 | √ | | | | | | | | 73 | | | | | | | | | 123 | | | | | | | |
| | 24 | √ | | | | | | | | 74 | | | | | | | | | 124 | | | | | | | |
| | 25 | | | | | | | | | 75 | | | | | | | | | 125 | | | | | | | |
| | 26 | | | | | | | | | 76 | | | | | | | | | 126 | | | | | | | |
| | 27 | | | | | | | | | 77 | | | | | | | | | 127 | | | | | | | |
| | 28 | | | | | | | | | 78 | | | | | | | | | 128 | | | | | | | |
| | 29 | | | | | | | | | 79 | | | | | | | | | 129 | | | | | | | |
| | 30 | | | | | | | | | 80 | | | | | | | | | 130 | | | | | | | |
| | 31 | | | | | | | | | 81 | | | | | | | | | 131 | | | | | | | |
| | 32 | | | | | | | | | 82 | | | | | | | | | 132 | | | | | | | |
| | 33 | | | | | | | | | 83 | | | | | | | | | 133 | | | | | | | |
| | 34 | | | | | | | | | 84 | | | | | | | | | 134 | | | | | | | |
| | 35 | | | | | | | | | 85 | | | | | | | | | 135 | | | | | | | |
| | 36 | | | | | | | | | 86 | | | | | | | | | 136 | | | | | | | |
| | 37 | | | | | | | | | 87 | | | | | | | | | 137 | | | | | | | |
| | 38 | | | | | | | | | 88 | | | | | | | | | 138 | | | | | | | |
| | 39 | | | | | | | | | 89 | | | | | | | | | 139 | | | | | | | |
| | 40 | | | | | | | | | 90 | | | | | | | | | 140 | | | | | | | |
| | 41 | | | | | | | | | 91 | | | | | | | | | 141 | | | | | | | |
| | 42 | | | | | | | | | 92 | | | | | | | | | 142 | | | | | | | |
| | 43 | | | | | | | | | 93 | | | | | | | | | 143 | | | | | | | |
| | 44 | | | | | | | | | 94 | | | | | | | | | 144 | | | | | | | |
| | 45 | | | | | | | | | 95 | | | | | | | | | 145 | | | | | | | |
| | 46 | | | | | | | | | 96 | | | | | | | | | 146 | | | | | | | |
| | 47 | | | | | | | | | 97 | | | | | | | | | 147 | | | | | | | |
| | 48 | | | | | | | | | 98 | | | | | | | | | 148 | | | | | | | |
| | 49 | | | | | | | | | 99 | | | | | | | | | 149 | | | | | | | |
| | 50 | | | | | | | | | 100 | | | | | | | | | 150 | | | | | | | |

U.S. Patent and Trademark Office

Part of Paper No.  10072014

Appx1024

ALTUMLLC000102

**Search Notes**

| Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|
| 13/585,994 | WACHTELL ET AL. |
| Examiner | Art Unit |
| DAVID PUROL | 3634 |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 160 | 201 230 | 10/7/2014 | DMP |
|  | 231.1 |  |  |
|  | 231.2 |  |  |
|  | 232 23.1 |  |  |
|  | 270 271 |  |  |
|  | Dig. 8 |  |  |
| 296 | 146.8 |  |  |
| F25D | 23/021 |  |  |
| E05D | 15/20 |  |  |
| E06B | 3/80 |  |  |
|  | 2003/7044 |  |  |
|  | 2003/7049 |  |  |
|  | 2003/7051 |  |  |
|  | 2003/7053 |  |  |

### INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

### SEARCH NOTES (INCLUDING SEARCH STRATEGY)

|  | DATE | EXMR |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Part of Paper No.  10072014

ALTUMLLC000103

PATENT

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | | | |
|---|---|---|---|---|
| In re Application of | : | Peter J. Wachtell et al. | Confirmation No.: | 9027 |
| Application Number | : | 13/585,994 | | |
| Filed | : | August 15, 2012 | | |
| Title | : | INSULATED OVERHEAD DOOR | | |
| TC/Art Unit | : | 3634 | | |
| Examiner: | : | David M. Purol | | |

| | | |
|---|---|---|
| Docket No. | : | 0149.0004 |
| Customer No. | : | 39878 |

**MAIL STOP 16**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

**REQUEST FOR REFUND**

Applicant respectfully requests a refund in the amount of $90.00 to account for the difference between the large entity Information Disclosure Statement fees paid with the filing of the above-identified application on July 28, 2014, and the small entity fees, which were due.

It is submitted that the small entity status applies and is appropriate for the above-identified application.  However, Applicant erroneously paid large entity fees in the amount of $180.00, with an overpayment in the amount of $90.00.  Therefore, a refund in the amount of $90.00 is respectfully requested and should be credited to the credit card used to pay the original fees.

Appx1026

ALTUMLLC000104

No fee is believed necessary with this submission.  However, if it is determined otherwise, the commissioner is hereby authorized to charge any additional fees or credit any overpayment to Deposit Account No. 50-2961.

Respectfully submitted,

Dated: <u>August 11, 2014</u>          By: <u> /Matthew L. Whipple/  </u>
                                      Matthew L. Whipple
                                      Reg. No. 47,217

                                      MH2 TECHNOLOGY LAW GROUP LLP

ALTUMLLC000105

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 19835990 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew L. Whipple (heg) |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 11-AUG-2014 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 19:20:56 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | no |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Refund Request | Request_for_Refund_8-11-14. pdf | 95645 <br> 4871245ba736a2f187cc064ae87847c846e b0025 | no | 2 |

| Warnings: |
|---|
| Information: |

ALTUMLLC000106

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111

If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371

If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office

If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

ALTUMLLC000107

PATENT

2?4 ??? 11 ?? 10: 51

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| In re Application of | : | Peter J. Wachtell et al. | Confirmation No.: | 9027 |
| Application Number | : | 13/585,994 | | |
| Filed | : | August 15, 2012 | | |
| Title | : | INSULATED OVERHEAD DOOR | | |
| TC/Art Unit | : | 3634 | | |
| Examiner: | : | David M. Purol | | |

| | | |
|---|---|---|
| Docket No. | : | 0149.0004 |
| Customer No. | : | 39878 |

**MAIL STOP 16**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

### REQUEST FOR REFUND

Applicant respectfully requests a refund in the amount of $90.00 to account for the difference between the large entity Information Disclosure Statement fees paid with the filing of the above-identified application on July 28, 2014, and the small entity fees, which were due.

It is submitted that the small entity status applies and is appropriate for the above-identified application. However, Applicant erroneously paid large entity fees in the amount of $180.00, with an overpayment in the amount of $90.00. Therefore, a refund in the amount of $90.00 is respectfully requested and should be credited to the credit card used to pay the original fees.

ALTUMLLC000108

No fee is believed necessary with this submission.  However, if it is determined otherwise, the commissioner is hereby authorized to charge any additional fees or credit any overpayment to Deposit Account No. 50-2961.

Respectfully submitted,

Dated: August 11, 2014                    By: /Matthew L. Whipple/
                                                 Matthew L. Whipple
                                                 Reg. No. 47,217

                                           MH2 TECHNOLOGY LAW GROUP LLP

-2-

ALTUMLLC000109

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13585994 |
| **Filing Date:** | 15-Aug-2012 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Filer:** | Timothy M. Hsieh/Matthew L. Whipple (heg) |
| **Attorney Docket Number:** | 0149.0004 |

Filed as Large Entity

### Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Refund Ref:        0030149119
08/15/2014

Credit Card Refund Total:        $90.00

Aa Exp.: XXXXXXXXXX2003

Adjustment date: 08/15/2014  SDIRETA1
00000673 13585994
07/29/2014 INTLFSW
01 FC:1806                    -180.00 OP

08/15/2014 SDIRETA1 00000008 13585994
                              90.00 OP
01 FC:2806

ALTUMLLC000110

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 180 | 180 |
| **Total in USD ($)** | | | | **180** |

ALTUMLLC000111

Adjustment date: 08/15/2014  SDIRET01
07/29/2014 INTEFSW  00000673 13585994
                                    -180.00 OP
01 FC:1806

ALTUMLLC000112

Doc code: IDS
Doc description: Information Disclosure Statement (IDS) Filed

PTO/SB/08a (01-10)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** ( Not for submission under 37 CFR 1.99) | | |
|---|---|---|
| | Application Number | 13585994 |
| | Filing Date | 2012-08-15 |
| | First Named Inventor | Peter J. Wachtell |
| | Art Unit | 3634 |
| | Examiner Name | Davind M. Purol |
| | Attorney Docket Number | 0149.0004 |

| U.S.PATENTS | | | | | Remove | |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Patent Number | Kind Code[1] | Issue Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 5515649 | | 1996-05-14 | STRAB | |

If you wish to add additional U.S. Patent citation information please click the Add button. **Add**

| U.S.PATENT APPLICATION PUBLICATIONS | | | | | | Remove |
|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Publication Number | Kind Code[1] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear |
| | 1 | 20100270826 | A1 | 2010-10-28 | WEEDA et al. | |

If you wish to add additional U.S. Published Application citation information please click the Add button. **Add**

| FOREIGN PATENT DOCUMENTS | | | | | | | Remove |
|---|---|---|---|---|---|---|---|
| Examiner Initial* | Cite No | Foreign Document Number[3] | Country Code[2] i | Kind Code[4] | Publication Date | Name of Patentee or Applicant of cited Document | Pages,Columns,Lines where Relevant Passages or Relevant Figures Appear | T[5] |
| | 1 | | | | | | ☐ |

If you wish to add additional Foreign Patent Document citation information please click the Add button **Add**

| NON-PATENT LITERATURE DOCUMENTS | | | Remove |
|---|---|---|---|
| Examiner Initials* | Cite No | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc), date, pages(s), volume-issue number(s), publisher, city and/or country where published. | T[5] |

ALTUMLLC000113

| INFORMATION DISCLOSURE STATEMENT BY APPLICANT ( Not for submission under 37 CFR 1.99) | Application Number | 13585994 |
|---|---|---|
| | Filing Date | 2012-08-15 |
| | First Named Inventor | Peter J. Wachtell |
| | Art Unit | 3634 |
| | Examiner Name | Davind M. Purol |
| | Attorney Docket  Number | 0149.0004 |

| | 1 | JOSEPH PAPE (Examiner), Non-Final Office Action dated April 16, 2014, U.S. Application No. 13/586,021 filed August 15, 2012, pages 1-19. | ☐ |
|---|---|---|---|

If you wish to add additional non-patent literature document citation information please click the Add button  **Add**

### EXAMINER SIGNATURE

| Examiner Signature | | Date Considered | |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609.  Draw line through a citation if not in conformance and not considered.  Include copy of this form with next communication to applicant.

[1] See Kind Codes of USPTO Patent Documents at www.USPTO.GOV or MPEP 901.04.  [2] Enter office that issued the document, by the two-letter code (WIPO Standard ST.3).  [3] For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document.  [4] Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible.  [5] Applicant is to place a check mark here if English language translation is attached.

ALTUMLLC000114

| | |
|---|---|
| Application Number | 13585994 |
| Filing Date | 2012-08-15 |
| First Named Inventor | Peter J. Wachtell |
| Art Unit | 3634 |
| Examiner Name | Davind M. Purol |
| Attorney Docket Number | 0149.0004 |

# INFORMATION DISCLOSURE STATEMENT BY APPLICANT
( **Not for submission under 37 CFR 1.99**)

## CERTIFICATION STATEMENT

Please see 37 CFR 1.97 and 1.98 to make the appropriate selection(s):

☐ That each item of information contained in the information disclosure statement was first cited in any communication from a foreign patent office in a counterpart foreign application not more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(1).

**OR**

☐ That no item of information contained in the information disclosure statement was cited in a communication from a foreign patent office in a counterpart foreign application, and, to the knowledge of the person signing the certification after making reasonable inquiry, no item of information contained in the information disclosure statement was known to any individual designated in 37 CFR 1.56(c) more than three months prior to the filing of the information disclosure statement. See 37 CFR 1.97(e)(2).

☐ See attached certification statement.

☒ The fee set forth in 37 CFR 1.17 (p) has been submitted herewith.

☐ A certification statement is not submitted herewith.

## SIGNATURE
A signature of the applicant or representative is required in accordance with CFR 1.33, 10.18. Please see CFR 1.4(d) for the form of the signature.

| Signature | /Matthew L. Whipple/ | Date (YYYY-MM-DD) | 2014-07-28 |
|---|---|---|---|
| Name/Print | Matthew L. Whipple | Registration Number | 47,217 |

This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 1 hour to complete, including gathering, preparing and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

ALTUMLLC000115

## Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these record s.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

Appx1038

ALTUMLLC000116

# Electronic Patent Application Fee Transmittal

| Application Number: | 13585994 |
| --- | --- |
| Filing Date: | 15-Aug-2012 |
| Title of Invention: | INSULATED OVERHEAD DOOR |
| First Named Inventor/Applicant Name: | Peter J. Wachtell |
| Filer: | Timothy M. Hsieh/Matthew L. Whipple (heg) |
| Attorney Docket Number: | 0149.0004 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
| --- | --- | --- | --- | --- |
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

Appx1039

ALTUMLLC000117

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Submission- Information Disclosure Stmt | 1806 | 1 | 180 | 180 |
| **Total in USD ($)** | | | | **180** |

ALTUMLLC000118

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 19699309 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew L. Whipple (heg) |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 28-JUL-2014 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 14:22:31 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $180 |
| RAM confirmation Number | 673 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

ALTUMLLC000119

| 1 | Information Disclosure Statement (IDS) Form (SB08) | SIDS_7-28-14.pdf | 612317<br>e6e4a84d4e67c5e9e8c82e810791253d6cbdf9cf | no | 4 |
|---|---|---|---|---|---|
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | Other Reference-Patent/App/Search documents | PTO_Non-Final_OA_2014-04-16.pdf | 742131<br>efa61e7d3db57ae13bfd388aea6b92f485ff35a1 | no | 19 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30566<br>a73cd8096656b894ebaef51652dfd50f0cbe064b | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | | 1385014 | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Appx1042

ALTUMLLC000120

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| In re Application of | : | Peter J. Wachtell et al. | Confirmation No.: | 9027 |
| Application Number | : | 13/585,994 | | |
| Filed | : | August 15, 2012 | | |
| Title | : | INSULATED OVERHEAD DOOR | | |
| TC/Art Unit | : | 3634 | | |
| Examiner: | : | David M. Purol | | |

| | | |
|---|---|---|
| Docket No. | : | 0149.0004 |
| Customer No. | : | **39878** |

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Commissioner:

## <u>AMENDMENT</u>

In reply to the Office Action mailed May 2, 2014, Applicant proposes that this

application be amended as follows:

**Amendments to the Claims** are reflected in the listing of claims in this paper.

**Remarks/Arguments** follow the amendment sections of this paper.

ALTUMLLC000121

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

**AMENDMENTS TO THE CLAIMS:**

This listing of claims will replace all prior versions and listings of claims in the application:

1.  (Currently Amended) An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door comprising:

    a thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening;

    a sheet of insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and

    wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

    wherein the overhead door comprises only a one of the single panel, the single panel being sufficiently flexible flexible along the entire length of the panel so as to be capable of to traverse approximating the curvature of curved tracks having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, Θ, relative to a track portion of a second length, wherein Θ ranges from about 80° to about 125°, wherein the overhead door does not have multiple rigid, hinged sections, the single panel not having multiple rigid, articulating sections.

ALTUMLLC000122

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

2.    (Currently Amended) The insulated overhead door of claim 1, wherein the thermoplastic membrane is a single sheet ~~that is approximately the size of the door opening to be covered~~.

3.    (Original) The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises glass fibers.

4.    (Previously Presented) The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises polypropylene impregnated with glass fibers.

5.    (Original) The insulated overhead door of claim 1, wherein the insulating material comprises foam.

6.    (Original) The insulated overhead door of claim 5, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend during opening and closing of the door.

7.    (Original) The insulated overhead door of claim 1, wherein the insulating material is closed cell foam.

8.    (Original) The insulated overhead door of claim 7, wherein the closed cell foam comprises ethylene vinyl acetate.

9.    (Original) The insulated overhead door of claim 7, wherein the closed cell foams is chosen from polyethylene foams, polypropylene foams or neoprene based foams.

10.    (Original) The insulated overhead door of claim 1, wherein the insulating material is an open cell foam.

-3-

ALTUMLLC000123

ATTORNEY DOCKET No. 0149.0004
APPLICATION No.: 13/585,994

11.    (Original) The insulated overhead door of claim 1, further comprising foam blocks configured to  increased an R-value of the door.

12.    (Cancelled).

13.    (Original) The insulated overhead door of claim 1, further comprising an additional membrane that is not the thermoplastic membrane.

14.    (Original) The insulated overhead door of claim 1, the door having an R value ranging from about 14 to about 50.

15.    (Original) A method comprising:

   providing the insulated overhead door of claim 1 on tracks, at least a portion of the tracks being curved; and

   moving the insulated overhead door so that a portion of the thermoplastic membrane and a portion of the insulating material flex to allow the door to traverse the curved portion of the tracks.

16.    (Currently Amended) An overhead door assembly comprising:

   a set of curved tracks; and

   an insulated overhead door configured to roll open and closed in the tracks to cover a door opening having a top and a bottom, the overhead door comprising:

      a thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening when the door is in a closed position;
      a sheet of insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is

-4-

ALTUMLLC000124

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

approximately the size of the door opening to be covered, a length
of the panel being the distance between the top side and the
bottom side; and

wheels attached to the door allowing the door to fit into tracks to guide
the opening and closing of the door,

wherein the overhead door comprises only a̶ one of the s̶i̶n̶g̶l̶e̶ panel, the
s̶i̶n̶g̶l̶e̶ panel being s̶u̶f̶f̶i̶c̶i̶e̶n̶t̶l̶y̶ ̶f̶l̶e̶x̶i̶b̶l̶e̶ flexible along the entire length of the panel
so as to be capable of t̶o̶ ̶t̶r̶a̶v̶e̶r̶s̶e̶ approximating the curvature of curved tracks
having a radius of curvature ranging from about 5 inches to about 25 inches,
where the track has a first length positioned at an angle, $\Theta$, relative to a track
portion of a second length, wherein $\Theta$ ranges from about 80$^{o}$ to about 125$^{o}$,
wherein the overhead door does not have multiple rigid, hinged sections, t̶h̶e̶
s̶i̶n̶g̶l̶e̶ ̶p̶a̶n̶e̶l̶ ̶n̶o̶t̶ ̶h̶a̶v̶i̶n̶g̶ ̶m̶u̶l̶t̶i̶p̶l̶e̶ ̶r̶i̶g̶i̶d̶,̶ ̶a̶r̶t̶i̶c̶u̶l̶a̶t̶i̶n̶g̶ ̶s̶e̶c̶t̶i̶o̶n̶s̶.

17.   (Cancelled).

18.   (Original) A truck comprising the insulated overhead door assembly of claim 16.

19.   (Original) A cold storage trailer comprising the insulated overhead door assembly
of claim 16.

20.   (Original) A building comprising the insulated overhead door assembly of claim
16.

21.   (Currently Amended) The insulated overhead door of claim 1, wherein the s̶i̶n̶g̶l̶e̶
panel is sufficiently flexible so that the overhead door is capable of traversing
tracks of varying radii of curvature ranging from about 5 inches to about 25
inches.

22.   (Currently Amended) The overhead door assembly of claim [[15]]16, wherein the
s̶i̶n̶g̶l̶e̶ panel is sufficiently flexible so that the overhead door is capable of

ALTUMLLC000125

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches.

23. (Currently Amended) An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door comprising:

a flexible thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the flexible thermoplastic membrane comprising polypropylene impregnated with glass fibers;

a sheet of flexible foam insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only one of the a single panel, the single panel not having multiple rigid, articulating hinged sections,

wherein the panel is flexible along the entire length of the panel single panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches, where the track portion has a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about 80° to about 125°.

24. (New) An insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door comprising:

-6-

ALTUMLLC000126

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

a thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening;

a sheet of insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only one of the panel, the panel being sufficiently flexible to traverse curved tracks, the panel not having multiple rigid sections.

ALTUMLLC000127

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

## REMARKS

Claims 1-11 and 13-24 are currently pending in the application. Claims 1, 2, 16, 21, 22 and 23 have been amended. Claim 12 has been cancelled.  New claim 24 has been added by this Amendment.

Written description support for the amendments to claims 1, 16 and 23 and new claim 24 can be found throughout the specification, including the figures and claims as originally filed.  For example, written description support can be found at paragraphs [004], [0025], [0026], [0028], [0029] and FIGS. 1 and 2B.

In particular, with respect to the added language as set forth in claim 1, of "the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks," written description support can be found from paragraph [0025], which recites that "<u>due to the flexibility of the thermoplastic membrane 4 and foam composite</u>" the doors can be made as a single integral unit, or panel, that is approximately the size of the door opening, without having to hinge together multiple sections to allow the door to traverse a curved track *(emphasis added)*.  The single laminate door can "flex sufficiently to traverse an existing track. FIGS 2A to 2B illustrate a door 2 flexing to traverse tracks 10…"

The specification additionally recites that the foam and liner of the panel has sufficient flexibility to bend across the horizontal dimension when running through the curved portion of the tracks. The flexibility may be increased or decreased by modifying the densities and thicknesses of the foam and liner so that the panel is able to flex over a very tight radius.  Specification, paragraph [0029].

-8-

ALTUMLLC000128

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

Thus, it is clear from the specification that it is the flexibility of both the thermoplastic membrane 4 and the foam composite from which the panel is made that allow the panel to flex to traverse the tracks, rather than relying on multiple rigid hinged sections. Because the foam and liner chosen for the panel are designed to flex, the flexibility is a property of the material chosen for the panel. It is the material itself that flexes, rather than bending at hinges, as would be the case with a rigid panel and hinge structure. Thus, because the entire panel is made from the flexible material, one of ordinary skill in the art would conclude the panel of the present application would exhibit the desired flexibility along its entire length.

Further, the specification states that FIG. 2B illustrates the door 2 flexing. It can be seen from looking at FIG. 2B that door 2 does not bend at hinge points, but rather that the panel itself flexes as it passes through the curved portion of the tracks. As stated in the specification, this allows the "portion of door 2 traversing the curve track" to curve so as to approximate the curved shape of the track". See both FIG. 2B and paragraph [0028], the second full sentence on page 7 of the specification.

These teachings showing the door panel curving as it passes through the track so as to approximate the curve in the track, combined with the inherent flexibility of the panel material as disclosed, would make clear to one of ordinary skill in the art that the panel itself flexes along its length so as to pass through the curved track portion. Thus, from reading the disclosure, one of ordinary skill in the art would understand that the panel would be flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks.

-9-

ALTUMLLC000129

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

## Rejections Under 35 USC § 112

Claims 1-11 and 13-23 are rejected under 35 USC § 112, first paragraph, as failing to comply with the written description requirement. While Applicants do not agree that the claims lacked written description, in an effort to quickly resolve this issue and move the case closer to allowance, Applicants have amended the claims to overcome the rejection.  Accordingly, Applicants request that the rejection be withdrawn.

## Rejections Under 35 USC § 103

Claims 1-11 and 13-23 are rejected under 35 USC § 103(a) as being unpatentable over Rauenbusch (US Patent No. 5,915,445, hereinafter "Rauenbusch") in view of Wendt (US Patent No. 2,827,118, hereinafter "Wendt") and Martin (US Patent No. 5,738,161, hereinafter "Martin").  Applicants respectfully traverse.

Claim 1, as amended, recites an insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door comprising: a thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening; a sheet of insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door, wherein the overhead door comprises only one panel, the panel being flexible along the entire length of the panel so as to be capable of

-10-

ALTUMLLC000130

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

approximating the curvature of curved tracks having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about $80^\circ$ to about $125^\circ$, wherein the overhead door does not have multiple rigid, hinged sections.

Amended claim 16 recites an overhead door assembly comprising: a set of curved tracks; and an insulated overhead door configured to roll open and closed in the tracks to cover a door opening having a top and a bottom, the overhead door comprising: a thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening when the door is in a closed position; a sheet of insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door, wherein the overhead door comprises only one of the panel, the panel being flexible along the entire length of the panel so as to be capable of approximating the curvature of curved tracks having a radius of curvature ranging from about 5 inches to about 25 inches, where the track has a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about $80^\circ$ to about $125^\circ$, wherein the overhead door does not have multiple rigid, hinged sections.

ALTUMLLC000131

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

Claim 23 recites an insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door comprising: a flexible thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening, the flexible thermoplastic membrane comprising polypropylene impregnated with glass fibers; a sheet of flexible foam insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door, wherein the overhead door comprises only one of the panel, the panel not having multiple rigid, hinged sections, wherein the panel is flexible along the entire length of the panel so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches, where the track portion has a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about 80° to about 125°.

Rauenbusch in view of Wendt and Martin do not teach or suggest the combination of limitations recited in claims 1, 16 or 23. For instance, the doors taught by Rauenbusch include alternating "rigid" panels and flexible strips, the flexible strips allowing the alticulating rigid panels to traverse a curved track. Rauenbusch, col. 4, lines 9-37, 56-65, and claim 1.

-12-

ALTUMLLC000132

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

Because the doors of Rauenbusch include alternating rigid panels, they are not the same as the claimed overhead doors comprising only one panel, the panel being flexible along the entire length of the panel, as recited in the claims. Further, it would not have been obvious to modify Rauenbusch based on the teachings of Wendt and Martin to provide the claimed panel being flexible along the entire length of the panel.

Wendt teaches a jalousie-type rolling door provided with a plurality of flexibly connected stiffening members, taught as rails 6 and 6'. These rails are taught as being overlapping metal rails that are rigidly connected to the elastic walls 3 and 4. Walls 3 and 4 are connected by rubber spacers 7 to form hollow cells that can be filled with insulating material. Wendt, col. 2, lines 3-25.

Reworking the rigid panel doors of Rauenbusch to have the hollow cell, jalousie type door structure of Wendt would entirely change the structure of the doors taught by Rauenbusch and the manner in which they operate. For instance, as pointed out by the Examiner in the last Office Action, Wendt does not employ articulating rigid panels, as does Rauenbusch, but relies on the entirely different hollow cell, jalousie type door structure to provide flexibility.

It is not obvious to combine reference teachings if doing so requires a substantial reconstruction and redesign of the elements shown in the references. MPEP 2143.01 (VI), citing In re Ratti, 270 F.2d 810, 123 USPQ 349 (CCPA 1959). For at least this reason, it would not have been obvious to combine Wendt and Rauenbusch in the manner suggested by the Examiner.

Furthermore, even if, for the sake of argument only, one were to modify the door of Rauenbusch to include the hollow cell, jalousie type door configuration of Wendt, it

-13-

ALTUMLLC000133

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

still would not result in applicants claimed invention. This is at least because Applicant's claims recite a thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening; a sheet of insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered.

On the other hand, the insulation in the jalousie type door of Wendt is in the hollow cells, which are separated by rubber spacers 7. Wendt, col. 2, lines 13-25. In such an arrangement, the rubber spacers separate the insulating material at each individual cell structure along the length of the door, so that the insulating material does not extend continuously, as claimed. Thus, the hollow cell structure of Wendt would not result in the overhead door as claimed.

Martin teaches a series of rigid, hinged panels to form a door. See Martin, Col. 2, lines 26-31, which specifically recites hinges. Thus, the teachings of Martin also cannot be used to modify the Rauenbusch door to provide the claimed combination of elements as recited in the present claims.

Further, Applicants note that the prior art of record does not teach the specific materials recited in the claims, such as polypropylene impregnated with glass fibers or the specifically claimed foam materials. The Examiner argues that such materials are a mere design choice. However, the Examiner has the burden to show that every material limitation of the claims is taught in the prior art references combined in support of the rejection in order to support a *prima facie* case of obviousness. In the present

-14-

ALTUMLLC000134

**ATTORNEY DOCKET NO. 0149.0004**
**APPLICATION NO.: 13/585,994**

case, Applicants respectfully assert that this burden is not being met for the specifically claimed materials.  Thus, for this additional reason, Applicants respectfully assert that the rejections are improper and should be withdrawn.

For all of the above reasons, the combination of limitations of the claims is not taught or suggested.  According, no *prima facie* case of obviousness has been made and the rejection should be withdrawn.

## New Claim 24

New claim 24 recites an insulated overhead door that is designed to roll open and closed in tracks to cover a door opening having a top and a bottom, the insulating overhead door comprising: a thermoplastic membrane having a top side corresponding to the top of the door opening and a bottom side corresponding to the bottom of the door opening; a sheet of insulating material attached to the thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; and wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door, wherein the overhead door comprises only one of the panel, the panel being sufficiently flexible to traverse curved tracks, the single panel not having multiple rigid sections.

None of the prior art of record teaches or suggests the combination of limitations recited in new claim 24.  For instance, the combination of Rauenbusch, Wendt and Martin does not teach or suggest a sheet of insulating material attached to the

-15-

ALTUMLLC000135

thermoplastic membrane, the insulating material extending continuously from the top side to the bottom side of the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel that is approximately the size of the door opening to be covered, a length of the panel being the distance between the top side and the bottom side; wherein the overhead door comprises only one of the panel, the panel being sufficiently flexible to traverse curved tracks, the single panel not having multiple rigid sections.

## **Conclusion**

In view of the foregoing remarks, Applicants submit that this claimed invention, as amended, is neither anticipated nor rendered obvious in view of the prior art references cited against this application. Applicants therefore request reconsideration and reexamination of the application, and the timely allowance of the pending claims.

Please grant any extensions of time required to enter this response and charge any additional required fees to our deposit account 50-2961.

Respectfully submitted,

Dated: July 28, 2014

By:/Matthew L. Whipple/ _____
         Matthew L. Whipple
         Reg. No. 47,217

         MH2 TECHNOLOGY LAW GROUP LLP
         1951 Kidwell Drive
         Suite 550
         Tysons Corner, VA 22182
         Phone: (703) 917-0000
         Facsimile: (703) 997-4905

-16-

ALTUMLLC000136

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13585994 |
| **Filing Date:** | 15-Aug-2012 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Attorney Docket Number:** | 0149.0004 |

Filed as Small Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| Independent Claims in Excess of 3 | 2201 | 1 | 210 | 210 |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

ALTUMLLC000137

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **210** |

ALTUMLLC000138

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 19699577 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 28-JUL-2014 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 14:31:41 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 210 |
| RAM confirmation Number | 755 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

ALTUMLLC000139

| 1 | | Amendment_7-28-14.pdf | 195610 | yes | 16 |
| | | | 938e5d32ff6422afb35c1a3ef1ed93bec3f719ee | | |

| Multipart Description/PDF files in .zip description | | |
| --- | --- | --- |
| Document Description | Start | End |
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Claims | 2 | 7 |
| Applicant Arguments/Remarks Made in an Amendment | 8 | 16 |

| Warnings: |
| --- |
| Information: |

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 30409 | no | 2 |
| | | | c98e7deab4b0ae5e9a356dcc3c321b77f691fdfa | | |

| Warnings: |
| --- |
| Information: |

| Total Files Size (in bytes): | 226019 |
| --- | --- |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

ALTUMLLC000140

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>13/585,994 | Filing Date<br>08/15/2012 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:**  ☐ LARGE  ☒ SMALL  ☐ MICRO

## APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

| | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|
| **07/28/2014** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| Total (37 CFR 1.16(i)) | · 22 | Minus | ** 22 | = 0 | x $40 = | 0 |
| Independent (37 CFR 1.16(h)) | · 4 | Minus | *** 3 | = 1 | x $210 = | 210 |
| ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | TOTAL ADD'L FEE | **210** |

| | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|
| | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | TOTAL ADD'L FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
/KAREN VESTAL/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

ALTUMLLC000141

Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Pᴀᴛᴇɴᴛ ᴀɴᴅ Tʀᴀᴅᴇᴍᴀʀᴋ Oғғɪᴄᴇ

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

39878        7590        05/02/2014
MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/02/2014 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

doreen@mh2law.com
kris@mh2law.com
docketing@mh2law.com

PTOL-90A  (Rev. 04/07)

ALTUMLLC000142

<table>
<tr><td rowspan="3"><strong><em>Office Action Summary</em></strong></td><td colspan="2"><strong>Application No.</strong><br>13/585,994</td><td colspan="2"><strong>Applicant(s)</strong><br>WACHTELL ET AL.</td></tr>
<tr><td colspan="2"><strong>Examiner</strong><br>DAVID PUROL</td><td><strong>Art Unit</strong><br>3634</td><td><strong>AIA (First Inventor to File) Status</strong><br>No</td></tr>
</table>

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

   A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒  Responsive to communication(s) filed on <u>March 19, 2014</u>.
     ☐  A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐  This action is **FINAL**.   2b)☒ This action is non-final.

3)☐  An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐  Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☒  Claim(s) <u>1-11 and 13-23</u> is/are pending in the application.
    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐  Claim(s) _____ is/are allowed.

7)☒  Claim(s) <u>1-11 and 13-23</u> is/are rejected.

8)☐  Claim(s) _____ is/are objected to.

9)☐  Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐  The specification is objected to by the Examiner.

11)☐  The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐  Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

   **Certified copies:**

    a)☐ All  b)☐ Some**  c)☐ None of the:

    1.☐  Certified copies of the priority documents have been received.

    2.☐  Certified copies of the priority documents have been received in Application No. _____.

    3.☐  Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐  Notice of References Cited (PTO-892)

2)☐  Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.

3)☐  Interview Summary (PTO-413) Paper No(s)/Mail Date. _____.

4)☐  Other: _____.

1.      A request for continued examination under 37 CFR 1.114, including the fee set

forth in 37 CFR 1.17(e), was filed in this application after final rejection.  Since this

application is eligible for continued examination under 37 CFR 1.114, and the fee set

forth in 37 CFR 1.17(e) has been timely paid, the finality of the previous Office action

has been withdrawn pursuant to 37 CFR 1.114.  Applicant's submission filed on March

19, 2014 has been entered.

2.      The following is a quotation of the first paragraph of 35 U.S.C. 112(a):

> (a)  IN GENERAL.—The specification shall contain a written description of the
> invention, and of the manner and process of making and using it, in such full, clear, concise,
> and exact terms as to enable any person skilled in the art to which it pertains, or with which it
> is most nearly connected, to make and use the same,  and shall set forth the best mode
> contemplated by the inventor or joint inventor of carrying out the invention.

The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the
> manner and process of making and using it, in such full, clear, concise, and exact terms as to
> enable any person skilled in the art to which it pertains, or with which it is most nearly
> connected, to make and use the same, and shall set forth the best mode contemplated by the
> inventor of carrying out his invention.

Claims 1-11,13-23 are rejected under 35 U.S.C. 112(a) or 35 U.S.C. 112 (pre-

AIA), first paragraph, as failing to comply with the written description requirement.  The

claim(s) contains subject matter which was not described in the specification in such a

way as to reasonably convey to one skilled in the relevant art that the inventor or a joint

inventor, or for pre-AIA the inventor(s), at the time the application was filed, had

possession of the claimed invention.

The claims have been amended to recite the new limitation of "the single panel

not having multiple rigid, articulating sections" and references ¶ [004], ¶ [0025], and Fig.

ALTUMLLC000144

2 of the instant application as providing support for the negative limitation/exclusionary

proviso. However, ¶ [004] merely provides a discussion of the prior art doors which have

a series of hinged horizontal metal panels filled with insulating foam which is not

indicative of a negative limitation/exclusionary proviso of which the claimed door is not

to encompass.  ¶ [0025] states that the claimed door is without having to hinge together

multiple sections to allow the door to traverse a curved track. There is no reference to

the claimed single panel as not having the panels as being rigid, but rather, the claimed

single panel is without hinges and it is to this extent of which is the negative

limitation/exclusionary proviso.  A hinge is an art specific item whereas the claim

limitation "articulating" as currently claimed is broader than a hinge and thus there is no

support for a negative limitation/exclusionary proviso. Note that the claimed

compression gaps configured to allow the foam to more easily bend during opening and

closing of the door is per se providing the negative limitation/exclusionary proviso of

"articulating" which would appear to be setting forth a contradictory limitation. Figure 2

of the instant application depicts the movement of the door as opposed to that which it

is not to comprise.  See MPEP 2173.05(i).


3.      The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.

ALTUMLLC000145

Claims 1-11,13-23 are rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over Rauenbusch (U.S. Patent No. 5,915,445) in view of Wendt (U.S.

Patent No. 2,827,118) and Martin (U.S. Patent No. 5,738,161).

Rauenbusch discloses an insulated single panel overhead door 10 comprising a

core member 13 between a pair of outer face layers 11,12 and cover sheets 15,16

having depressions 14 to facilitate the bending of the door 10 as it is guided in tracks.

Rauenbusch discloses that the insulated overhead door is a single-piece plate-shaped

body structure (col. 2, lines 1-2) that can be coiled to a roll or deflected along a curved

track (col. 2, lines 10-15; col. 4, lines 13-16, 32-37). It is axiomatic that in order for the

single-piece plate-shaped body structure to be capable of being either coiled to a roll or

deflected along a curved track it must be sufficiently flexible to do so.

The claims have been amended to include the negative limitation/exclusionary

proviso of "the single panel not having multiple rigid, articulating sections". Wendt

discloses an insulated overhead door 2 which is a single panel made of inner and outer

walls 3,4 filled with a suitable insulating material each being attached to one another

and of which are sufficiently flexible to traverse curved tracks (see col.2; fig. 5). While

the door of Wendt comprises rails 6 or 6' for stiffening, the rails are not "multiple rigid

articulating sections" as defined by the applicants' specification. There are no hinges to

provide any articulation to the rails relative to one another. Wendt sets forth in column 2

at lines 4-15 that it is the rails which are secured to the elastic walls by rivets. The rails

are not connected to one another per se but are secured to and move along with the

door. The movement of the door is not dependent upon the presence of the rails. To

have eliminated the use of the rails together with its function of stiffening, if this feature

ALTUMLLC000146

was not desired, would have been obvious to one of ordinary skill in the art for the door

would continue to function as intended.  In re Larson, 340 F.2d 965, 144 USPQ 347

(CCPA 1965). Note that the teaching relied upon from the Wendt reference is that of a

single panel door that is flexible per se, this teaching is evident regardless of the

presence of the rails.  To utilize the teachings of Wendt with that of Rauenbusch such

that the single panel is flexible *per se* would have been obvious to one of ordinary skill

in the art for the references are each from the applicants field of endeavor and the

applicants are presumed to have full knowledge of the prior art in their respective field of

endeavor.

Rauenbusch does not specifically set forth the use of wheels for guiding the door

in the tracks. Martin discloses an insulated overhead door 10 which employs the use of

wheels 16 for guiding in tracks 12,14. To one having ordinary skill in the art it would

have been obvious to have provided the overhead door of Rauenbusch with wheels, as

taught by Martin, for its purpose of maintaining the overhead door in a predetermined

path as it is guided in the tracks.

The type of material used in constructing the overhead door is considered a

matter of design preference for such a selection is to have been made and to have done

so yields nothing more than a predictable result. In re Leshin,  277  F.2d 197, 125

USPQ 416 (CCPA 1960).

Regarding the recited range of radii of curvature of the tracks as set forth in the

claims, where the only difference between the prior art and the claims is a recitation of

relative dimensions of the claimed device and a device having the claimed relative

dimensions does not perform differently than the prior art device, as is the case here,

ALTUMLLC000147

the claimed device is not patentably distinct from the prior art device. See In Gardner v.

TEC Systems, Inc., 725 F.2d 1338, 220 USPQ 777 (Fed. Cir. 1984), cert. denied, 469

U.S. 830, 225 USPQ 232 (1984).


4.      Any inquiry concerning this communication or earlier communications from the

Examiner should be directed to David M. Purol whose telephone number is (571) 272-

6833.

        If attempts to reach the examiner by telephone are unsuccessful, the Examiner's

supervisor, Katherine Mitchell, can be reached at (571) 272-7069.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

        Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free).


/David M Purol/
**David M Purol
Primary Examiner
Art Unit 3634**

/D. M. P./
(571) 272-6833
April 29, 2014

ALTUMLLC000148

**EAST Search History**

**EAST Search History (Prior Art)**

| Ref # | Hits | Search Query | DBs | Default Operator | Plurals | Time Stamp |
|---|---|---|---|---|---|---|
| S1 | 1031 | ((160/201) or (160/230)).CCLS. | US-PGPUB; USPAT; FPRS; EPO; JPO | OR | OFF | 2013/08/11 14:25 |
| S2 | 8 | ("2610681" \| "3870391" \| "5564164" \| "5738161" \| "5915445").PN. OR ("6443209").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2013/08/11 15:22 |
| S3 | 11 | ("3017218" \| "3084403" \| "3662410" \| "4194313" \| "5131448" \| "5267599" \| "5738161").PN. OR ("5915445").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2013/08/11 15:22 |
| S4 | 22 | ("1916651" \| "2789636" \| "2909718" \| "3017218" \| "3129752" \| "3336968" \| "3870391" \| "4811777" \| "4860813" \| "4893666" \| "5056847").PN. OR ("5738161").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2013/08/11 15:23 |
| S5 | 7 | ("3017218").URPN. | USPAT | OR | ON | 2013/08/11 15:25 |
| S6 | 35 | ("3017218" \| "5016700" \| "4506720" \| "6688369" \| "7992678" \| "4255907" \| "3231006" \| "20120018102" \| "5813172" \| "3662410" \| "6725898" \| "20080110580" \| "20100132894" \| "20110289857" \| "5915445" \| "3231006" \| "20090139665" \| "3036670" \| "3055379" \| "6119758" \| "20090139655" \| "7059378" \| "20070277943" \| "4040210" \| "20010005964" \| "5855235" \| "6001199" \| "20080110580" \| "5586594" \| "5738161" \| "20120085504" \| "3856072" \| "4039019" \| "5664613" \| "6112797" \| "6199337" \| "7748169").PN. | US-PGPUB; USPAT | OR | ON | 2013/08/11 15:28 |
| S7 | 23 | (US-20090255636-$ or US-20030173040-$ or US-20100132894-$ or US-20080110580-$).did. or (US-7708049-$ or US-7111661-$ or US-6745814-$ or US-6659158-$ or US-6554047-$ or US-6527035-$ or US-6443209-$ or US-5915445-$ or US-5738161-$ or US-5509457-$ or US-5042556-$ or US-5016700-$ or US-4445958-$ or US-3870391-$ or US-3662410-$ or US-3129752-$ or US-3017218-$ or US-2042002-$ or US-3084403-$).did. | US-PGPUB; USPAT | OR | ON | 2013/08/11 16:24 |
| S8 | 245630 | refrigerator | US-PGPUB; USPAT; USOCR; FPRS; | OR | ON | 2013/12/14 20:07 |

file:///C|/Users/dpurol/Documents/e-Red%20Folder/13585994/EASTSearchHistory.13585994_AccessibleVersion.htm[4/29/2014 6:41:01 PM]

Appx1071

ALTUMLLC000149

| | | | EPO; JPO; DERWENT; IBM_TDB | | | |
|---|---|---|---|---|---|---|
| S9 | 88949 | "296"/$.ccls. | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2013/12/14 20:08 |
| S10 | 597 | S8 and S9 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2013/12/14 20:08 |
| S11 | 11 | ("2827118").URPN. | USPAT | OR | ON | 2013/12/14 20:34 |
| S12 | 12088 | refrigerator adj door | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2013/12/14 20:37 |
| S13 | 14276 | single adj panel | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2013/12/14 20:37 |
| S14 | 60 | S12 and S13 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2013/12/14 20:37 |
| S15 | 623 | ((160/231.1) or (160/231.2) or (160/232)).CCLS. | US-PGPUB; USPAT; FPRS; EPO; JPO | OR | OFF | 2013/12/14 20:39 |
| S17 | 3068512 | insulat$3 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2013/12/14 20:57 |
| S18 | 994 | ((160/23.1) or (160/270) or (160/271)).CCLS. | US-PGPUB; USPAT; FPRS; EPO; JPO | OR | OFF | 2013/12/14 20:59 |
| S20 | 73 | S17 and S18 | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; | OR | ON | 2013/12/14 20:59 |

ALTUMLLC000150

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | DERWENT; IBM_TDB | | | |
| S21 | 11 | ("3017218" \| "3084403" \| "3662410" \| "4194313" \| "5131448" \| "5267599" \| "5738161").PN. OR ("5915445").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2013/12/15 14:23 |
| S22 | 7 | ("3017218").URPN. | USPAT | OR | ON | 2013/12/15 14:24 |
| S27 | 13 | "2827118" | USPAT | OR | ON | 2014/04/28 12:54 |
| S28 | 1148 | F25D23/021.cpc. | US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2014/04/28 13:24 |
| S29 | 4 | ("2891834").URPN. | USPAT | OR | ON | 2014/04/28 15:49 |
| S30 | 231 | E05D15/20.cpc. | US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2014/04/28 15:59 |
| S31 | 811 | E06B3/80.cpc. | US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2014/04/28 16:15 |
| S32 | 469 | E06B2003/7044.cpc. | US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2014/04/28 16:21 |
| S33 | 557 | E06B2003/7049.cpc. or E06B2003/7051.cpc. or E06B2003/7053.cpc. | US-PGPUB; USPAT; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2014/04/28 16:26 |
| S34 | 83 | (160/dig.8).CCLS. | US-PGPUB; USPAT; FPRS; EPO; JPO | OR | OFF | 2014/04/28 16:40 |
| S35 | 951 | (160/201).CCLS. | US-PGPUB; USPAT; FPRS; EPO; JPO | OR | OFF | 2014/04/28 16:43 |
| S36 | 16 | ("20060084468" \| "3349516" \| "4013113" \| "4966219" \| "4986331" \| "5042556" \| "5135040" \| "5172742" \| "6041843" \| "6257305" \| "6698490" \| "6752476" \| "6942000" \| "6955206" \| "7028741").PN. OR ("7708049").URPN. | US-PGPUB; USPAT; USOCR | OR | ON | 2014/04/28 16:48 |
| S37 | 20 | ("3021896" \| "3103967" \| "3126944" \| "3938577" \| "4231412" \| "4378043" \| "4653566" \| "4673019" \| "4770087" \| "4846241" \| "5050660" \| "5123474" \| | US-PGPUB; USPAT; USOCR | OR | ON | 2014/04/28 16:55 |

file:///C|/Users/dpurol/Documents/e-Red%20Folder/13585994/EASTSearchHistory.13585994_AccessibleVersion.htm[4/29/2014 6:41:01 PM]

Appx1073

ALTUMLLC000151

| | | | | | | |
|---|---|---|---|---|---|---|
| | | "5323835" \| "5427169" \| "5611382" \| "5848630").PN. OR ("6386262").URPN. | | | | |
| S38 | 145 | (single adj panel) and (garage adj door) and flexible | US-PGPUB; USPAT; USOCR; FPRS; EPO; JPO; DERWENT; IBM_TDB | OR | ON | 2014/04/28 17:14 |
| S39 | 485 | (296/146.8).CCLS. | US-PGPUB; USPAT; FPRS; EPO; JPO | OR | OFF | 2014/04/28 17:20 |
| S40 | 35 | ("3017218" \| "5016700" \| "4506720" \| "6688369" \| "7992678" \| "4255907" \| "3231006" \| "20120018102" \| "5813172" \| "3662410" \| "6725898" \| "20080110580" \| "20100132894" \| "20110289857" \| "5915445" \| "3231006" \| "20090139665" \| "3036670" \| "3055379" \| "6119758" \| "20090139655" \| "7059378" \| "20070277943" \| "4040210" \| "20010005964" \| "5855235" \| "6001199" \| "20080110580" \| "5586594" \| "5738161" \| "20120085504" \| "3856072" \| "4039019" \| "5664613" \| "6112797" \| "6199337" \| "7748169").PN. | US-PGPUB; USPAT | OR | ON | 2014/04/28 17:32 |

**EAST Search History (Interference)**

< This search history is empty>

**4/29/2014 6:39:44 PM**
**C:\ Users\ dpurol\ Documents\ EAST\ Workspaces\ 13585994.wsp**

file:///C\/Users/dpurol/Documents/e-Red%20Folder/13585994/EASTSearchHistory.13585994_AccessibleVersion.htm[4/29/2014 6:41:01 PM]

Appx1074

ALTUMLLC000152

**Search Notes**

| | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 13/585,994 | WACHTELL ET AL. |
| | Examiner | Art Unit |
| | DAVID PUROL | 3634 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 160 | 201 230 | 4/29/2014 | DMP |
| | 231.1 | | |
| | 231.2 | | |
| | 232 23.1 | | |
| | 270 271 | | |
| | Dig. 8 | | |
| 296 | 146.8 | | |
| F25D | 23/021 | | |
| E05D | 15/20 | | |
| E06B | 3/80 | | |
| | 2003/7044 | | |
| | 2003/7049 | | |
| | 2003/7051 | | |
| | 2003/7053 | | |

## SEARCH NOTES (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| East Search History | 4/29/2014 | DMP |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

U.S. Patent and Trademark Office

Part of Paper No. 04292014

Appx1075

ALTUMLLC000153

| | Index of Claims | | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|---|---|
| | | | 13/585,994 | WACHTELL ET AL. |
| | | | Examiner | Art Unit |
| | | | DAVID PUROL | 3634 |

| √ | Rejected | — | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Claim | | Date | | | | | | | Claim | | Date | | | | | | | Claim | | Date | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Final | Original | 4/29/14 | | | | | | | Final | Original | | | | | | | | | Final | Original | | | | | | | |
| | 1 | √ | | | | | | | | 51 | | | | | | | | | | 101 | | | | | | | |
| | 2 | √ | | | | | | | | 52 | | | | | | | | | | 102 | | | | | | | |
| | 3 | √ | | | | | | | | 53 | | | | | | | | | | 103 | | | | | | | |
| | 4 | √ | | | | | | | | 54 | | | | | | | | | | 104 | | | | | | | |
| | 5 | √ | | | | | | | | 55 | | | | | | | | | | 105 | | | | | | | |
| | 6 | √ | | | | | | | | 56 | | | | | | | | | | 106 | | | | | | | |
| | 7 | √ | | | | | | | | 57 | | | | | | | | | | 107 | | | | | | | |
| | 8 | √ | | | | | | | | 58 | | | | | | | | | | 108 | | | | | | | |
| | 9 | √ | | | | | | | | 59 | | | | | | | | | | 109 | | | | | | | |
| | 10 | √ | | | | | | | | 60 | | | | | | | | | | 110 | | | | | | | |
| | 11 | √ | | | | | | | | 61 | | | | | | | | | | 111 | | | | | | | |
| | 12 | - | | | | | | | | 62 | | | | | | | | | | 112 | | | | | | | |
| | 13 | √ | | | | | | | | 63 | | | | | | | | | | 113 | | | | | | | |
| | 14 | √ | | | | | | | | 64 | | | | | | | | | | 114 | | | | | | | |
| | 15 | √ | | | | | | | | 65 | | | | | | | | | | 115 | | | | | | | |
| | 16 | √ | | | | | | | | 66 | | | | | | | | | | 116 | | | | | | | |
| | 17 | √ | | | | | | | | 67 | | | | | | | | | | 117 | | | | | | | |
| | 18 | √ | | | | | | | | 68 | | | | | | | | | | 118 | | | | | | | |
| | 19 | √ | | | | | | | | 69 | | | | | | | | | | 119 | | | | | | | |
| | 20 | √ | | | | | | | | 70 | | | | | | | | | | 120 | | | | | | | |
| | 21 | √ | | | | | | | | 71 | | | | | | | | | | 121 | | | | | | | |
| | 22 | √ | | | | | | | | 72 | | | | | | | | | | 122 | | | | | | | |
| | 23 | √ | | | | | | | | 73 | | | | | | | | | | 123 | | | | | | | |
| | 24 | | | | | | | | | 74 | | | | | | | | | | 124 | | | | | | | |
| | 25 | | | | | | | | | 75 | | | | | | | | | | 125 | | | | | | | |
| | 26 | | | | | | | | | 76 | | | | | | | | | | 126 | | | | | | | |
| | 27 | | | | | | | | | 77 | | | | | | | | | | 127 | | | | | | | |
| | 28 | | | | | | | | | 78 | | | | | | | | | | 128 | | | | | | | |
| | 29 | | | | | | | | | 79 | | | | | | | | | | 129 | | | | | | | |
| | 30 | | | | | | | | | 80 | | | | | | | | | | 130 | | | | | | | |
| | 31 | | | | | | | | | 81 | | | | | | | | | | 131 | | | | | | | |
| | 32 | | | | | | | | | 82 | | | | | | | | | | 132 | | | | | | | |
| | 33 | | | | | | | | | 83 | | | | | | | | | | 133 | | | | | | | |
| | 34 | | | | | | | | | 84 | | | | | | | | | | 134 | | | | | | | |
| | 35 | | | | | | | | | 85 | | | | | | | | | | 135 | | | | | | | |
| | 36 | | | | | | | | | 86 | | | | | | | | | | 136 | | | | | | | |
| | 37 | | | | | | | | | 87 | | | | | | | | | | 137 | | | | | | | |
| | 38 | | | | | | | | | 88 | | | | | | | | | | 138 | | | | | | | |
| | 39 | | | | | | | | | 89 | | | | | | | | | | 139 | | | | | | | |
| | 40 | | | | | | | | | 90 | | | | | | | | | | 140 | | | | | | | |
| | 41 | | | | | | | | | 91 | | | | | | | | | | 141 | | | | | | | |
| | 42 | | | | | | | | | 92 | | | | | | | | | | 142 | | | | | | | |
| | 43 | | | | | | | | | 93 | | | | | | | | | | 143 | | | | | | | |
| | 44 | | | | | | | | | 94 | | | | | | | | | | 144 | | | | | | | |
| | 45 | | | | | | | | | 95 | | | | | | | | | | 145 | | | | | | | |
| | 46 | | | | | | | | | 96 | | | | | | | | | | 146 | | | | | | | |
| | 47 | | | | | | | | | 97 | | | | | | | | | | 147 | | | | | | | |
| | 48 | | | | | | | | | 98 | | | | | | | | | | 148 | | | | | | | |
| | 49 | | | | | | | | | 99 | | | | | | | | | | 149 | | | | | | | |
| | 50 | | | | | | | | | 100 | | | | | | | | | | 150 | | | | | | | |

U.S. Patent and Trademark Office

Part of Paper No.  04292014

ALTUMLLC000154

Doc code: RCEX    Case: 24-1138    Document: 54    Page: 389    Filed: 03/21/2024    PTO/SB/30EFS (07-09)
Doc description: Request for Continued Examination (RCE)    Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

## REQUEST FOR CONTINUED EXAMINATION(RCE)TRANSMITTAL
### (Submitted Only via EFS-Web)

| Application Number | 13585994 | Filing Date | 2012-08-15 | Docket Number (if applicable) | 0149.0004 | Art Unit | 3634 |
| First Named Inventor | Peter J. Wachtell | | | Examiner Name | David M. Purol | | |

**This is a Request for Continued Examination (RCE) under 37 CFR 1.114 of the above-identified application.**
Request for Continued Examination (RCE) practice under 37 CFR 1.114 does not apply to any utility or plant application filed prior to June 8, 1995, or to any design application. The Instruction Sheet for this form is located at WWW.USPTO.GOV

### SUBMISSION REQUIRED UNDER 37 CFR 1.114

Note: If the RCE is proper, any previously filed unentered amendments and amendments enclosed with the RCE will be entered in the order in which they were filed unless applicant instructs otherwise. If applicant does not wish to have any previously filed unentered amendment(s) entered, applicant must request non-entry of such amendment(s).

- [ ] Previously submitted. If a final Office action is outstanding, any amendments filed after the final Office action may be considered as a submission even if this box is not checked.

  - [ ] Consider the arguments in the Appeal Brief or Reply Brief previously filed on _____

  - [ ] Other _____

- [X] Enclosed

  - [X] Amendment/Reply

  - [ ] Information Disclosure Statement (IDS)

  - [ ] Affidavit(s)/ Declaration(s)

  - [ ] Other

### MISCELLANEOUS

- [ ] Suspension of action on the above-identified application is requested under 37 CFR 1.103(c) for a period of months (Period of suspension shall not exceed 3 months; Fee under 37 CFR 1.17(i) required) _____

- [ ] Other

### FEES

**The RCE fee under 37 CFR 1.17(e) is required by 37 CFR 1.114 when the RCE is filed.**
- [X] The Director is hereby authorized to charge any underpayment of fees, or credit any overpayments, to Deposit Account No _502961_____

### SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT REQUIRED

- [X] Patent Practitioner Signature
- [ ] Applicant Signature

ALTUMLLC000155

Doc code: RCEX
Doc description: Request for Continued Examination (RCE)

Case: 24-1138     Document: 54     Page: 390     Filed: 03/21/2024

PTO/SB/30EFS (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Signature of Registered U.S. Patent Practitioner | | | |
|---|---|---|---|
| Signature | /Matthew L. Whipple/ | Date (YYYY-MM-DD) | 2014-03-19 |
| Name | Matthew L. Whipple | Registration Number | 47217 |

This collection of information is required by 37 CFR 1.114.  The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

ALTUMLLC000156

# Privacy Act Statement

The Privacy Act of 1974 (P.L. 93-579) requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1.    The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether the Freedom of Information Act requires disclosure of these records.

2.    A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.

3.    A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.

4.    A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).

5.    A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.

6.    A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).

7.    A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (i.e., GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.

8.    A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspections or an issued patent.

9.    A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

ALTUMLLC000157

PATENT

**EXAMINING GROUP 3634**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| In re Application of | : | Peter J. Wachtell | Confirmation No.: | 9027 |
| Application Number | : | 13/585,994 | | |
| Filed | : | August 15, 2012 | | |
| Title | : | INSULATED OVERHEAD DOOR | | |
| TC/Art Unit | : | 3634 | | |
| Examiner: | : | David M. Purol | | |

| | | |
|---|---|---|
| Docket No. | : | 0149.0004 |
| Customer No. | : | **39878** |

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Commissioner:

## <u>AMENDMENT</u>

In reply to the Final Office Action mailed December 20, 2013, a response to

which is due on March 20, 2014, Applicants submit this Amendment and a Request for

Continued Examination.  Please amend the application as follows:

**Amendments to the Claims** are reflected in the listing of claims in this paper.

**Remarks/Arguments** follow the amendment sections of this paper.

ALTUMLLC000158

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

## AMENDMENTS TO THE CLAIMS:

This listing of claims will replace all prior versions and listings of claims in the application:

1.    (Currently Amended) An insulated overhead door that is designed to roll open and closed in tracks comprising:

a thermoplastic membrane;

a sheet of insulating material attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only a single panel, the single panel being sufficiently flexible to traverse curved tracks, the single panel not having multiple rigid, articulating sections.

2.    (Original) The insulated overhead door of claim 1, wherein the thermoplastic membrane is a single sheet that is approximately the size of the door opening to be covered.

3.    (Original) The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises glass fibers.

4.    (Previously Presented) The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises polypropylene impregnated with glass fibers.

5.    (Original) The insulated overhead door of claim 1, wherein the insulating material comprises foam.

-2-

ALTUMLLC000159

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

6.    (Original) The insulated overhead door of claim 5, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend during opening and closing of the door.

7.    (Original) The insulated overhead door of claim 1, wherein the insulating material is closed cell foam.

8.    (Original) The insulated overhead door of claim 7, wherein the closed cell foam comprises ethylene vinyl acetate.

9.    (Original) The insulated overhead door of claim 7, wherein the closed cell foams is chosen from polyethylene foams, polypropylene foams or neoprene based foams.

10.    (Original) The insulated overhead door of claim 1, wherein the insulating material is an open cell foam.

11.    (Original) The insulated overhead door of claim 1, further comprising foam blocks configured to  increased an R-value of the door.

12.    (Cancelled).

13.    (Original) The insulated overhead door of claim 1, further comprising an additional membrane that is not the thermoplastic membrane.

14.    (Original) The insulated overhead door of claim 1, the door having an R value ranging from about 14 to about 50.

15.    (Original) A method comprising:
        providing the insulated overhead door of claim 1 on tracks, at least a portion of the tracks being curved; and

-3-

ALTUMLLC000160

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

moving the insulated overhead door so that a portion of the thermoplastic membrane and a portion of the insulating material flex to allow the door to traverse the curved portion of the tracks.

16.    (Currently Amended) An overhead door assembly comprising:

a set of curved tracks; and

an insulated overhead door configured to roll open and closed in the tracks, the overhead door comprising:

a thermoplastic membrane;

a sheet of insulating material attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only a single panel, the single panel being sufficiently flexible to traverse the curved tracks, the single panel not having multiple rigid, articulating sections.

17.    (Previously Presented) The insulated overhead door of claim 21, wherein the single panel is sufficiently flexible to traverse curved tracks comprising a track portion of a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about $80^{o}$ to about $125^{o}$.

18.    (Original) A truck comprising the insulated overhead door assembly of claim 16.

19.    (Original) A cold storage trailer comprising the insulated overhead door assembly of claim 16.

20.    (Original) A building comprising the insulated overhead door assembly of claim 16.

-4-

ALTUMLLC000161

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

21.    (Previously Presented) The insulated overhead door of claim 1, wherein the single panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches.

22.    (Previously Presented) The overhead door assembly of claim 15, wherein the single panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches.

23.    (New) An insulated overhead door that is designed to roll open and closed in tracks comprising:

a flexible thermoplastic membrane comprising polypropylene impregnated with glass fibers;

a sheet of flexible foam insulating material attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only a single panel, the single panel not having multiple rigid, articulating sections,

wherein the single panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches, where the track portion has a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about 80$^{\circ}$ to about 125$^{\circ}$.

-5-

ALTUMLLC000162

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

## REMARKS

Claims 1-23 are currently pending in the application. Claims 1 and 16 have been amended. No claims have been cancelled.  Claim 23 has been added.

Written description support for the amendments can be found throughout the disclosure as originally filed.  For example, support for the language "the single panel not having multiple rigid, articulating sections," can be found at paragraph [004], which recites doors in the prior art having a series of hinged horizontal metal panels, or sections.  The sections are hinged together to form a single flexible door that can bend to traverse a curved track. Further, paragraph [0025] states that, "[d]ue to the flexibility of the thermoplastic membrane 4 and foam composite, the doors of the present disclosure can be made as a single integral unit, or panel, that is approximately the size of the door opening, without having to hinge together multiple sections to allow the door to traverse a curved track." Also see FIG. 2, which shows a door without multiple rigid, articulating section.  Given this disclosure, one of ordinary skill in the art would readily understand that the doors of the present application comprise a single panel not having multiple rigid, articulating sections.

## Interview Summary

Applicants thank Examiner Purol for the courtesies extended during the telephonic interview of February 18, 2014. During the interview, Applicants discussed the merits of the rejection, including details of the Rauenbusch and Wendt references, similarly as discussed in the response to the rejection below. While no agreement was

ALTUMLLC000163

reached, the Examiner indicated that amending the claims to include "the single panel not having multiple rigid, articulating sections," could potentially overcome the art.

## Rejections Under 35 USC § 103

Claims 1-22 are rejected under 35 USC § 103(a) as being unpatentable over Rauenbusch (US Patent No. 5,915,445, hereinafter "Rauenbusch") in view of Wendt (US Patent No. 2,827,118, hereinafter "Wendt") and Martin (US Patent No. 5,738,161, hereinafter "Martin"). Applicants respectfully traverse.

Amended claim 1 recites an insulated overhead door that is designed to roll open and closed in tracks. The insulated overhead door comprises, among other things, only a single panel, the single panel being sufficiently flexible to traverse curved tracks, the single panel not having multiple rigid, articulating sections. Claim 16 recites an overhead door assembly comprising, among other things, wherein the overhead door comprises only a single panel, the single panel being sufficiently flexible to traverse the curved tracks, the single panel not having multiple rigid, articulating sections.

The claimed overhead door of the present disclosure is clearly different from the doors taught by Rauenbusch, which include alternating rigid panels and flexible strips, the flexible strips allowing the alticulating rigid panels to traverse a curved track. Rauenbusch, col. 4, lines 9-37, 56-65, and claim 1. The doors of Rauenbusch are thus excluded by the recited claim language of "a single panel not having multiple rigid, articulating sections."

-7-

ALTUMLLC000164

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

With respect to Wendt, the Examiner has argued that Wendt provides the missing teaching of a single panel door. According to the Examiner, FIG. 5 of Wendt shows a single panel door.

However, a close reading reveals that Wendt also fails to teach a single panel door not having multiple rigid, articulating sections, as claimed. Rather, Wendt teaches a Jalousie-type rolling door provided with a plurality of flexibly connected stiffening members, taught as rails 6 and 6'. These rails are taught as being overlapping metal rails that are rigidly connected to the elastic walls 3 and 4. Wendt, col. 2, lines 3-14 and claims 1 and 3. The flexible connection of the rails 6 and 6' would allow the multiple stiff, or rigid, rails to articulate with respect to each other as the Jalousie-type rolling door traverses the curved track shown in FIG. 5. Thus, the Wendt rolling door does contain multiple rigid, articulating sections.

Further, it is Applicants' belief that FIG. 5 of Wendt, which the Examiner has relied upon to show a single panel without multiple rigid sections, only shows a partial view of the structure of the door. In actuality, a large number of stiffening rails 6 and 6' run up and down the full length of the door 2 of FIG. 5. This is evidenced from the teachings that the doors of the Wendt invention are "Jalousie –type" rolling doors, as well as the teaching at col. 1, lines 53-54 that FIG. 5 is a "side view of a vertical *partial* section of the arrangement…". *[Emphasis added]* In addition, FIGS. 1 to 3 all appear to show a jalousie type rolling door structure with a large number of rails 6 and 6' interconnected to form the length of the doors, as evidenced, for example, by the multiple horizontal lines running the length of door 2 in FIG. 1. Thus, rather than

-8-

ALTUMLLC000165

ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

teaching a single panel door not having multiple rigid, articulating sections, as claimed, Wendt teaches rolling doors that include multiple articulating, rigid rail sections.

For the above reasons, the applied Rauenbusch, Wendt and Martin combination does not teach the claimed insulated overhead door comprising, among other things, only a single panel, the single panel being sufficiently flexible to traverse curved tracks, the single panel not having multiple rigid, articulating sections.

Because every limitation of the claims is not taught or suggested, no *prima facie* case of obviousness has been made. For at least this reason, the rejection should be withdrawn.

### Conclusion

In view of the foregoing remarks, Applicants submit that this claimed invention, as amended, is neither anticipated nor rendered obvious in view of the prior art references cited against this application. Applicants therefore request reconsideration and reexamination of the application, and the timely allowance of the pending claims.

Please grant any extensions of time required to enter this response and charge any additional required fees to our deposit account 50-2961.

Respectfully submitted,

Dated: March 19, 2014

By:/Matthew L. Whipple/
Matthew L. Whipple
Reg. No. 47,217

MH2 TECHNOLOGY LAW GROUP LLP
1951 Kidwell Drive
Suite 550
Tysons Corner, VA 22182
Phone: (703) 917-0000
Facsimile: (703) 997-4905

-9-

ALTUMLLC000166

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13585994 |
| **Filing Date:** | 15-Aug-2012 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Attorney Docket Number:** | 0149.0004 |

Filed as Small Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

ALTUMLLC000167

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| Request for Continued Examination | 2801 | 1 | 600 | 600 |
| **Total in USD ($)** | | | | **600** |

ALTUMLLC000168

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 18527247 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 19-MAR-2014 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 17:11:46 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $600 |
| RAM confirmation Number | 4024 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

ALTUMLLC000169

| 1 | Request for Continued Examination (RCE) | RCE_3-19-14.pdf | 697782<br>91137b4aaef934b82e645c67a958acd9672c8cfa | no | 3 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 2 | | AmendmentAF_3-19-14.pdf | 176286<br>8102ab86047b5fad0577abd3416448f536e54dc | yes | 9 |
|---|---|---|---|---|---|

| | Multipart Description/PDF files in .zip description | | | | |
|---|---|---|---|---|---|
| | **Document Description** | | **Start** | | **End** |
| | Response After Final Action | | 1 | | 1 |
| | Claims | | 2 | | 5 |
| | Applicant Arguments/Remarks Made in an Amendment | | 6 | | 9 |

**Warnings:**

**Information:**

| 3 | Fee Worksheet (SB06) | fee-info.pdf | 30661<br>0c4a8e4f39ee10c39ac562edcfd6aaa49c91193a | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | **Total Files Size (in bytes):** | 904729 |
|---|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Appx1092

ALTUMLLC000170

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD Substitute for Form PTO-875 | Application or Docket Number 13/585,994 | Filing Date 08/15/2012 | ☐ To be Mailed |
|---|---|---|---|

ENTITY: ☐ LARGE  ☒ SMALL  ☐ MICRO

## APPLICATION AS FILED – PART I

| | (Column 1) | (Column 2) | | |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS (37 CFR 1.16(i)) | minus 20 = | * | X $ = | |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | minus 3 = | * | X $ = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

## APPLICATION AS AMENDED – PART II

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| AMENDMENT | 03/19/2014 | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * 22 | Minus | ** 22 | = 0 | x $40 = | 0 |
| | Independent (37 CFR 1.16(h)) | * 3 | Minus | *** 3 | = 0 | x $210 = | 0 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | TOTAL ADD'L FEE | **0** |

| | | (Column 1) | (Column 2) | (Column 3) | | |
|---|---|---|---|---|---|---|
| AMENDMENT | | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
| | Total (37 CFR 1.16(i)) | * | Minus | ** | = | x $ = | |
| | Independent (37 CFR 1.16(h)) | * | Minus | *** | = | x $ = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
/TARA WASHINGTON/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

ALTUMLLC000171



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

39878     7590     02/24/2014
MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/24/2014 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

doreen@mh2law.com
kris@mh2law.com
docketing@mh2law.com

PTOL-90A  (Rev. 04/07)

ALTUMLLC000172

| ***Applicant-Initiated Interview Summary*** | Application No. | Applicant(s) |
|---|---|---|
| | 13/585,994 | WACHTELL ET AL. |
| | Examiner | Art Unit | |
| | DAVID PUROL | 3634 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) _David Purol_.                                    (3) _Peter Wachtell_.

(2) _Matt Whipple_.                                  (4) _____.

Date of Interview: _February 18, 2014_.

Type:    ☒ Telephonic    ☐ Video Conference
         ☐ Personal [copy given to: ☐ applicant    ☐ applicant's representative]

Exhibit shown or demonstration conducted:    ☐ Yes    ☒ No.
   If Yes, brief description: _____.

Issues Discussed    ☐101 ☐112 ☐102 ☒103 ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: _1_.

Identification of prior art discussed: _Rauenbusch, Wendt_.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

_It is the applicants' position that the door of Rauenbusch is a plurality of rigid panels and that the reference to Wendt is a door of a plurality of rigid rails and thus are not a single panel door as claimed_ .

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /DAVID PUROL/ | |
|---|---|
| Primary Examiner, Art Unit 3634 | |

U.S. Patent and Trademark Office
PTOL-413 (Rev. 8/11/2010)            **Interview Summary**            Paper No. 02182014

ALTUMLLC000173

**Summary of Record of Interview Requirements**

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

**Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews**
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

37 CFR §1.2  Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

_____

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.
It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
–   An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
      (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

**Examiner to Check for Accuracy**

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

ALTUMLLC000174



U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

39878         7590         12/20/2013
MH2 TECHNOLOGY LAW GROUP, LLP
TIMOTHY M. HSIEH
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/20/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

doreen@mh2law.com
kris@mh2law.com
docketing@mh2law.com

PTOL-90A (Rev. 04/07)

ALTUMLLC000175

| | Application No. | Applicant(s) |
|---|---|---|
| **Office Action Summary** | 13/585,994 | WACHTELL ET AL. |
| | **Examiner**<br>DAVID PUROL | **Art Unit**<br>3634 | **AIA (First Inventor to File)**<br>**Status**<br>No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on *October 9, 2013*.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☒ This action is **FINAL.**    2b)☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5)☒ Claim(s) *1-22* is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) *1-22* is/are rejected.

8)☐ Claim(s) _____ is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a)☐ All  b)☐ Some**  c)☐ None of the:
      1. ☐ Certified copies of the priority documents have been received.
      2. ☐ Certified copies of the priority documents have been received in Application No. _____.
      3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
   Paper No(s)/Mail Date _____.

3)☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____.

4)☐ Other: _____.

1.      The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.

Claims 1-22 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable

over Rauenbusch (U.S. Patent No. 5,915,445) in view of Wendt (U.S. Patent No.

2,827,118) and Martin (U.S. Patent No. 5,738,161).

Rauenbusch discloses an insulated single panel overhead door 10 comprising a

core member 13 between a pair of outer face layers 11,12 and cover sheets 15,16

having depressions 14 to facilitate the bending of the door 10 as it is guided in tracks.

The claims have been amended to recite the new limitation of the single panel as

being sufficiently flexible to traverse curved tracks. The applicants' arguments are that

Rauenbusch does not teach a door comprising a single panel that is sufficiently flexible

to traverse a curved track for the door of Rauenbusch comprises a plurality of rigid

panels with alternating flexible zones formed there between.  This is not convincing for

Rauenbusch specifically states that the insulated overhead door is a single-piece plate-

shaped body structure (col. 2, lines 1-2) that can be coiled to a roll or deflected along a

curved track (col. 2, lines 10-15; col. 4, lines 13-16, 32-37). It is axiomatic that in order

for the single-piece plate-shaped body structure to be capable of being either coiled to a

roll or deflected along a curved track it must be sufficiently flexible to do so.

Even so, to alleviate any uncertainty of the prior art as disclosing a single panel

that is sufficiently flexible to traverse a curved track as argued by the applicants the

ALTUMLLC000177

reference to Wendt is made of record and applied herein. Wendt discloses an insulated

overhead door 2 which is a single panel made of inner and outer walls 3,4 filled with a

suitable insulating material each being attached to one another and of which are

sufficiently flexible to traverse curved tracks (see col.2; fig. 5). To utilize the teachings of

Wendt with that of Rauenbusch such that the single panel is flexible *per se* would have

been obvious to one of ordinary skill in the art for the references are each from the

applicants field of endeavor and the applicants are presumed to have full knowledge of

the prior art in their respective field of endeavor.

Rauenbusch does not specifically set forth the use of wheels for guiding the door

in the tracks. Martin discloses an insulated overhead door 10 which employs the use of

wheels 16 for guiding in tracks 12,14. To one having ordinary skill in the art it would

have been obvious to have provided the overhead door of Rauenbusch with wheels, as

taught by Martin, for its purpose of maintaining the overhead door in a predetermined

path as it is guided in the tracks.

The type of material used in constructing the overhead door is considered a

matter of design preference for such a selection is to have been made and to have done

so yields nothing more than a predictable result. In re Leshin, 277 F.2d 197, 125

USPQ 416 (CCPA 1960).

Official Notice had been given with respect to Claims 18-20 specifying that the

overhead door used in the environment of a truck, cold storage trailer, or building is of

such a well-known and common knowledge in the art capable of instant and

unquestionable demonstration that patentable weight cannot be contributed thereto.

The applicants have not traversed the Examiner's assertion of Official Notice and as

ALTUMLLC000178

Application/Control Number: 13/585,994                                    Page 4
Art Unit: 3634

such the overhead door used in the environment of a truck, cold storage trailer, or

building is taken to be admitted prior art.

   Regarding the recited range of radii of curvature of the tracks as set forth in new

claims 21 and 22, where the only difference between the prior art and the claims is a

recitation of relative dimensions of the claimed device and a device having the claimed

relative dimensions does not perform differently than the prior art device, as is the case

here, the claimed device is not patentably distinct from the prior art device. See  In

Gardner v. TEC Systems, Inc., 725 F.2d 1338, 220 USPQ 777 (Fed. Cir. 1984), cert.

denied, 469 U.S. 830, 225 USPQ 232 (1984).


2.    Applicant's arguments have been fully considered and addressed above but they

are not persuasive inasmuch as all the claimed elements are known in the prior art and

one skilled in the art could have combined the elements as claimed by known methods

with no change in their respective functions, and the combination would have yielded

predictable results to one of ordinary skill in the art at the time of the invention.


3.    Applicant's amendment presenting the new limitation of the single panel as being

sufficiently flexible to traverse curved tracks necessitated the new ground(s) of rejection

presented in this Office action.  Accordingly, **THIS ACTION IS MADE FINAL**.  See

MPEP § 706.07(a).  Applicant is reminded of the extension of time policy as set forth in

37 CFR 1.136(a).

   A shortened statutory period for reply to this final action is set to expire THREE
MONTHS from the mailing date of this action.  In the event a first reply is filed within
TWO MONTHS of the mailing date of this final action and the advisory action is not
mailed until after the end of the THREE-MONTH shortened statutory period, then the
shortened statutory period will expire on the date the advisory action is mailed, and any
extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

ALTUMLLC000179

Application/Control Number: 13/585,994                                          Page 5
Art Unit: 3634

the advisory action.  In no event, however, will the statutory period for reply expire later
than SIX MONTHS from the date of this final action.

4.      Any inquiry concerning this communication or earlier communications from the

Examiner should be directed to David M. Purol whose telephone number is (571) 272-

6833.

        If attempts to reach the examiner by telephone are unsuccessful, the Examiner's

supervisor, Katherine Mitchell, can be reached at (571) 272-7069.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

        Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free).

/David M Purol/
**David M Purol
Primary Examiner
Art Unit 3634**

/D. M. P./
(571) 272-6833
December 15, 2013

ALTUMLLC000180

| | Notice of References Cited | | Application/Control No.<br>13/585,994 | Applicant(s)/Patent Under Reexamination<br>WACHTELL ET AL. | |
|---|---|---|---|---|---|
| | | | Examiner<br>DAVID PUROL | Art Unit<br>3634 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-2,827,118 | 03-1958 | EUGEN WENDT | 160/184 |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**                    Part of Paper No. 12152013

ALTUMLLC000181

***Search Notes***

| | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 13/585,994 | WACHTELL ET AL. |
| | Examiner | Art Unit |
| | DAVID PUROL | 3634 |

### SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 160 | 201 | 12/15/2013 | DMP |
| | 230 | | |
| | 231.1 | | |
| | 231.2 | | |
| | 232 | | |
| | 23.1 | | |
| | 270 | | |
| | 271 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### SEARCH NOTES
### (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

### INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

ALTUMLLC000182

## Index of Claims

| Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|
| 13/585,994 | WACHTELL ET AL. |
| **Examiner** | **Art Unit** |
| DAVID PUROL | 3634 |

| √ | Rejected | − | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Final | Original | 12/15/13 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | √ | | | | | | | |
| | 2 | √ | | | | | | | |
| | 3 | √ | | | | | | | |
| | 4 | √ | | | | | | | |
| | 5 | √ | | | | | | | |
| | 6 | √ | | | | | | | |
| | 7 | √ | | | | | | | |
| | 8 | √ | | | | | | | |
| | 9 | √ | | | | | | | |
| | 10 | √ | | | | | | | |
| | 11 | √ | | | | | | | |
| | 12 | √ | | | | | | | |
| | 13 | √ | | | | | | | |
| | 14 | √ | | | | | | | |
| | 15 | √ | | | | | | | |
| | 16 | √ | | | | | | | |
| | 17 | √ | | | | | | | |
| | 18 | √ | | | | | | | |
| | 19 | √ | | | | | | | |
| | 20 | √ | | | | | | | |
| | 21 | √ | | | | | | | |
| | 22 | √ | | | | | | | |
| | 23 | | | | | | | | |
| | 24 | | | | | | | | |
| | 25 | | | | | | | | |
| | 26 | | | | | | | | |
| | 27 | | | | | | | | |
| | 28 | | | | | | | | |
| | 29 | | | | | | | | |
| | 30 | | | | | | | | |
| | 31 | | | | | | | | |
| | 32 | | | | | | | | |
| | 33 | | | | | | | | |
| | 34 | | | | | | | | |
| | 35 | | | | | | | | |
| | 36 | | | | | | | | |
| | 37 | | | | | | | | |
| | 38 | | | | | | | | |
| | 39 | | | | | | | | |
| | 40 | | | | | | | | |
| | 41 | | | | | | | | |
| | 42 | | | | | | | | |
| | 43 | | | | | | | | |
| | 44 | | | | | | | | |
| | 45 | | | | | | | | |
| | 46 | | | | | | | | |
| | 47 | | | | | | | | |
| | 48 | | | | | | | | |
| | 49 | | | | | | | | |
| | 50 | | | | | | | | |

| Final | Original | Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 51 | | | | | | | | |
| | 52 | | | | | | | | |
| | 53 | | | | | | | | |
| | 54 | | | | | | | | |
| | 55 | | | | | | | | |
| | 56 | | | | | | | | |
| | 57 | | | | | | | | |
| | 58 | | | | | | | | |
| | 59 | | | | | | | | |
| | 60 | | | | | | | | |
| | 61 | | | | | | | | |
| | 62 | | | | | | | | |
| | 63 | | | | | | | | |
| | 64 | | | | | | | | |
| | 65 | | | | | | | | |
| | 66 | | | | | | | | |
| | 67 | | | | | | | | |
| | 68 | | | | | | | | |
| | 69 | | | | | | | | |
| | 70 | | | | | | | | |
| | 71 | | | | | | | | |
| | 72 | | | | | | | | |
| | 73 | | | | | | | | |
| | 74 | | | | | | | | |
| | 75 | | | | | | | | |
| | 76 | | | | | | | | |
| | 77 | | | | | | | | |
| | 78 | | | | | | | | |
| | 79 | | | | | | | | |
| | 80 | | | | | | | | |
| | 81 | | | | | | | | |
| | 82 | | | | | | | | |
| | 83 | | | | | | | | |
| | 84 | | | | | | | | |
| | 85 | | | | | | | | |
| | 86 | | | | | | | | |
| | 87 | | | | | | | | |
| | 88 | | | | | | | | |
| | 89 | | | | | | | | |
| | 90 | | | | | | | | |
| | 91 | | | | | | | | |
| | 92 | | | | | | | | |
| | 93 | | | | | | | | |
| | 94 | | | | | | | | |
| | 95 | | | | | | | | |
| | 96 | | | | | | | | |
| | 97 | | | | | | | | |
| | 98 | | | | | | | | |
| | 99 | | | | | | | | |
| | 100 | | | | | | | | |

| Final | Original | Date | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 101 | | | | | | | | |
| | 102 | | | | | | | | |
| | 103 | | | | | | | | |
| | 104 | | | | | | | | |
| | 105 | | | | | | | | |
| | 106 | | | | | | | | |
| | 107 | | | | | | | | |
| | 108 | | | | | | | | |
| | 109 | | | | | | | | |
| | 110 | | | | | | | | |
| | 111 | | | | | | | | |
| | 112 | | | | | | | | |
| | 113 | | | | | | | | |
| | 114 | | | | | | | | |
| | 115 | | | | | | | | |
| | 116 | | | | | | | | |
| | 117 | | | | | | | | |
| | 118 | | | | | | | | |
| | 119 | | | | | | | | |
| | 120 | | | | | | | | |
| | 121 | | | | | | | | |
| | 122 | | | | | | | | |
| | 123 | | | | | | | | |
| | 124 | | | | | | | | |
| | 125 | | | | | | | | |
| | 126 | | | | | | | | |
| | 127 | | | | | | | | |
| | 128 | | | | | | | | |
| | 129 | | | | | | | | |
| | 130 | | | | | | | | |
| | 131 | | | | | | | | |
| | 132 | | | | | | | | |
| | 133 | | | | | | | | |
| | 134 | | | | | | | | |
| | 135 | | | | | | | | |
| | 136 | | | | | | | | |
| | 137 | | | | | | | | |
| | 138 | | | | | | | | |
| | 139 | | | | | | | | |
| | 140 | | | | | | | | |
| | 141 | | | | | | | | |
| | 142 | | | | | | | | |
| | 143 | | | | | | | | |
| | 144 | | | | | | | | |
| | 145 | | | | | | | | |
| | 146 | | | | | | | | |
| | 147 | | | | | | | | |
| | 148 | | | | | | | | |
| | 149 | | | | | | | | |
| | 150 | | | | | | | | |

ALTUMLLC000183

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of   :  Peter J. Wachtell          Confirmation No.:   9027

Application Number   :  13/585,994

Filed              :  August 15, 2012

Title              :  INSULATED OVERHEAD DOOR

TC/Art Unit       :  3634

Examiner:        :  David M. Puroi

Docket No.      :  0149.0004

Customer No.    :  **39878**

**Mail Stop Amendment**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

## <u>AMENDMENT</u>

In reply to the Office Action mailed August 16, 2013, Applicant proposes that this

application be amended as follows:

**Amendments to the Claims** are reflected in the listing of claims in this paper.

**Remarks/Arguments** follow the amendment sections of this paper.

ALTUMLLC000184

AMENDMENT
ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

**AMENDMENTS TO THE CLAIMS:**

This listing of claims will replace all prior versions and listings of claims in the application:

1.    (Currently Amended) An insulated overhead door that is designed to roll open and closed in tracks comprising:

a thermoplastic membrane;

a sheet of insulating material attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only a single panel, the single panel being sufficiently flexible to traverse curved tracks.

2.    (Original) The insulated overhead door of claim 1, wherein the thermoplastic membrane is a single sheet that is approximately the size of the door opening to be covered.

3.    (Original) The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises glass fibers.

4.    (Currently Amended) The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises ~~a material chosen from~~ polypropylene impregnated with glass fibers ~~and laminated together to create a directional structure; poly vinyl chloride (PVC) combined with rubberizing agents; polyurea or polyurethane~~.

-2-

ALTUMLLC000185

AMENDMENT
ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

5.    (Original) The insulated overhead door of claim 1, wherein the insulating material comprises foam.

6.    (Original) The insulated overhead door of claim 5, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend during opening and closing of the door.

7.    (Original) The insulated overhead door of claim 1, wherein the insulating material is closed cell foam.

8.    (Original) The insulated overhead door of claim 7, wherein the closed cell foam comprises ethylene vinyl acetate.

9.    (Original) The insulated overhead door of claim 7, wherein the closed cell foams is chosen from polyethylene foams, polypropylene foams or neoprene based foams.

10.    (Original) The insulated overhead door of claim 1, wherein the insulating material is an open cell foam.

11.    (Original) The insulated overhead door of claim 1, further comprising foam blocks configured to  increased an R-value of the door.

12.    (Original) The insulated overhead door of claim 1, wherein the door does not include hinged panels.

13.    (Original) The insulated overhead door of claim 1, further comprising an additional membrane that is not the thermoplastic membrane.

14.    (Original) The insulated overhead door of claim 1, the door having an R value ranging from about 14 to about 50.

-3-

ALTUMLLC000186

AMENDMENT
ATTORNEY DOCKET No. 0149.0004
APPLICATION No.: 13/585,994

15.    (Original) A method comprising:

    providing the insulated overhead door of claim 1 on tracks, at least a portion of the tracks being curved; and

    moving the insulated overhead door so that a portion of the thermoplastic membrane and a portion of the insulating material flex to allow the door to traverse the curved portion of the tracks.

16.    (Currently Amended) An overhead door assembly comprising:

    a set of curved tracks, the tracks comprises a track portion of a first length positioned at an angle, Θ, relative to a track portion of a second length, wherein Θ ranges from about 80° to about 125°; and

    an insulated overhead door configured to roll open and closed in the tracks, the overhead door comprising:

        a thermoplastic membrane;

        a sheet of insulating material attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel; and

        wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

    wherein the overhead door comprises only a single panel, the single panel being sufficiently flexible to traverse the curved tracks.

17.    (Currently Amended) The overhead door assembly insulated overhead door of claim [[16]] 21, wherein the track comprises the single panel is sufficiently flexible to traverse curved tracks comprising a track portion of a first length positioned at an angle, Θ, relative to a track portion of a second length, wherein Θ ranges from about 80° to about 125°.

-4-

ALTUMLLC000187

AMENDMENT
ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

18.    (Original) A truck comprising the insulated overhead door assembly of claim 16.

19.    (Original) A cold storage trailer comprising the insulated overhead door assembly of claim 16.

20.    (Original) A building comprising the insulated overhead door assembly of claim 16.

21.    (New) The insulated overhead door of claim 1, wherein the single panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches.

22.    (New) The overhead door assembly of claim 15, wherein the single panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches.

-5-

ALTUMLLC000188

AMENDMENT
ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

## REMARKS

Claims 1-22 are pending in the application.  Claims 1, 4, 16 and 17 have been amended.  New claims 21 and 22 have been added. No new matter has been added.

### Interview Summary

Examiner Purol is thanked for the courtesies extended to Applicant and his undersigned representative during the telephonic interview of September 26, 2013. During the interview, Applicants presented an amendment as set forth in claim 1, above, to the Examiner.  It was further argued that Rauenbusch teaches a plurality of rigid panels separated by depressions 14 that form flexible strips 17 between the rigid panels. See, for example, claim 1 of Rauenbusch; FIG. 1; col. 4, lines 9-18; FIGS. 4 and 5; col. 4, lines 56-65 and col. 1, lines 5-9.  Because Rauenbush teaches that each door comprises a plurality of rigid panels with alternating flexible zones formed there between, Rauenbush does not teach a door comprising a single panel that is sufficiently flexible to traverse a curved track, as recited in claim 1.

Applicants further discussed an advantage of the claimed flexible single panel design, which is the ability of the dock door to traverse tracks having varying radii of curvature. As one of ordinary skill in the art would understand, overhead doors with rigid panels employ wheels, where the spacing of the wheels is such that they fit at the flex points between the rigid panels of the door. Further, the width of the rigid panels and consequent wheel spacing dictate the radius of curvature of the tracks that the door is able to traverse without binding up.  For this reason, it is common for overhead doors to be designed to fit into a known track with a known radius of curvature. The ability of

-6-

ALTUMLLC000189

AMENDMENT
ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

applicants flexible single panel design to traverse tracks having varying radii of curvature is a step forward in the art.

During the interview, Examiner Purol agreed that the amendment to claim 1, as set forth above, overcomes the Rauenbusch reference.

## Rejections Under 35 USC § 103

Claims 1-20 are rejected under 35 USC § 103(a) as being unpatentable over Rauenbusch (US 5,915,445, hereinafter "Rauenbusch") in view of Martin (US 5,738,161, hereinafter "Martin").

For the reasons discussed in the above Interview Summary, the amendment to claim 1 overcomes the Rauenbusch reference, which teaches a door having a plurality of rigid panels instead of a single panel being sufficiently flexible to traverse a curved track, as is presently claimed.

The Martin reference also teaches a door having a plurality of rigid panels.  See Martin, FIG. 4 and col. 1, line 66 to col. 2, line 31. Thus, Martin does not providing the missing teaching of Rauenbusch.

Because neither Rauenbusch nor Martin, either alone or in combination, teach an overhead door, as claimed, comprising only a single panel, the single panel being sufficiently flexible to traverse a curved track, every limitation of the claims is not taught or suggested. For at least this reason, a *prima facie* case of obviousness does not exist, and the rejection should be withdrawn.

## New Claims 21 and 22

New claims 21 and 22 are allowable at least because they depend from, and therefore incorporate all the limitations of, claims 1 or 15. In addition, claims 21 and 22

-7-

ALTUMLLC000190

AMENDMENT
ATTORNEY DOCKET NO. 0149.0004
APPLICATION NO.: 13/585,994

are also allowable because neither Rauenbusch nor Martin teach or suggest an overhead door comprising only a single panel, wherein the single panel is sufficiently flexible so that the overhead door is capable of traversing tracks of varying radii of curvature ranging from about 5 inches to about 25 inches.

As discussed above, doors with rigid panels, such as those taught by Rauenbusch and Martin, are designed to fit into a known track with a known radius of curvature. Such doors cannot traverse tracks of varying radii in the manner claimed. Therefore, Applicants request allowance of claims 21 and 22 for this additional reason.

### Conclusion

In view of the foregoing remarks, Applicants submit that this claimed invention, as amended, is neither anticipated nor rendered obvious in view of the prior art references cited against this application.  Applicants therefore request reconsideration and reexamination of the application, and the timely allowance of the pending claims.

Please grant any extensions of time required to enter this response and charge any additional required fees to our deposit account 50-2961.

Respectfully submitted,

Dated: October 9, 2013                    By: /Matthew L. Whipple/_____
                                                    Matthew L. Whipple
                                                    Reg. No. 47,217

-8-

Appx1113

ALTUMLLC000191

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13585994 |
| **Filing Date:** | 15-Aug-2012 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Attorney Docket Number:** | 0149.0004 |

Filed as Small Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| Claims in excess of 20 | 2202 | 2 | 40 | 80 |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

ALTUMLLC000192

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **80** |

ALTUMLLC000193

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 17076687 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 09-OCT-2013 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 08:30:56 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 80 |
| RAM confirmation Number | 9350 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

ALTUMLLC000194

| 1 | | Amendment_10-9-13.pdf | 47842 | yes | 8 |
|---|---|---|---|---|---|
| | | | e081e9a930bbe5e520c98bac3da439c58c8e2dcc | | |

| Multipart Description/PDF files in .zip description | | |
|---|---|---|
| **Document Description** | **Start** | **End** |
| Amendment/Req. Reconsideration-After Non-Final Reject | 1 | 1 |
| Claims | 2 | 5 |
| Applicant Arguments/Remarks Made in an Amendment | 6 | 8 |

**Warnings:**

**Information:**

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 30475 | no | 2 |
|---|---|---|---|---|---|
| | | | 4fef4cfaa26e709af7b45a10ced41496359aa1b3 | | |

**Warnings:**

**Information:**

| **Total Files Size (in bytes):** | 78317 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

ALTUMLLC000195

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>13/585,994 | Filing Date<br>08/15/2012 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:**   ☐ LARGE   ☒ SMALL   ☐ MICRO

## APPLICATION AS FILED – PART I

|  | (Column 1) | (Column 2) |  |  |
|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE ($) | FEE ($) |
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A |  |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A |  |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A |  |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | X $ = |  |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | X $ = |  |
| ☐ APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). |  |  |  |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) |  |  |  |  |
| * If the difference in column 1 is less than zero, enter "0" in column 2. |  |  | TOTAL |  |

## APPLICATION AS AMENDED – PART II

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** | **10/09/2013** | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|  | Total (37 CFR 1.16(i)) | * 22 | Minus ** 20 | = 2 | x $40 = | 80 |
|  | Independent (37 CFR 1.16(h)) | * 2 | Minus *** 3 | = 0 | x $210 = | 0 |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) |  |  |  |  |  |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) |  |  |  | TOTAL ADD'L FEE | **80** |

|  |  | (Column 1) | (Column 2) | (Column 3) |  |  |
|---|---|---|---|---|---|---|
| **AMENDMENT** |  | CLAIMS REMAINING AFTER AMENDMENT | HIGHEST NUMBER PREVIOUSLY PAID FOR | PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|  | Total (37 CFR 1.16(i)) | * | Minus ** | = | x $ = |  |
|  | Independent (37 CFR 1.16(h)) | * | Minus *** | = | x $ = |  |
|  | ☐ Application Size Fee (37 CFR 1.16(s)) |  |  |  |  |  |
|  | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) |  |  |  | TOTAL ADD'L FEE |  |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.

** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".

*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".

The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1.

LIE
/KATRINA . TURNER/

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

ALTUMLLC000196



U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

39878          7590          10/02/2013
MH2 TECHNOLOGY LAW GROUP, LLP
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 10/02/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

doreen@mh2law.com
kris@mh2law.com
docketing@mh2law.com

PTOL-90A (Rev. 04/07)

ALTUMLLC000197

| ***Applicant-Initiated Interview Summary*** | Application No. | Applicant(s) |
| | 13/585,994 | WACHTELL ET AL. |
| | Examiner | Art Unit | |
| | DAVID PUROL | 3634 | |

All participants (applicant, applicant's representative, PTO personnel):

(1) _David Purol_.                                    (3) _____.

(2) _Peter Wachtell_.                                 (4) _____.

Date of Interview: _26 September 2013_.

Type:    ☒ Telephonic    ☐ Video Conference
         ☐ Personal [copy given to: ☐ applicant    ☐ applicant's representative]

Exhibit shown or demonstration conducted:    ☐ Yes    ☒ No.
   If Yes, brief description: _____.

Issues Discussed    ☐101    ☐112    ☐102    ☒103    ☐Others
(For each of the checked box(es) above, please describe below the issue and detailed description of the discussion)

Claim(s) discussed: _all_.

Identification of prior art discussed: _Rauenbusch_.

Substance of Interview
(For each issue discussed, provide a detailed description and indicate if agreement was reached. Some topics may include: identification or clarification of a reference or a portion thereof, claim interpretation, proposed amendments, arguments of any applied references etc...)

_It is the applicants' position that the door of Rauenbusch is a plurality of rigid panels hinged together and not a single panel being sufficiently flexible to traverse a curved track. The applicants will be submitting a further amendment clarifying the flexibility of the single panel in relation to a curved track ._

**Applicant recordation instructions:** The formal written reply to the last Office action must include the substance of the interview. (See MPEP section 713.04). If a reply to the last Office action has already been filed, applicant is given a non-extendable period of the longer of one month or thirty days from this interview date, or the mailing date of this interview summary form, whichever is later, to file a statement of the substance of the interview

**Examiner recordation instructions:** Examiners must summarize the substance of any interview of record. A complete and proper recordation of the substance of an interview should include the items listed in MPEP 713.04 for complete and proper recordation including the identification of the general thrust of each argument or issue discussed, a general indication of any other pertinent matters discussed regarding patentability and the general results or outcome of the interview, to include an indication as to whether or not agreement was reached on the issues raised.

☐ Attachment

| /David M Purol/ | |
| Primary Examiner, Art Unit 3634 | |

ALTUMLLC000198

# Summary of Record of Interview Requirements

**Manual of Patent Examining Procedure (MPEP), Section 713.04, Substance of Interview Must be Made of Record**
A complete written statement as to the substance of any face-to-face, video conference, or telephone interview with regard to an application must be made of record in the application whether or not an agreement with the examiner was reached at the interview.

### Title 37 Code of Federal Regulations (CFR) § 1.133 Interviews
Paragraph (b)

In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. An interview does not remove the necessity for reply to Office action as specified in §§ 1.111, 1.135. (35 U.S.C. 132)

### 37 CFR §1.2  Business to be transacted in writing.
All business with the Patent or Trademark Office should be transacted in writing. The personal attendance of applicants or their attorneys or agents at the Patent and Trademark Office is unnecessary. The action of the Patent and Trademark Office will be based exclusively on the written record in the Office. No attention will be paid to any alleged oral promise, stipulation, or understanding in relation to which there is disagreement or doubt.

―――――

The action of the Patent and Trademark Office cannot be based exclusively on the written record in the Office if that record is itself incomplete through the failure to record the substance of interviews.

It is the responsibility of the applicant or the attorney or agent to make the substance of an interview of record in the application file, unless the examiner indicates he or she will do so. It is the examiner's responsibility to see that such a record is made and to correct material inaccuracies which bear directly on the question of patentability.

Examiners must complete an Interview Summary Form for each interview held where a matter of substance has been discussed during the interview by checking the appropriate boxes and filling in the blanks. Discussions regarding only procedural matters, directed solely to restriction requirements for which interview recordation is otherwise provided for in Section 812.01 of the Manual of Patent Examining Procedure, or pointing out typographical errors or unreadable script in Office actions or the like, are excluded from the interview recordation procedures below. Where the substance of an interview is completely recorded in an Examiners Amendment, no separate Interview Summary Record is required.

The Interview Summary Form shall be given an appropriate Paper No., placed in the right hand portion of the file, and listed on the "Contents" section of the file wrapper. In a personal interview, a duplicate of the Form is given to the applicant (or attorney or agent) at the conclusion of the interview. In the case of a telephone or video-conference interview, the copy is mailed to the applicant's correspondence address either with or prior to the next official communication. If additional correspondence from the examiner is not likely before an allowance or if other circumstances dictate, the Form should be mailed promptly after the interview rather than with the next official communication.

The Form provides for recordation of the following information:
– Application Number (Series Code and Serial Number)
– Name of applicant
– Name of examiner
– Date of interview
– Type of interview (telephonic, video-conference, or personal)
– Name of participant(s) (applicant, attorney or agent, examiner, other PTO personnel, etc.)
– An indication whether or not an exhibit was shown or a demonstration conducted
– An identification of the specific prior art discussed
–   An indication whether an agreement was reached and if so, a description of the general nature of the agreement (may be by attachment of a copy of amendments or claims agreed as being allowable). Note: Agreement as to allowability is tentative and does not restrict further action by the examiner to the contrary.
– The signature of the examiner who conducted the interview (if Form is not an attachment to a signed Office action)

It is desirable that the examiner orally remind the applicant of his or her obligation to record the substance of the interview of each case. It should be noted, however, that the Interview Summary Form will not normally be considered a complete and proper recordation of the interview unless it includes, or is supplemented by the applicant or the examiner to include, all of the applicable items required below concerning the substance of the interview.

A complete and proper recordation of the substance of any interview should include at least the following applicable items:
1) A brief description of the nature of any exhibit shown or any demonstration conducted,
2) an identification of the claims discussed,
3) an identification of the specific prior art discussed,
4) an identification of the principal proposed amendments of a substantive nature discussed, unless these are already described on the Interview Summary Form completed by the Examiner,
5) a brief identification of the general thrust of the principal arguments presented to the examiner,
     (The identification of arguments need not be lengthy or elaborate. A verbatim or highly detailed description of the arguments is not required. The identification of the arguments is sufficient if the general nature or thrust of the principal arguments made to the examiner can be understood in the context of the application file. Of course, the applicant may desire to emphasize and fully describe those arguments which he or she feels were or might be persuasive to the examiner.)
6) a general indication of any other pertinent matters discussed, and
7) if appropriate, the general results or outcome of the interview unless already described in the Interview Summary Form completed by the examiner.
Examiners are expected to carefully review the applicant's record of the substance of an interview. If the record is not complete and accurate, the examiner will give the applicant an extendable one month time period to correct the record.

### Examiner to Check for Accuracy

If the claims are allowable for other reasons of record, the examiner should send a letter setting forth the examiner's version of the statement attributed to him or her. If the record is complete and accurate, the examiner should place the indication, "Interview Record OK" on the paper recording the substance of the interview along with the date and the examiner's initials.

ALTUMLLC000199

# United States Patent and Trademark Office

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 | 9027 |

39878       7590       08/16/2013
MH2 TECHNOLOGY LAW GROUP, LLP
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

| EXAMINER |
|---|
| PUROL, DAVID M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3634 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/16/2013 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

doreen@mh2law.com
kris@mh2law.com
docketing@mh2law.com

PTOL-90A (Rev. 04/07)

ALTUMLLC000200

| **Office Action Summary** | Application No. 13/585,994 | | Applicant(s) WACHTELL ET AL. | |
| --- | --- | --- | --- | --- |
| | Examiner DAVID PUROL | | Art Unit 3634 | AIA (First Inventor to File) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>15 August 2012</u>.
   ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a) ☐ This action is **FINAL.**    2b) ☒ This action is non-final.

3) ☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

5) ☒ Claim(s) <u>1-20</u> is/are pending in the application.
   5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☒ Claim(s) <u>1-20</u> is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10) ☐ The specification is objected to by the Examiner.

11) ☒ The drawing(s) filed on <u>15 August 2012</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   **Certified copies:**
   a)☐ All   b)☐ Some *   c)☐ None of the:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
   * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08)
   Paper No(s)/Mail Date _____.

3) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .

4) ☐ Other: _____.

Appx1123

ALTUMLLC000201

1.     The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.

Claims 1-20 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable

over Rauenbusch (U.S. Patent No. 5,915,445) in view of Martin (U.S. Patent No.

5,738,161).

Rauenbusch discloses an insulated single panel overhead door 10 comprising a

core member 13 between a pair of outer face layers 11,12 and cover sheets 15,16

having depressions 14 to facilitate the bending of the door 10 as it is guided in tracks.

Rauenbusch does not specifically set forth the use of wheels for guiding the door

in the tracks. Martin discloses an insulated overhead door 10 which employs the use of

wheels 16 for guiding in tracks 12,14. To one having ordinary skill in the art it would

have been obvious to have provided the overhead door of Rauenbusch with wheels, as

taught by Martin, for its purpose of maintaining the overhead door in a predetermined

path as it is guided in the tracks.

The type of material used in constructing the overhead door is considered a

matter of design preference for such a selection is to have been made and to have done

so yields nothing more than a predictable result. In re Leshin,  277  F.2d 197, 125

USPQ 416 (CCPA 1960).

ALTUMLLC000202

Application/Control Number: 13/585,994                                      Page 3
Art Unit: 3634

Claims 18-20 specify that the overhead door is used in the environment of a

truck, cold storage trailer, or building. However, the use of an overhead door in the

environment of a truck, cold storage trailer, or building is of such a well-known and

common knowledge in the art capable of instant and unquestionable demonstration that

patentable weight cannot be contributed thereto and as such Official Notice is hereby

given to that effect.


2.      The prior art made of record and not relied upon is considered pertinent to

applicant's disclosure.


3.      Any inquiry concerning this communication or earlier communications from the

Examiner should be directed to David M. Purol whose telephone number is (571) 272-

6833.

If attempts to reach the examiner by telephone are unsuccessful, the Examiner's

supervisor, Katherine Mitchell, can be reached at (571) 272-7069.  The fax phone

number for the organization where this application or proceeding is assigned is 571-

273-8300.

Information regarding the status of an application may be obtained from the
Patent Application Information Retrieval (PAIR) system.  Status information for
published applications may be obtained from either Private PAIR or Public PAIR.
Status information for unpublished applications is available through Private PAIR only.
For more information about the PAIR system, see http://pair-direct.uspto.gov. Should
you have questions on access to the Private PAIR system, contact the Electronic
Business Center (EBC) at 866-217-9197 (toll-free).

ALTUMLLC000203

/David M Purol/
**David M Purol
Primary Examiner
Art Unit 3634**

/D. M. P./
(571) 272-6833
August 11, 2013

ALTUMLLC000204

| *Notice of References Cited* | Application/Control No.<br>13/585,994 | Applicant(s)/Patent Under Reexamination<br>WACHTELL ET AL. | |
| --- | --- | --- | --- |
| | Examiner<br>DAVID PUROL | Art Unit<br>3634 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
| --- | --- | --- | --- | --- | --- |
| * | A | US-2,042,002 A | 05-1936 | HOVEY OTIS W | 160/133 |
| * | B | US-3,017,218 A | 01-1962 | CARLSSON KARL A I et al. | 296/106 |
| * | C | US-3,084,403 A | 04-1963 | ARMIN ELMENDORF | 428/166 |
| * | D | US-3,662,410 A | 05-1972 | Lankheet, Jay A. | 4/498 |
| * | E | US-4,445,958 A | 05-1984 | Jaksha, Jerome F. | 156/211 |
| * | F | US-5,016,700 A | 05-1991 | Wegner et al. | 160/232 |
| * | G | US-5,738,161 A | 04-1998 | Martin, John C. | 160/201 |
| * | H | US-5,915,445 A | 06-1999 | Rauenbusch, Gerd | 160/230 |
| * | I | US-6,443,209 B1 | 09-2002 | Hurst, William | 160/230 |
| * | J | US-2003/0173040 A1 | 09-2003 | Court et al. | 160/230 |
| * | K | US-7,111,661 B2 | 09-2006 | Laugenbach, Guido | 160/270 |
| * | L | US-2008/0110580 A1 | 05-2008 | Hoerner et al. | 160/113 |
| * | M | US-2010/0132894 A1 | 06-2010 | Knutson et al. | 160/113 |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
| --- | --- | --- | --- | --- | --- | --- |
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
| --- | --- | --- |
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                **Notice of References Cited**                Part of Paper No. 08112013

ALTUMLLC000205



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

## BIB DATA SHEET

**CONFIRMATION NO. 9027**

| SERIAL NUMBER 13/585,994 | FILING or 371(c) DATE 08/15/2012 RULE | CLASS 160 | GROUP ART UNIT 3634 | ATTORNEY DOCKET NO. 0149.0004 |
|---|---|---|---|---|

**APPLICANTS**
Peter J. Wachtell, Boise, ID;
Daniel M. Aragon, Meridian, ID;
John J. Prehn, Boise, ID;
Todd J. Lindsey, Boise, ID;

** CONTINUING DATA **************************
This appln claims benefit of 61/523,786 08/15/2011

** FOREIGN APPLICATIONS **************************

** IF REQUIRED, FOREIGN FILING LICENSE GRANTED ** ** SMALL ENTITY **
08/24/2012

| Foreign Priority claimed ☐ Yes ☒ No<br>35 USC 119(a-d) conditions met ☐ Yes ☒ No<br>Verified and Acknowledged /DAVID M PUROL/ Examiner's Signature | ☐ Met after Allowance<br>Initials | STATE OR COUNTRY ID | SHEETS DRAWINGS 2 | TOTAL CLAIMS 20 | INDEPENDENT CLAIMS 2 |
|---|---|---|---|---|---|

**ADDRESS**
MH2 TECHNOLOGY LAW GROUP, LLP
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182
UNITED STATES

**TITLE**
INSULATED OVERHEAD DOOR

| FILING FEE RECEIVED 595 | FEES: Authority has been given in Paper No._____ to charge/credit DEPOSIT ACCOUNT No._____ for following: | ☐ All Fees<br>☐ 1.16 Fees (Filing)<br>☐ 1.17 Fees (Processing Ext. of time)<br>☐ 1.18 Fees (Issue)<br>☐ Other _____<br>☐ Credit |
|---|---|---|

BIB (Rev. 05/07).

ALTUMLLC000206

***Search Notes***

| | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 13/585,994 | WACHTELL ET AL. |
| | **Examiner** | **Art Unit** |
| | DAVID PUROL | 3634 |

## SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| 160 | 201 | 8/11/2013 | DMP |
| | 230 | | |
| | 231.1 | | |
| | 231.2 | | |
| | 232 | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## SEARCH NOTES
## (INCLUDING SEARCH STRATEGY)

| | DATE | EXMR |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## INTERFERENCE SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

U.S. Patent and Trademark Office

Part of Paper No.  08112013

Appx1129

# *Index of Claims*

| | Application/Control No. | Applicant(s)/Patent under Reexamination |
|---|---|---|
| | 13/585,994 | WACHTELL ET AL. |
| | **Examiner** | **Art Unit** |
| | DAVID PUROL | 3634 |

| √ | Rejected | — | (Through numeral) Cancelled | N | Non-Elected | A | Appeal |
|---|---|---|---|---|---|---|---|
| = | Allowed | ÷ | Restricted | I | Interference | O | Objected |

| Final | Original | 8/11/13 | | | | | | Final | Original | | | | | | | Final | Original | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | √ | | | | | | | 51 | | | | | | | | 101 | | | | | | |
| | 2 | √ | | | | | | | 52 | | | | | | | | 102 | | | | | | |
| | 3 | √ | | | | | | | 53 | | | | | | | | 103 | | | | | | |
| | 4 | √ | | | | | | | 54 | | | | | | | | 104 | | | | | | |
| | 5 | √ | | | | | | | 55 | | | | | | | | 105 | | | | | | |
| | 6 | √ | | | | | | | 56 | | | | | | | | 106 | | | | | | |
| | 7 | √ | | | | | | | 57 | | | | | | | | 107 | | | | | | |
| | 8 | √ | | | | | | | 58 | | | | | | | | 108 | | | | | | |
| | 9 | √ | | | | | | | 59 | | | | | | | | 109 | | | | | | |
| | 10 | √ | | | | | | | 60 | | | | | | | | 110 | | | | | | |
| | 11 | √ | | | | | | | 61 | | | | | | | | 111 | | | | | | |
| | 12 | √ | | | | | | | 62 | | | | | | | | 112 | | | | | | |
| | 13 | √ | | | | | | | 63 | | | | | | | | 113 | | | | | | |
| | 14 | √ | | | | | | | 64 | | | | | | | | 114 | | | | | | |
| | 15 | √ | | | | | | | 65 | | | | | | | | 115 | | | | | | |
| | 16 | √ | | | | | | | 66 | | | | | | | | 116 | | | | | | |
| | 17 | √ | | | | | | | 67 | | | | | | | | 117 | | | | | | |
| | 18 | √ | | | | | | | 68 | | | | | | | | 118 | | | | | | |
| | 19 | √ | | | | | | | 69 | | | | | | | | 119 | | | | | | |
| | 20 | √ | | | | | | | 70 | | | | | | | | 120 | | | | | | |
| | 21 | | | | | | | | 71 | | | | | | | | 121 | | | | | | |
| | 22 | | | | | | | | 72 | | | | | | | | 122 | | | | | | |
| | 23 | | | | | | | | 73 | | | | | | | | 123 | | | | | | |
| | 24 | | | | | | | | 74 | | | | | | | | 124 | | | | | | |
| | 25 | | | | | | | | 75 | | | | | | | | 125 | | | | | | |
| | 26 | | | | | | | | 76 | | | | | | | | 126 | | | | | | |
| | 27 | | | | | | | | 77 | | | | | | | | 127 | | | | | | |
| | 28 | | | | | | | | 78 | | | | | | | | 128 | | | | | | |
| | 29 | | | | | | | | 79 | | | | | | | | 129 | | | | | | |
| | 30 | | | | | | | | 80 | | | | | | | | 130 | | | | | | |
| | 31 | | | | | | | | 81 | | | | | | | | 131 | | | | | | |
| | 32 | | | | | | | | 82 | | | | | | | | 132 | | | | | | |
| | 33 | | | | | | | | 83 | | | | | | | | 133 | | | | | | |
| | 34 | | | | | | | | 84 | | | | | | | | 134 | | | | | | |
| | 35 | | | | | | | | 85 | | | | | | | | 135 | | | | | | |
| | 36 | | | | | | | | 86 | | | | | | | | 136 | | | | | | |
| | 37 | | | | | | | | 87 | | | | | | | | 137 | | | | | | |
| | 38 | | | | | | | | 88 | | | | | | | | 138 | | | | | | |
| | 39 | | | | | | | | 89 | | | | | | | | 139 | | | | | | |
| | 40 | | | | | | | | 90 | | | | | | | | 140 | | | | | | |
| | 41 | | | | | | | | 91 | | | | | | | | 141 | | | | | | |
| | 42 | | | | | | | | 92 | | | | | | | | 142 | | | | | | |
| | 43 | | | | | | | | 93 | | | | | | | | 143 | | | | | | |
| | 44 | | | | | | | | 94 | | | | | | | | 144 | | | | | | |
| | 45 | | | | | | | | 95 | | | | | | | | 145 | | | | | | |
| | 46 | | | | | | | | 96 | | | | | | | | 146 | | | | | | |
| | 47 | | | | | | | | 97 | | | | | | | | 147 | | | | | | |
| | 48 | | | | | | | | 98 | | | | | | | | 148 | | | | | | |
| | 49 | | | | | | | | 99 | | | | | | | | 149 | | | | | | |
| | 50 | | | | | | | | 100 | | | | | | | | 150 | | | | | | |

Appx1130

ALTUMLLC000208



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 |

**CONFIRMATION NO. 9027**

39878
MH2 TECHNOLOGY LAW GROUP, LLP
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

**PUBLICATION NOTICE**

*OC000000059440787*

**Title:**INSULATED OVERHEAD DOOR

**Publication No.**US-2013-0042983-A1
**Publication Date:**02/21/2013

## NOTICE OF PUBLICATION OF APPLICATION

The above-identified application will be electronically published as a patent application publication pursuant to 37 CFR 1.211, et seq. The patent application publication number and publication date are set forth above.

The publication may be accessed through the USPTO's publically available Searchable Databases via the Internet at www.uspto.gov. The direct link to access the publication is currently http://www.uspto.gov/patft/.

The publication process established by the Office does not provide for mailing a copy of the publication to applicant. A copy of the publication may be obtained from the Office upon payment of the appropriate fee set forth in 37 CFR 1.19(a)(1). Orders for copies of patent application publications are handled by the USPTO's Office of Public Records. The Office of Public Records can be reached by telephone at (703) 308-9726 or (800) 972-6382, by facsimile at (703) 305-8759, by mail addressed to the United States Patent and Trademark Office, Office of Public Records, Alexandria, VA 22313-1450 or via the Internet.

In addition, information on the status of the application, including the mailing date of Office actions and the dates of receipt of correspondence filed in the Office, may also be accessed via the Internet through the Patent Electronic Business Center at www.uspto.gov using the public side of the Patent Application Information and Retrieval (PAIR) system. The direct link to access this status information is currently http://pair.uspto.gov/. Prior to publication, such status information is confidential and may only be obtained by applicant using the private side of PAIR.

Further assistance in electronically accessing the publication, or about PAIR, is available by calling the Patent Electronic Business Center at 1-866-217-9197.

Office of Data Managment, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

page 1 of 1

Appx1131

ALTUMLLC000209

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | | | Application or Docket Number<br>13/585,994 |
|---|---|---|---|

### APPLICATION AS FILED - PART I

| | (Column 1)<br>NUMBER FILED | (Column 2)<br>NUMBER EXTRA | SMALL ENTITY<br>RATE($) | FEE($) | OR | OTHER THAN<br>SMALL ENTITY<br>RATE($) | FEE($) |
|---|---|---|---|---|---|---|---|
| FOR | NUMBER FILED | NUMBER EXTRA | RATE($) | FEE($) | | RATE($) | FEE($) |
| BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | 98 | | N/A | |
| SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | 310 | | N/A | |
| EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | 125 | | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | 20 | minus 20 = * | x 31 = | 0.00 | OR | | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | 2 | minus 3 = * | x 125 = | 0.00 | | | |
| APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | 0.00 | | | |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | 0.00 | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | 533 | | TOTAL | |

### APPLICATION AS AMENDED - PART II

| | | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | SMALL ENTITY<br>RATE($) | ADDITIONAL FEE($) | OR | OTHER THAN<br>SMALL ENTITY<br>RATE($) | ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| AMENDMENT A | Total<br>(37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |
| AMENDMENT B | Total<br>(37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

\* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
\*\*\* If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

ALTUMLLC000210

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | 3634 | 595 | 0149.0004 | 20 | 2 |

**CONFIRMATION NO. 9027**

39878
MH2 TECHNOLOGY LAW GROUP, LLP
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

**UPDATED FILING RECEIPT**


*OC000000057359946*

Date Mailed: 11/02/2012

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Inventor(s)**

Peter J. Wachtell, Boise, ID;
Daniel M. Aragon, Meridian, ID;
John J. Prehn, Boise, ID;
Todd J. Lindsey, Boise, ID;

**Applicant(s)**

Peter J. Wachtell, Boise, ID;
Daniel M. Aragon, Meridian, ID;
John J. Prehn, Boise, ID;
Todd J. Lindsey, Boise, ID;

**Power of Attorney:** The patent practitioners associated with Customer Number 39878

**Domestic Priority data as claimed by applicant**
This appln claims benefit of 61/523,786 08/15/2011

**Foreign Applications** (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.)

Permission to Access - A proper **Authorization to Permit Access to Application by Participating Offices** (PTO/SB/39 or its equivalent) has been received by the USPTO.

**If Required, Foreign Filing License Granted:** 08/24/2012
The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 13/585,994**
**Projected Publication Date:** 02/21/2013

page 1 of 3

Appx1133

**Non-Publication Request:** No

**Early Publication Request:** No
**\*\* SMALL ENTITY \*\***
**Title**

      INSULATED OVERHEAD DOOR

**Preliminary Class**

      160

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

ALTUMLLC000212

# LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

### NOT GRANTED

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

### *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage, facilitate, and accelerate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

ALTUMLLC000213

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 14020752 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 18-OCT-2012 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 16:21:23 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $130 |
| RAM confirmation Number | 3335 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

ALTUMLLC000214

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re Application of | : | Peter J. Wachtell et al. | Confirmation No.:    9027 |
| Application Number | : | 13/585,994 | |
| Filed | : | August 15, 2012 | |
| Title | : | INSULATED OVERHEAD DOOR | |
| TC/Art Unit | : | 3634 | |
| Examiner: | : | Not yet assigned | |

| | | |
|---|---|---|
| Docket No. | : | 0149.0004 |
| Customer No. | : | **39878** |

**Mail Stop Missing Parts**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

### RESPONSE TO NOTICE TO FILE
### MISSING PARTS OF APPLICATION

In response to the communication of August 28, 2012, Applicants submit a Declaration/Power of Attorney for filing in this application, and the required fee of $130.00.

Please associate the enclosed declaration with the application, grant any extensions of time required to enter this response, and charge any additional required fees to our deposit account 50-2961.

Respectfully submitted,

Dated: October 18, 2012          By:  /Matthew L. Whipple/_____
                                        Matthew L. Whipple
                                        Reg. No. 47,217

Appx1137

ALTUMLLC000215

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of : Peter J. Wachtell et al.    Confirmation No.:    9027

Application Number : 13/585,994

Filed : August 15, 2012

Title : INSULATED OVERHEAD DOOR

TC/Art Unit : 3634

Examiner: : Not yet assigned


Docket No. : 0149.0004

Customer No. : **39878**


**Mail Stop Missing Parts**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Sir:

### RESPONSE TO NOTICE TO FILE
### MISSING PARTS OF APPLICATION

In response to the communication of August 28, 2012, Applicants submit a Declaration/Power of Attorney for filing in this application, and the required fee of $130.00.

Please associate the enclosed declaration with the application, grant any extensions of time required to enter this response, and charge any additional required fees to our deposit account 50-2961.

Respectfully submitted,


Dated: October 18, 2012         By:  /Matthew L. Whipple/_____
                                        Matthew L. Whipple
                                        Reg. No. 47,217

Appx1138

ALTUMLLC000216

## DECLARATION AND POWER OF ATTORNEY FOR PATENT APPLICATION

As a below named inventor, I hereby declare that:

My residence, post office address, and citizenship are as stated below next to my name;

I believe that I am the original, first, and sole inventor (if only one name is listed below) or an original, first, and joint inventor (if plural names are listed below) of the subject matter that is claimed and for which a patent is sought on the invention titled:

### INSULATED OVERHEAD DOOR

the specification of which:    ☒ is attached hereto.
                      ☐ was filed on: _____
                       as United States Application No.: _____
                       or PCT International Application No.: _____
                       and was amended on: _____ (if applicable).

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment specifically referred to above.

I acknowledge the duty to disclose information that is material to patentability, as defined in 37 C.F.R. § 1.56.

### Prior Foreign Application(s)

I hereby claim foreign priority benefits under 35 U.S.C. §§ 119(a)-(d) or (f), or § 365(b) of any foreign application(s) for patent, inventor's or plant breeder's rights certificate(s), or § 365(a) of any PCT international application(s) designating at least one country other than the United States of America, listed below and have also identified below by checking the box, any foreign application(s) for patent, inventor's or plant breeder's rights certificate(s), or any PCT international application(s) having a filing date before that of the application(s) of which priority is claimed:

| Application Number | Country | Date of Filing (day, month, year) | Date of Issue (day, month, year) | Priority Claimed | |
|---|---|---|---|---|---|
| | | | | Yes ☐ | No ☐ |
| | | | | Yes ☐ | No ☐ |
| | | | | Yes ☐ | No ☐ |

Page 1

ALTUMLLC000217

**Authorization to Permit Access to Application by Participating Offices**

☒  If checked, the undersigned hereby grants the USPTO authority to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), and any other intellectual property offices in which a foreign application claiming priority to the above-identified patent application is filed access to the above-identified patent application.  See 37 C.F.R. § 1.14(c) and (h).  This box should not be checked if the applicant does not wish the EPO, JPO, or other intellectual property office in which a foreign application claiming priority to the above-identified application is filed to have access to the application.

In accordance with 37 C.F.R. § 1.14(h)(3), access will be provided to a copy of the application-as-filed with respect to:  1) the above-identified application, 2) any foreign application to which the above-identified application claims priority under 35 U.S.C. § 119(a)-(d) if a copy of the foreign application that satisfies the certified copy requirement of 37 C.F.R. § 1.55 has been filed in the above-identified US application, and 3) any U.S. application from which benefit is sought in the above-identified application.

In accordance with 37 C.F.R. § 1.14(c), access may be provided to information concerning the date of filing the Authorization to Permit Access to Application by Participating Offices.

**Prior Provisional Application(s)**

I hereby claim the benefit under 35 U.S.C. § 119(e) of any United States provisional application(s) listed below:

| Application Number | Date of Filing (day, month, year) |
|---|---|
| 61/523,786 | 15 August, 2011 |
|  |  |
|  |  |

**Prior United States Application(s)**

I hereby claim the benefit under 35 U.S.C. § 120 of any United States application(s), or § 365(c) of any PCT international application(s) designating the United States of America, listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States or PCT International application(s) in the manner provided by the first paragraph of 35 U.S.C. § 112, I acknowledge the duty to disclose information material to patentability, as defined in 37 C.F.R. § 1.56, that became available between the filing date of the prior application(s) and the national or PCT international filing date of this application:

| Application Number | Date of Filing (day, month, year) | Status - Patented, Pending, Abandoned |
|---|---|---|
|  |  |  |
|  |  |  |

ALTUMLLC000218

|  |  |  |
|---|---|---|

And I hereby appoint, both jointly and severally, with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected herewith the MH2 Technology Law Group, LLP attorneys and agents associated with:

> **CUSTOMER NUMBER**
> **39878**

All correspondence and telephone communications should be addressed to:

> **CUSTOMER NUMBER**
> **39878**

corresponding to the law firm of MH2 Technology Law Group, LLP, 1951 Kidwell Drive, Suite 550, Tysons Corner, VA 22182; telephone number (703) 917-0000; facsimile number (703) 997-4905.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine and imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

**NAME OF SOLE OR FIRST INVENTOR:**    ☐ A petition has been filed for this unsigned inventor

| | |
|---|---|
| Signature | _____  Date   8/15/12 |
| Given Name (first and middle (if any))  **Peter J.** | Family Name or Surname   **Wachtell** |
| Citizenship:  USA | |
| Residence:  Boise, ID | |
| Mailing Address:  2733 Warm Springs Avenue, Boise, ID 83712 | |

ALTUMLLC000219

**NAME OF SECOND INVENTOR:**   ☐   A petition has been filed for this unsigned inventor

Signature _____   Date   08/16/12

Given Name
(first and middle (if any))   **Daniel M.**        Family Name
or Surname   **Aragon**

Citizenship:        USA

Residence:        Meridian, ID

Mailing Address:   677 Jordanelle Dr., Meridian, ID 83646

**NAME OF THIRD INVENTOR:**   ☐   A petition has been filed for this unsigned inventor

Signature _____   Date   8/15/12

Given Name
(first and middle (if any))   **John J.**        Family Name
or Surname   **Prehn**

Citizenship:        USA

Residence:        Boise, ID

Mailing Address:   2280 E. Bluestem Lane, Boise, ID 83706

**NAME OF FOURTH INVENTOR:**   ☐   A petition has been filed for this unsigned inventor

Signature _____   Date   12/15/12

Given Name
(first and middle (if any))   **Todd J.**        Family Name
or Surname   **Lindsey**

Citizenship:        USA

Residence:        Boise, ID

Mailing Address:   929 Warm Springs Avenue, Boise, ID 83712

ALTUMLLC000220

## Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | 13585994 |
| **Filing Date:** | 15-Aug-2012 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Attorney Docket Number:** | 0149.0004 |

Filed as Large Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| Late filing fee for oath or declaration | 1051 | 1 | 130 | 130 |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |

ALTUMLLC000221

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | | | **Total in USD ($)** | **130** |

ALTUMLLC000222

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 14020752 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 18-OCT-2012 |
| **Filing Date:** | 15-AUG-2012 |
| **Time Stamp:** | 16:21:23 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 130 |
| RAM confirmation Number | 3335 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

ALTUMLLC000223

| 1 | RespMP_Dec_10-18-12.pdf | 317332 | yes | 5 |
| | | 04d62e2887d5bbb57a7a387313f46912f1740b8 | | |

| Multipart Description/PDF files in .zip description | | | |
|---|---|---|---|
| **Document Description** | **Start** | **End** | |
| Applicant Response to Pre-Exam Formalities Notice | 1 | 1 | |
| Oath or Declaration filed | 2 | 5 | |

**Warnings:**

**Information:**

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 30189 | no | 2 |
| | | | 8cf3a7487d970e51aa4bc1663d47909227831e2b | | |

**Warnings:**

**Information:**

| **Total Files Size (in bytes):** | 347521 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

Appx1146

ALTUMLLC000224

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | | Application or Docket Number<br>13/585,994 |
|---|---|---|

### APPLICATION AS FILED - PART I

| FOR | NUMBER FILED<br>(Column 1) | NUMBER EXTRA<br>(Column 2) | SMALL ENTITY<br>RATE($) | SMALL ENTITY<br>FEE($) | OR | OTHER THAN<br>SMALL ENTITY<br>RATE($) | OTHER THAN<br>SMALL ENTITY<br>FEE($) |
|---|---|---|---|---|---|---|---|
| BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | 95 | | N/A | |
| SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | 310 | | N/A | |
| EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | 125 | | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | 20 | minus 20 = * | x 30 | = 0.00 | OR | | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | 2 | minus 3 = * | x 125 | = 0.00 | | | |
| APPLICATION SIZE FEE<br>(37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | 0.00 | | | |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | 0.00 | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | 530 | | TOTAL | |

### APPLICATION AS AMENDED - PART II

| | | CLAIMS<br>REMAINING<br>AFTER<br>AMENDMENT<br>(Column 1) | HIGHEST<br>NUMBER<br>PREVIOUSLY<br>PAID FOR<br>(Column 2) | PRESENT<br>EXTRA<br>(Column 3) | SMALL ENTITY<br>RATE($) | SMALL ENTITY<br>ADDITIONAL<br>FEE($) | OR | OTHER THAN<br>SMALL ENTITY<br>RATE($) | OTHER THAN<br>SMALL ENTITY<br>ADDITIONAL<br>FEE($) |
|---|---|---|---|---|---|---|---|---|---|
| AMENDMENT A | Total<br>(37 CFR 1.16(i)) | * | Minus ** | = | x | = | OR | x | = |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus *** | = | x | = | OR | x | = |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL<br>ADD'L FEE | | OR | TOTAL<br>ADD'L FEE | |
| AMENDMENT B | Total<br>(37 CFR 1.16(i)) | * | Minus ** | = | x | = | OR | x | = |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus *** | = | x | = | OR | x | = |
| | Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| | FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | | TOTAL<br>ADD'L FEE | | OR | TOTAL<br>ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
    The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

ALTUMLLC000225



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 13/585,994 | 08/15/2012 | 3634 | 530 | 0149.0004 | 20 | 2 |

**CONFIRMATION NO. 9027**

39878
MH2 TECHNOLOGY LAW GROUP, LLP
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

**FILING RECEIPT**

*OC000000056171507*

Date Mailed: 08/28/2012

Receipt is acknowledged of this non-provisional patent application. The application will be taken up for examination in due course. Applicant will be notified as to the results of the examination. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please submit a written request for a Filing Receipt Correction. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Applicant(s)**
Peter J. Wachtell, Residence Not Provided;
Daniel M. Aragon, Residence Not Provided;
John T. Prehn, Residence Not Provided;
Todd N. Lindsey, Residence Not Provided;

**Power of Attorney:** None

**Domestic Priority data as claimed by applicant**
This appln claims benefit of 61/523,786 08/15/2011

**Foreign Applications** (You may be eligible to benefit from the **Patent Prosecution Highway** program at the USPTO. Please see http://www.uspto.gov for more information.)

**If Required, Foreign Filing License Granted:** 08/24/2012

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 13/585,994**

**Projected Publication Date:** To Be Determined - pending completion of Missing Parts

**Non-Publication Request:** No

**Early Publication Request:** No
**\*\* SMALL ENTITY \*\***

page 1 of 3

Appx1148

ALTUMLLC000226

**Title**

INSULATED OVERHEAD DOOR

**Preliminary Class**

160

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

## LICENSE FOR FOREIGN FILING UNDER

### Title 35, United States Code, Section 184

### Title 37, Code of Federal Regulations, 5.11 & 5.15

**<u>GRANTED</u>**

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as

ALTUMLLC000227

set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

---

### *SelectUSA*

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage, facilitate, and accelerate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

ALTUMLLC000228



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING OR 371(C) DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO./TITLE |
|---|---|---|---|
| 13/585,994 | 08/15/2012 | Peter J. Wachtell | 0149.0004 |

**CONFIRMATION NO. 9027**

39878
MH2 TECHNOLOGY LAW GROUP, LLP
1951 KIDWELL DRIVE
SUITE 550
TYSONS CORNER, VA 22182

**FORMALITIES LETTER**

*OC000000056171508*

Date Mailed: 08/28/2012

# NOTICE TO FILE MISSING PARTS OF NONPROVISIONAL APPLICATION

## FILED UNDER 37 CFR 1.53(b)

### *Filing Date Granted*

**Items Required To Avoid Abandonment:**

An application number and filing date have been accorded to this application. The item(s) indicated below, however, are missing. Applicant is given **TWO MONTHS** from the date of this Notice within which to file all required items below to avoid abandonment. Extensions of time may be obtained by filing a petition accompanied by the extension fee under the provisions of 37 CFR 1.136(a).

- The oath or declaration is missing.
  *A properly signed oath or declaration in compliance with 37 CFR 1.63, identifying the application by the above Application Number and Filing Date, is required.*
  *Note: If a petition under 37 CFR 1.47 is being filed, an oath or declaration in compliance with 37 CFR 1.63 signed by all available joint inventors, or if no inventor is available by a party with sufficient proprietary interest, is required.*

The applicant needs to satisfy supplemental fees problems indicated below.

The required item(s) identified below must be timely submitted to avoid abandonment:

- A surcharge (for late submission of filing fee, search fee, examination fee or oath or declaration) as set forth in 37 CFR 1.16(f) of **$65** for a small entity in compliance with 37 CFR 1.27, must be submitted.

**SUMMARY OF FEES DUE:**

Total fee(s) required within **TWO MONTHS** from the date of this Notice is **$65** for a small entity
- **$65** Surcharge.

page 1 of 2

Appx1151

Replies should be mailed to:

Mail Stop Missing Parts
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Registered users of EFS-Web may alternatively submit their reply to this notice via EFS-Web.
https://sportal.uspto.gov/authenticate/AuthenticateUserLocalEPF.html

For more information about EFS-Web please call the USPTO Electronic Business Center at **1-866-217-9197** or visit our website at http://www.uspto.gov/ebc.

If you are not using EFS-Web to submit your reply, you must include a copy of this notice.

/bnguyen/

_____

Office of Data Management, Application Assistance Unit (571) 272-4000, or (571) 272-4200, or 1-888-786-0101

ALTUMLLC000230

# UTILITY
# PATENT APPLICATION
# TRANSMITTAL
(Only for new nonprovisional applications under 37 CFR 1.53(b))

| Attorney Docket No.: | 0149.0004 | Total Pages: | 18 |
|---|---|---|---|
| First Named Inventor or Application Identifier | | | |
| Peter J. Wachtell et al. | | | |
| Express Mail Label No.: | | | |

## APPLICATION ELEMENTS
See MPEP Chapter 600 concerning utility patent application contents.

**ADDRESS TO:  Commissioner for Patents**
**P. O. Box 1450**
**Alexandria, VA  22313-1450**

1. ☐ Fee Transmittal Form

2. ☒ Specification (incl. claims)    (Total Pages:  13)

3. ☒ Drawing(s) (35 USC 113)    (Total Sheets:  2)
   ☐ Informal    ☒ Formal
   Use Figure 1 for front page of Publication.

4. ☐ Oath or Declaration    (Total Pages: )
   a. ☐ Newly executed (original or copy)
   b. ☐ Copy from a prior application (37 CFR 1.63(d))
      (for continuation/divisional with Box 17 completed)
      [Note Box 5 below]
      ☐ i. DELETION OF INVENTOR(S)
      Signed statement attached deleting Inventor(s) named in the prior application, see 37 CFR 1.63(d)(2) and 1.33(b).

5. ☐ Incorporation By Reference
   (usable if Box 4b is checked)
   The entire disclosure of the prior application, from which a copy of the oath or declaration is supplied under Box 4b, is considered as being part of the disclosure of the accompanying application and is hereby incorporated by reference therein.

6. ☐ Microfiche Computer Program (Appendix)

7. ☐ Nucleotide and/or Amino Acid Sequence Submission (If applicable, all necessary)
   a. ☐ Computer Readable Copy
   b. ☐ Paper Copy (Identical to computer copy)
   c. ☐ Statement verifying identity of above copies

### ACCOMPANYING APPLICATION PARTS

8. ☐ Assignment Papers (cover sheet & document(s))

9. ☐ 37 CFR 3.73(b) Statement    ☐ Power of Attorney
   (when there is an assignee)

10. ☐ English Translation Document (if applicable)

11. ☐ Information Disclosure Statement (IDS)/PTO-1449    ☐ Copies of IDS Citations

12. ☐ Preliminary Amendment

13. ☐ Return Receipt Postcard (MPEP 503) (Should be specifically itemized)

14. ☐ Small Entity Statement)    ☐ Statement filed in prior application, Status still proper and desired

15. ☐ Certified Copy of Priority Document(s) (If foreign priority is claimed)

16. ☐ Other:

17. ☐ If a **CONTINUING APPLICATION**, check appropriate box and supply the requisite information:
   ☐ Continuation  ☐ Divisional  ☐ Continuation-in-part (CIP)  of prior application No:      /

## 18. CORRESPONDENCE ADDRESS
☐ Same as prior application    ☒ Correspondence address below

# CUSTOMER NO. 39878

| NAME | MH2 TECHNOLOGY LAW GROUP, LLP | | | | |
|---|---|---|---|---|---|
| ADDRESS | 1951 Kidwell Drive, Suite 550 | | | | |
| CITY | Tysons Corner | STATE | VA | ZIP CODE | 22182 |
| COUNTRY | US | TELEPHONE | 703-917-0000 | FAX | 703-997-4905 |

**UTILITY PATENT APPLICATION TRANSMITTAL - 37 CFR 1.53(b)**    **Page 2**
(Executed Attachment to Page 1)

Attorney Docket No. 0149.0004

19. ☒    The filing fee is calculated below:

| | Number of Claims | | Basic | Extra Claims | | |
|---|---|---|---|---|---|---|
| Basic Application Filing Fee | | | | | $380 | $      380.00 |
| Search Fee | | | | | $620 | $      620.00 |
| Examination Fee | | | | | $250 | $      250.00 |
| Total Claims (37 CFR 1.16(c)) | 20 | - | 20 | 0 | x $60 | $ |
| Independent Claims (37 CFR 1.16(b)) | 3 | - | 3 | 0 | x $250 | $ |
| ☐ Presentation of Multiple Dep. Claim(s) (37 CFR 16(d)) | | | | | +$450 | $ |
| ☐ Application Size Fee (for over 100 pages) (for each add'l 50 sheets) | | | | | x $310 | $ |
| Subtotal | | | | | | $    1250.00 |
| Reduction by 1/2 if small entity (further reduced by $95 for electronic filing for small entity) | | | | | | -      720.00 |
| TOTAL APPLICATION FILING FEE | | | | | | $      530.00 |

20. ☒    The Commissioner is hereby authorized to charge any filing or prosecution fees that may be required, under 37 CFR 1.16, 1.17, and 1.21 (but not 1.18), or to credit any overpayment, to **MH2 Technology Law Group LLP**, **Account No. 50-2961**.

21. ☒    This is an authorization under 37 CFR 1.136(a)(3) to treat any concurrent or future reply, requiring a petition for extension of time, as incorporating a petition for the appropriate extension of time.

22. ☐    A CIP declaration is enclosed.

23. ☒    Power of Attorney

    a. ☐    The power of attorney appears in the original papers of the enclosed prior application.
    b. ☐    Enclosed is a copy of the declaration and power of attorney from the enclosed prior application.
    c. ☒    A new declaration with power of attorney is enclosed.

24. ☐    The following inventors named in the prior application are deleted per 37 CFR 1.53(b)(1), 1.63(d)(2) and 1.33 (b):

Appx1154

ALTUMLLC000232

**UTILITY PATENT APPLICATION TRANSMITTAL - 37 CFR 1.53(b)**        **Page 3**
(Executed Attachment to Page 1)

Attorney Docket No. 0149.0004

25. ☐   This application is adding one or more inventors under 37 CFR 1.48 to a previously executed application, with an enclosed:  petition, fee, newly executed declaration from all inventors, and written consent of the assignee.

26. ☒   This application claims the priority benefit of one or more Provisional Application No.: 61/523,786 and the first sentence of this application has been or will be amended to so indicate.

27. ☐   **This application is NOT to be published under 35 U.S.C. 122(b).  The undersigned attorney or agent hereby certifies pursuant to 37 CFR §1.213, that the invention disclosed in this application has not been and will not be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.**

28. ☐   Other paper(s) enclosed:

Dated:  August 15, 2012                                    Respectfully submitted,

                                                           _/Matthew L. Whipple/_____
                                                           Matthew L. Whipple
                                                           Signature per 37 CFR 1.33 & 34
                                                           Registration No. 47,217

                                                           MH2 TECHNOLOGY LAW GROUP LLP
                                                           1951 Kidwell Drive
                                                           Suite 550
                                                           Tysons Corner, VA  22182
                                                           Phone: (703) 917-0000
                                                           Facsimile: (703) 997-4905

ALTUMLLC000233

**APPLICATION FOR UNITED STATES LETTERS PATENT**


**For**


**INSULATED OVERHEAD DOOR**


**By**


**INVENTORS:**


**Peter J. Wachtell**

**Daniel M. Aragon**

**John T. Prehn**

**Todd N. Lindsey**

ALTUMLLC000234

## INSULATED OVERHEAD DOOR

[001]   This application claims benefit of U.S. Provisional Application No. 61/523,786, filed August 15, 2011, the disclosure of which is hereby incorporated by reference in its entirety.

<u>BACKGROUND</u>

[002]   This invention relates generally to the field of overhead insulated doors and, more specifically, to an insulated overhead door that is designed to roll open and closed in tracks.

[003]   In the cold storage distribution industry, insulated doors of various types are used to cover openings between cold areas and warm areas.  Depending upon the locations and use of the opening, the doors may be opened multiple times each day, which can result in increased energy costs for maintaining desired temperatures of cold storage containers.  Over time, the industry has developed and used doors with increasing insulating qualities (R-value) and with door opening assistance mechanisms (springs and counter weights) that allow for the door to be quickly opened and closed.  The speed with which a door can be opened and closed is important as the more that the door can be kept closed, the more energy is saved from having to cool the cold side of the door, and the better the condition of the material that is being kept cool.

[004]   With regard to refrigerated trucks, most outer doors that are used for loading and unloading the interior truck space are made of a series of hinged horizontal metal panels filled with insulating foam material.  These sections are hinged together to form a single flexible door unit that is sized to fit the opening to be covered.  This single unit with several hinged sections is designed to slide up and down in tracks, with the hinged sections allowing the door to bend such that it can slide up and around a curved track path and be suspended in the tracks directly overhead from the refrigerated interior of the truck.

[005]   The current state of insulated overhead truck doors is such that they are heavy (e.g., 500+ lbs.), have a lower R-value than that desired by the shippers, and can require large numbers of hinges and other hardware for their construction.  There can be significant costs associated with the regular servicing and maintenance of the hinge hardware.  In addition to these drawbacks, because the current doors are made up of several separate panels held together by hinges, painting the truck door or applying the company logos or other advertisements  to the back panel of the door can be complicated and expensive due, in part, to the need to align the message across multiple panels so as to be readable when door is in the closed position.  If a

ALTUMLLC000235

single panel of the door is damaged and requires replacement, the entire door may need to be cleaned and repainted. Further, the doors often employ complicated gaskets in an attempt to provide an improved seal between each of the panel sections. Even then, the multiple horizontal panel design reduces the thermal performance of the entire door.

[006]   Due to the heavy nature of most existing overhead doors, large assistance springs or counter weights are often fitted to the door to enable a driver to open and close the door. The springs and/or counter weights increase the total cost and complicate installation of the doors on the truck. In addition, due to the weight of the door, automated systems for opening and closing these doors have not been commercially successful because they are generally considered to be too slow to be useful.

<u>SUMMARY</u>

[007]   One or more of the following advantages may be realized by the doors of the present disclosure: a door with a higher R-value for openings designed to utilize an overhead door that runs on tracks; elimination of horizontal seams in the door that result in air leaks and heat intrusion and cause a reduction of the overall thermal performance of the door; providing an improved, seam free door surface for affixing decals, logos or advertising information; providing a simpler door with fewer parts used for its manufacture than many existing doors and a reduction of maintenance costs; reducing the weight of the door to allow a trailer to carry increased amounts of freight; and providing a door that easily utilizes existing overhead track technologies.

[008]   The present disclosure addresses some of the current problems with existing overhead door technology, and in particular, the problems associated with insulated doors used in the cold storage industry, such as on delivery trucks for cold storage distribution. By looking at the existing materials that are used in the current door technology, it was determined that finding a lighter weight solution would be advantageous, and that new closed cell foam insulation material existed that could provide a higher R-value with less weight than existing door panels. In attempting to construct a lighter weight version of an operating door, it was apparent that the hinged door design dictated that the door be cut into discreet sections that could be hinged together so as to allow the door to open and close by traversing along curved tracks, thereby positioning the door out of the way of the driver for loading and unloading the truck.

2

ALTUMLLC000236

[009]   The inventors of the present disclosure realized that if suitable materials are used, single panel overhead doors can be made that are sufficiently flexible to open and close in curved tracks, as described in detail herein. This would allow for overhead doors having one or more advantages, such as higher R-value for insulation, reduced heat intrusion into a cooled space and reduced weight or elimination of springs and counterweights.  Other advantages of the present invention will become apparent from the following descriptions, taken in connection with the accompanying drawings, wherein, by way of illustration and example, an embodiment of the present invention is disclosed.

[0010]  An embodiment of the present disclosure is directed to an insulated overhead door that is designed to roll open and closed in tracks. The overhead door comprises a thermoplastic membrane. A sheet of insulating material is attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel. Wheels are attached to the door allowing the door to fit into tracks to guide the opening and closing of the door. The overhead door comprises only a single panel.

[0011] Another embodiment of the present disclosure is directed to an overhead door assembly. The overhead door assembly comprises a set of curved tracks. An insulated overhead door is configured to roll open and closed in the tracks. The overhead door comprises a thermoplastic membrane. A sheet of insulating material is attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel. Wheels are attached to the door allowing the door to fit into tracks to guide the opening and closing of the door. The overhead door comprises only a single panel.


BRIEF DESCRIPTION OF THE DRAWINGS

[0012] The drawings constitute a part of this specification and include exemplary embodiments to the invention, which may be embodied in various forms.  It is to be understood that in some instances various aspects of the invention may be shown exaggerated or enlarged to facilitate an understanding of the invention.

[0013] Figure 1 is a perspective view of an insulated door, according to an embodiment of the present disclosure.

[0014] Figures 2A to 2C illustrate an insulated door at different positions on a track, according to an embodiment of the present disclosure.

3

Appx1159

ALTUMLLC000237

Attorney Docket No.: 0149.0004

DETAILED DESCRIPTION

[0015] In the following detailed description, reference is made to the accompanying drawings that form a part hereof, and in which is shown by way of illustration specific embodiments in which the invention may be practiced. These embodiments are described in sufficient detail to enable those skilled in the art to practice the invention, and it is to be understood that other embodiments may be utilized and that various changes may be made without departing from the spirit and scope of the present invention. The following detailed description is, therefore, not to be taken in a limiting sense.

[0016] Detailed descriptions of the preferred embodiment are provided herein. It is to be understood, however, that the present invention may be embodied in various forms. Therefore, specific details disclosed herein are not to be interpreted as limiting, but rather as a basis for the claims and as a representative basis for teaching one skilled in the art to employ the present invention in virtually any appropriately detailed system, structure or manner.

[0017] In accordance with an embodiment of the disclosure, there is disclosed an article of manufacture for use as an insulated overhead door that is designed to roll open and closed in curved tracks. The door comprises for example, a single sheet of thermoplastic material that acts as the outer door membrane and barrier to entry. The overhead door can also include a single sheet or multiple sheets of material that can act as a base insulating barrier. The door can also include suitable hardware for allowing the door to fit into tracks so as to guide the opening and closing of the door. For example, the door can comprise blocks to which wheels with bearings may be affixed.

[0018] FIG. 1 illustrates an overhead door 2, according to an embodiment of the present disclosure. A thermoplastic membrane 4 can be affixed to an insulating material 6 in any suitable manner so as to form a single panel capable of flexing as it traverses curved tracks. For example, the thermoplastic membrane 4 can be cut or otherwise formed to be approximately the size of the opening to be covered. Insulating material 6 can be affixed to thermoplastic membrane 4 using an adhesive or other fastener. In an embodiment, the fastener can be suitable for cold temperature performance. Suitable techniques for affixing the insulating material to the thermoplastic membrane 4 are well known in the art.

4

ALTUMLLC000238

**[0019]** In another embodiment, the thermoplastic membrane 4 can be applied to the insulating material 6 in a liquid form, such as by spraying or coating in any suitable manner. The thermoplastic membrane 4 can then be dried or cured on the insulating material 6. The Insulating material 6 can be cut to size either before or after the thermoplastic membrane 4 is applied.

**[0020]** In an embodiment, the thermoplastic membrane 4 comprises a flexible, durable polymeric material that will protect the insulating material 6 from physical damage and from the elements, including moisture. It can also include other materials, such as fiber glass, to strengthen and/or provide the desired flexibility versus stiffness or other desired properties. Examples of suitable thermoplastic membrane materials include, for example, polypropylene impregnated with glass fibers and laminated together to create a directional structure, such as VERSATEX® VX or VERSATEX VR, both available from US Liner based in Cranberry Township, PA. Other examples of suitable thermaplastic membrane material include poly vinyl chloride (PVC) combined with rubberizing agents to increase flexibility, which are well known in the art; or polyurea and/or polyurethane applied directly to the foam or any other acceptable substrate, such as the spray on liners available from LINE X Protective Coatings of Huntsville, Alabama, or Rhino Linings Corporation of San Diego, California.

**[0021]** Examples of insulating materials include foam. Suitable foams can include, for example, closed cell foams, such as ethylene vinyl acetate ("EVA") foam, which is a copolymer of ethylene and vinyl acetate and is available from many sources. The weight percent vinyl acetate may vary, for example, from about 10% to about 40%, based on the total weight of the EVA material, with the remainder being ethylene. Other examples of suitable closed cell foams include polyethylene foams, polypropylene foams or neoprene based foams. Open cell foams, such as polyether based polyurethanes foams or polyester based polyurethane foams, can also be used. All of these listed foams are generally well known in the art.

**[0022]** In an embodiment, solid blocks or any other suitable hardware may be attached to the thermoplastic mambrane to allow for the attachment of wheels 18 (which may or may not include bearings), such that the door may be run in overhead door tracks.

**[0023]** In an embodiment, , foam blocks 7, as illustrated in Figure 1, (such as EVA foam or any other insulating material, including any foam discussed herein) may be adhered to, for example, an initial sheet of foam, such as closed cell foam, that is employed as insulating material 6. In this manner, a door with an increased R-value may be provided. The insulating

5

ALTUMLLC000239

foam can be bonded together in any suitable manner. Techniques for bonding insulting foam together, such as with adhesives, are well known in the art.

[0024] The insulating foam can optionally include compression gaps 8, examples of which are shown in FIG. 1. The compression gaps 8 in the foam material allow the foam to more easily bend during the opening and closing of the door. The compression gaps 8 can be formed between the foam blocks, as illustrated. Alternatively, the compression gaps 8 can be formed partially through a foam sheet, such as where a second foam sheet is used to replace some or all of the foam blocks bonded to the first foam sheet shown in FIG. 1. In yet another embodiment, compression gaps 8 could be formed in the foam sheet illustrated in FIG. 1.

[0025] Due to the flexibility of the thermoplastic membrane 4 and foam composite, the doors of the present disclosure can be made as a single integral unit, or panel, that is approximately the size of the door opening, without having to hinge together multiple sections to allow the door to traverse a curved track. In an embodiment, the single laminate door section can flex sufficiently to traverse an existing track. FIGS 2A to 2B illustrate a door 2 flexing to traverse tracks 10, according to an embodiment of the present disclosure. The tracks 10 can be attached to, for example, a truck or enclosed trailor used for cold storage during transport. Alternatively, the tracks 10 can be attached to a building for which thermally insulated doors are desired, such as might be used for cold storage on a walk-in freezer or refrigerated warehouse, or a garage door.

[0026] The tracks 10 comprises a track portion 12 of a first length, $L_1$, positioned at an angle, $\Theta$, relative to track portion 14 of a second length, $L_2$, as shown in FIG. 2A. $\Theta$ can range, for example, from about $80^o$ to about $125^o$. In an embodiment, $\Theta$ is approximately $90^o$. In an embodiment, the door is positioned substantially horizontally from a point near the top of the door opening, so that most or all of the door is in a substantially vertical position when closed and most or all of the door is in a substantially horizontal position when open (assuming the truck or refrigerated container the tracks 10 are attached to is positioned on a substantially level surface).

[0027] In embodiments, the track portions 12 and 14 can be relatively straight. In alternative embodiments, the track portions 12 and 14 can be somewhat curved.

[0028] A third curved track portion 16 connects the first portion 12 and second portion 14. Curved track portion 16 can be curved in any suitable manner that will provide the transition

6

ALTUMLLC000240

Attorney Docket No.: 0149.0004

between the relative angles of track portion 12 and track portion 14.  The door 2 is designed so that it is capable of flexing to traverse the curved track portion 16. In an embodiment, the portion of door 2 traversing the curve track portion 16 will generally curve to approximate the curved shape of the curved track portion 16.  For example, all or a part of track portion 16 can be curved in a circular arc so that the inner path contacted by the wheels has a radius of curvature, R (illustrated in FIG. 2B), where R can range, for example, from about 1 inch to about 25 inches, such as about 5 inches to about 18 inches.

[0029] The density of the closed cell foam combined with the thermoplastic liner thickness provides enough stiffness to create a good seal around the edge of the door when the panel is in the closed position, yet may be flexible enough to bend across the horizontal dimension up to, for example, approximately 90 degrees when running through the curved portion of the tracks 10.  The flexibility may be increased or decreased by modifying the densities and thicknesses of the foam and liners that are combined such that the panel is able to flex over a very tight radius or a longer radius track curve as a particular door opening and track curvature dictates.

[0030] The wheels 18 can be affixed to the door in any suitable manner so that the wheels 18 are positioned to fit into the tracks 10.   There are many ways to attach the wheels to the door.  For example, the wheels 18 can be mounted using blocks, as discussed above, or brackets.  Wheels with sleeves might also be employed to attach the wheels 18 to the door, as is well known in the art.

[0031] An optional flexible membrane 20 can also be employed, as illustrated in FIG. 1. The flexible membrane 20 can be made of any suitable flexible material, such as cloth, plastic or rubber sheeting.  Optional flexible covers 22 can be employed at the hinge locations, if desired, as is also illustrated in FIG. 1.  The flexible covers 22 can also be made of any suitable flexible material, such as those listed for the flexible membrane 20. In an alternative embodiment, the flexible membrane 20 and flexible covers 22 can be a single integral piece of flexible material.

[0032] The door can be any desired size or shape. Example door sizes can range from about 6 feet to about 10 feet in width, and about 6 feet to about 12 feet in height.  The thickness of the door can be fashioned up to, for example, 12 inches in thickness. Example R values for the door can range from about 14 to about 50.  The R value can be increased by increasing the thickness of the door and the amount of EVA foam that is used.

7

ALTUMLLC000241

[0033] In an embodiment, the door is relatively light weight, so that it can easily be opened and closed by a manual process, or by use of an automatic system, such as, for example, electric, hydraulic or pneumatic systems. These systems can be made to be very efficient at quickly opening and closing doors that are lightweight. Furthermore, the use of these systems may allow the door's opening trigger to be manual or to be automatic based upon the approach of the driver carrying, for example, an RFID transmitter (not shown).

[0034] Other alterations or changes to the design of the embodiment of FIG. 1 can also be made. For example, rather than employing insulating foam blocks, as illustrated in FIG. 1, the insulating foam sheet can be employed without the foam blocks, in combination with the sheet of thermoplastic material. Further, the location and number of wheels 18 can also be changed. Still other alterations can be made, as would readily be understood by one of ordinary skill in the art.

[0035] While the invention has been described in connection with various detailed embodiments, the description is not intended to limit the scope of the invention to the particular forms set forth herein, but on the contrary, it is intended to cover such alternatives, modifications, and equivalents as may be included within the spirit and scope of the invention as defined by the appended claims.

8

ALTUMLLC000242

Attorney Docket No.: 0149.0004

WHAT IS CLAIMED IS:

1.   An insulated overhead door that is designed to roll open and closed in tracks comprising:

    a thermoplastic membrane;

    a sheet of insulating material attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel; and

    wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

    wherein the overhead door comprises only a single panel.

2.   The insulated overhead door of claim 1, wherein the thermoplastic membrane is a single sheet that is approximately the size of the door opening to be covered.

3.   The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises glass fibers.

4.   The insulated overhead door of claim 1, wherein the thermoplastic membrane comprises a material chosen from polypropylene impregnated with glass fibers and laminated together to create a directional structure; poly vinyl chloride (PVC) combined with rubberizing agents; polyurea or polyurethane.

5.   The insulated overhead door of claim 1, wherein the insulating material comprises foam.

6.   The insulated overhead door of claim 5, wherein the insulating foam comprises compression gaps configured to allow the foam to more easily bend during opening and closing of the door.

7.   The insulated overhead door of claim 1, wherein the insulating material is closed cell foam.

9

ALTUMLLC000243

8.  The insulated overhead door of claim 7, wherein the closed cell foam comprises ethylene vinyl acetate.

9.  The insulated overhead door of claim 7, wherein the closed cell foams is chosen from polyethylene foams, polypropylene foams or neoprene based foams.

10. The insulated overhead door of claim 1, wherein the insulating material is an open cell foam.

11. The insulated overhead door of claim 1, further comprising foam blocks configured to increased an R-value of the door.

12. The insulated overhead door of claim 1, wherein the door does not include hinged panels.

13. The insulated overhead door of claim 1, further comprising an additional membrane that is not the thermoplastic membrane.

14. The insulated overhead door of claim 1, the door having an R value ranging from about 14 to about 50.

15. A method comprising:

    providing the insulated overhead door of claim 1 on tracks, at least a portion of the tracks being curved; and

    moving the insulated overhead door so that a portion of the thermoplastic membrane and a portion of the insulating material flex to allow the door to traverse the curved portion of the tracks.

16. An overhead door assembly comprising:

    a set of curved tracks; and

    an insulated overhead door configured to roll open and closed in the tracks, the overhead door comprising:

10

ALTUMLLC000244

Attorney Docket No.: 0149.0004

a thermoplastic membrane;

a sheet of insulating material attached to the thermoplastic membrane, the thermoplastic membrane and insulating material forming a panel; and

wheels attached to the door allowing the door to fit into tracks to guide the opening and closing of the door,

wherein the overhead door comprises only a single panel.

17. The overhead door assembly of claim 16, wherein the track comprises a track portion of a first length positioned at an angle, $\Theta$, relative to a track portion of a second length, wherein $\Theta$ ranges from about $80^{o}$ to about $125^{o}$.

18. A truck comprising the insulated overhead door assembly of claim 16.

19. A cold storage trailer comprising the insulated overhead door assembly of claim 16.

20. A building comprising the insulated overhead door assembly of claim 16.

ALTUMLLC000245

Attorney Docket No.: 0149.0004

<u>ABSTRACT</u>

An article of manufacture for use as an insulated overhead door that is designed to roll open and closed in tracks,  with a sheet of thermoplasitc material that acts as the outer door membrane and barrier to entry, a sheet of insulating material that acts as a base insulating barrier adhered to the thermoplastic membrane.

12

ALTUMLLC000246



**FIG. 1**

ALTUMLLC000247



**FIG. 2A**

**FIG. 2B**

**FIG. 2C**

ALTUMLLC000248

# Electronic Patent Application Fee Transmittal

| | |
|---|---|
| **Application Number:** | |
| **Filing Date:** | |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Attorney Docket Number:** | 0149.0004 |

Filed as Small Entity

## Utility under 35 USC 111(a) Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Utility filing Fee (Electronic filing) | 4011 | 1 | 95 | 95 |
| Utility Search Fee | 2111 | 1 | 310 | 310 |
| Utility Examination Fee | 2311 | 1 | 125 | 125 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |

ALTUMLLC000249

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Post-Allowance-and-Post-Issuance:** | | | | |
| **Extension-of-Time:** | | | | |
| **Miscellaneous:** | | | | |
| | | **Total in USD ($)** | | **530** |

ALTUMLLC000250

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 13500540 |
| **Application Number:** | 13585994 |
| **International Application Number:** | |
| **Confirmation Number:** | 9027 |
| **Title of Invention:** | INSULATED OVERHEAD DOOR |
| **First Named Inventor/Applicant Name:** | Peter J. Wachtell |
| **Customer Number:** | 39878 |
| **Filer:** | Timothy M. Hsieh/Matthew Whipple/srj |
| **Filer Authorized By:** | Timothy M. Hsieh |
| **Attorney Docket Number:** | 0149.0004 |
| **Receipt Date:** | 15-AUG-2012 |
| **Filing Date:** | |
| **Time Stamp:** | 12:09:47 |
| **Application Type:** | Utility under 35 USC 111(a) |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | Credit Card |
| Payment was successfully received in RAM | $ 530 |
| RAM confirmation Number | 9367 |
| Deposit Account | |
| Authorized User | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|

ALTUMLLC000251

| 1 | ApplicationAsFiled_8-15-12.pdf | 110974 | yes | 18 |
| | | b8f019e454e7fb32e86ad75b10482f0bcc57 2c31 | | |

| **Multipart Description/PDF files in .zip description** | | | |
|---|---|---|---|
| **Document Description** | **Start** | **End** |
| Transmittal of New Application | 1 | 3 |
| Specification | 4 | 12 |
| Claims | 13 | 15 |
| Abstract | 16 | 16 |
| Drawings-only black and white line drawings | 17 | 18 |

**Warnings:**

**Information:**

| 2 | Fee Worksheet (SB06) | fee-info.pdf | 32857 | no | 2 |
| | | | f25def325f367b792d141d185932273258b b428a | | |

**Warnings:**

**Information:**

| **Total Files Size (in bytes):** | 143831 |
|---|---|

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

ALTUMLLC000252

EXHIBIT

D-19

Title:                Re: Meeting regarding door
From:              Gary Grandominico <gary.grandominico@ridgecorp.com>
To:                  Jeff Phlipot <Jeff_Phlipot@knl.cc>
Sent:               October 25, 2022 5:19:04 PM EDT
Received:         October 25, 2022 5:19:06 PM EDT

NO

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android <https://aka.ms/AAb9ysg>


From: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Sent: Tuesday, October 25, 2022 3:55:48 PM
To: Gary Grandominico <gary.grandominico@ridgecorp.com>
Subject: RE: Meeting regarding door

Gary,

I apologize for the delay in responding. I felt I needed time to research and ensure that I was understanding all of this process correctly.

I must disagree with your statement that "it appears that Ridge has grounds to challenge any attempt on your part to obtain a patent that does not name us and offer full rights to the same." The patent application properly names only those persons who took part in inventing the single-panel roll-up door. During the development phase of the product, we utilized your services solely to manufacture samples of panels, based on my instructions. Ridge did not contribute to any aspect of the design of the invention claimed in the patent application. In other words, you do not have "grounds to challenge" the application for not including Ridge employees as co-inventors -- they simply were not co-inventors.

You say at the end of your e-mail "we can reconvene as originally planned." We still are interested in using Ridge as a supplier, and remain willing to enter into a business agreement for the panel that is in the interests of both the inventors and Ridge. If you wish to continue to discuss an agreement, please let me know.

Thank you.

Jeff Phlipot|CEO

Kirk NationaLease Co.

3885 W. Michigan Ave. Sidney, OH 45365 <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-b022a620faa882ca&q=1&e=02c6c8d2-3670-4a6f-84de-fc7f19db0e64&u=https://www.google.com/maps/place/Kirk+NationaLease+Co./@40.2871101,-84.2282287,17z/data=!4m12!1m6!3m5!1s0x883f090025d17fab:0x988a782a4471e9fa!2sKirk+NationaLease+Co.!8m2!3d40.2871101!4d-84.22604!3m4!1s0x883f090025d17fab:0x988a782a4471e9fa!8m2!3d40.2871101!4d-84.22604>

Å937.498.1151 |þwww.knl.cc <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-be339cc5cf065982&q=1&e=02c6c8d2-3670-4a6f-84de-fc7f19db0e64&u=http://www.knl.cc/>

Follow us on Facebook <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-95172216b4cf17a3&q=1&e=02c6c8d2-3670-4a6f-84de-

confidential - subject to protective order

RIDGE000922

fc7f19db0e64&u=https://www.facebook.com/KirkNationalLease/>

Jeff Phlipot|CEO

Kirk NationalLease Co.

3885 W. Michigan Ave. Sidney, OH 45365 <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-
454455535732-b022a620faa882ca&q=1&e=02c6c8d2-3670-4a6f-84de-
fc7f19db0e64&u=https://www.google.com/maps/place/Kirk+NationalLease+Co./@40.2871101,-
84.2282287,17z/data=!4m12!1m6!3m5!1s0x883f090025d17fab:0x988a782a4471e9fa!2sKirk+NationalLease+Co.!8m2!
3d40.2871101!4d-84.22604!3m4!1s0x883f090025d17fab:0x988a782a4471e9fa!8m2!3d40.2871101!4d-84.22604>

Å937.498.1151 |bwww.knl.cc <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-
be339cc5cf065982&q=1&e=02c6c8d2-3670-4a6f-84de-fc7f19db0e64&u=http://www.knl.cc/>

Follow us on Facebook <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-
95172216b4cf17a3&q=1&e=02c6c8d2-3670-4a6f-84de-
fc7f19db0e64&u=https://www.facebook.com/KirkNationalLease/>

From: Gary Grandominico [mailto:gary.grandominico@ridgecorp.com]
Sent: Thursday, September 29, 2022 5:16 PM
To: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Subject: RE: Meeting regarding door

Jeff,

After considerable research, it appears that Ridge has grounds to challenge any attempt on your part to obtain a
patent that does not name us and offer full rights to the same.

PLEASE UNDERSTAND THAT WE HAVE NO INTEREST IN CAUSING YOU HARM (the opposite is true) BUT WE
MUST STANDUP AND RESPECT THE HARD WORK OUR EMPLOYEES HAVE ACCOMPLISHED.

WE WILL DEFEND RIDGE WORK WITH VIGOR AND ALL MEANS AVAILABLE, DESPITE ANY COSTS.

Having said this, our primary interests remain as always in seeing this product line to a successful launch and
returning long-term monies and recognition to you and your team.

It is unfortunate that outside influences may have recently swayed you away from your original intentions, as you had
described them to me from the get-go.

I wish you the best of luck and respectfully offer this for consideration: Ridge possesses ALL the knowhow required to
make a successful launch with ongoing returns.

If there is interest in discourse on this matter, we can reconvene as originally planned.

Let me know.

From: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Sent: Monday, September 12, 2022 1:45 PM
To: Gary Grandominico <gary.grandominico@ridgecorp.com>; Ray McDonald <ray.mcdonald@ridgecorp.com>
Cc: Larry Phlipot <larry_phlipot@ttpsusa.com>; schnelec@woh.rr.com; John Garmhausen (jgarmhausen@fgks-

confidential - subject to protective
order

RIDGE000923

law.com) <jgarmhausen@fgks-law.com>

Subject: RE: Meeting regarding door

Thanks Gary. I'll see if I can find another vendor.

Will I still be able to sell the other products Ridge produces?

Jeff Phlipot|CEO

Kirk NationaLease Co.

3885 W. Michigan Ave. Sidney, OH 45365 <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-b022a620faa882ca&q=1&e=1ec61812-96ad-4996-8562-9c4e35ed643b&u=https://www.google.com/maps/place/Kirk+NationaLease+Co./@40.2871101,-84.2282287,17z/data=!4m12!1m6!3m5!1s0x883f090025d17fab:0x988a782a4471e9fa!2sKirk+NationaLease+Co.!8m2!3d40.2871101!4d-84.22604!3m4!1s0x883f090025d17fab:0x988a782a4471e9fa!8m2!3d40.2871101!4d-84.22604>

À937.498.1151 |bwww.knl.cc <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-be339cc5cf065982&q=1&e=1ec61812-96ad-4996-8562-9c4e35ed643b&u=http://www.knl.cc/>

Follow us on Facebook <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-95172216b4cf17a3&q=1&e=1ec61812-96ad-4996-8562-9c4e35ed643b&u=https://www.facebook.com/KirkNationaLease/>

From: Gary Grandominico [mailto:gary.grandominico@ridgecorp.com]
Sent: Monday, September 12, 2022 1:01 PM
To: Jeff Phlipot <Jeff_Phlipot@knl.cc>; Ray McDonald <ray.mcdonald@ridgecorp.com>
Cc: Larry Phlipot <larry_phlipot@ttpsusa.com>; schnelec@woh.rr.com; John Garmhausen (jgarmhausen@fgks-law.com) <jgarmhausen@fgks-law.com>
Subject: RE: Meeting regarding door

Jeff,

Ray and I started Ridge in my basement….we wrote that book.

Like you said to me, " It's not about the money." It seems it is about the money after all.

As you are aware, we have high demand and limited lamination and routing time.

We have assisted in every way possible to date, but supply agreements don't exist here.

You may want to gain some experience by having others build the panel.

I will cancel the meeting invite.

Good luck.

VALUE always exceeds price,

Gary A. Grandominico

confidential - subject to protective order

RIDGE000924

Co-Founder & CEO

Ridge Corporation

1201 Etna Parkway

Pataskala, OH 43062

p 614.421.7434

c 614.207.2087

f 614-294-7434

gary.grandominico@ridgecorp.com

www.ridgecorp.com <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-b7e0f198bf601d74&q=1&e=1ec61812-96ad-4996-8562-9c4e35ed643b&u=http://www.ridgecorp.com/>

Join our team! Click to applyhttps://jobs.teamengine.io/ridge_corporation_ <https://protect2.fireeye.com/v1/url?k=31323334-501d2dca-31356f64-454455534531-6a230f9610c20b3d&q=1&e=4bfb9eb2-ba86-4d64-8a76-4d5d1c9dfdfb&u=https://jobs.teamengine.io/ridge_corporation_>

From: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Sent: Monday, September 12, 2022 11:45 AM
To: Gary Grandominico <gary.grandominico@ridgecorp.com>
Cc: Larry Phlipot <larry_phlipot@ttpsusa.com>; schnelec@woh.rr.com; John Garmhausen (jgarmhausen@fgks-law.com) <jgarmhausen@fgks-law.com>
Subject: Meeting regarding door

Gary,

I met with Larry and Mark this past Friday (the other two owners of the patent). At this time, we do not want to sell exclusive rights to the patent. I know the old saying "everyone has a price". At this early stage in the project, it's hard to put a value on it. We are excited about seeing an idea come to reality. We would like to take this ourselves as far as we can. I've heard about a lot of businesses started in the garage, and they became very successful. This may be one of those stories.

We would like Ridge to continue making the panels for us. If that is agreeable, we can still meet Monday and put a business agreement together for the panels.

If you wanted to get in deeper discussions about the door, we will have to reschedule. Mark Schneider is leaving for Dallas, Texas this Friday, and won't be back until Wednesday, Sept.21st.

Thank you.

Jeff Phlipot|CEO

Kirk NationaLease Co.

confidential - subject to protective order

Appx1178

RIDGE000925



# BUSINESS PLAN/COOPERATIVE AGREEMENT
## SecureCore™ Roll-up Door
### January 11, 2022

Authors:  Gary Grandominico, Ray McDonald, John Maynie,
Zach Rittler, Bret Moss, Sherry Pattison



EXHIBIT

D-14

ALTUMLLC000001

**Ridge Corporation Roll-Up Door Business Plan/Cooperative Agreement**

To achieve these projections, we need to invest an estimated $2,000,000 over the initial two years.  *(Assumption: R&D testing $400K, Router $650K, Assy. Fixturing $200K, Automated progressive die tools $150K, Inventory Space and Labor expense, training & service expense)*

**Figure 1: Estimated annual sales volumes**

| | | | | | | |
|---|---|---|---|---|---|---|
| **SecureCore Roll-up Door Marketing Goals** | | | | | | |
| **Year #** | **Year** | **Roll up door sales** | **$/door w/inflation** | **Total $** | **% Market share @ 132,500** | ***Est. Royalty** |
| 1 | 2022 | 99 | $0.00 | $0.00 | 0% | $0.00 |
| 2 | 2023 | 299 | $1,001.00 | $299,299.00 | 0% | $5,985.98 |
| 3 | 2024 | 3500 | $1,031.96 | $3,611,855.67 | 3% | $72,237.11 |
| 4 | 2025 | 5224 | $1,063.88 | $5,557,683.07 | 4% | $111,153.66 |
| 5 | 2026 | 7463 | $1,096.78 | $8,185,256.93 | 6% | $163,705.14 |
| 6 | 2027 | 9951 | $1,130.70 | $11,251,212.28 | 8% | $225,024.25 |
| 7 | 2028 | 13268 | $1,165.67 | $15,465,583.89 | 10% | $309,311.68 |
| 8 | 2029 | 17690 | $1,201.72 | $21,258,534.55 | 13% | $112,582.18 |

*Royalty Cap of $1,000,000 for Lifetime of the program

ALTUMLLC000014





EXHIBIT
D-44



EXHIBIT

D-45

**EXCLUSIVE SUPPLY AGREEMENT**
**FOR PATENT APPLICATION _____**

This Exclusive Supply Agreement for Patent Application (this "Agreement") is made, effective as of the [DAY] day of [MONTH], 2023 ("Effective Date"), by and between Altum, LLC, a limited liability corporation and existing under the laws of the State of Ohio, with its principal place of business located at 403 Streamwater Dr., Blacklick, OH 43004 (hereinafter referred to as "Altum") and Truck & Trailer Parts Solutions, LLC, a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located at XXXXXXX (hereinafter referred to as "TTPS") (each is individually referred to herein as a "Party" and collectively as the "Parties").

**RECITALS**

WHEREAS, Altum is engaged in the design, manufacture, sale, marketing and distribution of plastics including structural composite panels;

WHEREAS, TTPS is engaged in the design, manufacture, sale, marketing and distribution of various parts and solutions for trucks and trailers,

WHEREAS, Altum has a patent on the crosslinking of thermoplastic and lightweight polymer core that provides structural, weight and cosmetic advantages to other offerings available in structural composites;

WHEREAS, TTPS has patent application No. US 2022/0168099 pending for a novel single panel roll-up door for use on delivery vehicles ("The Single Panel Door");

WHEREAS, TTPS believes Altum's patent, unique panel design and potential manufacturing capability make Altum an ideal supplier for the primary component of The Single Panel Door (herein, the primary component of The Single Panel Door is referred to as "The Composite Panel" or simply "Product");

WHEREAS, TTPS wishes to incentivize Altum to invest in the manufacturing capability to supply The Composite Panel to TTPS;

WHEREAS, Altum wishes to secure the right to manufacture the The Composite Panel for TTPS or any entity who may acquire the rights to TTPS's patent and/or TTPS's design;

WHEREAS, TTPS wishes to ensure Altum does not work around TTPS's pending patent application, or otherwise seek to undermine TTPS's efforts to secure customers for The Single Panel Door;

WHEREAS, TTPS and Altum are two companies who wish to find mutually-advantageous ways of working together to grow their companies and be successful while bringing jobs and investment to Ohio and the Midwest,

Attorneys' Eyes Only

Exhibit P26

ALTUMLLC001266

WHEREAS, Altum and TTPS wish to work together to enable the production and sale of The Single Panel Door;

WHEREAS, Altum desires to become the Standard Supplier as defined below of the The Composite Panel in accordance with the terms and conditions of this Agreement; and,

WHEREAS, the spirit of this Agreement is to support the growth and broad use of The Single Panel Door, and provide a reliable source of The Composite Panel, while protecting Altum's financial and operational investment.

NOW, THEREFORE, in consideration of the foregoing, and of the mutual benefits and obligations set forth in this Agreement, the Parties agree as follows:

## AGREEMENT

The Parties incorporate and make a part of this Agreement the introduction, recitals and and definitions contained above as if rewritten here.

## 1.    EXCLUSIVE SUPPLY AS INVESTMENT INCENTIVE; EXCEPTIONS

TTPS wishes to incentivize Altum to build production capacity by investing significant capital expenditures and hiring Ohioans so that Altum can produce the The Composite Panel for TTPS's use in the sale of The Single Panel Door. In order to so incentivize Altum, TTPS appoints Altum as the exclusive production partner for the The Composite Panel.

TTPS agrees and warrants that this exclusive supply arrangement shall run with patent application No. US 2022/0168099, if issued, such that TTPS will not sell, license or subcontract the rights to produce under patent application No. US 2022/0168099 or designs similar to The Single Panel Door without ensuring that Altum's rights under this agreement run with the sale, license or subcontract of the right to produce or sell under the patent or designs similar thereto.

**Exceptions**

The parties acknowledge that there may be bumps in the road as they attempt to scale together. Thus they agree that Altum's "exclusive" right to to supply TTPS with The Composite Panel shall not limit TTPS's ability to use a stand-in for The Composite Panel from a secondary supplier as needed in the first two years of this Agreement. The parties contemplate that this secondary supply shall not exceed 20% of TTPS's annual production needs of The Composite Panel, but the parties shall work together to modify this arrangement if Altum is unable to meet the production needs of TTPS.

Attorneys' Eyes Only

Exhibit P26
ALTUMLLC001267

**2.    SUPPLY PARTICULARS**

A.   TTPS appoints Altum as its Standard Supplier for The Composite Panel, described roughly as The Single Panel Door. The size, depth and particulars are set forth generally in Exhibit A incorporated herein, but shall be updated and amended as TTPS's clients' needs evolve and change during the course of this Agreement.

B.   If TTPS fails to purchase at least _____ then _____.

A.   TTPS shall at all times use its diligent and good faith efforts to market, promote and expand the sale of The Single Panel Door.

B.   TTPS shall submit to Altum monthly sales and inventory data within ten (10) days following the beginning of each calendar month. Sales data will include breakdown of volume, by sku, by account, by date.

C.   At least once per year, at the request of either Party, or more frequently as agreed by the Parties, TTPS shall meet with a company representative of Altum to discuss, review and outline sale and distribution goals and to establish distribution targets.

D.   TTPS shall submit written orders for all Products to be purchased hereunder. Those purchase orders shall contain the following terms, which such terms must be in full conformity with the terms and conditions of this Agreement:

   I.    The purchase order number and date;
   II.   The type and quantity of each Product ordered;
   III.  The total Cost of the Products ordered;
   IV.   The suggested delivery date (which, for purposes of clarity, shall be subject to the delivery schedule and requirements of the Altum); and
   V.    All relevant shipping information
   VI.   Standard lead time of 4-6 weeks on new orders unless communicated otherwise and agreed upon by both parties
   VII.  Minimum order quantities of XXXX sqft/units/lineal feet/etc…

E.   Products shall be manufactured and labeled in all material respects in accordance with TTPS's requirements.  TTPS shall inspect all deliveries within 30 days and thereafter will have accepted the fit, finish and quality of the Products.

F.   Altum agrees to allocate available capacity and resources to meet TTPS's volumes as requested by TTPS provided a 6 month forecast is developed and

Attorneys' Eyes Only

Exhibit P26
ALTUMLLC001268

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **From:** | DJ Marks |
| **Sent:** | Friday, December 16, 2022 11:53 AM |
| **To:** | Jack Webster |
| **Subject:** | Green APU |
| **Attachments:** | Comp chart.webp |

Hey Jack,

Thanks for taking time out of your day to talk to me this morning. As we talked about with Green APU's, we would be more than happy to talk to Jeff on your procurement side or have him engage directly with Greg the owner of Green APU if he has any specific questions related to the unit.

My boss Mitch and myself would be more than happy to have a conversation with Jeff as well if it makes things any easier as well and can give a live demonstration at your USA facilities anytime that works for Jeff and your company. If you visit www.greenapu.com you can find everything about the system very specifically as well.

We also have Merlin Solar, Dhollandia liftgates (the global leader in liftgates) and a one piece roll door that we have patented in case there might be any interested generated there as well. You are more than welcome to see demonstrations of everything at our website at www.ttpsusa.com

Thanks Jack!

DJ Marks | **Regional Sales Manager**
Kirk NationaLease Co.
3885 W. Michigan Ave
Sidney, OH  45365
Ph : 937-638-6789



KNL 001476
Exhibit P47

Case: 24-1138     Document: 54     Page: 500     Filed: 03/21/2024

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

   

| DIESEL | 3-cyl Tier 4 Final Kubota 50 State Legal 17 HP @ 2,300RPM | 2-cyl Tier 4 Kubota | 2-cyl Tier 4 Kubota | 2-cyl Tier 4 Final Kohler 50 State Legal 10.5 HP @ 2,300 RPM |
|---|---|---|---|---|
| DC Charging | 60A | 65A | 60A | 60A |
| A/C Compressor | Automotive | Automotive | Hermetic | Automotive |
| Bunk Heat | Automotive Heater Core | Fuel-Fired | Water/Electric | Heat Pump |
| Available BTU (Heat/Cool) | 26,000 / 26,000 | 7,500 / 13,000 | 10,000 / 12,000 | 13,500 / 24,000 |
| Total Weight | 315lbs | 415lbs | 482lbs | 410lbs |
| Condenser | Internal | Cab Mounted | Cab Mounted | Internal |
| Engine RPM | 2,300 RPM | 2,700 RPM | 2,700 RPM | 2,400 RPM |
| Appx. Fuel/hr | 0.27 GPH | 0.2 GPH | 0.2 GPH | 0.25 GPH |
| PM Interval | 1000 hrs for extended engine life | 2,000 hrs | 2,000 hrs | 600 hrs |
| Tech Support | Lifetime 24/7 | Dealer Only | Dealer Only | Dealer Only |
| Diagnostics | Built In Diagnostics | Special Equipment Required | Special Equipment Required | Special Equipment Required |
| Blower | 700 CFM, Brushless | Not Advertised | 650 CFM | 600 CFM |
| Construction | All Aluminum Casing | Steel Casing | Steel Casing | Steel Casing |
| Cold Start / Engine Preheat | Standard, 3 Electric Glow Plugs | Optional | Standard | Based on Configuration |
| Warranty | 2 Years / 3000 Hours | 2 Years / 2000 Hours | 2 Years / 2000 Hours | 2 Years / 2000 Hours |
| Jump Start Accessibility | Easy to Access | Not Available | Not Available | Not Available |
| Battery Monitoring | Included | Not Available | Optional | Included |
| Coolant Temp Monitoring | Included | Optional | Optional | Not Available |

Appx1239                                        **KNL 001477**

Exhibit P47

| | |
|---|---|
| **From:** | DJ Marks |
| **Sent:** | Tuesday, August 8, 2023 2:49 PM |
| **To:** | justinw@nussbaum.com |
| **Cc:** | Mitchell Rank; Brandon Bishop |
| **Subject:** | KNL Follow up |
| **Attachments:** | PM B Sheet 2023.pdf; PM T Sheet 2023.pdf; Parking Sheet.xlsx; Seymour App.pdf |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | justinw@nussbaum.com | |
| | Mitchell Rank | Read: 8/8/2023 4:26 PM |
| | Brandon Bishop | Read: 8/8/2023 5:28 PM |

Justin,

Thank you so much for reaching out to me on behalf of Hans, he's always been a pleasure to work with.  I have included Mitch Rank our President and Brandon Bishop our VP of Operations who will be helping oversee on board Nussbaum into our system and there might be some specific questions that they have to ask.

As promised, I'm sending a plethora of information over to you.  I have attached the application for credit for Nussbaum to set up an account throughout the KNL network and your rate will be the same at every shop as we've agreed upon so that you have a record for you and your team -

$140/hr for all truck work performed
$95/hr for all trailer work performed

I will include into our sheets for our shops that if we do a PM and DOT on any of your trailers we will charge 1.3hrs to complete both.  1 hour for the PM and .3 for the DOT paperwork and sticker and not 1 hour SRT time for each.  Our call out fee for mobile is $55 and like we discussed, this is a one-time fee to charge and will only apply to the first unit that we touch, anything else will be standard SRT time.  Our mileage fee is $2.95/mile.  One thing that I didn't mention while we were on the phone is that we have the ability to pick up and deliver your units as well.

I know that we spoke of your fleet being around 560 tractors and mainly running Freightliner Cascadias with Detroits under the hood and around 1500+ trailers that you're responsible for.  Would you be able to provide us with a VIN number of one of your trucks so that we can get you a flat rate PM price across all of our shops?  Once we are able to get the VIN we'll be able to get pricing back over to you and delegated to all of our shops so we can take care of any of your PM's that can't make it back to your shops.  I have also attached our PM forms for you and your team and just need to know if you would like us to use our PM forms or if you have any you would like to use of yours?

I have also included a parking sheet that we spoke of listing all available parking within all of our shops if they will be of any benefit to Nussbaum, as we spoke of about Seymour we can put a package together if there are multiple spots that Nussbaum would need in any location, just let us know if there are any areas of interest.

Lastly, Mitch is in charge of our sister company at TTPS, where I briefly talked to you about the services that we provide.  We have Dhollandia lift gate (which are the global leader in lift gates), Merlin Solar Solutions that range in many various capacities, Idlefree systems and diesel APUs which run self-diagnostics and parts are available from most auto manufacturer stores, Merlot Vango conestoga kits for 48' and 53' flatbeds and our patented single panel roll door.  You and your team are more than welcome to browse our website at www.ttpsusa.com for any additional information.

KNL 001478
Exhibit P57

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

I'm trying not to make this a novel and I know this is a lot of information to digest after everything that we talked about, so if you or anyone from your team have any additional questions, please don't hesitate at all to reach out and ask us.  We certainly appreciate the opportunity to grow and partner further with Nussbaum and be able to nurture this relationship together!  Thanks again Justin!

DJ Marks | **Regional Sales Manager**
Kirk NationaLease Co.
3885 W. Michigan Ave
Sidney, OH  45365
Ph : 937-638-6789



**KNL 001479**
Exhibit P57

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **From:** | DJ Marks |
| **Sent:** | Wednesday, December 14, 2022 11:05 AM |
| **To:** | Marty Van Heulen; Kasey Stiles; Kristen Stroup |
| **Cc:** | Steven Wright - Shop 32 Manager; Brent Bishop; Justin Smith; Melissa Powell - Admin 32 |
| **Subject:** | KNL Huber Heights |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | Marty Van Heulen | |
| | Kasey Stiles | |
| | Kristen Stroup | |
| | Steven Wright - Shop 32 Manager | Read: 12/14/2022 11:30 AM |
| | Brent Bishop | Read: 12/14/2022 11:12 AM |
| | Justin Smith | Read: 12/15/2022 8:07 AM |
| | Melissa Powell - Admin 32 | Read: 12/14/2022 12:14 PM |

Good Morning GFS team,

I wanted to reach out to you because it's been awhile since we've all corresponded. Our Huber shop has been taken over by Steve Wright, who has a very versatile background in working on several makes and models of equipment as well as a background in multiple applications of painting (waterborne, metallic, base/clear, etc) and has been doing an excellent job in changing the culture and expectations of not only what this shop is capable of but making sure that communication stays tight and problems are addressed head on.

I know that there have been some hiccups in the past on our side and I didn't want to reach back out until we were ready to be completely sure that GFS wasn't going to experience the same trauma in the past. I have told our team that we would love to have GFS back on board with us at some point in the future, but the necessary changes needed to be made and we can only stand behind our proof. I have actually struck up a very good relationship with Gerber Collision in Wilmington who I know has been doing your paint and body work for you from time to time and have told Sonny about our previous relationship. If there is any body work that Gerber cannot attend to because they are backed up, we would be more than happy to help assist.

We finally have a full 1st and 2nd shift on the maintenance side as well, with our tech's having an enormous amount of experience on both shifts as well and would love to help out any way that we can.

Lastly, I wanted to let you know that we have branched out at Kirk with our TTPS (Truck and Trailer Parts Solutions) side of our business. Besides being able to sell, lease and buy equipment such as spotters as we've discussed before in the past, we now have several products to help our partners in maintenance costs and OTR solutions. We have solar panel solutions from Merlin Solar, Dhollandia liftgates who are the global leader in liftgate distribution with parts in stock at a moment's notice. We are also able to get liftgates of any make and size, as well as the bulk of our inventory in stock and ready to put on between 5-10 days. Merlot Vango conestoga and tarp solutions and Green APU for OTR applications in stock as well. We have also patented a roll door that weighs only 95lbs, is a single panel door and is 20,000lb puncture resistant for trailer and box truck applications. You are more than welcome to visit www.ttpsusa.com or let me know if you have any interest with any of these for your fleet.

Hope that everyone is doing well and please let us know if we can be of any assistance in any way for GFS!

DJ Marks | **Regional Sales Manager**
Kirk NationaLease Co.

**KNL 001487**
Exhibit P58

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

3885 W. Michigan Ave
Sidney, OH   45365
Ph : 937-638-6789



KNL 001488

Exhibit P58

## Mary Brautigam

| | |
|---|---|
| **From:** | DJ Marks |
| **Sent:** | Monday, April 17, 2023 5:01 PM |
| **To:** | 'Umphress, Dan' |
| **Subject:** | RE: Kirk NationaLease |

No problem sir, didn't know if maybe there was some opportunity to overflow from that location was the biggest reason I wanted to talk to someone.  If there's a possibility for any overflow please keep me in mind!

DJ Marks | Regional Sales Manager
Kirk NationaLease Co.
3885 W. Michigan Ave
Sidney, OH   45365
Ph : 937-638-6789

-----Original Message-----
From: Umphress, Dan [mailto:dan.umphress@kroger.com]
Sent: Monday, April 17, 2023 4:58 PM
To: DJ Marks <dj_marks@knl.cc>
Subject: Re: Kirk NationaLease

I am responsible for providing their Tractors and Trailers from the Kroger private fleet. They only have 53 dry vans and 16 tractors at this location. They have a shop that will hold several vehicles at a time that I think is plenty big enough for this small fleet.

Sent from my iPhone

> On Apr 17, 2023, at 4:50 PM, DJ Marks <dj_marks@knl.cc> wrote:
>
> Hey Dan,
>
> I tried to call you concerning Ruler foods in Seymour IN last week and left you a voicemail.  I wasn't sure if you have any influence on this location at all or if it's just ran by a local branch, but from what I understand they have a good amount of equipment and a very small shop to maintain 1 or 2 things at the same time.
>
> Didn't know if maybe you could point me in the right direction or if any of this might get delegated through you?  Any insight would help as we would love to be able to help out down the street.  Thanks Dan!
>
> DJ Marks | Regional Sales Manager
> Kirk NationaLease Co.
> 3885 W. Michigan Ave
> Sidney, OH   45365
> Ph : 937-638-6789
>
>
> -----Original Message-----
> From: DJ Marks

KNL 001498
Exhibit P59

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

> Sent: Tuesday, March 28, 2023 1:05 PM
> To: 'Umphress, Dan' <dan.umphress@kroger.com>
> Subject: RE: Kirk NationaLease
>
> I completely understand where you're coming from sir.  Unfortunately, our new generation doesn't want to have a drive to stay loyal and dollar hop, but it's those of us who have maintained partnerships and loyalties over the years that have kept things afloat, but makes us wear many different hats than what we're used to.
>
> Although we've done very minimal business with the Kirk NationaLease maintenance side for Kroger, I just want to let you know that we align with you on a lot of different territories and have experience in all of your equipment bumper to bumper, including working on liftgates vs just selling them on the TTPS side.  (We used to do work in Delaware, OH I believe years ago)
>
> If you're ever in a situation where your equipment goes down in any of these territories that I have attached, please don't hesitate to reach out to me by any means at all Dan.  I've been doing my best to have backups to different parts and vendors for a solution since I started back in 2020.  I'm really hoping things get better for all of us sooner rather than later, but we'll keep doing what we do best and press forward with what we're given.
>
> DJ Marks | Regional Sales Manager
> Kirk NationaLease Co.
> 3885 W. Michigan Ave
> Sidney, OH   45365
> Ph : 937-638-6789
>
>
>
> -----Original Message-----
> From: Umphress, Dan [mailto:dan.umphress@kroger.com]
> Sent: Tuesday, March 28, 2023 11:28 AM
> To: DJ Marks <dj_marks@knl.cc>
> Subject: RE: Kirk NationaLease
>
> No problem DJ, You are right, we are short handed and fighting fires full time these days. I keep thinking it has to let up at some point, but hasn't happened yet.
>
> Sincerely,
>
> Dan Umphress | Manager Fleet Services
> Supply Chain | The Kroger Co.
> office: 513-762-4349 cell: 870-754-6364
>
>
> Disclaimer
>
> -----Original Message-----
> From: DJ Marks <dj_marks@knl.cc>
> Sent: Tuesday, March 28, 2023 10:57 AM
> To: Umphress, Dan <dan.umphress@kroger.com>
> Subject: RE: Kirk NationaLease
>
> No problem Dan, thanks for reaching back out to me.
>

KNL 001499
Exhibit P59

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

> I really try not to be a nuisance being in sales and following up with anyone that doesn't have a need for us.  Just please keep me in the back of your mind if there is ever any use that we can be for you folks, as well as if you might have any other questions about anything.
>
> I initially reached out to you because you had contact with Chris Fannen who worked at Ridge Corp and wanted me to reach out to you and your team to see if there is any interest.
>
> If it's ok with you, I'll follow back up with you gentlemen months down the road to see if there is any possibility there as the supply market is constantly changing and products are becoming harder and harder to get.
>
> Hope you and the team enjoy the springtime and stay safe sir!
>
> DJ Marks | Regional Sales Manager
> Kirk NationaLease Co.
> 3885 W. Michigan Ave
> Sidney, OH   45365
> Ph : 937-638-6789
>
>
>
> -----Original Message-----
> From: Umphress, Dan [mailto:dan.umphress@kroger.com]
> Sent: Tuesday, March 28, 2023 10:51 AM
> To: DJ Marks <dj_marks@knl.cc>
> Subject: RE: Kirk NationaLease
>
> Hello DJ,
>
> No interest today.
>
> Sincerely,
>
> Dan Umphress | Manager Fleet Services
> Supply Chain | The Kroger Co.
> office: 513-762-4349 cell: 870-754-6364
>
>
> Disclaimer
>
> -----Original Message-----
> From: DJ Marks <dj_marks@knl.cc>
> Sent: Tuesday, March 28, 2023 10:32 AM
> To: Umphress, Dan <dan.umphress@kroger.com>
> Cc: Arledge, Justin L <justin.arledge@kroger.com>; Messer, Paul D <paul.messer@kroger.com>
> Subject: RE: Kirk NationaLease
>
> Good Morning Kroger team,
>
> I just wanted to follow up with you and touch base to see if there was any level of interest with everything that we laid out in our last e-mail.  I believe Justin Smith had talked to Paul and Justin about liftgates a couple of months back.  We just wanted to touch base with you to see if there is still any interest that might be generated on your end.
>

KNL 001500
Exhibit P59

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

> We have liftgates in stock with some that we can get in 7-10 days as well as solar solutions and Merrit aftermarkets such as battery boxes and bulk heads that we can obtain as well.

>

> Please let me know if there is anything more that I can be of assistance with.  Thanks!

>

> DJ Marks | Regional Sales Manager

> Kirk NationaLease Co.

> 3885 W. Michigan Ave

> Sidney, OH  45365

> Ph : 937-638-6789

>

>

> -----Original Message-----

> From: Umphress, Dan [mailto:dan.umphress@kroger.com]

> Sent: Thursday, January 26, 2023 10:18 AM

> To: DJ Marks <dj_marks@knl.cc>

> Cc: Arledge, Justin L <justin.arledge@kroger.com>; Messer, Paul D <paul.messer@kroger.com>

> Subject: RE: Kirk NationaLease

>

> Thank You DJ,

>

> We will take a look here and see if we can find a match that works for us both.

>

> Sincerely,

>

> Dan Umphress | Manager Fleet Services

> Supply Chain | The Kroger Co.

> office: 513-762-4349 cell: 870-754-6364

>

>

> Disclaimer

>

> -----Original Message-----

> From: DJ Marks <dj_marks@knl.cc>

> Sent: Thursday, January 26, 2023 10:01 AM

> To: Umphress, Dan <dan.umphress@kroger.com>

> Cc: Arledge, Justin L <justin.arledge@kroger.com>; Messer, Paul D <paul.messer@kroger.com>

> Subject: RE: Kirk NationaLease

>

> ** [EXTERNAL EMAIL]: Do not click links or open attachments unless you recognize the sender and know the content is safe. **

>

> Good Morning Gentlemen,

>

> I wanted to reach back out to you and see if there was any opportunity that TTPS or Kirk NationaLease could be of any assistance to you.  I believe that Justin Smith had reached out to Justin Arledge about the products that TTPS can provide to Kroger and I left Dan a voicemail if Kirk NationaLease could be of any assistance to help with any mechanical repairs we could assist with in our networks.

>

> I have attached a facilities list to give you an oversight on all of our locations that we can assist in.  I hope that you all have a great rest of your week and we look forward to hearing from you!

>

KNL 001501

Exhibit P59

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

> DJ Marks | Regional Sales Manager
> Kirk NationaLease Co.
> 3885 W. Michigan Ave
> Sidney, OH  45365
> Ph : 937-638-6789
>
>
> -----Original Message-----
> From: DJ Marks
> Sent: Friday, November 18, 2022 4:46 PM
> To: daniel.umphress@kroger.com
> Cc: justin.arledge@kroger.com; paul.messer@kroger.com
> Subject: Kirk NationaLease
>
> Good afternoon Dan,
>
> My name is DJ Marks and I'm a Regional sales Manager here at Kirk NationaLease.  I've tried to reach out to you a couple of times regarding any help that we can be with any maintenance and a whole host of other upfitting solutions that I believe would be worth showing you and your team if we can get the chance to talk on the phone or come and visit sometime.  We have patented a new roll door that is one piece and weighs only 95lbs which significantly reduces the fatigue to your drivers using the door many times a day.  We have many of these doors into companies like Coca-Cola, Target and Aunt Millie's just to name a few.  We have also been tasked with selling Merlin Solar panels, Green APU power systems, Merlot Vango conestoga kits and tarp systems as well as Dhollandia lift gates.
>
> Chris Fannin reached out to me to give me your information as well as two gentlemen whom I believe help you directly in Justin Arledge and Paul Messer.  Chris came from Ridge and had talked to you gentlemen before and now works with us at Kirk and sells these products as well for our company which is also known as TTPS (Truck and Trailer Parts Solutions).  My role at Kirk is to extend our hand at any of the 23 locations in the 9 states that we have shops in to see if there is ever a need for any maintenance that you might need assistance with.  We handle all trucks and trailers bumper to bumper.
>
> If there would be a time that we could have a conversation to go in depth a bit more or meet in person, we would certainly appreciate the opportunity to assist in anyway that we possibly can.  Thanks Dan and I hope you have a great rest of your Friday!
>
> DJ Marks | Regional Sales Manager
> Kirk NationaLease Co.
> 3885 W. Michigan Ave.
> Sidney, OH 45365
> Ph: 937-638-6789
>
> _____
>
> This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.
>
> _____
>
> This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use,

KNL 001502
Exhibit P59

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

\>

\> _____

\>

> This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

_____

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

KNL 001503

Exhibit P59

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **From:** | Mitchell Rank |
| **To:** | rduken@rlcarriers.com |
| **Subject:** | Patented Roll Door |
| **Date:** | Thursday, July 14, 2022 1:27:46 PM |
| **Attachments:** | Dhollandia Demo Complete.jpg |
| | Coke Roll Door Complete.jpg |
| | 20220628_120119_resized.jpg |
| | Poor Image Example.jpg |

---

Some of this is what I sent Bob Zimmerman a month or two ago. We have 30 more of these doors arriving Monday from the manufacturer of the material, and we'd like to install one or two in a trailer of yours. I'll reiterate this product is in the demo/prototype phase. Several have been running for 2+ years, and have been through numerous industry tests. It's very lightweight, and provides numerous cosmestic benefits. No hinges and rusty metal parts on the outside. No splits that require decal cuts, no build-up of grime/dust from the lubrication that leaks to the outside and is a dirt magnet. Etc etc. I've attached a pic of a FedEx door that looks like a bunch of roll doors after years of use. I know I'm not telling you anything, with as many as you run and try to keep maintained.

I know you've probably been doing this a very long time Rick, and there isn't much you haven't seen or that I'm going to change your mind on. I'll simply ask for an open mind for us to prove what our door can do for you. I'd be happy to welcome you up to Sidney, or we can come to Wilmington with one of your completed trailers. We are unavailable next week, but are clear to move our schedule otherwise. Thanks for your time.

Thank you,


**Mitch Rank** | **Director of Sales**
Kirk NationaLease Co.
3885 W. Michigan Ave. Sidney, OH 45365
Cell: 937.726.5658 Office: 937.498.1151
***www.knl.cc*** | ***Click For Our 23 Locations***

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| From: | Mitchell Rank |
| To: | Chris Anderson: Alli Kalsow |
| Subject: | Patented Roll Door |
| Date: | Thursday, August 24, 2023 3:02:16 PM |
| Attachments: | Coca-Cola Pilot.jpg |
| | Coca-Cola Roll Door Pilots.jpg |
| | Anheiser Busch Pilot.jpg |
| | Kuerig Dr Pepper Pilot.jpg |

Chris, I know we've briefly discussed this door. I wanted to bring it to your attention again. You run a lot of roll doors for Lowe's. Our patented door is a solid piece, under 100lbs, won't hold water and get heavier, is extremely durable, and dramatically improves your image from having aged and rusty roll doors and hardware. Coca-Cola is running our door exclusively and we are working with numerous fleets as well. Any interest between your or Alli to learn more?

Our Findlay and Seymour locations can supply/install these.  See video of the door in operation. FYI, you can see light through the door in the video (from inside trailer). The material is translucent and we router the inside layers away to expose the outer skin. Those are not holes!
https://vimeo.com/738496616/5502c3bcf7

Pricing is very reasonable.

Thank you,

**Mitch Rank** | **President**
Kirk NationaLease Co.
3885 W. Michigan Ave. Sidney, OH 45365
Cell: 937.726.5658 Office: 937.498.1151
***www.knl.cc*** | ***Click For Our 23 Locations***

KNL 001523
Exhibit P61

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **From:** | Mitchell Rank |
| **To:** | Nicholas.Isaac@xpo.com |
| **Subject:** | Patented Single Panel Roll Door |
| **Date:** | Tuesday, September 20, 2022 9:49:26 AM |
| **Attachments:** | 20220628_120110_resized.jpg |
| | Dhollandia Demo Truck2.jpg |
| | TTPS SDN Ad Photo 2.jpg |

Nick,

I don't want to hype this door up too much, but I'll just say that you need to see it. I'd appreciate it if you elevate this to the appropriate personnel as well. We'd like to install one of them on a trailer of yours as well. Full production coming in 2023. We are currently in the pilot phase. We have this door in a test stand and it has over 130k up/down cycles. It's also been through rigorous testing beyond the test stand. It's also extremely lightweight.

Let me know if one of your Sidney trailers is perhaps in need. Or can we divert a Dayton or Cincy trailer up to Sidney for us to install? I have put a quick VIMEO video together and you can find it halfway down our home page at www.ttpsusa.com

You'll notice you can see light through the routered sections of the door from the viewpoint inside the trailer looking out. The outer skin is translucent. It has zero impact on integrity, but it catches your eye. I wanted to address that in case you had a concern when you see it. When these go in to production that will be remedied, although it's not hurting anything.

We are running this project under our sister company TTPS. We have numerous major fleets piloting this door, so this isn't some here today gone tomorrow project. See attached picture of some beverage and food distributors bringing trailers our way. We are also piloting several LTLs as well.

I'll be in a meeting at 10am for appx an hour. Give me a shout on my cell if you get a free moment after 11.


Thank you,


**Mitch Rank** | **Director of Sales**
Kirk NationaLease Co.
3885 W. Michigan Ave. Sidney, OH 45365
Cell: 937.726.5658 Office: 937.498.1151
***www.knl.cc*** | ***Click For Our 23 Locations***

KNL 001524

Exhibit P62

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **From:** | Mitchell Rank |
| **To:** | Tommy.Cottingham@jbhunt.com |
| **Subject:** | Proprietary Roll Door |
| **Date:** | Thursday, May 12, 2022 10:20:00 AM |
| **Attachments:** | Dhollandia Decal Install.jpg |
| | Dhollandia Demo Complete.jpg |
| | Dhollandia Demo.jpg |
| | Poor Image Illustration.jpg |

Tommy,

I got your email from Mary Armstrong. We work closely, as it relates to us assisting with maintenance in numerous markets. We have a couple of products we'd like to discuss showing you in the near future. Our owner has patented a new roll door unlike anything you will have seen in the market. It's a single panel, lightweight (only 90lbs), lifetime white finish, no interior field hinges or bolts to rust, no gaps/seams to collect grime, among some other benefits we can present. The aesthetic improvement to your fleet alone might get your attention, but coupled with the tangible benefits in every day use, we can say it's garnering quite a bit of attention. We currently have demos in to Coca-Cola, Aunt Millies Bakery, Schwebels, and have scheduled installs for Schneider, Fed Ex, and various others. I don't throw those names out there for any reason other than to lend some credibility to the product. We firmly believe this is the future of the industry, and we've aligned with a manufacturer whom already has an industry presence with side skirts and numerous product lines in this market segment. We anticipate being market-ready by Q4, but are strategically engaging with fleets of different sizes and applications, to demo the door and get desired feedback. There are three segments we have focus on. Roll door replacements, swing door conversions that maintain almost the entire opening, and of course the OEM upfitting on day 1. Our current progression is focused on the existing roll door market and replacement systems.

Additionally, you may have heard of Dhollandia Liftgates from the TMC, or through your industry experience. They are a global leader in liftgate solutions, but relatively young in the U.S. Our relationship went from being a user of the gate to now being a dealer/installer. Although you may be pleased overall with Maxon/Waltco or any other gates you might be running, I'd like an opportunity to bring a Dhollandia representative to your HQ with a demo truck to show you in-person. One of their demo trucks has our prototype running on it now, so we can kill two birds with one stone. See attached image. I think we have a pretty firm grasp on the items you would be evaluating to see if Dhollandia qualifies as a fit with JB Hunt. Quality, ease of maintenance, post-sale support to include 24/7 technical, parts availability, etc., national footprint, stable organization, value/price competitive in the industry, and more. I think Dhollandia checks all those boxes, but the one thing that may be missing is the relationship. I also understand with an organization your size, there is an expectation for direct to OEM purchasing. We don't intend to obstruct or be in the middle if that impedes the process, but as partners to JB Hunt in other capacities, we'd like to encourage you to give an honest look to the organization and be a part of their bright future/growth here in the states.

I'll conclude by clarifying one more thing. We have opened an affiliate company (TTPS, Truck & Trailer Parts Solutions) with a stand-alone brick & mortar to focus on these products, along with Green APU, Vango conestoga systems and a couple of other OEM relationships we are developing. For example, we are doing all of Toyota Logistics conestoga systems. They were previously using an

KNL 001525
Exhibit P63

outfit out of Tennessee, but have fully switched to purchasing and installation with us in Ohio. We literally moved in to our building last week, and are in the process of creating our logo, webpage/digital media stuff, Google listing, etc etc. So, it's very fresh on our end in that regard. Although it's a young entity on paper, our roots run deep in this industry and we are excited for the future.

I look forward to your feedback, and hopefully an introduction in the near future. Fyi, I included the FedEx image on here to illustrate the obvious issue with most all doors as they age. That won't be the case with our door.

Thank you,


**Mitch Rank** | **Director of Sales**
Kirk NationaLease Co.
3885 W. Michigan Ave. Sidney, OH 45365
Cell: 937.726.5658 Office: 937.498.1151
***www.knl.cc*** | ***Click For Our 23 Locations***

**KNL 001526**
Exhibit P63

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

| | |
|---|---|
| **From:** | Mitchell Rank |
| **To:** | brusewitzd@schneider.com |
| **Subject:** | Quick Introduction - Anthony Littleton |
| **Date:** | Monday, April 4, 2022 1:12:17 PM |
| **Attachments:** | image001.jpg |

Dale,

I can imagine you are a very busy guy, so I hope you can spare a moment to hear me out. I got your info from Anthony, and he mentioned you being the one to talk to. I have a couple things I'd like to discuss. We have developed a patented single-panel roll door. There's nothing like it in the market. Target markets are:

1. Direct replacement of existing roll door
2. Swing door conversion (This design allows for increased width/height vs a traditional roll.......in most every case)
3. OEM

Additionally, we are a Merlot Vango dealer now and have opened a fabrication & install facility in Ohio (we can service all makes). You may not be involved directly with the purchase of trailers or conestoga kits, but I would imagine you deal with installs and repairs on any kits Schneider owns? It's my understanding you are using a facility near Knoxville Tennessee for a lot of this work.

I have a visit scheduled with Anthony in Green Bay on the 12th. Would it be possible for the two of us to talk in advance to see if you have any interest in joining the meeting for any matters that pertain to your department?

Thank you,

**Mitch Rank** | **Director of Sales**
Kirk NationaLease Co.
3885 W. Michigan Ave. Sidney, OH 45365
 937.726.5658   937.498.1151
**www.knl.cc** | **Click For Our 22 Locations**
50 years logo

KNL 001527
Exhibit P64

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

---

**From:** Eddie Beavers <eddie_beavers@knl.cc>
**Sent:** Tuesday, September 26, 2023 12:01 PM
**To:** Jeff Phlipot
**Subject:** FW: [External] Requested Info

I contacted Steve Conkel at Day and Ross about the door.

---

**From:** Eddie Beavers
**Sent:** Tuesday, January 31, 2023 4:15 AM
**To:** 'CONKEL, STEPHEN' <Steve.CONKEL@dayross.com>
**Cc:** Mitchell Rank <mitchell_rank@knl.cc>; Jeff Phlipot <Jeff_Phlipot@knl.cc>; 'SHENBERGER, Dan' <Dan.SHENBERGER@dayross.com>; Justin Smith <justin_smith@knl.cc>
**Subject:** RE: [External] Requested Info

Steve,

What do you think about our door based on the info you were able to review?  Next step is to let us do a conversion on one of your trailers so you can see how our door sets a new standard in the roll up door arena.  If we can help getting a trailer to our Sidney location let me know and we will get one on our shuttle schedule.

One more thing,  it would be nice to be working with you again.

---

**From:** Eddie Beavers
**Sent:** Friday, January 27, 2023 12:40 PM
**To:** 'CONKEL, STEPHEN' <Steve.CONKEL@dayross.com>
**Cc:** Mitchell Rank <mitchell_rank@knl.cc>; Jeff Phlipot <Jeff_Phlipot@knl.cc>; SHENBERGER, Dan <Dan.SHENBERGER@dayross.com>; Justin Smith <justin_smith@knl.cc>
**Subject:** RE: [External] Requested Info

I'll add him to my contact list. I am adding Justin Smith who will be working with me on your account, he is in sales at TTPS.

---

**From:** CONKEL, STEPHEN [mailto:Steve.CONKEL@dayross.com]
**Sent:** Friday, January 27, 2023 12:33 PM
**To:** Eddie Beavers <eddie_beavers@knl.cc>
**Cc:** Mitchell Rank <mitchell_rank@knl.cc>; Jeff Phlipot <Jeff_Phlipot@knl.cc>; SHENBERGER, Dan <Dan.SHENBERGER@dayross.com>
**Subject:** RE: [External] Requested Info

Eddie,

Adding Dan who Manages the Trailer Shop here in York.

**Steve Conkel**
Director of Maintenance
Day & Ross
T: 717 792-3632 x 11342
C: 410-274-1317
dayross.com

KNL 001559
Exhibit P66

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

---

**From:** Eddie Beavers <eddie_beavers@knl.cc>
**Sent:** Friday, January 27, 2023 12:27 PM
**To:** CONKEL, STEPHEN <Steve.CONKEL@dayross.com>
**Cc:** Mitchell Rank <mitchell_rank@knl.cc>; Jeff Phlipot <Jeff_Phlipot@knl.cc>
**Subject:** [External] Requested Info

<span style="color:red">This message is from an EXTERNAL SENDER - be CAUTIOUS with links and attachments.</span>

---

Here is some more info on the door and our TTPS division. Open the attached link to our TTPS website and scroll down to the bottom until you see the window for the Patented Single Panel Roll Door.  This video will give you a much better look at the door inside and out. The other attached link is a short video of one of our doors in the test apparatus running open / close cycles.

Is it possible for you to get me pictures of the outside and inside of one of the twelve trailers you are wanting to convert from swing door to roll door units?  The outside shot can be of the trailer with the doors closed, a shot of the hinge post, and one of the inside showing the header where it meets the roof.

Let me know of anything else.

https://ttpsusa.com


https://linksharing.samsungcloud.com/vCx5LgrcEJ8J




**EDDIE BEAVERS**
**Director of Accounts – Fleet Services**
**Kirk NationaLease Co.**
3885 W. Michigan Ave. Sidney, OH 45365
eddie_beavers@knl.cc
**M** 334.220.5536 **O** 937.498.1151

KNL 001560
Exhibit P66

**ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER**

*www.knl.cc* | *Click For Our 22 Locations*



**KNL 001561**

Exhibit P66

```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                   WESTERN DIVISION AT COLUMBUS
                              -  -  -
 3    RIDGE CORPORATION,              : CASE NO. 2:23-cv-3012
                                      :
 4              Plaintiff,            :
           vs.                        : 65.1 Conference
 5                                    :
      KIRK NATIONAL LEASE CO., ET AL., : SEPTEMBER 21, 2023
 6                                    :
                Defendants.           :
 7                                    :
                                      :
 8                            -  -  -
                     TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE ALGENON L. MARBLEY,
            UNITED STATES DISTRICT JUDGE, PRESIDING
10                            -  -  -

11    APPEARANCES:
      For the Plaintiff:
12                      CHRISTOPHER W. TACKETT, ESQ.
                        GRAYCEN MARIE WOOD, ESQ.
13                      JOHN PHILLIP MILLER, ESQ.
                        Bailey Cavalieri, LLC
14                      10 W. Broad Street, Suite 2100
                        Columbus, OH  43215
15
      For the Defendants Kirk National Lease Co., TTPS, and
16    Transglobal:
                        DONALD E. BURTON, ESQ.
17                      Faruki, PLL
                        110 N. Main Street, Suite, 1600
18                      Dayton, OH  45402

19    For the Defendant Altum LLC:
                        DAMION M. CLIFFORD, ESQ.
20                      MICHAEL DILLARD, ESQ.
                        Arnold & Clifford, LLP
21                      115 W. Main Street, Suite 400
                        Columbus, OH  43215
22
      Stenographer:     Mary Schweinhagen, RPR, RMR, RDR, CRR
23                      United States District Court
                        200 West Second Street, Room 910
24                      Dayton, Ohio 45402
          Proceedings reported by mechanical stenography,
25    transcript produced by computer.
                        *** *** *** ***
```

1   it happen.

2       Ridge takes it, assembles it, writes them notes:  Here's

3   what we're doing on it.  Here's what we're doing on it.  Here,

4   we made it.  Do you like this?

5       And Kirk National at the time says, yeah, this works.

6       And Ridge asks, do you intend to -- do you intend to file

7   a patent application.

8       And the people at Kirk National, if I understand, thought

9   that was a good idea.  They filed an application.

10      Ridge later found out that they were not included as a

11  co-inventor.  And for good reason.  Kirk National said, you

12  know, it was our idea.  All you did was kind of assemble our

13  idea.

14      And so at that time Ridge said, well, we're not going to

15  make the door anymore.  So what does Kirk National do?  They

16  said, well, if they are not going to do it, they looked for

17  other companies to do it.  They consulted with at least three

18  companies.  Ultimately, Altum could do the -- offer the panel

19  they needed, and so they started doing business with Altum.

20      So Ridge's position in this case really is:  You

21  developed a door and a design that isn't really related to the

22  Cold Chain patent.  We helped you do it originally.  We

23  refused to help you because you wouldn't list us as a

24  co-inventor, but now you can't and no one else can make that

25  door except for us, when it's not the Cold Chain patent, it's

1    actually the design that you brought to us in 2018.  That's

2    what the facts are going to show.  That's why it's not a

3    substantial likelihood of success on the merits.

4        And, again, I think I talked a little bit about, you

5    know -- I don't want to get back into the difference in the

6    doors unless you have questions about the difference in the

7    doors.

8            THE COURT:  No, I don't.

9            MR. DILLARD:  And so then moving on, I think you

10   started with the strongest argument.  Let's say somehow Ridge

11   is able to show patent infringement at trial some day.  What's

12   the end result?  Here you have got three parties, maybe

13   four -- I am saying three because Kirk National and TTPS are

14   the same company really.

15           THE COURT:  Okay.

16           MR. DILLARD:  So you have three parties that are

17   dealing together making doors, making money off of them,

18   right.  So at the end of that, Ridge is going to look and say,

19   what did you make?  That was ours.  You used our stuff.

20       Even if they were to license it, even if you license it,

21   here's what we owe.  That's a damage check.  That's a check.

22   That's not -- we're not affecting the market.  They have never

23   even been in the market.  They weren't even in the market.

24   They didn't have the idea for doors until Kirk National went

25   to them in 2018 and said you couldn't be on the patent.



EXHIBIT

D-19

| | |
|---|---|
| Title: | Re: Meeting regarding door |
| From: | Gary Grandominico <gary.grandominico@ridgecorp.com> |
| To: | Jeff Phlipot <Jeff_Phlipot@knl.cc> |
| Sent: | October 25, 2022 5:19:04 PM EDT |
| Received: | October 25, 2022 5:19:06 PM EDT |

NO

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android <https://aka.ms/AAb9ysg>

From: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Sent: Tuesday, October 25, 2022 3:55:48 PM
To: Gary Grandominico <gary.grandominico@ridgecorp.com>
Subject: RE: Meeting regarding door

Gary,

I apologize for the delay in responding. I felt I needed time to research and ensure that I was understanding all of this process correctly.

I must disagree with your statement that "it appears that Ridge has grounds to challenge any attempt on your part to obtain a patent that does not name us and offer full rights to the same." The patent application properly names only those persons who took part in inventing the single-panel roll-up door. During the development phase of the product, we utilized your services solely to manufacture samples of panels, based on my instructions. Ridge did not contribute to any aspect of the design of the invention claimed in the patent application. In other words, you do not have "grounds to challenge" the application for not including Ridge employees as co-inventors -- they simply were not co-inventors.

You say at the end of your e-mail "we can reconvene as originally planned." We still are interested in using Ridge as a supplier, and remain willing to enter into a business agreement for the panel that is in the interests of both the inventors and Ridge. If you wish to continue to discuss an agreement, please let me know.

Thank you.

Jeff Phlipot|CEO

Kirk NationaLease Co.

3885 W. Michigan Ave. Sidney, OH 45365 <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-b022a620faa882ca&q=1&e=02c6c8d2-3670-4a6f-84de-fc7f19db0e64&u=https://www.google.com/maps/place/Kirk+NationaLease+Co./@40.2871101,-84.2282287,17z/data=!4m12!1m6!3m5!1s0x883f090025d17fab:0x988a782a4471e9fa!2sKirk+NationaLease+Co.!8m2!3d40.2871101!4d-84.22604!3m4!1s0x883f090025d17fab:0x988a782a4471e9fa!8m2!3d40.2871101!4d-84.22604>

À937.498.1151 |þwww.knl.cc <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-be339cc5cf065982&q=1&e=02c6c8d2-3670-4a6f-84de-fc7f19db0e64&u=http://www.knl.cc/>

Follow us on Facebook <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-95172216b4cf17a3&q=1&e=02c6c8d2-3670-4a6f-84de-

confidential - subject to protective order

RIDGE000922

fc7f19db0e64&u=https://www.facebook.com/KirkNationalLease/>

Jeff Phlipot|CEO

Kirk NationalLease Co.

3885 W. Michigan Ave. Sidney, OH 45365 <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-
454455535732-b022a620faa882ca&q=1&e=02c6c8d2-3670-4a6f-84de-
fc7f19db0e64&u=https://www.google.com/maps/place/Kirk+NationaLease+Co./@40.2871101,-
84.2282287,17z/data=!4m12!1m6!3m5!1s0x883f090025d17fab:0x988a782a4471e9fa!2sKirk+NationaLease+Co.!8m2!
3d40.2871101!4d-84.22604!3m4!1s0x883f090025d17fab:0x988a782a4471e9fa!8m2!3d40.2871101!4d-84.22604>

Å937.498.1151 |þwww.knl.cc <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-
be339cc5cf065982&q=1&e=02c6c8d2-3670-4a6f-84de-fc7f19db0e64&u=http://www.knl.cc/>

Follow us on Facebook <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-
95172216b4cf17a3&q=1&e=02c6c8d2-3670-4a6f-84de-
fc7f19db0e64&u=https://www.facebook.com/KirkNationalLease/>

From: Gary Grandominico [mailto:gary.grandominico@ridgecorp.com]
Sent: Thursday, September 29, 2022 5:16 PM
To: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Subject: RE: Meeting regarding door

Jeff,

After considerable research, it appears that Ridge has grounds to challenge any attempt on your part to obtain a
patent that does not name us and offer full rights to the same.

PLEASE UNDERSTAND THAT WE HAVE NO INTEREST IN CAUSING YOU HARM (the opposite is true) BUT WE
MUST STANDUP AND RESPECT THE HARD WORK OUR EMPLOYEES HAVE ACCOMPLISHED.

WE WILL DEFEND RIDGE WORK WITH VIGOR AND ALL MEANS AVAILABLE, DESPITE ANY COSTS.

Having said this, our primary interests remain as always in seeing this product line to a successful launch and
returning long-term monies and recognition to you and your team.

It is unfortunate that outside influences may have recently swayed you away from your original intentions, as you had
described them to me from the get-go.

I wish you the best of luck and respectfully offer this for consideration: Ridge possesses ALL the knowhow required to
make a successful launch with ongoing returns.

If there is interest in discourse on this matter, we can reconvene as originally planned.

Let me know.

From: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Sent: Monday, September 12, 2022 1:45 PM
To: Gary Grandominico <gary.grandominico@ridgecorp.com>; Ray McDonald <ray.mcdonald@ridgecorp.com>
Cc: Larry Phlipot <larry_phlipot@ttpsusa.com>; schnelec@woh.rr.com; John Garmhausen (jgarmhausen@fgks-

confidential - subject to protective
order

RIDGE000923

law.com) <jgarmhausen@fgks-law.com>
Subject: RE: Meeting regarding door

Thanks Gary. I'll see if I can find another vendor.

Will I still be able to sell the other products Ridge produces?

Jeff Phlipot|CEO

Kirk NationaLease Co.

3885 W. Michigan Ave. Sidney, OH 45365 <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-
454455535732-b022a620faa882ca&q=1&e=1ec61812-96ad-4996-8562-
9c4e35ed643b&u=https://www.google.com/maps/place/Kirk+NationaLease+Co./@40.2871101,-
84.2282287,17z/data=!4m12!1m6!3m5!1s0x883f090025d17fab:0x988a782a4471e9fa!2sKirk+NationaLease+Co.!8m2!
3d40.2871101!4d-84.22604!3m4!1s0x883f090025d17fab:0x988a782a4471e9fa!8m2!3d40.2871101!4d-84.22604>

Å937.498.1151 |þwww.knl.cc <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-
be339cc5cf065982&q=1&e=1ec61812-96ad-4996-8562-9c4e35ed643b&u=http://www.knl.cc/>

Follow us on Facebook <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-
95172216b4cf17a3&q=1&e=1ec61812-96ad-4996-8562-
9c4e35ed643b&u=https://www.facebook.com/KirkNationaLease/>

From: Gary Grandominico [mailto:gary.grandominico@ridgecorp.com]
Sent: Monday, September 12, 2022 1:01 PM
To: Jeff Phlipot <Jeff_Phlipot@knl.cc>; Ray McDonald <ray.mcdonald@ridgecorp.com>
Cc: Larry Phlipot <larry_phlipot@ttpsusa.com>; schnelec@woh.rr.com; John Garmhausen (jgarmhausen@fgks-
law.com) <jgarmhausen@fgks-law.com>
Subject: RE: Meeting regarding door

Jeff,

Ray and I started Ridge in my basement….we wrote that book.

Like you said to me, " It's not about the money." It seems it is about the money after all.

As you are aware, we have high demand and limited lamination and routing time.

We have assisted in every way possible to date, but supply agreements don't exist here.

You may want to gain some experience by having others build the panel.

I will cancel the meeting invite.

Good luck.

VALUE always exceeds price,

Gary A. Grandominico

confidential - subject to protective
order

Co-Founder & CEO

Ridge Corporation

1201 Etna Parkway

Pataskala, OH 43062

p 614.421.7434

c 614.207.2087

f 614-294-7434

gary.grandominico@ridgecorp.com

www.ridgecorp.com <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-b7e0f198bf601d74&q=1&e=1ec61812-96ad-4996-8562-9c4e35ed643b&u=http://www.ridgecorp.com/>

Join our team! Click to applyhttps://jobs.teamengine.io/ridge_corporation_
<https://protect2.fireeye.com/v1/url?k=31323334-501d2dca-31356f64-454455534531-6a230f9610c20b3d&q=1&e=4bfb9eb2-ba86-4d64-8a76-4d5d1c9dfdfb&u=https://jobs.teamengine.io/ridge_corporation_>

From: Jeff Phlipot <Jeff_Phlipot@knl.cc>
Sent: Monday, September 12, 2022 11:45 AM
To: Gary Grandominico <gary.grandominico@ridgecorp.com>
Cc: Larry Phlipot <larry_phlipot@ttpsusa.com>; schnelec@woh.rr.com; John Garmhausen (jgarmhausen@fgks-law.com) <jgarmhausen@fgks-law.com>
Subject: Meeting regarding door

Gary,

I met with Larry and Mark this past Friday (the other two owners of the patent). At this time, we do not want to sell exclusive rights to the patent. I know the old saying "everyone has a price". At this early stage in the project, it's hard to put a value on it. We are excited about seeing an idea come to reality. We would like to take this ourselves as far as we can. I've heard about a lot of businesses started in the garage, and they became very successful. This may be one of those stories.

We would like Ridge to continue making the panels for us. If that is agreeable, we can still meet Monday and put a business agreement together for the panels.

If you wanted to get in deeper discussions about the door, we will have to reschedule. Mark Schneider is leaving for Dallas, Texas this Friday, and won't be back until Wednesday, Sept.21st.

Thank you.

Jeff Phlipot|CEO

Kirk NationaLease Co.

confidential - subject to protective order.

RIDGE000925

3885 W. Michigan Ave. Sidney, OH 45365 <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-b022a620faa882ca&q=1&e=766269bb-a2d5-46ee-8941-f4ed5e3d9131&u=https://www.google.com/maps/place/Kirk+NationaLease+Co./@40.2871101,-84.2282287,17z/data=!4m12!1m6!3m5!1s0x883f090025d17fab:0x988a782a4471e9fa!2sKirk+NationaLease+Co.!8m2!3d40.2871101!4d-84.22604!3m4!1s0x883f090025d17fab:0x988a782a4471e9fa!8m2!3d40.2871101!4d-84.22604>

Å937.498.1151 |þwww.knl.cc <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-be339cc5cf065982&q=1&e=766269bb-a2d5-46ee-8941-f4ed5e3d9131&u=http://www.knl.cc/>

Follow us on Facebook <https://protect2.fireeye.com/v1/url?k=31323334-501cfaeb-31356f64-454455535732-95172216b4cf17a3&q=1&e=766269bb-a2d5-46ee-8941-f4ed5e3d9131&u=https://www.facebook.com/KirkNationalLease/>

confidential - subject to protective order

RIDGE000926

**From:** Dominic Grandominico <dominicg@altumllc.com>
**To:** Chris Fannin <chris_fannin@ttpsusa.com>, "Jeff_Phlipot@knl.cc" <Jeff_Phlipot@knl.cc>, "Larry_Phlipot@knl.cc" <Larry_Phlipot@knl.cc>
**CC:** Kyle Gaines <kyleg@altumllc.com>, Greg Karst <gregk@altumllc.com>
**Subject:** Altum Follow Up
**Date:** Fri, 09 Sep 2022 13:16:27 -0400
**Inline-Images:** Outlook-132mm1wg.jpg

---

Jeff, Larry, and Chris,

Thanks for having me out yesterday to your shop. I really enjoyed meeting you and reconnecting with Chris. I've shared the project with my partners (Kyle and Greg copied here) and I can say that everyone is excited to tackle a design for your door. A lot was discussed yesterday on ways to grow and hopefully we can continue those discussions down the road. For now I just wanted to summarize our "To-do's" for all of us. Please weigh in if you need to adjust anything.

The short-term goal is for Altum to develop two prototype panels. Requirements below:

1. Prototype 1 -Full size panel dimensions are approximately 100" x 110" for a blank.
2. Prototype 2 -Testing prototype panel dimensions for door frame cycle tester need confirmed by Larry and Jeff
3. Core will be made of recycled PET foam with a density TBD from testing. We'll likely start with a 150 kg/m3 (9.36 lb/ft3) or another density in that neighborhood for your initial consideration
4. EXO-skeleton (our name for the composite skins) will be glass reinforced polypropylene with thickness determined by Altum and feedback from Kirk/TTPS on performance will drive changes if necessary
5. Finished panel thickness target is 0.500" (adjustments can be made to thickness as required by cycle testing and stiffness assessment)
6. Panel must have a durable yet flexible skin to handle high cycle environment
7. Initial prototype will be natural composite, though Altum will drive towards a colored film or similar option for future commercial product
8. Panel will be machinable with standard wood working equipment
9. Initial panels will have embedded seems that will land in between routing locations, but future boards once production equipment is ready will not contain seems
10. Delivery estimate will be 3-4 weeks to Sidney (10/9/2022)

We have already contacted our core supplier for options and delivery and should have an idea shortly on when to expect the core. We have composite in stock at 100" wide that we can use to build the EXO skeleton so that will not be an issue.

We are confident we can deliver an option that will meet or exceed expectations and appreciate your patience and understanding while we continue to grow and add capability to meet your needs.

I would really like to bring Kyle and Greg out in the near future to meet you all if that is ok with you. We have next Monday afternoon open and can be there around 2 pm, or Tuesday morning. I know you have a lot going on, so if that's no good, please let us know a date that works in the next couple weeks.

Please don't hesitate to reach out to me if you need anything or if I can help in any way.

Exhibit P24

Attorneys' Eyes Only

ALTUMLLC000402

Best,



Dominic Grandominico
Cell: (614) 207-5823
92 Elm Street, Suite B
Canal Winchester, OH 43110
**www.altumllc.com**

## <u>CERTIFICATE OF SERVICE AND FILING</u>

I certify that on March 21, 2024, I electronically filed the foregoing using the Court's CM/ECF filing system. All counsel of record who are deemed to have consented to electronic service, including counsel for appellant, were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).


Dated: March 21, 2024          Respectfully submitted,

/s/ Donald E. Burton
Donald E. Burton
FARUKI PLL
110 North Main Street, Suite 1600
Dayton, Ohio 45402
(937) 227-3736

*Counsel for Appellants*
  *Kirk National Lease Co. and*
  *Truck & Trailer Parts Solutions, Inc.*